## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

EMILY LEY PAPER, INC., d/b/a
SIMPLIFIED,

        *Plaintiff,*

v.

DONALD J. TRUMP, in his official
capacity as President of the United
States; EXECUTIVE OFFICE OF THE
PRESIDENT; UNITED STATES OF
AMERICA; KRISTI NOEM, in her
official capacity as Secretary of the U.S.
Department of Homeland Security;
DEPARTMENT OF HOMELAND
SECURITY; PETE R. FLORES, in his
official capacity as Acting Commissioner
for U.S. Customs and Border Protection;
and U.S. CUSTOMS AND BORDER
PROTECTION,

        *Defendants*.

Civil Case No. _____


**COMPLAINT FOR
INJUNCTIVE AND
DECLARATORY RELIEF**


        Plaintiff Emily Ley Paper Inc., d/b/a Simplified ("Simplified") alleges

as follows for its Complaint against Defendants Donald J. Trump, in his official

capacity as President of the United States; Executive Office of the President; United

States of America; Kristi Noem, in her official capacity as Secretary of Homeland

Security; Department of Homeland Security; Pete R. Flores, in his official capacity as Acting Commissioner for U.S. Customs and Border Protection; and U.S. Customs and Border Protection.

## INTRODUCTION

1.      Plaintiff challenges President Trump's unlawful use of emergency power to impose a tariff on all imports from China. The President ordered this tariff in an Executive Order issued on  February 1, 2025, then doubled it in an Executive Order he issued a month later on March 3, 2025. The President issued these China-related Executive Orders ("China Executive Orders") as part of a set of Executive Orders imposing across-the-board tariffs on our three largest trading partners: China, Canada, and Mexico. The President purported to order these tariffs under the International Emergency Economic Powers Act of 1977 ("IEEPA"), but that is a statute that authorizes presidents to order sanctions as a rapid response to international emergencies. It does not allow a president to impose tariffs on the American people. President Trump's Executive Orders imposing a China tariff are, therefore, *ultra vires* and unconstitutional. This Court should enjoin their implementation and enforcement. It also should vacate all resulting modifications made to the Harmonized Tariff Schedule of the United States ("HTSUS").

2.      A tariff is a tax on Americans' commerce with other countries. The Constitution assigns Congress exclusive power to impose tariffs and regulate foreign

commerce. Presidents can impose tariffs only when Congress grants permission, which it has done in carefully drawn trade statutes. These statutes typically authorize tariffs only on industries or countries that meet specified criteria, and only under specified conditions, after following specified procedures. Such statutes require advance investigations, detailed factual findings, and a close fit between the statutory authority and a tariff's scope.

3.    President Trump is attempting to bypass these constraints by invoking the IEEPA. But in the IEEPA's almost 50-year history, no previous president has used it to impose tariffs. Which is not surprising, since the statute does not even mention tariffs, nor does it say anything else suggesting it authorizes presidents to tax American citizens.

4.    IEEPA does authorize asset freezes, trade embargoes, and similar economic sanctions. Presidents have used the IEEPA to target dangerous foreign actors—primarily terrorist organizations and hostile countries such as Iran, Russia, and North Korea. Congress passed the IEEPA to counter external emergencies, not to grant presidents a blank check to write domestic economic policy.

5.    Even if the IEEPA did permit tariffs in some cases—which it does not— it still would not permit them here. The IEEPA limits presidents to actions that are "necessary" to address the specific emergency at hand. Here, President Trump declared an emergency relating to China because of illegal opioids entering the

United States. But his China Executive Orders show no connection between the opioid problem and the tariff he ordered—much less that the tariff is "necessary" to resolve that problem. The means of an across-the-board tariff does not fit the end of stopping an influx of opioids, and is in no sense "necessary" to that stated purpose.

6.     In fact, President Trump's own statements reveal the real reason for the China tariff, which is to reduce American trade deficits while raising federal revenue. While the "emergency" is not challenged here, the "fit" of the tariffs to the declared emergency does not meet the requirements of the IEEPA.

7.     If the President is permitted to use the IEEPA to bypass the statutory scheme for tariffs, the President will have nearly unlimited authority to commandeer Congress's power over tariffs. He would be empowered to declare a national emergency based on some long-running national problem, then impose tariffs purportedly in the name of that emergency—thus sidestepping the detailed constraints Congress has placed on the tariff authority it has granted.

8.     The heavy tariff the President imposed on products from China has inflicted economic and competitive harm on Plaintiff Simplified, a small business that purchases products from sources in China and pays the related tariffs. The China Executive Orders require Simplified to pay significantly more in tariffs, thus inflicting severe competitive injury in the form of higher costs, competitive disadvantage, and lost profits. These Executive Orders also deny Simplified the

protection the Constitution promised when it assigned Congress sole control of tariffs and the regulation of commerce with foreign nations.

9.    The tariffs imposed by the China Executive Orders will greatly damage Simplified because it imports material from China each year, from December to March. Simplified has to pay tariffs as orders are received in the United States. Under current plans, the new tariffs will impose hundreds of thousands of dollars in costs on Simplified. If it moves its manufacturing operations away from China, this would impose further costs. Either course would require Simplified to raise its prices to its customers and either reduce its already small staff or not hire more staff. Any raised prices for Simplified's products will likely reduce demand for those products.

10.    The China Executive Orders and the resulting modifications to the HTSUS are unlawful for at least four reasons.

a.    First, the China Executive Orders are *ultra vires* because the IEEPA does not authorize a president to impose tariffs. Basic tools of statutory construction dictate this conclusion. The Supreme Court's major questions doctrine confirms it. Because the Executive Orders present a question of "vast economic and political significance," the major questions doctrine requires the President to show that the IEEPA "clearly" authorizes him to impose tariffs. The President cannot make that showing.

b. Second, the China Executive Orders are *ultra vires* because the President has not—and cannot—meet the IEEPA requirement that he show the tariffs are "necessary" to address the stated "emergency" of illegal opioids.

c. Third, if IEEPA permits the China Executive Orders, then this statute violates the nondelegation doctrine because it lacks an intelligible principle that constrains a president's authority. In that case, the IEEPA is unconstitutional because it delegates Congress's prerogative to tax and to regulate commerce with foreign nations.

d. Fourth, the resulting modifications made to the HTSUS violate the Administrative Procedure Act because they are contrary to law. The Department of Homeland Security, acting primarily through U.S. Customs and Border Protection, made these modifications to comply with the China Executive Orders. But for the reasons just noted, those Order are themselves unlawful, making the resulting HTSUS modifications contrary to law.

11.    Accordingly, Plaintiff asks the Court to declare the China Executive Orders and the related HTSUS modifications unlawful and unconstitutional, to

enjoin Defendants from implementing or enforcing them, and to set aside the modifications to the tariff schedule.

## JURISDICTION AND VENUE

12.    The Court has subject matter jurisdiction under 28 U.S.C. § 1331 because this action arises under the United States Constitution, the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701 *et seq*., and the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq*.

13.    The Court has authority to grant declaratory and injunctive relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202; the Administrative Procedure Act, 5 U.S.C. § 702; and the Court's inherent equitable powers.

14.    Venue is proper in this District under 28 U.S.C. § 1391(e)(1), because Defendants are officers or employees of agencies of the United States acting in their official capacities, and because a substantial part of the events or omissions giving rise to this action occurred in this District.

## THE PARTIES

15.    Simplified is a Florida corporation with its principal place of business in Pensacola, Florida. It sells premium planners, organizational tools, and home management products. A woman-owned and led business, Simplified's mission is to inspire and empower women with the tools they need to simplify their lives. Simplified has made and makes significant purchases from sources in China. The products it imports are not reasonably available from a supplier in the United States.

Simplified has paid substantial tariffs and, because of the China Executive Orders, will pay higher tariffs and suffer economic injuries including lost profits.

16.    Defendant Donald J. Trump is the President of the United States and is sued in his official capacity. President Trump issued the China Executive Orders, purportedly acting under authority of the IEEPA, 50 U.S.C. § 1701 *et seq.*, and the National Emergencies Act ("NEA"), 50 U.S.C. § 1601 *et seq.*

17.    Defendant Executive Office of the President is a federal agency headquartered in Washington, D.C.

18.    Defendant United States of America is a sovereign state governed under the United States Constitution that engages in commerce with foreign nations.

19.    Defendant Kristi Noem is the Secretary of Homeland Security and is sued in her official capacity. The China Executive Orders tasked Secretary Noem with implementing the China Executive Orders by modifying the HTSUS.

20.    Defendant Department of Homeland Security is a federal agency headquartered in Washington, D.C.

21.    Defendant Pete R. Flores is the Acting Commissioner for U.S. Customs and Border Protection. U.S. Customs and Border Protection implemented modifications to the HTSUS to comply with the China Executive Orders. This agency also performs critical functions to collect tariff payments, including payments for the China tariff challenged in this lawsuit.

22.    Defendant U.S. Customs and Border Protection is a federal agency headquartered in Washington, D.C.

## FACTUAL ALLEGATIONS

### The President's Authority Under Tariff Statutes

23.    The U.S. Constitution assigns Congress the sole power to legislate, regulate foreign commerce, and impose tariffs. U.S. Const. art. I, § 8. President Trump can impose tariffs only to the extent Congress has expressly allowed him to do so.

24.    Until the President ordered the tariffs at issue here, presidents imposing tariffs had relied on authority Congress has delegated in trade statutes. Those statutes all are located in the "Customs Duties" Title of the United States Code. *See* U.S. Code Title 19.

25.    During President Trump's first term, for example, his Administration imposed tariffs on imports from China by complying with Section 301 of the Trade Act of 1974 (known as the "Unilateral Trade Sanctions" provision), which authorizes tariffs on countries that have violated certain trade agreements. *See* 19 U.S.C. § 2411.[1]

---

[1] USTR, *President Trump Announces Strong Actions to Address China's Unfair Trade* (Mar. 22, 2018), https://ustr.gov/about-us/policy-offices/press-office/press-releases/2018/march/president-trump-announces-strong.

26.    The first Trump Administration imposed tariffs on steel and aluminum under authority granted by another tariff statute, Section 232 of the Trade Expansion Act (the "National Security Provision"). *See* 19 U.S.C. § 1862.[2] As this statute permits, the Administration imposed the tariffs to protect the domestic steel and aluminum industries and, in turn, national security.

27.    That Administration also imposed tariffs on solar cells and washing machines, this time under Section 201 of the Trade Act of 1974 (the "Global Safeguard Provision"). In this provision, Congress authorized tariffs to provide temporary relief to industries while they adjust to foreign competition. 19 U.S.C. § 2251.[3]

28.    These trade statutes all require the Executive Branch to follow specific procedures before imposing a tariff. For example, Section 301 of the Trade Act of 1974, 19 U.S.C. § 2411-2420, required the U.S. Trade Representative to navigate a multi-step administrative process: Publish a Federal Register request for public comment on the proposed tariffs; conduct a factual investigation into China's trade practices; conduct a public hearing on the matter; then issue a detailed report. To meet the statutory requirements for a tariff, the report had to contain factual findings

---

[2]  Proclamation 9704 (March 8, 2018), 83 FR 11619 (Mar. 15, 2018).

[3] USTR, *President Trump Approves Relief for U.S. Washing Machine and Solar Cell Manufacturers* (Jan. 22, 2018), https://ustr.gov/about-us/policy-offices/press-office/press-releases/2018/january/president-trump-approves-relief-us.

showing that China's trade practices did violate trade agreements. *See* 19 U.S.C. §§ 2411(a)–(c), 2414.[4] If the U.S. Trade Representative had not found facts establishing that conclusion, the statute would not have permitted the Administration to impose the tariffs.

29.     Performing the required procedures for the China tariff took more than 10 months.[5] The procedures for the steel and aluminum tariffs took eleven months,[6] and the procedures for the washer and solar cell tariffs took more than eight months.[7]

**The President's Authority Under the IEEPA**

30.     When President Trump began his second term, he chose to bypass these tariff statutes. Instead of again relying on the "Customs Duties" Title, U.S. Code Title 19, he turned to a different part of the U.S. Code, "War and National Defense," U.S. Code Title 50. This Title contains the IEEPA. 50 U.S.C. §§ 1701–1706

---

[4] USTR, *Findings of the Investigation Into China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation Under Section 301 of The Trade Act of 1974* (Mar. 22, 2018), https://ustr.gov/sites/default/files/Section%20301%20FINAL.PDF .

[5] See summary in Nina M. Hart and Brandon J. Murrill, Cong. Rsch. Serv., LSB10553, *Section 301 Tariffs on Goods from China: International and Domestic Legal Challenges* (2022).

[6] U.S. Department of Commerce, *Section 232 Investigation on the Effect of Imports of Steel on U.S. National Security* (Mar, 18, 2018), https://www.commerce.gov/issues/trade-enforcement/section-232-steel.

[7] USTR Fact Sheet, *Section 201 Cases: Imported Large Residential Washing Machines and Imported Solar Cells and Modules* (Jan. 22, 2018) (addressing washer and solar-cell tariffs), https://ustr.gov/sites/default/files/files/Press/fs/201%20Cases%20Fact%20Sheet.pdf.

31.     The IEEPA authorizes a president to respond to a foreign threat by declaring a national emergency, then ordering one of the economic responses the statute describes. 50 U.S.C. § 1702(a). The statute defines an emergency as "an unusual and extraordinary threat, which has its source … outside the United States, to the national security, foreign policy, or economy of the United States." 50 U.S.C. § 1701(a). The IEEPA provides that, after declaring a national emergency, a president can order a responsive action if it meets two requirements. First, the action must be included in the IEEPA's list of permissible actions, such as freezing assets and blocking international transactions. 50 U.S.C. § 1702(a)(1)(A), (B). Second, the specific action must be "necessary" to address the specific declared emergency. 50 U.S.C. § 1703(b)(4).

32.     Consistent with these limitations, presidents have cited the IEEPA to impose economic sanctions such as import bans and asset freezes.[8] Typical targets of the sanctions have been foreign governments, foreign political parties, and terrorist organizations.[9] In limited instances presidents have cited the IEEPA against

---

[8] Christopher A. Casey and Jennifer K. Elsea, Cong. Rsch. Serv., R45618, *The International Emergency Economic Powers Act: Origins, Evolution, and Use* 25–26 (2024). For a history of sanctions under the IEEPA, *see id.* at App. A.
[9] *Id*. at 22.

domestic targets, but those typically have been specific wrongdoers such as "Persons Who Commit, Threaten to Commit, or Support Terrorism."[10]

33.    President Trump has previously cited the IEEPA, though not to impose tariffs. In 2019, for example, he invoked it to freeze the assets of the main Venezuelan state-owned oil company.[11] Like President Trump during his first term, other presidents have used the IEEPA to impose consequences on America's foes, not taxes on American citizens.

**The Executive Orders Imposing Tariffs Under the IEEPA**

34.    That changed when President Trump took office for his second term. On Inauguration Day, January 20, 2025, he took the first step to using the IEEPA to impose tariffs. That day, he issued a Proclamation declaring an emergency at the U.S.-Mexican border, emphasizing the threat from cartels, other illegal actors, and illegal drugs. His Proclamation stated that the Mexican border was "overrun by cartels, criminal gangs, known terrorists, human traffickers, smugglers, unvetted military-age males from foreign adversaries, and illicit narcotics that harm

---

[10] *See, e.g.*, E.O. 13224, *Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism* (September 23, 2001).

[11] E.O. 13857, *Taking Additional Steps to Address the National Emergency with Respect to Venezuela* (Jan. 25, 2019); *Treasury Sanctions Venezuela's State-Owned Oil Company Petroleos de Venezuela, S.A.*, U.S. Department of the Treasury (Jan. 28, 2019), https://home.treasury.gov/news/press-releases/sm594.

Americans."[12] This emergency declaration was a basis of the Executive Order imposing tariffs on Mexican products, which as explained below, the President issued 12 days later.

35.    Also on Inauguration Day, the President issued a separate "Memorandum" on trade issues, titled "America First Trade Policy."[13] It directed key agencies to review existing tariffs and other trade measures to "Address[] Unfair and Unbalanced Trade." It discussed "our country's large and persistent annual trade deficits" and referred to a possible "global supplemental tariff … to remedy" the trade deficits.[14] It discussed the revenue the United States can raise through tariffs.[15] The Memorandum referred to only three countries: China, Canada, and Mexico.[16]

36.    Twelve days later, on February 1, 2025, President Trump issued Executive Orders imposing the tariffs. First, however, he extended the Mexico emergency to China and Canada, now describing the emergency as "[t]he extraordinary threat posed by illegal aliens and drugs, including deadly fentanyl."[17]

---

[12]  Proclamation 10886, *Declaring a National Emergency at the Southern Border of the United States* (Jan. 20, 2025).

[13] Memorandum from President Trump to the Secretary of State, *et al.*, *America First Trade Policy* (Jan. 20, 2025), https://www.whitehouse.gov/presidential-actions/2025/01/america-first-trade-policy/.

[14] *Id.* § 2.

[15] *Id.* § 2(b), (i).

[16] *Id.* §§ 3, 4(g).

[17] The White House, Fact Sheet, *President Donald J. Trump Imposes Tariffs on Imports from Canada, Mexico, and China* (Feb. 1, 2025),

Addressing China's role, the President stated that "Chinese officials have failed to take the actions necessary to stem the flow of precursor chemicals to known criminal cartels and shut down money laundering by transnational criminal organizations."[18] The President also criticized "the failure of the [People's Republic of China] government to arrest, seize, detain, or otherwise intercept chemical precursor suppliers, money launderers, other [transnational criminal organizations], criminals at large, and drugs."[19]

37.    The President further discussed the expanded emergencies in Mexico and Canada, declaring that those countries' governments had failed "to arrest, seize, detain, or otherwise intercept [drug trafficking organizations], other drug and human traffickers, … and [illicit] drugs."[20]

38.    Based on the expanded emergency, President Trump issued the three Executive Orders imposing tariffs. The February 1, 2025 China Executive Order imposed an incremental 10% tariff (on top of existing tariffs) on all imports from China. *See* E.O. 14195, "Imposing Duties to Address the Synthetic Opioid Supply

---

https://www.whitehouse.gov/fact-sheets/2025/02/fact-sheet-president-donald-j-trump-imposes-tariffs-on-imports-from-canada-mexico-and-china/.

[18] *Id*.

[19] Presidential Action, *Imposing Duties to Address the Synthetic Opioid Supply Chain in the People's Republic of China* (Feb. 1, 2025).

[20] Presidential Action, *Imposing Duties to Address the Situation at Our Southern Border* (Feb. 1, 2025); Presidential Action, *Imposing Duties to Address the Flow of Illicit Drugs Across Our Northern Border* (Feb. 1, 2025).

Chain in the People's Republic of China." This incremental tariff doubled the average tariff on goods from China, which had been 10%.[21]

39.    The China tariff took effect on February 4, 2025. *See* 90 Fed. Reg. 9431 (Feb. 12, 2025) (publishing revision to the HTSUS). A month later, on March 3, 2025, the President doubled this incremental tariff to 20%, bringing the total average tariff on Chinese products to 30%. Explaining the increase, that Executive Order stated that "the PRC has not taken adequate steps to alleviate the illicit drug crisis." E.O. 14228 (Mar. 3, 2025). *See* 90 Fed. Reg. 11426 (Mar. 6, 2025) (publishing revision to the HTSUS).

40.    The other two February 1, 2025 Executive Orders imposed a 25% tariff on all products from Mexico and Canada respectively (except setting the tariff on Canadian energy at 10%). See E.O. 14194, "Imposing Duties to Address the Situation at Our Southern Border;" E.O. 14193, "Imposing Duties to Address the

---

[21] Before the Executive Orders, the effective tariff rate on imports from China was approximately 10%. *See* Hannah Miao, *Breaking Down Trump's Tariffs on China and the World, in Charts,* Wall St. J. (Dec. 3, 2024), https://www.wsj.com/economy/trade/trump-tariff-rates-china-world-trade-charts-3d6aee09; *Effects of U.S. Tariff Policy Changes Will Vary Sharply Across Sectors, Countries*, FitchRatings (Jan. 9, 2025), https://www.fitchratings.com/research/structured-finance/effects-of-us-tariff-policy-changes-will-vary-sharply-across-sectors-countries-09-01-2025.

Flow of Illicit Drugs Across Our Northern Border." Before these new tariffs, tariffs on goods from Canada and Mexico were near zero.[22]

41.    Two days later, on February 3, the President declared a one-month delay in the effective date of the Canada and Mexico tariffs. E.O. 14197 (Feb. 3, 2025); E.O. 14198 (Feb. 3, 2025). Those tariffs became effective on March 4, 2025.[23] On March 6, 2025, President Trump announced a one-month pause (until April 2, 2025) on goods and services that were covered by the United States-Mexico-Canada Agreement, a 2020 trade agreement.[24]

---

[22] Before the Executive Orders, *i.e.*, in 2024, the effective tariff rate on imports from Mexico was less than 1%, Hannah Miao, *Breaking Down Trump's Tariffs on China and the World, in Charts,* Wall St. J. (Dec. 3, 2024), https://www.wsj.com/economy/trade/trump-tariff-rates-china-world-trade-charts-3d6aee09, and from Canada was just 0.1%, *Effects of U.S. Tariff Policy Changes Will Vary Sharply Across Sectors, Countries*, Fitch Ratings (Jan. 9, 2025), https://www.fitchratings.com/research/structured-finance/effects-of-us-tariff-policy-changes-will-vary-sharply-across-sectors-countries-09-01-2025.

[23]  U.S. Customs and Border Protection Notice, 90 Fed. Reg. 11743 (Mar. 11, 2025) (modification of the HTSUS for products of Canada); U.S. Customs and Border Protection Notice, 90 Fed. Reg. 11429 (Mar. 6, 2025) (modification of the HTSUS for products of Mexico).

[24] David Goldman, *Trump delays some tariffs on Mexico and Canada for one month*, CNN (Mar. 6, 2025), https://www.cnn.com/2025/03/06/economy/tariffs-delay-mexico-canada/index.html; *see also* Presidential Action, *Amendment to Duties to Address the Flow of Illicit Drugs Across Our Northern Border* (March 6, 2025); Presidential Action, *Amendment to Duties to Address the Flow of Illicit Drugs Across Our Southern Border* (March 6, 2025).

**The Revisions to the HSTUS**

42.    The China Executive Orders direct the Secretary of Homeland Security to implement the tariffs by modifying the HTSUS, which sets out the tariff rates and statistical categories for all merchandise imported into the United States. The China Executive Orders instruct the Secretary of Homeland Security to modify the HTSUS "through notice in the *Federal Register*."

43.    As described above, *see* ¶¶ 39, 41, U.S. Customs and Border Protection published notices modifying the HSTUS to reflect all changes required by the relevant Executive Orders.

## CLAIMS FOR RELIEF

### COUNT I
**(Defendants President Trump and Executive Office of the President)**
**Presidential Order in Excess of Statutory Authority:**
**IEEPA Does Not Authorize Tariffs**

44.    Plaintiff incorporates the preceding paragraphs by reference as if fully set forth herein.

45.    The tariff ordered in the China Executive Orders must be supported by clear and explicit congressional authorization. It is not, because the IEEPA does not authorize a president to impose tariffs.

46.    When this Court interprets the text of the IEEPA to determine whether it authorizes tariffs, the Court must "determine the best reading" of the IEEPA, without deferring to the Executive Branch's proposed interpretation. *Loper Bright*

*Enterprises v. Raimondo* and *Relentless v. Dep't of Commerce*, 603 U.S. 369, 400 (2024). That legal question—whether the IEEPA authorizes tariffs—does not involve determining whether an emergency exists. Nor does it involve making any judgments about national security.

47.    The Supreme Court has warned against finding new authority in decades-old statutes. *See*, *e.g.*, *Util. Air Regul. Group* (*UARG*) v. *EPA*, 573 U.S. 302, 324 (2014) ("When an agency claims to discover in a long-extant statute an unheralded power to regulate 'a significant portion of the American economy,' … we typically greet its announcement with a measure of skepticism.") (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159 (2000)).

48.    In the 48 years since Congress enacted the IEEPA—years that cover eight presidents—no president had cited it to impose tariffs until President Trump issued the February 1, 2025 Executive Orders.

49.    That pre-2025 history is consistent with the IEEPA's text, because the text does not authorize a president to require Americans to pay tariffs. *See* § 1702(a)(1)(A), (B).

50.    Moreover, tariffs differ in kind from the actions the IEEPA does authorize. None of the authorized emergency actions involves imposing a tax on American citizens and residents. *See* § 1702(a)(1)(A), (B).

51.    The absence in the IEEPA of any authority to impose tariffs contrasts with the text of tariff statutes, which expressly refer to duties or tariffs. For example, Section 301 of the Trade Act of 1974 authorizes the president to "impose *duties* or other import restrictions." 19 U.S.C. § 2411(c)(1)(B) (emphasis added). Likewise, Section 201 of the Trade Act of 1974 authorizes the president to "proclaim an increase in, or the imposition of, any *duty* on the imported article" or **"**proclaim a *tariff*-rate quota on the article." 19 U.S.C. §2251(a)(3)(A), (B) (emphasis added). And Section 232 of the Trade Expansion Act refers to authority to change the level of "*duties*" on imports, 19 U.S.C. § 1862(a) (emphasis added), and to "adjust the imports," 19 U.S.C. § 1862(c).

52.    Basic principles of statutory construction establish that the IEEPA does not authorize the president to impose tariffs on Americans. This conclusion is reinforced by the major questions doctrine, which presumes that Congress "speak[s] clearly" if it authorizes the Executive Branch to make "decisions of vast 'economic and political significance.'" *UARG*, 573 U.S. at 324. *Accord West Virginia v. EPA*, 597 U.S. 697, 716 (2022).

53.    It is just such a decision when a president imposes heavy across-the-board tariffs on all imports from our country's three largest trading partners. These tariffs represent a tax increase of hundreds of billions of dollars each year: In 2024,

imports from Canada, China and Mexico reached more than $1.3 trillion.[25] These tariffs constitute the largest tax increase in a generation, according to the Peterson Institute for International Economics.[26]

54.    Because the IEEPA does not authorize a president to impose tariffs, the China Executive Orders are *ultra vires*, lying outside the bounds of the authority Congress delegated to the president. And because the China Executive Orders are unlawful, the HTSUS modifications made in reliance on them also are unlawful.

55.    The President's *ultra vires* Executive Orders and the modifications to the HTSUS have caused and will continue to cause irreparable harm to Plaintiff.

---

[25] According to the Office of the U.S. Trade Representative, 2024 imports from Canada were $412.7 billion, USTR, *Canada Trade Summary,* https://ustr.gov/countries-regions/americas/canada, from China were $438.9 billion, USTR, *China Trade Summary*, Executive Office of the President, https://ustr.gov/countries-regions/china-mongolia-taiwan/peoples-republic-china, and from Mexico were $505.9 billion, USTR, *Mexico Trade Summary*, Executive Office of the President, https://ustr.gov/countries-regions/americas/mexico.
[26] Kimberly Clausing and Mary E. Lovely, *Trump's tariffs on Canada, Mexico, and China would cost the typical US household over $1,200 a year*, Peterson Institute for International Economics (Feb. 3, 2025), https://www.piie.com/research/piie-charts/2025/trumps-tariffs-canada-mexico-and-china-would-cost-typical-us-household

**COUNT II**
**(Defendants President Trump and Executive Office of the President)**
***Ultra Vires* Executive Orders**
**The President Has Not Shown That the China Executive Orders**
**Are "Necessary" to Address the Stated Emergency**

56.     Plaintiff incorporates paragraphs 1–43 by reference as if fully set forth herein.

57.     The IEEPA requires a president to establish that the emergency actions he takes are "*necessary*" to address the specific emergency he declared. 50 U.S.C. § 1703(b)(4). Likewise, it mandates that "[t]he authorities granted to the President … may *only* be exercised *to deal with* an unusual and extraordinary threat with respect to which a *national emergency* has been declared." 50 U.S.C. § 1701(b) (emphasis added). *See also id.* § 1701(a) (limiting the president's authority to actions "to deal with" the emergency). The IEEPA requires presidents to use the powers granted only for the emergency, specifying that authority under the IEEPA "may not be exercised for any other purpose." *Id.* § 1701(b).

58.     The President's broad tariff—described by one economist as a strategy of "flipping over the gameboard and scattering the pieces"[27]—does not meet the requirement that the specific emergency action be "necessary" to address the specific (opioid) problem. 50 U.S.C. § 1703(b)(4).

---

[27] Oren Cass, *O Canada! Time to Talk Tariffs*, Understanding America (Feb. 3, 2025), https://www.understandingamerica.co/p/o-canada-time-to-talk-tariffs.

59.    There is no "necessary" connection between the across-the-board tariff and the opioid problem, because the opioid problem is not a trade problem at all (given that what is being imported is in many cases an illegal substance), much less a trade "emergency."

60.    Nor do the China Executive Orders make the required showing that the president ordered the tariffs "*only* … to deal with" the "national emergency" he declared. 50 U.S.C. § 1701(b) (emphasis added).

61.    To the contrary, other presidential statements show that the Executive Orders imposed the tariff for a different purpose: to lower the United States trade deficit and raise revenue.

62.    Those statements allow the Court to determine whether the stated reason for the President's action is the actual reason. *See Dep't of Com. v. New York*, 588 U.S. 752, 782 (2019) (remanding to the agency where the evidence did not match the secretary's explanation of his decision).

63.    For example, as described above, the Inauguration Day Memorandum, "America First Trade Policy," discussed "our country's large and persistent annual trade deficits" and a possible "global supplemental tariff." The Memorandum discusses Mexico, Canada, and China, but not other countries.

64.    The following week, a day before the President issued the first China Executive Order, he discussed imposing universal tariffs on all products from these

three countries. Explaining the reason for the tariffs on China, Canada, and Mexico, he stated, "It's pure economic." He added, "We have big deficits with, as you know, with all three of them."[28]

65.     The day after he imposed the tariffs on these three countries, the President made a Truth Social post addressing imports from Canada. Referring to the United States' trade deficit with Canada, the President asserted that United States's imports provide it a "massive subsidy."[29]

66.     Because the China Executive Orders do not meet the IEEPA's requirements that the action ordered be "necessary" to address the specific emergency, 50 U.S.C. §§ 1701, 1703(b)(4) & (5), and that the specific emergency be the "only" reason for the action ordered, *id.* § 1701(b), the China Executive Orders are *ultra vires* and unlawful. Because those Orders are unlawful, the HTSUS modifications made in reliance on them also are unlawful.

67.     The President's *ultra vires* actions have caused and will continue to cause irreparable harm to Plaintiff.

---

[28] Aime Williams, *et al.*, *Donald Trump threatens to ignite era of trade wars with new tariffs*, Financial Times (Jan. 31, 2025) (quoting President Trump), https://www.ft.com/content/ff8116f0-b01f-4687-934a-a1b8a07bd5b0.
[29] Donald J. Trump (@realDonaldTrump), Truth Social (Feb. 2, 2025), https://truthsocial.com/@realDonaldTrump/posts/113934520197790682.

## COUNT III
## (Defendants President Trump and Executive Office of the President)
## Violation of the U.S. Constitution, Art. I
## The IEEPA Violates the Nondelegation Doctrine

68.    Plaintiff incorporates paragraphs 1–43 by reference as if fully set forth herein.

69.    Article I, Section 1 of the Constitution (the Vesting Clause) states that "All legislative powers herein granted shall be vested in a Congress of the United States … ."

70.    Article I, Section 8 of the Constitution states that "The Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises," Art. I, § 8, cl. 1 (Taxing and Spending Clause), and "[t]o regulate Commerce with foreign Nations." Art. I, § 8, cl. 3 (Foreign Commerce Clause).

71.    Congress "may not transfer to another branch 'powers which are strictly and exclusively legislative.'" *Gundy v. United States*, 588 U.S. 128, 135 (2019) (quoting *Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 42–43 (1825)). *See also Marshall Field & Co. v. Clark*, 143 U.S. 649, 692 (1892) ("That [C]ongress cannot delegate legislative power to the president is a principle universally recognized as vital to the integrity and maintenance of the system of government ordained by the [C]onstitution.").

72.    When Congress legislates, it must impose sufficient constraints on the Executive Branch's use of delegated authority. *Gundy*, 588 U.S. at 135-36. Congress

can delegate power to another branch only if it "has supplied an intelligible principle to guide the deleg[at]ee's use of discretion." *Id.* at 135.

73.    If the IEEPA does authorize the President to impose the China tariff at issue in the Executive Orders, then the IEEPA lacks an "intelligible principle" that constrains Executive Branch decision-making authority. *Gundy*, 588 U.S. at 135. In that case, the IEEPA is unconstitutional because it transfers core legislative powers to the President by permitting him to set tariffs and regulate commerce with foreign nations.

74.    Accordingly, if the IEEPA is construed to allow tariffs, then it violates the intelligible principle requirement and violates the nondelegation doctrine, and the Executive Orders are unconstitutional. In that case, the China Executive Orders are unlawful and the HTSUS modifications made in reliance on them also are unlawful.

75.    The President's unconstitutional exercise of legislative power has caused and will continue to cause irreparable harm to Plaintiff.

**COUNT IV**
**(Defendants Secretary Noem, Department of Homeland Security, Acting Commissioner Flores, U.S. Customs and Border Protection)**
**The Modifications to the HTSUS Violate the Administrative Procedure Act**

76.    Plaintiff incorporates paragraphs 1–43 by reference as if fully set forth herein.

77.    The Administrative Procedure Act requires a reviewing court to "hold unlawful and set aside agency action" that is "arbitrary, capricious,  an  abuse  of

discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), "contrary to constitutional right, power, privilege, or immunity," *id*. § 706(2)(B), or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," *id.* § 706(2)(C).

78.    As pleaded above, the HTSUS modifications made to comply with them are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), "contrary to constitutional right, power, privilege, or immunity," *id*. § 706(2)(B), and "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," *id.* § 706(2)(C).

79.    Accordingly, the HTSUS modifications must be vacated and set aside.

80.    Defendants' APA violations have caused and will continue to cause ongoing irreparable harm to Plaintiff.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that this Court grant the following relief:

A.    A declaratory judgment pursuant to 28 U.S.C. § 2201(a) declaring that the China Executive Orders are unlawful and unconstitutional, either (1) because they are *ultra vires* as not being authorized by the statute, or (2) because the IEEPA violates the Constitution by failing to provide an intelligible principle constraining actions a president takes under that statute.

B.    A declaratory judgment pursuant to 28 U.S.C. § 2201(a) declaring

that, because the China Executive Orders are unlawful, the resulting HTSUS modifications are unlawful and in violation of the Administrative Procedure Act.

C.     Vacatur of the HTSUS modifications, holding them unlawful and setting them aside as per APA § 706.

D.     Permanent injunctive relief enjoining the Defendants Noem, Department of Homeland Security, Flores, and U.S. Customs and Border Protection from implementing or enforcing the China Executive Orders or the resulting modifications to the HTSUS, and from taking any other actions to implement or enforce those Executive Orders.

E.     An award to Plaintiff of the costs of this action and reasonable attorneys' fees pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412(d).

F.     Such other and relief as this Court may deem just and proper.

April 3, 2025                              Respectfully submitted,

Andrew J. Morris *
Virginia Bar No. 88921
John J. Vecchione*
Virginia Bar No. 73828
NEW CIVIL LIBERTIES ALLIANCE
4250 N. Fairfax Drive, Suite 300
Arlington, VA 22203
Tel.: (202) 869-5210
andrew.morris@ncla.legal
john.vecchione@ncla.legal

/s/ *Bryan S. Gowdy*

Bryan S. Gowdy

Florida Bar No.
176631
CREED & GOWDY, P.A.
865 May Street
Jacksonville, FL 32204
Tel.: (904) 350-0075
bgowdy@appellate-firm.com

*Pro hac vice admission forthcoming*