# EXHIBITS TO AMENDED COMPLAINT

## TABLE OF EXHIBITS

| Exhibit # | Document Title | Page # |
|---|---|---|
| 1 | America First Trade Policy – The White House | 1 |
| 2 | Procl 10886 | 10 |
| 3 | EO 14193 | 14 |
| 4 | EO 14194 | 19 |
| 5 | EO 14195 | 24 |
| 6 | Fact Sheet Tariffs on Canada, Mexico, and China | 29 |
| 7 | Imposing Duties to Address the Flow of Illicit Drugs Across Our Northern Border – The White House | 35 |
| 8 | Imposing Duties to Address the Situation at Our Southern Border – The White House | 43 |
| 9 | Imposing Duties to Address the Synthetic Opioid Chain in the People's Republic of China – The White House | 51 |
| 10 | EO 14197 | 60 |
| 11 | EO 14198 | 63 |
| 12 | 90 Fed Reg 9038 | 66 |
| 13 | 90 Fed Reg 9431 | 70 |
| 14 | EO 14228 | 75 |
| 15 | 90 Fed Reg 11426 | 78 |
| 16 | 90 Fed Reg 11429 | 83 |
| 17 | 90 Fed Reg 11473 | 87 |
| 18 | EO 14257 | 92 |
| 19 | Fact Sheet Apr 2 | 162 |
| 20 | EO 14259 | 172 |
| 21 | EO 14266 | 176 |
| 22 | Emily Ley Paper Co. Invoice | 181 |
| 23 | Kilo Brava Invoice | 183 |
| 24 | Rokland Invoices | 187 |

# Exhibit 1

*The* WHITE HOUSE

PRESIDENTIAL ACTIONS

America First Trade Policy

The White House

January 20, 2025

January 20, 2025

MEMORANDUM FOR THE SECRETARY OF STATE

THE SECRETARY OF THE TREASURY

THE SECRETARY OF DEFENSE

THE SECRETARY OF COMMERCE

THE SECRETARY OF HOMELAND SECURITY

THE DIRECTOR OF THE OFFICE OF MANAGEMENT AND
  BUDGET

THE UNITED STATES TRADE REPRESENTATIVE

THE ASSISTANT TO THE PRESIDENT FOR ECONOMIC
  POLICY

THE SENIOR COUNSELOR FOR TRADE AND MANUFACTURING

SUBJECT:          America First Trade Policy

Section 1.  Background.  In 2017, my Administration pursued trade and economic policies
that put the American economy, the American worker, and our national security first.
 This spurred an American revitalization marked by stable supply chains, massive
economic growth, historically low inflation, a substantial increase in real wages and real
median household wealth, and a path toward eliminating destructive trade deficits.
My Administration treated trade policy as a critical component to national security and
reduced our Nation's dependence on other countries to meet our key security needs.

Americans benefit from and deserve an America First trade policy. Therefore, I am establishing a robust and reinvigorated trade policy that promotes investment and productivity, enhances our Nation's industrial and technological advantages, defends our economic and national security, and — above all — benefits American workers, manufacturers, farmers, ranchers, entrepreneurs, and businesses.

Sec. 2. Addressing Unfair and Unbalanced Trade. (a) The Secretary of Commerce, in consultation with the Secretary of the Treasury and the United States Trade Representative, shall investigate the causes of our country's large and persistent annual trade deficits in goods, as well as the economic and national security implications and risks resulting from such deficits, and recommend appropriate measures, such as a global supplemental tariff or other policies, to remedy such deficits.

(b) The Secretary of the Treasury, in consultation with the Secretary of Commerce and the Secretary of Homeland Security, shall investigate the feasibility of establishing and recommend the best methods for designing, building, and implementing an External Revenue Service (ERS) to collect tariffs, duties, and other foreign trade-related revenues.

(c) The United States Trade Representative, in consultation with the Secretary of the Treasury, the Secretary of Commerce, and the Senior Counselor for Trade and Manufacturing, shall undertake a review of, and identify, any unfair trade practices by other countries and recommend appropriate actions to remedy such practices under applicable authorities, including, but not limited to, the Constitution of the United States; sections 71 through 75 of title 15, United States Code; sections 1337, 1338, 2252, 2253, and 2411 of title 19, United States Code; section 1701 of title 50, United States Code; and trade agreement implementing acts.

(d) The United States Trade Representative shall commence the public consultation process set out in section 4611(b) of title 19, United States Code, with respect to the United States–Mexico–Canada Agreement (USMCA) in preparation for the July 2026 review of the USMCA. Additionally, the United States Trade Representative, in consultation with the heads of other relevant executive departments and agencies, shall assess the impact of the USMCA on American workers, farmers, ranchers, service providers, and other businesses and make recommendations regarding the United States' participation in the agreement. The United States Trade Representative shall also report to appropriate congressional committees on the operation of the USMCA and related matters consistent with section 4611(b) of title 19, United States Code.

(e)  The Secretary of the Treasury shall review and assess the policies and practices of major United States trading partners with respect to the rate of exchange between their currencies and the United States dollar pursuant to section 4421 of title 19, United States Code, and section 5305 of title 22, United States Code.  The Secretary of the Treasury shall recommend appropriate measures to counter currency manipulation or misalignment that prevents effective balance of payments adjustments or that provides trading partners with an unfair competitive advantage in international trade, and shall identify any countries that he believes should be designated as currency manipulators.

(f)  The United States Trade Representative shall review existing United States trade agreements and sectoral trade agreements and recommend any revisions that may be necessary or appropriate to achieve or maintain the general level of reciprocal and mutually advantageous concessions with respect to free trade agreement partner countries.

(g)  The United States Trade Representative shall identify countries with which the United States can negotiate agreements on a bilateral or sector-specific basis to obtain export market access for American workers, farmers, ranchers, service providers, and other businesses and shall make recommendations regarding such potential agreements.

(h)  The Secretary of Commerce shall review policies and regulations regarding the application of antidumping and countervailing duty (AD/CVD) laws, including with regard to transnational subsidies, cost adjustments, affiliations, and "zeroing."  Further, the Secretary of Commerce shall review procedures for conducting verifications pursuant to section 1677m of title 19, United States Code, and assess whether these procedures sufficiently induce compliance by foreign respondents and governments involved in AD/CVD proceedings.  The Secretary of Commerce shall consider modifications to these procedures, as appropriate.

(i)  The Secretary of the Treasury, the Secretary of Commerce, the Secretary of Homeland Security, and the Senior Counselor for Trade and Manufacturing, in consultation with the United States Trade Representative, shall assess the loss of tariff revenues and the risks from importing counterfeit products and contraband drugs, e.g., fentanyl, that each result from the current implementation of the $800 or less, duty-free *de minimis* exemption under section 1321 of title 19, United States Code, and shall recommend modifications as warranted to protect both the revenue of the United States and the public health by preventing unlawful importations.

(j)  The Secretary of the Treasury, in consultation with the Secretary of Commerce and the United States Trade Representative, shall investigate whether any foreign country subjects United States citizens or corporations to discriminatory or extraterritorial taxes pursuant to section 891 of title 26, United States Code.

(k)  The United States Trade Representative, in consultation with the Senior Counselor for Trade and Manufacturing, shall review the impact of all trade agreements — including the World Trade Organization Agreement on Government Procurement — on the volume of Federal procurement covered by Executive Order 13788 of April 18, 2017 (Buy American and Hire American), and shall make recommendations to ensure that such agreements are being implemented in a manner that favors domestic workers and manufacturers, not foreign nations.

Sec. 3.  Economic and Trade Relations with the People's Republic of China (PRC).  (a)  The United States Trade Representative shall review the Economic and Trade Agreement Between the Government of the United States of America and the Government of the People's Republic of China to determine whether the PRC is acting in accordance with this agreement, and shall recommend appropriate actions to be taken based upon the findings of this review, up to and including the imposition of tariffs or other measures as needed.

(b)  The United States Trade Representative shall assess the May 14, 2024, report entitled "Four-Year Review of Actions Taken in the Section 301 Investigation:  China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation" and consider potential additional tariff modifications as needed under section 2411 of title 19, United States Code — particularly with respect to industrial supply chains and circumvention through third countries, including an updated estimate of the costs imposed by any unfair trade practices identified in such review — and he shall recommend such actions as are necessary to remediate any issues identified in connection with this process.

(c)  The United States Trade Representative shall investigate other acts, policies, and practices by the PRC that may be unreasonable or discriminatory and that may burden or restrict United States commerce, and shall make recommendations regarding appropriate responsive actions, including, but not limited to, actions authorized by section 2411 of title 19, United States Code.

(d)  The Secretary of Commerce and the United States Trade Representative shall assess legislative proposals regarding Permanent Normal Trade Relations with the PRC and

make recommendations regarding any proposed changes to such legislative proposals.

(e)  The Secretary of Commerce shall assess the status of United States intellectual property rights such as patents, copyrights, and trademarks conferred upon PRC persons, and shall make recommendations to ensure reciprocal and balanced treatment of intellectual property rights with the PRC.

Sec. 4.  Additional Economic Security Matters.  (a)  The Secretary of Commerce, in consultation with the Secretary of Defense and the heads of any other relevant agencies, shall conduct a full economic and security review of the United States' industrial and manufacturing base to assess whether it is necessary to initiate investigations to adjust imports that threaten the national security of the United States under section 1862 of title 19, United States Code.

(b)  The Assistant to the President for Economic Policy, in consultation with the Secretary of Commerce, the United States Trade Representative, and the Senior Counselor for Trade and Manufacturing, shall review and assess the effectiveness of the exclusions, exemptions, and other import adjustment measures on steel and aluminum under section 1862 of title 19, United States Code, in responding to threats to the national security of the United States, and shall make recommendations based upon the findings of this review.

(c)  The Secretary of State and the Secretary of Commerce, in cooperation with the heads of other agencies with export control authorities, shall review the United States export control system and advise on modifications in light of developments involving strategic adversaries or geopolitical rivals as well as all other relevant national security and global considerations.  Specifically, the Secretary of State and the Secretary of Commerce shall assess and make recommendations regarding how to maintain, obtain, and enhance our Nation's technological edge and how to identify and eliminate loopholes in existing export controls -- especially those that enable the transfer of strategic goods, software, services, and technology to countries to strategic rivals and their proxies.  In addition, they shall assess and make recommendations regarding export control enforcement policies and practices, and enforcement mechanisms to incentivize compliance by foreign countries, including appropriate trade and national security measures.

(d)  The Secretary of Commerce shall review and recommend appropriate action with respect to the rulemaking by the Office of Information and Communication Technology

and Services (ICTS) on connected vehicles, and shall consider whether controls on ICTS transactions should be expanded to account for additional connected products.

(e)  The Secretary of the Treasury, in consultation with the Secretary of Commerce and, as appropriate, the heads of any other relevant agencies, shall review whether Executive Order 14105 of August 9, 2023 (Addressing United States Investments in Certain National Security Technologies and Products in Countries of Concern) should be modified or rescinded and replaced, and assess whether the final rule entitled "Provisions Pertaining to U.S. Investments in Certain National Security Technologies and Products in Countries of Concern," 89 Fed. Reg. 90398 (November 15, 2024), which implements Executive Order 14105, includes sufficient controls to address national security threats.  The Secretary of the Treasury shall make recommendations based upon the findings of this review, including potential modifications to the Outbound Investment Security Program.

(f)  The Director of the Office of Management and Budget shall assess any distorting impact of foreign government financial contributions or subsidies on United States Federal procurement programs and propose guidance, regulations, or legislation to combat such distortion.

(g)  The Secretary of Commerce and the Secretary of Homeland Security shall assess the unlawful migration and fentanyl flows from Canada, Mexico, the PRC, and any other relevant jurisdictions and recommend appropriate trade and national security measures to resolve that emergency.

Sec. 5.  Reports.  The results of the reviews and investigations, findings, identifications, and recommendations identified in:

(a)  sections 2(a), 2(h), 3(d), 3(e), 4(a), 4(b), 4(c), 4(d), and 4(g) shall be delivered to me in a unified report coordinated by the Secretary of Commerce by April 1, 2025;

(b)  sections 2(b), 2(e), 2(i), 2(j), and 4(e) shall be delivered to me in a unified report coordinated by the Secretary of the Treasury by April 1, 2025;

(c)  sections 2(c), 2(d), 2(f), 2(g), 2(k), 3(a), 3(b), and 3(c) shall be delivered to me in a unified report coordinated by the United States Trade Representative by April 1, 2025; and

(d)  section 4(f) shall be delivered to me by the Director of the Office of Management and Budget by April 30, 2025.

Sec. 6.  General Provisions.  (a)  Nothing in this memorandum shall be construed to impair or otherwise affect:

(i)   the authority granted by law to an executive department or agency, or the head thereof; or

(ii)  the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b)  This memorandum shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c)  This memorandum is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

NEWS

ADMINISTRATION

ISSUES

CONTACT

EOP

VISIT

GALLERY

VIDEO LIBRARY

AMERICA 250

FOUNDING FATHERS



Subscribe to The White House newsletter

Your email    SIGN UP

THE WHITE HOUSE

1600 Pennsylvania Ave NW
Washington, DC 20500

WH.GOV

Copyright

Privacy



Exhibit 2

Federal Register

Vol. 90, No. 18

Wednesday, January 29, 2025

# Presidential Documents

Title 3—

The President

Proclamation 10886 of January 20, 2025

## Declaring a National Emergency at the Southern Border of the United States

**By the President of the United States of America**

**A Proclamation**

By the authority vested in me as President by the Constitution and the laws of the United States of America, I hereby proclaim:

America's sovereignty is under attack. Our southern border is overrun by cartels, criminal gangs, known terrorists, human traffickers, smugglers, unvetted military-age males from foreign adversaries, and illicit narcotics that harm Americans, including America.

This invasion has caused widespread chaos and suffering in our country over the last 4 years. It has led to the horrific and inexcusable murders of many innocent American citizens, including women and children, at the hands of illegal aliens. Foreign criminal gangs and cartels have begun seizing control of parts of cities, attacking our most vulnerable citizens, and terrorizing Americans beyond the control of local law enforcement. Cartels control vast territories just south of our southern border, effectively controlling who can and cannot travel to the United States from Mexico. Hundreds of thousands of Americans have tragically died from drug overdoses because of the illicit narcotics that have flowed across the southern border.

This assault on the American people and the integrity of America's sovereign borders represents a grave threat to our Nation.

Because of the gravity and emergency of this present danger and imminent threat, it is necessary for the Armed Forces to take all appropriate action to assist the Department of Homeland Security in obtaining full operational control of the southern border.

To protect the security and safety of United States citizens, to protect each of the States against invasion, and to uphold my duty to take care that the laws be faithfully executed, it is my responsibility as President to ensure that the illegal entry of aliens into the United States via the southern border be immediately and entirely stopped.

As Commander in Chief, I have no more solemn duty than to protect the American people.

NOW, THEREFORE, I, DONALD J. TRUMP, President of the United States of America, by the authority vested in me by the Constitution and the laws of the United States of America, including sections 201 and 301 of the National Emergencies Act (50 U.S.C. 1601 *et seq.*), hereby declare that a national emergency exists at the southern border of the United States, and that section 12302 of title 10, United States Code, is invoked and made available, according to its terms, to the Secretaries of the military departments concerned, subject to the direction of the Secretary of Defense. To provide additional authority to the Department of Defense to support the Federal Government's response to the emergency at the southern border, I hereby declare that this emergency requires use of the Armed Forces and, in accordance with section 301 of the National Emergencies Act (50 U.S.C. 1631), that the construction authority provided in section 2808 of

title 10, United States Code, is invoked and made available, according to its terms, to the Secretary of Defense and, at the discretion of the Secretary of Defense, to the Secretaries of the military departments. I hereby direct as follows:

**Section 1.** *Deployment of Personnel and Resources.* The Secretary of Defense, or the Secretary of each relevant military department, as appropriate and consistent with applicable law, shall order as many units or members of the Armed Forces, including the Ready Reserve and the National Guard, as the Secretary of Defense determines to be appropriate to support the activities of the Secretary of Homeland Security in obtaining complete operational control of the southern border of the United States. The Secretary of Defense shall further take all appropriate action to facilitate the operational needs of the Secretary of Homeland Security along the southern border, including through the provision of appropriate detention space, transportation (including aircraft), and other logistics services in support of civilian-controlled law enforcement operations.

**Sec. 2.** *Additional Physical Barriers.* The Secretaries of Defense and Homeland Security shall immediately take all appropriate action, consistent with law, including 10 U.S.C. 2214, to construct additional physical barriers along the southern border. To the extent possible, the Secretaries of Defense and Homeland Security shall coordinate with any Governor of a State that is willing to assist with the deployment of any physical infrastructure to improve operational security at the southern border.

**Sec. 3.** *Unmanned Aerial Systems.* The Secretary of Transportation and the Federal Communications Commission shall, consistent with applicable law, consider waiving all applicable Federal Aviation Administration and Federal Communications Commission regulations or policies, respectively, that restrict the Department of Homeland Security's ability to counter unmanned aerial systems within 5 miles of the southern border.

**Sec. 4.** *Revision of Policies and Strategies.* The Secretary of Defense and the Secretary of Homeland Security, in consultation with the Attorney General, shall take all appropriate action, consistent with law, to prioritize the impedance and denial of the unauthorized physical entry of aliens across the southern border of the United States, and to ensure that use of force policies prioritize the safety and security of Department of Homeland Security personnel and of members of the Armed Forces.

**Sec. 5.** *Revocation.* Proclamation 10142 of January 20, 2021 (Termination of Emergency With Respect to the Southern Border of the United States and Redirection of Funds Diverted to Border Wall Construction), is hereby revoked.

**Sec. 6.** *Reporting Requirement.* (a) Within 30 days of the date of this proclamation, the Secretary of Defense shall submit to the President, through the Homeland Security Advisor, a report outlining all actions taken to fulfill the requirements and objectives of this proclamation; and

(b) Within 90 days of the date of this proclamation, the Secretary of Defense and the Secretary of Homeland Security shall submit a joint report to the President about the conditions at the southern border of the United States and any recommendations regarding additional actions that may be necessary to obtain complete operational control of the southern border, including whether to invoke the Insurrection Act of 1807.

**Sec. 7.** *General Provisions.* (a) Nothing in this proclamation shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This proclamation shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This proclamation is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

IN WITNESS WHEREOF, I have hereunto set my hand this twentieth day of January, in the year of our Lord two thousand twenty-five, and of the Independence of the United States of America the two hundred and forty-ninth.

[FR Doc. 2025–01948
Filed 1–28–25; 8:45 am]
Billing code 3395–F4–P

Exhibit 3

**Federal Register**

Vol. 90, No. 25

Friday, February 7, 2025

# Presidential Documents

Title 3—

The President

Executive Order 14193 of February 1, 2025

## Imposing Duties To Address the Flow of Illicit Drugs Across Our Northern Border

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the International Emergency Economic Powers Act (50 U.S.C. 1701 *et seq.*) (IEEPA), the National Emergencies Act (50 U.S.C. 1601 *et seq.*) (NEA), section 604 of the Trade Act of 1974, as amended (19 U.S.C. 2483), and section 301 of title 3, United States Code,

I, DONALD J. TRUMP, President of the United States of America, find that the sustained influx of illicit opioids and other drugs has profound consequences on our Nation, endangering lives and putting a severe strain on our healthcare system, public services, and communities.

This challenge threatens the fabric of our society. Gang members, smugglers, human traffickers, and illicit drugs of all kinds have poured across our borders and into our communities. Canada has played a central role in these challenges, including by failing to devote sufficient attention and resources or meaningfully coordinate with United States law enforcement partners to effectively stem the tide of illicit drugs.

Drug trafficking organizations (DTOs) are the world's leading producers of fentanyl, methamphetamine, cocaine, and other illicit drugs, and they cultivate, process, and distribute massive quantities of narcotics that fuel addiction and violence in communities across the United States. These DTOs often collaborate with transnational cartels to smuggle illicit drugs into the United States, utilizing clandestine airstrips, maritime routes, and overland corridors.

The challenges at our southern border are foremost in the public consciousness, but our northern border is not exempt from these issues. Criminal networks are implicated in human trafficking and smuggling operations, enabling unvetted illegal migration across our northern border. There is also a growing presence of Mexican cartels operating fentanyl and nitazene synthesis labs in Canada. The flow of illicit drugs like fentanyl to the United States through both illicit distribution networks and international mail—due, in the case of the latter, to the existing administrative exemption from duty and taxes, also known as *de minimis,* under section 1321 of title 19, United States Code—has created a public health crisis in the United States, as outlined in the Presidential Memorandum of January 20, 2025 (America First Trade Policy) and Executive Order 14157 of January 20, 2025 (Designating Cartels and Other Organizations as Foreign Terrorist Organizations and Specially Designated Global Terrorists). With respect to smuggling of illicit drugs across our northern border, Canada's Financial Transactions and Reports Analysis Centre recently published a study on the laundering of proceeds of illicit synthetic opioids, which recognized Canada's heightened domestic production of fentanyl, largely from British Columbia, and its growing footprint within international narcotics distribution. Despite a North American dialogue on the public health impacts of illicit drugs since 2016, Canadian officials have acknowledged that the problem has only grown. And while U.S. Customs and Border Protection (CBP) within the Department of Homeland Security seized, comparatively, much less fentanyl from Canada than from Mexico last year, fentanyl is so potent that even a very small parcel of the drug can cause many deaths and

destruction to America families. In fact, the amount of fentanyl that crossed the northern border last year could kill 9.5 million Americans.

Immediate action is required to finally end this public health crisis and national emergency, which will not happen unless the compliance and cooperation of Canada is assured.

I hereby determine and order:

**Section 1**. (a) As President of the United States, my highest duty is the defense of the country and its citizens. A Nation without borders is not a nation at all. I will not stand by and allow our sovereignty to be eroded, our laws to be trampled, our citizens to be endangered, or our borders to be disrespected anymore.

I previously declared a national emergency with respect to the grave threat to the United States posed by the influx of illegal aliens and illicit drugs into the United States in Proclamation 10886 of January 20, 2025 (Declaring a National Emergency at the Southern Border). Pursuant to the NEA, I hereby expand the scope of the national emergency declared in that Proclamation to cover the threat to the safety and security of Americans, including the public health crisis of deaths due to the use of fentanyl and other illicit drugs, and the failure of Canada to do more to arrest, seize, detain, or otherwise intercept DTOs, other drug and human traffickers, criminals at large, and drugs. In addition, this failure to act on the part of Canada constitutes an unusual and extraordinary threat, which has its source in substantial part outside the United States, to the national security and foreign policy of the United States. I hereby declare and reiterate a national emergency under the NEA and IEEPA to deal with that threat. This national emergency requires decisive and immediate action, and I have decided to impose, consistent with law, ad valorem tariffs on articles that are products of Canada set forth in this order. In doing so, I invoke my authority under section 1702(a)(1)(B) of IEEPA, and specifically find that action under other authority to impose tariffs is inadequate to address this unusual and extraordinary threat.

**Sec. 2**. (a) All articles that are products of Canada as defined by the *Federal Register* notice described in subsection (e) of this section (*Federal Register* notice), and except for those products described in subsection (b) of this section, shall be, consistent with law, subject to an additional 25 percent ad valorem rate of duty. Such rate of duty shall apply with respect to goods entered for consumption, or withdrawn from warehouse for consumption, on or after 12:01 a.m. eastern time on February 4, 2025, except that goods entered for consumption, or withdrawn from warehouse for consumption, after such time that were loaded onto a vessel at the port of loading or in transit on the final mode of transport prior to entry into the United States before 12:01 a.m. eastern time on February 1, 2025, shall not be subject to such additional duty, only if the importer certifies to CBP as specified in the *Federal Register* notice.

(b) With respect to energy or energy resources, as defined in section 8 of Executive Order 14156 of January 20, 2025 (Declaring a National Energy Emergency), and as otherwise included in the *Federal Register* notice, such articles that are products of Canada as defined by the *Federal Register* notice shall be, consistent with law, subject to an additional 10 percent ad valorem rate of duty. Such rate of duty shall apply with respect to goods entered for consumption, or withdrawn from warehouse for consumption, on or after 12:01 a.m. eastern time on February 4, 2025, except that goods entered for consumption, or withdrawn from warehouse for consumption, after such time that were loaded onto a vessel at the port of loading or in transit on the final mode of transport prior to entry into the United States before 12:01 a.m. eastern time on February 1, 2025, shall not be subject to such additional duty, only if the importer certifies to CBP as specified in the *Federal Register* notice.

(c) The rates of duty established by this order are in addition to any other duties, fees, exactions, or charges applicable to such imported articles.

(d) Should Canada retaliate against the United States in response to this action through import duties on United States exports to Canada or similar measures, the President may increase or expand in scope the duties imposed under this order to ensure the efficacy of this action.

(e) In order to establish the duty rate on imports of articles that are products of Canada, the Secretary of Homeland Security shall determine the modifications necessary to the Harmonized Tariff Schedule of the United States (HTSUS) in order to effectuate this order consistent with law and shall make such modifications to the HTSUS through notice in the *Federal Register*. The modifications made to the HTSUS by this notice shall be effective with respect to goods entered for consumption, or withdrawn from warehouse for consumption, on or after 12:01 a.m. eastern time on February 4, 2025, and shall continue in effect until such actions are expressly reduced, modified, or terminated.

(f) Articles that are products of Canada, except those that are eligible for admission under "domestic status" as defined in 19 CFR 146.43, which are subject to the duties imposed by this order and are admitted into a United States foreign trade zone on or after 12:01 a.m. eastern time on February 4, 2025, except as otherwise noted in subsections (a) and (b) of this section, must be admitted as "privileged foreign status" as defined in 19 CFR 146.41. Such articles will be subject upon entry for consumption to the rates of duty related to the classification under the applicable HTSUS subheading in effect at the time of admittance into the United States foreign trade zone.

(g) No drawback shall be available with respect to the duties imposed pursuant to this order.

(h) For avoidance of doubt, duty-free *de minimis* treatment under 19 U.S.C. 1321 shall not be available for the articles described in subsection (a) and subsection (b) of this section.

(i) Any prior Presidential Proclamation, Executive Order, or other Presidential directive or guidance related to trade with Canada that is inconsistent with the direction in this order is hereby terminated, suspended, or modified to the extent necessary to give full effect to this order.

(j) The articles described in subsection (a) and subsection (b) of this section shall exclude those encompassed by 50 U.S.C. 1702(b).

**Sec. 3**. (a) The Secretary of Homeland Security shall regularly consult with the Secretary of State, the Attorney General, the Assistant to the President for National Security Affairs, and the Assistant to the President for Homeland Security on the situation at our northern border. The Secretary of Homeland Security shall inform the President of any circumstances that, in the opinion of the Secretary of Homeland Security, indicate that the Government of Canada has taken adequate steps to alleviate this public health crisis through cooperative enforcement actions. Upon the President's determination of sufficient action to alleviate the crisis, the tariffs described in section 2 of this order shall be removed.

(b) The Secretary of Homeland Security, in coordination with the Secretary of State, the Attorney General, the Assistant to the President for National Security Affairs, and the Assistant to the President for Homeland Security, shall recommend additional action, if necessary, should the Government of Canada fail to take adequate steps to alleviate the illegal migration and illicit drug crises through cooperative enforcement actions.

**Sec. 4**. The Secretary of Homeland Security, in consultation with the Secretary of the Treasury, the Attorney General, and the Secretary of Commerce, is hereby authorized to take such actions, including adopting rules and regulations, and to employ all powers granted to the President by IEEPA as may be necessary to implement this order. The Secretary of Homeland Security may, consistent with applicable law, redelegate any of these functions within the Department of Homeland Security. All executive departments

and agencies shall take all appropriate measures within their authority to implement this order.

**Sec. 5**. The Secretary of Homeland Security, in coordination with the Secretary of the Treasury, the Attorney General, the Secretary of Commerce, the Assistant to the President for National Security Affairs, and the Assistant to the President for Homeland Security, is hereby authorized to submit recurring and final reports to the Congress on the national emergency under IEEPA declared in this order, consistent with section 401(c) of the NEA (50 U.S.C. 1641(c)) and section 204(c) of IEEPA (50 U.S.C. 1703(c)).

**Sec. 6**. *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department, agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
*February 1, 2025.*

[FR Doc. 2025–02406
Filed 2–6–25; 8:45 am]
Billing code 3395–F4–P

Exhibit 4

# Presidential Documents

Executive Order 14194 of February 1, 2025

## Imposing Duties To Address the Situation at Our Southern Border

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the International Emergency Economic Powers Act (50 U.S.C. 1701 *et seq.*) (IEEPA), the National Emergencies Act (50 U.S.C. 1601 *et seq.*) (NEA), section 604 of the Trade Act of 1974, as amended (19 U.S.C. 2483), and section 301 of title 3, United States Code,

I, DONALD J. TRUMP, President of the United States of America, find that the sustained influx of illegal aliens and illicit opioids and other drugs has profound consequences on our Nation, endangering lives and putting a severe strain on our healthcare system, public services, communities, and schools. Since the end of my first term, U.S. Customs and Border Protection (CBP) within the Department of Homeland Security has recorded more than three times as many inadmissible encounters nationwide as during my first term.

These challenges threaten the fabric of our society. Gang members, smugglers, human traffickers, and illicit drugs of all kinds have poured across our borders and into our communities. Mexico has played a central role in these challenges, including by failing to devote sufficient attention and resources to meaningfully stem the tide of unlawful migration and illicit drugs.

Mexican drug trafficking organizations (DTOs) are the world's leading traffickers of fentanyl, methamphetamine, cocaine, and other illicit drugs, and they cultivate, process, and distribute massive quantities of narcotics that fuel addiction and violence in communities across the United States. These DTOs collaborate and conspire with transnational cartels and other global partners to smuggle drugs into the United States, utilizing clandestine airstrips, maritime routes, tunnels, and overland corridors, and both willing and unwilling human couriers.

The Mexican DTOs have an intolerable alliance with the government of Mexico. This alliance endangers the national security of the United States, and we must eradicate the influence of these dangerous cartels from the bilateral environment. The government of Mexico has afforded safe havens for the cartels to engage in the manufacturing and transportation of illicit drugs, which collectively have led to the overdose deaths of hundreds of thousands of American victims.

Mexican cartels are also implicated in human trafficking and smuggling operations, enabling the illegal migration of millions across our borders. These operations are often tied to organized crime, and they create pathways for cartel activities to expand into the United States. Furthermore, violent criminals originating from Central and South America easily transit into and through Mexico, and into the United States, where they cause irreparable harm to our citizens. These dangerous criminals are involved in drug-related violence, gang activity, and other crimes that endanger the safety of American communities.

Immediate action is required to address the national emergency I declared in Proclamation 10886 of January 20, 2025 (Declaring a National Emergency at the Southern Border of the United States), and to finally end the public

health crisis caused by opioid use and addiction, which will not happen unless the compliance and cooperation of the government of Mexico is assured.

I hereby determine and order:

**Section 1.** (a) As President of the United States, my highest duty is the defense of the country and its citizens. A Nation without borders is not a Nation at all. I will not stand by and allow our sovereignty to be eroded, our laws to be trampled, our citizens to be endangered, or our borders to be disrespected anymore.

I previously declared a national emergency with respect to the grave threat to the United States posed by the influx of illegal aliens and illicit drugs into the United States in Proclamation 10886. Pursuant to the NEA, I hereby expand the scope of the national emergency declared in that proclamation to cover the failure of Mexico to arrest, seize, detain, or otherwise intercept DTOs, other drug and human traffickers, criminals at large, and illicit drugs. In addition, this failure to act on the part of the government of Mexico constitutes an unusual and extraordinary threat, which has its source in substantial part outside the United States, to the national security, foreign policy, and economy of the United States. I hereby declare and reiterate a national emergency under the NEA and IEEPA to deal with that threat. This national emergency requires decisive and immediate action, and I have decided to impose, consistent with law, ad valorem tariffs on articles that are products of Mexico as set forth in this order. In doing so, I invoke my authority under section 1702(a)(1)(B) of IEEPA, and specifically find that action under other authority to impose tariffs is inadequate to address this unusual and extraordinary threat.

**Sec. 2.** (a) All articles that are products of Mexico, as defined by the *Federal Register* notice described in section 2(d) of this order (the *Federal Register* notice), shall be, consistent with law, subject to an additional 25 percent ad valorem rate of duty. Such rate of duty shall apply with respect to goods entered for consumption, or withdrawn from warehouse for consumption, on or after 12:01 a.m. eastern time on February 4, 2025, except that goods entered for consumption, or withdrawn from warehouse for consumption, after such time that were loaded onto a vessel at the port of loading or in transit on the final mode of transport prior to entry into the United States before 12:01 a.m. eastern time on February 1, 2025, shall not be subject to such additional duty, only if the importer certifies to CBP as specified in the *Federal Register* notice.

(b) The rates of duty established by this order are in addition to any other duties, fees, exactions, or charges applicable to such imported articles.

(c) Should the government of Mexico retaliate against the United States in response to this action through import duties on United States exports to Mexico or similar measures, the President may increase or expand in scope the duties imposed under this Executive Order to ensure the efficacy of this action.

(d) In order to establish the duty rate on imports of articles that are products of Mexico, the Secretary of Homeland Security shall determine the modifications necessary to the Harmonized Tariff Schedule of the United States (HTSUS) in order to effectuate this order consistent with law and shall make such modifications to the HTSUS through notice in the *Federal Register*. The modifications made to the HTSUS by this notice shall be effective with respect to goods entered for consumption, or withdrawn from warehouse for consumption, on or after 12:01 a.m. eastern time on February 4, 2025, except as otherwise noted in subsection 2(a) of this section, and shall continue in effect until such actions are expressly reduced, modified, or terminated.

(e) Articles that are products of Mexico, except those that are eligible for admission under "domestic status" as defined in 19 CFR 146.43, which are subject to the duties imposed by this order and are admitted into a

United States foreign trade zone on or after 12:01 a.m. eastern time on February 4, 2025, except as otherwise noted in subsection 2(a) of this section, must be admitted as ''privileged foreign status'' as defined in 19 CFR 146.41. Such articles will be subject upon entry for consumption to the rates of duty related to the classification under the applicable HTSUS subheading in effect at the time of admittance into the United States foreign trade zone.

(f) No drawback shall be available with respect to the duties imposed pursuant to this order.

(g) For avoidance of doubt, duty-free *de minimis* treatment under 19 U.S.C. 1321 shall not be available for the articles described in subsection (a) of this section.

(h) Any prior Presidential Proclamation, Executive Order, or other presidential directive or guidance related to trade with Mexico that is inconsistent with the direction in this order is hereby terminated, suspended, or modified to the extent necessary to give full effect to this order.

(i) The articles described in subsection (a) of this section shall exclude those encompassed by 50 U.S.C. 1702(b).

**Sec. 3.** (a) The Secretary of Homeland Security shall regularly consult with the Secretary of State, the Attorney General, the Assistant to the President for National Security Affairs, and the Assistant to the President for Homeland Security on the situation at our southern border. The Secretary of Homeland Security shall inform the President of any circumstances that, in the opinion of the Secretary of Homeland Security, indicate that the government of Mexico has taken adequate steps to alleviate the illegal migration and illicit drug crisis through cooperative actions. Upon the President's determination of sufficient action to alleviate the crisis, the tariffs described in section 2 of this order will be removed.

(b) The Secretary of Homeland Security, in coordination with the Secretary of State, the Attorney General, the Assistant to the President for National Security Affairs, and the Assistant to the President for Homeland Security shall recommend additional action, if necessary, should the government of Mexico fail to take adequate steps to alleviate the illegal migration and illicit drug crises through cooperative enforcement actions.

**Sec. 4.** The Secretary of Homeland Security, in consultation with the Secretary of the Treasury, the Attorney General, and the Secretary of Commerce, is hereby authorized to take such actions, including adopting rules and regulations, and to employ all powers granted to me by IEEPA as may be necessary to implement this order. The Secretary of Homeland Security may, consistent with applicable law, redelegate any of these functions within the Department of Homeland Security. All agencies shall take all appropriate measures within their authority to implement this order.

**Sec. 5.** The Secretary of Homeland Security, in coordination with the Secretary of the Treasury, the Attorney General, the Secretary of Commerce, the Assistant to the President for National Security Affairs, and the Assistant to the President for Homeland Security, is hereby authorized to submit recurring and final reports to the Congress on the national emergency under IEEPA declared in this order, consistent with section 401(c) of the NEA (50 U.S.C. 1641(c)) and section 204(c) of IEEPA (50 U.S.C. 1703(c)).

**Sec. 6.** *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department, agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
*February 1, 2025.*

[FR Doc. 2025–02407
Filed 2–6–25; 8:45 am]
Billing code 3395–F4–P

# Exhibit 5

## Presidential Documents

Executive Order 14195 of February 1, 2025

## Imposing Duties To Address the Synthetic Opioid Supply Chain in the People's Republic of China

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the International Emergency Economic Powers Act (50 U.S.C. 1701 *et seq.*) (IEEPA), the National Emergencies Act (50 U.S.C. 1601 *et seq.*) (NEA), section 604 of the Trade Act of 1974, as amended (19 U.S.C. 2483), and section 301 of title 3, United States Code,

I, DONALD J. TRUMP, President of the United States of America, find that the sustained influx of synthetic opioids has profound consequences on our Nation, including by killing approximately two hundred Americans per day, putting a severe strain on our healthcare system, ravaging our communities, and destroying our families. Synthetic opioid overdose is the leading cause of death for people aged 18 to 45 in the United States.

During my first term, I took steps to end the direct flow of fentanyl and other synthetic opioids from the People's Republic of China (PRC) to the United States. Since then, the Chinese Communist Party (CCP), which exerts ultimate control over the government and enterprises of the PRC, has subsidized and otherwise incentivized PRC chemical companies to export fentanyl and related precursor chemicals that are used to produce synthetic opioids sold illicitly in the United States.

Furthermore, the PRC provides support to and safe haven for PRC-origin transnational criminal organizations (TCOs) that launder the revenues from the production, shipment, and sale of illicit synthetic opioids. These PRC-origin TCOs coordinate and communicate using PRC social media software applications in the conduct of their business.

Many PRC-based chemical companies also go to great lengths to evade law enforcement and hide illicit substances in the flow of legitimate commerce. Some of the techniques employed by these PRC-based companies to conceal the true contents of the parcels and the identity of the distributors include the use of re-shippers in the United States, false invoices, fraudulent postage, and deceptive packaging. While more than 500,000 pounds of drugs have been seized at the southern border each of the last 3 fiscal years, in addition, more than 42,000 pounds of drugs have been seized at the northern border each year on average over the last 3 years. Illicit drugs kill tens of thousands of Americans each year, including 75,000 deaths per year attributed to fentanyl alone.

The influx of these drugs to our Nation threatens the fabric of our society. The PRC plays a central role in this challenge, not merely by failing to stem the ultimate source of many illicit drugs distributed in the United States, but by actively sustaining and expanding the business of poisoning our citizens.

The flow of contraband drugs like fentanyl to the United States through illicit distribution networks has created a national emergency, including a public health crisis in the United States, as outlined in the Presidential Memorandum of January 20, 2025 (America First Trade Policy), Proclamation 10886 of January 20, 2025 (Declaring a National Emergency at the Southern Border of the United States), and Executive Order 14157 of January 20,

2025 (Designating Cartels and Other Organizations as Foreign Terrorist Organizations and Specially Designated Global Terrorists).

Despite multiple attempts to resolve this crisis at its root source through bilateral dialogue, PRC officials have failed to follow through with the decisive actions needed to stem the flow of precursor chemicals to known criminal cartels and shut down the money laundering TCOs. The PRC implements the most sophisticated domestic surveillance network coupled with the most comprehensive domestic law enforcement apparatus in the world. The PRC also routinely exerts extraterritorial reach across the globe to threaten, harass, and suppress what it views as political dissent. As such, the CCP does not lack the capacity to severely blunt the global illicit opioid epidemic; it simply is unwilling to do so.

Immediate action is required to address the national emergency I declared and to finally end this emergency, including the public health crisis caused by opioid use and addiction, which will not happen until the full compliance and cooperation of the PRC government is assured.

I hereby determine and order:

**Section 1.** (a) As President of the United States, my highest duty is the defense of the country and its citizens. I will not stand by and allow our citizens to be poisoned, our laws to be trampled, our communities to be ravaged, or our families to be destroyed.

I previously declared a national emergency with respect to the grave threat to the United States posed by the influx of illegal aliens and drugs into the United States in Proclamation 10886. Pursuant to the NEA, I hereby expand the scope of the national emergency declared in that proclamation to cover the failure of the PRC government to arrest, seize, detain, or otherwise intercept chemical precursor suppliers, money launderers, other TCOs, criminals at large, and drugs. In addition, this failure to act constitutes an unusual and extraordinary threat, which has its source in substantial part outside the United States, to the national security, foreign policy, and economy of the United States. I hereby declare and reiterate a national emergency under the NEA and IEEPA to deal with that threat. This national emergency requires decisive and immediate action, and I have decided to impose, consistent with law, ad valorem tariffs on articles that are products of the PRC as set forth in this order. In doing so, I invoke my authority under section 1702(a)(1)(B) of IEEPA, and specifically find that action under other authority to impose tariffs is inadequate to address this unusual and extraordinary threat.

**Sec. 2.** (a) All articles that are products of the PRC, as defined by the *Federal Register* notice described in section 2(d) of this order (the *Federal Register* notice), shall be, consistent with law, subject to an additional 10 percent ad valorem rate of duty. Such rate of duty shall apply with respect to goods entered for consumption, or withdrawn from warehouse for consumption, on or after 12:01 a.m. eastern time on February 4, 2025, except that goods entered for consumption, or withdrawn from warehouse for consumption, after such time that were loaded onto a vessel at the port of loading or in transit on the final mode of transport prior to entry into the United States before 12:01 a.m. eastern time on February 1, 2025, shall not be subject to such additional duty, only if the importer certifies to U.S. Customs and Border Protection within the Department of Homeland Security as specified in the *Federal Register* notice.

(b) The rates of duty established by this order are in addition to any other duties, fees, exactions, or charges applicable to such imported articles.

(c) Should the PRC retaliate against the United States in response to this action through import duties on United States exports to the PRC or similar measures, the President may increase or expand in scope the duties imposed under this Executive Order to ensure the efficacy of this action.

(d) In order to establish the duty rate on imports of articles that are products of the PRC, the Secretary of Homeland Security shall determine the modifications necessary to the Harmonized Tariff Schedule of the United States (HTSUS) in order to effectuate the objectives of this order consistent with law and shall make such modifications to the HTSUS through notice in the *Federal Register.* The modifications made to the HTSUS by this notice shall be effective with respect to goods entered for consumption, or withdrawn from warehouse for consumption, on or after 12:01 a.m. eastern time on February 4, 2025, except as otherwise noted in subsection 2(a) of this section, and shall continue in effect until such actions are expressly reduced, modified, or terminated.

(e) Articles that are products of the PRC, except those that are eligible for admission under "domestic status" as defined in 19 CFR 146.43, which are subject to the duties imposed by this order and are admitted into a United States foreign trade zone on or after 12:01 a.m. eastern time on February 4, 2025, except as otherwise noted in subsection 2(a) of this section, must be admitted as "privileged foreign status" as defined in 19 CFR 146.41. Such articles will be subject upon entry for consumption to the rates of duty related to the classification under the applicable HTSUS subheading in effect at the time of admittance into the United States foreign trade zone.

(f) No drawback shall be available with respect to the duties imposed pursuant to this order.

(g) For avoidance of doubt, duty-free *de minimis* treatment under 19 U.S.C. 1321 shall not be available for the articles described in subsection (a) of this section.

(h) Any prior Presidential Proclamation, Executive Order, or other presidential directive or guidance related to trade with the PRC that is inconsistent with the direction in this order is hereby terminated, suspended, or modified to the extent necessary to give full effect to this order.

(i) The articles described in subsection (a) of this section shall exclude those encompassed by 50 U.S.C. 1702(b).

**Sec. 3**. (a) The Secretary of Homeland Security shall regularly consult with the Secretary of State, the Attorney General, the Assistant to the President for National Security Affairs, the Attorney General, and the Assistant to the President for Homeland Security on the situation regarding the PRC. The Secretary of Homeland Security shall inform the President of any circumstances that, in the opinion of the Secretary of Homeland Security, indicate that the PRC government has taken adequate steps to alleviate the opioid crisis through cooperative actions. Upon the President's determination of sufficient action to alleviate the crisis, the tariffs described in section 2 of this order will be removed.

(b) The Secretary of Homeland Security, in coordination with the Secretary of State, the Attorney General, the Assistant to the President for National Security Affairs, and the Assistant to the President for Homeland Security, shall recommend additional action, if necessary, should the PRC fail to take adequate steps to alleviate the illicit drug crisis through cooperative enforcement actions.

**Sec. 4**. The Secretary of Homeland Security, in consultation with the Secretary of the Treasury, the Attorney General, and the Secretary of Commerce, is hereby authorized to take such actions, including adopting rules and regulations, and to employ all powers granted to the President by IEEPA as may be necessary to implement this order. The Secretary of Homeland Security may, consistent with applicable law, redelegate any of these functions within the Department of Homeland Security. All executive departments and agencies shall take all appropriate measures within their authority to implement this order.

**Sec. 5**. The Secretary of Homeland Security, in coordination with the Secretary of the Treasury, the Secretary of Commerce, the Assistant to the

President for National Security Affairs, the Attorney General, and the Assistant to the President for Homeland Security, is hereby authorized to submit recurring and final reports to the Congress on the national emergency under IEEPA declared in this order, consistent with section 401(c) of the NEA (50 U.S.C. 1641(c)) and section 204(c) of IEEPA (50 U.S.C. 1703(c)).

**Sec. 6.** *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department, agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
*February 1, 2025.*

[FR Doc. 2025–02408
Filed 2–6–25; 8:45 am]
Billing code 3395–F4–P

Exhibit 6

*The* WHITE HOUSE

FACT SHEETS

Fact Sheet: President Donald J. Trump Imposes Tariffs on Imports from Canada, Mexico and China

The White House

February 1, 2025

**ADDRESSING AN EMERGENCY SITUATION**: The extraordinary threat posed by illegal aliens and drugs, including deadly fentanyl, constitutes a national emergency under the International Emergency Economic Powers Act (IEEPA).

- Until the crisis is alleviated, President Donald J. Trump is implementing a 25% additional tariff on imports from Canada and Mexico and a 10% additional tariff on imports from China.  Energy resources from Canada will have a lower 10% tariff.

- President Trump is taking bold action to hold Mexico, Canada, and China accountable to their promises of halting illegal immigration and stopping poisonous fentanyl and other drugs from flowing into our country.

- The orders make clear that the flow of contraband drugs like fentanyl to the United States, through illicit distribution networks, has created a national emergency, including a public health crisis. Chinese officials have failed to take the actions necessary to stem the flow of precursor chemicals to known criminal cartels and shut down money laundering by transnational criminal organizations.

  - In addition, the Mexican drug trafficking organizations have an intolerable alliance with the government of Mexico. The government of Mexico has afforded safe havens for the cartels to engage in the manufacturing and transportation of dangerous narcotics, which collectively have led to the overdose deaths of hundreds of thousands of American victims. This alliance endangers the national security of the United States, and we must eradicate the influence of these dangerous cartels.

  - There is also a growing presence of Mexican cartels operating fentanyl and nitazene synthesis labs in Canada.  A recent study recognized Canada's

5/2/25, 2:13 PM  Fact Sheet: President Donald J. Trump Imposes Tariffs on Imports from Canada, Mexico and China – The White House

Case 3:25-cv-00464-TKW-ZCB  Document 30-1  Filed 05/05/25  Page 33 of 201

heightened domestic production of fentanyl, and its growing footprint within international narcotics distribution

**USING OUR LEVERAGE TO ENSURE AMERICANS' SAFETY**: Previous Administrations failed to fully leverage America's economic position as a tool to secure our borders against illegal migration and combat the scourge of fentanyl, preferring to let problems fester.

- Access to the American market is a privilege. The United States has one of the most open economies in the world, and the lowest average tariff rates in the world.

- While trade accounts for 67% of Canada's GDP, 73% of Mexico's GDP, and 37% of China's GDP, it accounts for only 24% of U.S. GDP. However, in 2023 the U.S. trade deficit in goods was the world's largest at over $1 trillion.

- Tariffs are a powerful, proven source of leverage for protecting the national interest.  President Trump is using the tools at hand and taking decisive action that puts Americans' safety and our national security first.

- Though previous Administrations have failed to leverage America's combination of exceptional strength and its unique role in world trade to advance the security interests of the American people, President Trump has not.

**PRESIDENT TRUMP IS KEEPING HIS PROMISE TO STOP THE FLOOD OF ILLEGAL ALIENS AND DRUGS:** When voters overwhelmingly elected Donald J. Trump as President, they gave him a mandate to seal the border. That is exactly what he is doing.

- The Biden Administration's policies have fueled the worst border crisis in U.S. history.

- More than 10 million illegal aliens attempted to enter the United States under Biden's leadership, including a rising number of Chinese nationals and people on the terror watchlist.

- This problem is not confined to the southern border – encounters at the northern border with Canada are rising as well.

- The sustained influx of illegal aliens has profound consequences on every aspect of our national life – overwhelming our schools, lowering our wages, reducing our housing supply and raising rents, overcrowding our hospitals, draining our welfare system, and causing crime.

5/2/25, 2:13 PM   Fact Sheet: President Donald J. Trump Imposes Tariffs on Imports from Canada, Mexico and China – The White House

Case 3:25-cv-00464-TKW-ZGB   Document 20-1   Filed 05/05/25   Page 34 of 201

- Gang members, smugglers, human traffickers, and illegal drugs and narcotics of all kinds are pouring across our borders and into our communities.
  - Last fiscal year, Customs and Border Protection (CBP) apprehended more than 21,000 pounds of fentanyl at our borders, enough fentanyl to kill more than 4 billion people.
  - It is estimated that federal officials are only able to seize a fraction of the fentanyl smuggled across the southern border.

- These drugs kill tens of thousands of Americans each year, including 75,000 deaths per year attributed to fentanyl alone.
  - More Americans are dying from fentanyl overdoses each year than the number of American lives lost in the entirety of the Vietnam War.

**BUILDING ON PAST SUCCESS**: President Trump continues to demonstrate his commitment to ensuring U.S. trade policy serves the national interest.

- As President Trump said in the Presidential Memorandum on American First Trade Policy, trade policy is a critical component in national security.

- President Trump promised in November to "sign all necessary documents to charge Mexico and Canada a 25% Tariff on ALL products coming into the United States, and its ridiculous Open Borders. This Tariff will remain in effect until such time as Drugs, in particular Fentanyl, and all Illegal Aliens stop this Invasion of our Country!"

- During his first term as President of the United States, President Trump established the President's Commission on Combating Drug Addiction and the Opioid Crisis and declared the Opioid Crisis a public health emergency.

- President Trump also has a long record of putting America first on trade. In his first term, President Trump successfully used threats of tariffs on Mexico to help secure our border.

- When our national security was threatened by a global oversupply of steel and aluminum, President Trump took swift action to protect America's national security by implementing tariffs on imports of these goods.

- In response to China's intellectual property theft, forced technology transfer, and other unreasonable behavior, President Trump acted with conviction to impose

tariffs on imports from China, using that leverage to reach a historic bilateral economic agreement.

- Just last week, President Trump leveraged tariffs to successfully resolve national security concerns with Colombia, swiftly reaching an outcome that prioritizes the safety and security of the American people and the sanctity of our national borders.

NEWS

ADMINISTRATION

ISSUES

CONTACT

EOP

VISIT

GALLERY

VIDEO LIBRARY

AMERICA 250

FOUNDING FATHERS



Subscribe to The White House newsletter

Your email                                          SIGN UP

5/2/25, 2:13 PM
Fact Sheet: President Donald J. Trump Imposes Tariffs on Imports from Canada, Mexico and China – The White House

Case 3:25-cv-00464-TKW-ZGB    Document 30-1    Filed 05/05/25    Page 36 of 201

THE WHITE HOUSE

1600 Pennsylvania Ave NW
Washington, DC 20500

WH.GOV

Copyright

Privacy



Exhibit 7

PRESIDENTIAL ACTIONS

## IMPOSING DUTIES TO ADDRESS THE FLOW OF ILLICIT DRUGS ACROSS OUR NORTHERN BORDER

The White House

February 1, 2025

By the authority vested in me as President by the Constitution and the laws of the

*The* WHITE HOUSE

(NEA), section 604 of the Trade Act of 1974, as amended (19 U.S.C. 2483), and section 301 of title 3, United States Code,

I, DONALD J. TRUMP, President of the United States of America, find that the sustained influx of illicit opioids and other drugs has profound consequences on our Nation, endangering lives and putting a severe strain on our healthcare system, public services, and communities.

This challenge threatens the fabric of our society.  Gang members, smugglers, human traffickers, and illicit drugs of all kinds have poured across our borders and into our communities.  Canada has played a central role in these challenges, including by failing to devote sufficient attention and resources or meaningfully coordinate with United States law enforcement partners to effectively stem the tide of illicit drugs.

Drug trafficking organizations (DTOs) are the world's leading producers of fentanyl, methamphetamine, cocaine, and other illicit drugs, and they cultivate, process, and distribute massive quantities of narcotics that fuel addiction and violence in communities across the United States.  These DTOs often collaborate with transnational

cartels to smuggle illicit drugs into the United States, utilizing clandestine airstrips, maritime routes, and overland corridors.

The challenges at our southern border are foremost in the public consciousness, but our northern border is not exempt from these issues.  Criminal networks are implicated in human trafficking and smuggling operations, enabling unvetted illegal migration across our northern border.  There is also a growing presence of Mexican cartels operating fentanyl and nitazene synthesis labs in Canada.  The flow of illicit drugs like fentanyl to the United States through both illicit distribution networks and international mail — due, in the case of the latter, to the existing administrative exemption from duty and taxes, also known as *de minimis*, under section 1321 of title 19, United States Code — has created a public health crisis in the United States, as outlined in the Presidential Memorandum of January 20, 2025 (America First Trade Policy) and Executive Order 14157 of January 20, 2025 (Designating Cartels and Other Organizations as Foreign Terrorist Organizations and Specially Designated Global Terrorists).  With respect to smuggling of illicit drugs across our northern border, Canada's Financial Transactions and Reports Analysis Centre recently published a study on the laundering of proceeds of illicit synthetic opioids, which recognized Canada's heightened domestic production of fentanyl, largely from British Columbia, and its growing footprint within international narcotics distribution.  Despite a North American dialogue on the public health impacts of illicit drugs since 2016, Canadian officials have acknowledged that the problem has only grown.  And while U.S. Customs and Border Protection (CBP) within the Department of Homeland Security seized, comparatively, much less fentanyl from Canada than from Mexico last year, fentanyl is so potent that even a very small parcel of the drug can cause many deaths and destruction to America families.  In fact, the amount of fentanyl that crossed the northern border last year could kill 9.5 million Americans.

Immediate action is required to finally end this public health crisis and national emergency, which will not happen unless the compliance and cooperation of Canada is assured.

I hereby determine and order:

  Section 1.  (a)  As President of the United States, my highest duty is the defense of the country and its citizens.  A Nation without borders is not a nation at all.  I will not stand by and allow our sovereignty to be eroded, our laws to be trampled, our citizens to be endangered, or our borders to be disrespected anymore.

I previously declared a national emergency with respect to the grave threat to the United States posed by the influx of illegal aliens and illicit drugs into the United States in Proclamation 10886 of January 20, 2025 (Declaring a National Emergency at the Southern Border).  Pursuant to the NEA, I hereby expand the scope of the national emergency declared in that Proclamation to cover the threat to the safety and security of Americans, including the public health crisis of deaths due to the use of fentanyl and other illicit drugs, and the failure of Canada to do more to arrest, seize, detain, or otherwise intercept DTOs, other drug and human traffickers, criminals at large, and drugs.  In addition, this failure to act on the part of Canada constitutes an unusual and extraordinary threat, which has its source in substantial part outside the United States, to the national security and foreign policy of the United States.  I hereby declare and reiterate a national emergency under the NEA and IEEPA to deal with that threat.  This national emergency requires decisive and immediate action, and I have decided to impose, consistent with law, ad valorem tariffs on articles that are products of Canada set forth in this order.  In doing so, I invoke my authority under section 1702(a)(1)(B) of IEEPA and specifically find that action under other authority to impose tariffs is inadequate to address this unusual and extraordinary threat.

  Sec. 2.  (a)  All articles that are products of Canada as defined by the *Federal Register* notice described in subsection (e) of this section (*Federal Register* notice), and except for those products described in subsection (b) of this section, shall be, consistent with law, subject to an additional 25 percent ad valorem rate of duty.  Such rate of duty shall apply with respect to goods entered for consumption, or withdrawn from warehouse for consumption, on or after 12:01 a.m. eastern time on February 4, 2025, except that goods entered for consumption, or withdrawn from warehouse for consumption, after such time that were loaded onto a vessel at the port of loading or in transit on the final mode of transport prior to entry into the United States before 12:01 a.m. eastern time on February 1, 2025, shall not be subject to such additional duty, only if the importer certifies to CBP as specified in the *Federal Register* notice.

(b)  With respect to energy or energy resources, as defined in section 8 of Executive Order 14156 of January 20, 2025 (Declaring a National Energy Emergency), and as otherwise included in the *Federal Register* notice, such articles that are products of Canada as defined by the *Federal Register* notice shall be, consistent with law, subject to an additional 10 percent ad valorem rate of duty.  Such rate of duty shall apply with respect to goods entered for consumption, or withdrawn from warehouse for

consumption, on or after 12:01 a.m. eastern time on February 4, 2025, except that goods entered for consumption, or withdrawn from warehouse for consumption, after such time that were loaded onto a vessel at the port of loading or in transit on the final mode of transport prior to entry into the United States before 12:01 a.m. eastern time on February 1, 2025, shall not be subject to such additional duty, only if the importer certifies to CBP as specified in the *Federal Register* notice.

(c)  The rates of duty established by this order are in addition to any other duties, fees, exactions, or charges applicable to such imported articles.

(d)  Should Canada retaliate against the United States in response to this action through import duties on United States exports to Canada or similar measures, the President may increase or expand in scope the duties imposed under this order to ensure the efficacy of this action.

(e)  In order to establish the duty rate on imports of articles that are products of Canada, the Secretary of Homeland Security shall determine the modifications necessary to the Harmonized Tariff Schedule of the United States (HTSUS) in order to effectuate this order consistent with law and shall make such modifications to the HTSUS through notice in the *Federal Register*.  The modifications made to the HTSUS by this notice shall be effective with respect to goods entered for consumption, or withdrawn from warehouse for consumption, on or after 12:01 a.m. eastern time on February 4, 2025, and shall continue in effect until such actions are expressly reduced, modified, or terminated.

(f)  Articles that are products of Canada, except those that are eligible for admission under "domestic status" as defined in 19 CFR 146.43, which are subject to the duties imposed by this order and are admitted into a United States foreign trade zone on or after 12:01 a.m. eastern time on February 4, 2025, except as otherwise noted in subsections (a) and (b) of this section, must be admitted as "privileged foreign status" as defined in 19 CFR 146.41.  Such articles will be subject upon entry for consumption to the rates of duty related to the classification under the applicable HTSUS subheading in effect at the time of admittance into the United States foreign trade zone.

(g)  No drawback shall be available with respect to the duties imposed pursuant to this order.

(h)  For avoidance of doubt, duty-free *de minimis* treatment under 19 U.S.C. 1321 shall not be available for the articles described in subsection (a) and subsection (b) of this section.

(i)  Any prior Presidential Proclamation, Executive Order, or other Presidential directive or guidance related to trade with Canada that is inconsistent with the direction in this order is hereby terminated, suspended, or modified to the extent necessary to give full effect to this order.

(j)  The articles described in subsection (a) and subsection (b) of this section shall exclude those encompassed by 50 U.S.C. 1702(b).

Sec. 3.  (a)  The Secretary of Homeland Security shall regularly consult with the Secretary of State, the Attorney General, the Assistant to the President for National Security Affairs, and the Assistant to the President for Homeland Security on the situation at our northern border.  The Secretary of Homeland Security shall inform the President of any circumstances that, in the opinion of the Secretary of Homeland Security, indicate that the Government of Canada has taken adequate steps to alleviate this public health crisis through cooperative enforcement actions.  Upon the President's determination of sufficient action to alleviate the crisis, the tariffs described in section 2 of this order shall be removed.

(b)  The Secretary of Homeland Security, in coordination with the Secretary of State, the Attorney General, the Assistant to the President for National Security Affairs, and the Assistant to the President for Homeland Security, shall recommend additional action, if necessary, should the Government of Canada fail to take adequate steps to alleviate the illegal migration and illicit drug crises through cooperative enforcement actions.

Sec. 4.  The Secretary of Homeland Security, in consultation with the Secretary of the Treasury, the Attorney General, and the Secretary of Commerce, is hereby authorized to take such actions, including adopting rules and regulations, and to employ all powers granted to the President by IEEPA as may be necessary to implement this order.  The Secretary of Homeland Security may, consistent with applicable law, redelegate any of these functions within the Department of Homeland Security.  All executive departments and agencies shall take all appropriate measures within their authority to implement this order.

Sec. 5.  The Secretary of Homeland Security, in coordination with the Secretary of the Treasury, the Attorney General, the Secretary of Commerce, the Assistant to the President for National Security Affairs, and the Assistant to the President for Homeland Security, is hereby authorized to submit recurring and final reports to the Congress on the national emergency under IEEPA declared in this order, consistent with section 401(c) of the NEA (50 U.S.C. 1641(c)) and section 204(c) of IEEPA (50 U.S.C. 1703(c)).

 Sec. 6.  General Provisions.  (a)  Nothing in this order shall be construed to impair or otherwise affect:

(i)   the authority granted by law to an executive department, agency, or the head thereof; or

(ii)  the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b)  This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c)  This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,

   February 1, 2025.

NEWS

ADMINISTRATION

ISSUES

CONTACT

EOP

VISIT

GALLERY

VIDEO LIBRARY

AMERICA 250

FOUNDING FATHERS



Subscribe to The White House newsletter

| Your email | SIGN UP |
|---|---|

THE WHITE HOUSE

1600 Pennsylvania Ave NW
Washington, DC 20500

WH.GOV

Copyright

Privacy



# Exhibit 8

*The* WHITE HOUSE

PRESIDENTIAL ACTIONS

Imposing Duties to Address the Situation at Our Southern Border

The White House

February 1, 2025

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the International Emergency Economic Powers Act (50 U.S.C. 1701 *et seq*.) (IEEPA), the National Emergencies Act (50 U.S.C. 1601 *et seq*.) (NEA), section 604 of the Trade Act of 1974, as amended (19 U.S.C. 2483), and section 301 of title 3, United States Code,

I, DONALD J. TRUMP, President of the United States of America, find that the sustained influx of illegal aliens and illicit opioids and other drugs has profound consequences on our Nation, endangering lives and putting a severe strain on our healthcare system, public services, communities, and schools.  Since the end of my first term, U.S. Customs and Border Protection (CBP) within the Department of Homeland Security has recorded more than three times as many inadmissible encounters nationwide as during my first term.

These challenges threaten the fabric of our society.  Gang members, smugglers, human traffickers, and illicit drugs of all kinds have poured across our borders and into our communities.  Mexico has played a central role in these challenges, including by failing to devote sufficient attention and resources to meaningfully stem the tide of unlawful migration and illicit drugs.

Mexican drug trafficking organizations (DTOs) are the world's leading traffickers of

fentanyl, methamphetamine, cocaine, and other illicit drugs, and they cultivate, process, and distribute massive quantities of narcotics that fuel addiction and violence in communities across the United States.  These DTOs collaborate and conspire with transnational cartels and other global partners to smuggle drugs into the United States, utilizing clandestine airstrips, maritime routes, tunnels, and overland corridors, and both willing and unwilling human couriers.

The Mexican DTOs have an intolerable alliance with the government of Mexico. This alliance endangers the national security of the United States, and we must eradicate the influence of these dangerous cartels from the bilateral environment. The government of Mexico has afforded safe havens for the cartels to engage in the manufacturing and transportation of illicit drugs, which collectively have led to the overdose deaths of hundreds of thousands of American victims.

Mexican cartels are also implicated in human trafficking and smuggling operations, enabling the illegal migration of millions across our borders.  These operations are often tied to organized crime, and they create pathways for cartel activities to expand into the United States.  Furthermore, violent criminals originating from Central and South America easily transit into and through Mexico, and into the United States, where they cause irreparable harm to our citizens.  These dangerous criminals are involved in drug-related violence, gang activity, and other crimes that endanger the safety of American communities.

Immediate action is required to address the national emergency I declared in Proclamation 10886 of January 20, 2025 (Declaring a National Emergency at the Southern Border of the United States), and to finally end the public health crisis caused by opioid use and addiction, which will not happen unless the compliance and cooperation of the government of Mexico is assured.

I hereby determine and order:

Section 1.  (a)  As President of the United States, my highest duty is the defense of the country and its citizens.  A Nation without borders is not a Nation at all.  I will not stand by and allow our sovereignty to be eroded, our laws to be trampled, our citizens to be endangered, or our borders to be disrespected anymore.

I previously declared a national emergency with respect to the grave threat to the

United States posed by the influx of illegal aliens and illicit drugs into the United States in Proclamation 10886.  Pursuant to the NEA, I hereby expand the scope of the national emergency declared in that proclamation to cover the failure of Mexico to arrest, seize, detain, or otherwise intercept DTOs, other drug and human traffickers, criminals at large, and illicit drugs.  In addition, this failure to act on the part of the government of Mexico constitutes an unusual and extraordinary threat, which has its source in substantial part outside the United States, to the national security, foreign policy, and economy of the United States.  I hereby declare and reiterate a national emergency under the NEA and IEEPA to deal with that threat.  This national emergency requires decisive and immediate action, and I have decided to impose, consistent with law, ad valorem tariffs on articles that are products of Mexico as set forth in this order.  In doing so, I invoke my authority under section 1702(a)(1)(B) of IEEPA, and specifically find that action under other authority to impose tariffs is inadequate to address this unusual and extraordinary threat.

Sec. 2.  (a)  All articles that are products of Mexico, as defined by the *Federal Register* notice described in section 2(d) of this order (the *Federal Register* notice), shall be, consistent with law, subject to an additional 25 percent ad valorem rate of duty.  Such rate of duty shall apply with respect to goods entered for consumption, or withdrawn from warehouse for consumption, on or after 12:01 a.m. eastern time on February 4, 2025, except that goods entered for consumption, or withdrawn from warehouse for consumption, after such time that were loaded onto a vessel at the port of loading or in transit on the final mode of transport prior to entry into the United States before 12:01 a.m. eastern time on February 1, 2025, shall not be subject to such additional duty, only if the importer certifies to CBP as specified in the *Federal Register* notice.

(b)  The rates of duty established by this order are in addition to any other duties, fees, exactions, or charges applicable to such imported articles.

(c)  Should the government of Mexico retaliate against the United States in response to this action through import duties on United States exports to Mexico or similar measures, the President may increase or expand in scope the duties imposed under this Executive Order to ensure the efficacy of this action.

(d)  In order to establish the duty rate on imports of articles that are products of Mexico, the Secretary of Homeland Security shall determine the modifications necessary to the Harmonized Tariff Schedule of the United States (HTSUS) in order to

effectuate this order consistent with law and shall make such modifications to the HTSUS through notice in the *Federal Register*.  The modifications made to the HTSUS by this notice shall be effective with respect to goods entered for consumption, or withdrawn from warehouse for consumption, on or after 12:01 a.m. eastern time on February 4, 2025, except as otherwise noted in subsection 2(a) of this section, and shall continue in effect until such actions are expressly reduced, modified, or terminated.

(e)  Articles that are products of Mexico, except those that are eligible for admission under "domestic status" as defined in 19 CFR 146.43, which are subject to the duties imposed by this order and are admitted into a United States foreign trade zone on or after 12:01 a.m. eastern time on February 4, 2025, except as otherwise noted in subsection 2(a) of this section, must be admitted as "privileged foreign status" as defined in 19 CFR 146.41.  Such articles will be subject upon entry for consumption to the rates of duty related to the classification under the applicable HTSUS subheading in effect at the time of admittance into the United States foreign trade zone.

(f)  No drawback shall be available with respect to the duties imposed pursuant to this order.

(g)  For avoidance of doubt, duty-free *de minimis* treatment under 19 U.S.C. 1321 shall not be available for the articles described in subsection (a) of this section.

(h)  Any prior Presidential Proclamation, Executive Order, or other presidential directive or guidance related to trade with Mexico that is inconsistent with the direction in this order is hereby terminated, suspended, or modified to the extent necessary to give full effect to this order.

(i)  The articles described in subsection (a) of this section shall exclude those encompassed by 50 U.S.C. 1702(b).


Sec. 3.  (a)  The Secretary of Homeland Security shall regularly consult with the Secretary of State, the Attorney General, the Assistant to the President for National Security Affairs, and the Assistant to the President for Homeland Security on the situation at our southern border.  The Secretary of Homeland Security shall inform the President of any circumstances that, in the opinion of the Secretary of Homeland Security, indicate that the government of Mexico has taken adequate steps to alleviate the illegal migration and illicit drug crisis through cooperative actions.  Upon the President's determination of sufficient action to alleviate the crisis, the tariffs described in section 2 of this order will be removed.

(b)  The Secretary of Homeland Security, in coordination with the Secretary of State, the Attorney General, the Assistant to the President for National Security Affairs, and the Assistant to the President for Homeland Security shall recommend additional action, if necessary, should the government of Mexico fail to take adequate steps to alleviate the illegal migration and illicit drug crises through cooperative enforcement actions.

Sec. 4.  The Secretary of Homeland Security, in consultation with the Secretary of the Treasury, the Attorney General, and the Secretary of Commerce, is hereby authorized to take such actions, including adopting rules and regulations, and to employ all powers granted to me by IEEPA as may be necessary to implement this order.  The Secretary of Homeland Security may, consistent with applicable law, redelegate any of these functions within the Department of Homeland Security.  All agencies shall take all appropriate measures within their authority to implement this order.

Sec. 5.  The Secretary of Homeland Security, in coordination with the Secretary of the Treasury, the Attorney General, the Secretary of Commerce, the Assistant to the President for National Security Affairs,  and the Assistant to the President for Homeland Security, is hereby authorized to submit recurring and final reports to the Congress on the national emergency under IEEPA declared in this order, consistent with section 401(c) of the NEA (50 U.S.C. 1641(c)) and section 204(c) of IEEPA (50 U.S.C. 1703(c)).

Sec. 6.  General Provisions.  (a)  Nothing in this order shall be construed to impair or otherwise affect:

(i)  the authority granted by law to an executive department, agency, or the head thereof; or

(ii)  the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b)  This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c)  This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,

  February 1, 2025.

NEWS

ADMINISTRATION

ISSUES

CONTACT

EOP

VISIT

GALLERY

VIDEO LIBRARY

AMERICA 250

FOUNDING FATHERS



Subscribe to The White House newsletter

Your email

SIGN UP

THE WHITE HOUSE

1600 Pennsylvania Ave NW
Washington, DC 20500

WH.GOV

Copyright

Privacy



# Exhibit 9

*The* WHITE HOUSE

PRESIDENTIAL ACTIONS

Imposing Duties to Address the Synthetic Opioid Supply Chain in the People's Republic of China

The White House

February 1, 2025

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the International Emergency Economic Powers Act (50 U.S.C. 1701 *et seq*.) (IEEPA), the National Emergencies Act (50 U.S.C. 1601 *et seq*.) (NEA), section 604 of the Trade Act of 1974, as amended (19 U.S.C. 2483), and section 301 of title 3, United States Code,

I, DONALD J. TRUMP, President of the United States of America, find that the sustained influx of synthetic opioids has profound consequences on our Nation, including by killing approximately two hundred Americans per day, putting a severe strain on our healthcare system, ravaging our communities, and destroying our families. Synthetic opioid overdose is the leading cause of death for people aged 18 to 45 in the United States.

During my first term, I took steps to end the direct flow of fentanyl and other synthetic opioids from the People's Republic of China (PRC) to the United States. Since then, the Chinese Communist Party (CCP), which exerts ultimate control over the government and enterprises of the PRC, has subsidized and otherwise incentivized PRC chemical companies to export fentanyl and related precursor chemicals that are used to produce synthetic opioids sold illicitly in the United States.

Furthermore, the PRC provides support to and safe haven for PRC–origin

transnational criminal organizations (TCOs) that launder the revenues from the production, shipment, and sale of illicit synthetic opioids.  These PRC-origin TCOs coordinate and communicate using PRC social media software applications in the conduct of their business.

Many PRC-based chemical companies also go to great lengths to evade law enforcement and hide illicit substances in the flow of legitimate commerce.  Some of the techniques employed by these PRC-based companies to conceal the true contents of the parcels and the identity of the distributors include the use of re-shippers in the United States, false invoices, fraudulent postage, and deceptive packaging.  While more than 500,000 pounds of drugs have been seized at the southern border each of the last 3 fiscal years, in addition, more than 42,000 pounds of drugs have been seized at the northern border each year on average over the last 3 years.  Illicit drugs kill tens of thousands of Americans each year, including 75,000 deaths per year attributed to fentanyl alone.

The influx of these drugs to our Nation threatens the fabric of our society.  The PRC plays a central role in this challenge, not merely by failing to stem the ultimate source of many illicit drugs distributed in the United States, but by actively sustaining and expanding the business of poisoning our citizens.

The flow of contraband drugs like fentanyl to the United States through illicit distribution networks has created a national emergency, including a public health crisis in the United States, as outlined in the Presidential Memorandum of January 20, 2025 (America First Trade Policy), Proclamation 10886 of January 20, 2025 (Declaring a National Emergency at the Southern Border of the United States), and Executive Order 14157 of January 20, 2025 (Designating Cartels and Other Organizations as Foreign Terrorist Organizations and Specially Designated Global Terrorists).

Despite multiple attempts to resolve this crisis at its root source through bilateral dialogue, PRC officials have failed to follow through with the decisive actions needed to stem the flow of precursor chemicals to known criminal cartels and shut down the money laundering TCOs.  The PRC implements the most sophisticated domestic surveillance network coupled with the most comprehensive domestic law enforcement

apparatus in the world.  The PRC also routinely exerts extraterritorial reach across the globe to threaten, harass, and suppress what it views as political dissent.  As such, the CCP does not lack the capacity to severely blunt the global illicit opioid epidemic; it simply is unwilling to do so.

Immediate action is required to address the national emergency I declared and to finally end this emergency, including the public health crisis caused by opioid use and addiction, which will not happen until the full compliance and cooperation of the PRC government is assured.

I hereby determine and order:

Section 1.  (a)  As President of the United States, my highest duty is the defense of the country and its citizens.  I will not stand by and allow our citizens to be poisoned, our laws to be trampled, our communities to be ravaged, or our families to be destroyed.

I previously declared a national emergency with respect to the grave threat to the United States posed by the influx of illegal aliens and drugs into the United States in Proclamation 10886.  Pursuant to the NEA, I hereby expand the scope of the national emergency declared in that proclamation to cover the failure of the PRC government to arrest, seize, detain, or otherwise intercept chemical precursor suppliers, money launderers, other TCOs, criminals at large, and drugs.  In addition, this failure to act constitutes an unusual and extraordinary threat, which has its source in substantial part outside the United States, to the national security, foreign policy, and economy of the United States.  I hereby declare and reiterate a national emergency under the NEA and IEEPA to deal with that threat.  This national emergency requires decisive and immediate action, and I have decided to impose, consistent with law, ad valorem tariffs on articles that are products of the PRC as set forth in this order.  In doing so, I invoke my authority under section 1702(a)(1)(B) of IEEPA, and specifically find that action under other authority to impose tariffs is inadequate to address this unusual and extraordinary threat.

Sec. 2.  (a)  All articles that are products of the PRC, as defined by the *Federal Register* notice described in section 2(d) of this order (the *Federal Register* notice), shall be, consistent with law, subject to an additional 10 percent ad valorem rate of duty.  Such rate of duty shall apply with respect to goods entered for consumption, or withdrawn

from warehouse for consumption, on or after 12:01 a.m. eastern time on February 4, 2025, except that goods entered for consumption, or withdrawn from warehouse for consumption, after such time that were loaded onto a vessel at the port of loading or in transit on the final mode of transport prior to entry into the United States before 12:01 a.m. eastern time on February 1, 2025, shall not be subject to such additional duty, only if the importer certifies to U.S. Customs and Border Protection within the Department of Homeland Security as specified in the *Federal Register* notice.

(b)  The rates of duty established by this order are in addition to any other duties, fees, exactions, or charges applicable to such imported articles.

(c)  Should the PRC retaliate against the United States in response to this action through import duties on United States exports to the PRC or similar measures, the President may increase or expand in scope the duties imposed under this Executive Order to ensure the efficacy of this action.

(d)  In order to establish the duty rate on imports of articles that are products of the PRC, the Secretary of Homeland Security shall determine the modifications necessary to the Harmonized Tariff Schedule of the United States (HTSUS) in order to effectuate the objectives of this order consistent with law and shall make such modifications to the HTSUS through notice in the *Federal Register*.  The modifications made to the HTSUS by this notice shall be effective with respect to goods entered for consumption, or withdrawn from warehouse for consumption, on or after 12:01 a.m. eastern time on February 4, 2025, except as otherwise noted in subsection 2(a) of this section, and shall continue in effect until such actions are expressly reduced, modified, or terminated.

(e)  Articles that are products of the PRC, except those that are eligible for admission under "domestic status" as defined in 19 CFR 146.43, which are subject to the duties imposed by this order and are admitted into a United States foreign trade zone on or after 12:01 a.m. eastern time on February 4, 2025, except as otherwise noted in subsection 2(a) of this section, must be admitted as "privileged foreign status" as defined in 19 CFR 146.41.  Such articles will be subject upon entry for consumption to the rates of duty related to the classification under the applicable HTSUS subheading in effect at the time of admittance into the United States foreign trade zone.

(f)  No drawback shall be available with respect to the duties imposed pursuant to this order.

(g)  For avoidance of doubt, duty–free *de minimis* treatment under 19 U.S.C. 1321 shall not be available for the articles described in subsection (a) of this section.

(h)  Any prior Presidential Proclamation, Executive Order, or other presidential directive or guidance related to trade with the PRC that is inconsistent with the direction in this order is hereby terminated, suspended, or modified to the extent necessary to give full effect to this order.

(i)  The articles described in subsection (a) of this section shall exclude those encompassed by 50 U.S.C. 1702(b).

Sec. 3.  (a)  The Secretary of Homeland Security shall regularly consult with the Secretary of State, the Attorney General, the Assistant to the President for National Security Affairs, the Attorney General, and the Assistant to the President for Homeland Security on the situation regarding the PRC.  The Secretary of Homeland Security shall inform the President of any circumstances that, in the opinion of the Secretary of Homeland Security, indicate that the PRC government has taken adequate steps to alleviate the opioid crisis through cooperative actions.  Upon the President's determination of sufficient action to alleviate the crisis, the tariffs described in section 2 of this order will be removed.

(b)  The Secretary of Homeland Security, in coordination with the Secretary of State, the Attorney General, the Assistant to the President for National Security Affairs, and the Assistant to the President for Homeland Security, shall recommend additional action, if necessary, should the PRC fail to take adequate steps to alleviate the illicit drug crisis through cooperative enforcement actions.

Sec. 4.  The Secretary of Homeland Security, in consultation with the Secretary of the Treasury, the Attorney General, and the Secretary of Commerce, is hereby authorized to take such actions, including adopting rules and regulations, and to employ all powers granted to the President by IEEPA as may be necessary to implement this order.  The Secretary of Homeland Security may, consistent with applicable law, redelegate any of these functions within the Department of Homeland Security.  All executive departments and agencies shall take all appropriate measures within their authority to implement this order.

Sec. 5.  The Secretary of Homeland Security, in coordination with the Secretary of the Treasury, the Secretary of Commerce, the Assistant to the President for National Security Affairs, the Attorney General, and the Assistant to the President for Homeland

Security, is hereby authorized to submit recurring and final reports to the Congress on the national emergency under IEEPA declared in this order, consistent with section 401(c) of the NEA (50 U.S.C. 1641(c)) and section 204(c) of IEEPA (50 U.S.C. 1703(c)).

Sec. 6.  General Provisions.  (a)  Nothing in this order shall be construed to impair or otherwise affect:

(i)  the authority granted by law to an executive department, agency, or the head thereof; or

(ii)  the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b)  This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
  February 1, 2025.

NEWS

ADMINISTRATION

ISSUES

CONTACT

EOP

VISIT

GALLERY

VIDEO LIBRARY

AMERICA 250

FOUNDING FATHERS



Subscribe to The White House newsletter

Your email

SIGN UP

THE WHITE HOUSE

1600 Pennsylvania Ave NW
Washington, DC 20500

WH.GOV

Copyright

Privacy



Exhibit 10

## Presidential Documents

**Executive Order 14197 of February 3, 2025**

### Progress on the Situation at Our Northern Border

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the International Emergency Economic Powers Act (50 U.S.C. 1701 *et seq.*) (IEEPA), the National Emergencies Act (50 U.S.C. 1601 *et seq.*), section 604 of the Trade Act of 1974, as amended (19 U.S.C. 2483), and section 301 of title 3, United States Code, it is hereby ordered:

**Section 1**. *Background.* On February 1, 2025, I determined that the failure of Canada to arrest, seize, detain, or otherwise intercept drug trafficking organizations, other drug and human traffickers, criminals at large, and illicit drugs constitutes an unusual and extraordinary threat, which has its source in substantial part outside the United States, to the national security, foreign policy, and economy of the United States. To address that threat, I invoked my authority under section 1702(a)(1)(B) of IEEPA to impose ad valorem tariffs on articles that are products of Canada.

**Sec. 2**. *Immediate Steps.* Pursuant to section 3 of my Executive Order of February 1, 2025, titled ''Imposing Duties to Address the Situation at Our Northern Border'' (''the Executive Order of February 1, 2025''), I have determined that the Government of Canada has taken immediate steps designed to alleviate the illegal migration and illicit drug crisis through cooperative actions. Further time is needed, however, to assess whether these steps constitute sufficient action to alleviate the crisis and resolve the unusual and extraordinary threat beyond our northern border.

**Sec. 3**. *Pause.* (a) In recognition of the steps taken by the Government of Canada, and in order to assess whether the threat described in section 1 of this order has abated, the additional 25 percent ad valorem rates of duty, and 10 percent ad valorem rates of duty as to energy products, shall be paused and will not take effect until March 4, 2025, at 12:01 a.m. eastern time. Accordingly, section 2(a), section 2(b), section 2(e), and section 2(f) of the Executive Order of February 1, 2025, are amended by striking the term ''February 4, 2025,'' where it appears in those sections and inserting in lieu thereof the term ''March 4, 2025.'' The exceptions set forth in section 2(a) and section 2(b) of the Executive Order of February 1, 2025, related to covered goods loaded onto a vessel at a port of entry or in transit on the final mode of transport prior to entry into the United States are, hereby, withdrawn.

(b) During this pause, the Secretary of Homeland Security, in consultation with the Secretary of State, the Attorney General, the Assistant to the President for National Security Affairs, and the Assistant to the President for Homeland Security shall continue to assess the situation at our northern border, as provided in section 3 of the Executive Order of February 1, 2025.

(c) If the illegal migration and illicit drug crises worsen, and if the Government of Canada fails to take sufficient steps to alleviate these crises, the President shall take necessary steps to address the situation, including by immediate implementation of the tariffs described in the Executive Order of February 1, 2025.

**Sec. 4**. *Severability.* If any provision of this order, or the application of any provision to any person or circumstance, is held to be invalid, the

remainder of this order and the application of its provisions to any other persons or circumstances shall not be affected thereby.

**Sec. 5**. *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
*February 3, 2025*.

[FR Doc. 2025–02478
Filed 2–7–25; 8:45 am]
Billing code 3395–F4–P

Exhibit 11

# Presidential Documents

Executive Order 14198 of February 3, 2025

## Progress on the Situation at Our Southern Border

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the International Emergency Economic Powers Act (50 U.S.C. 1701 *et seq.*) (IEEPA), the National Emergencies Act (50 U.S.C. 1601 *et seq.*), section 604 of the Trade Act of 1974, as amended (19 U.S.C. 2483), and section 301 of title 3, United States Code, it is hereby ordered:

**Section 1**. *Background.* On February 1, 2025, I determined that the failure of Mexico to arrest, seize, detain, or otherwise intercept Mexican drug trafficking organizations, other drug and human traffickers, criminals at large, and illicit drugs constitutes an unusual and extraordinary threat, which has its source in substantial part outside the United States, to the national security, foreign policy, and economy of the United States. To address that threat, I invoked my authority under section 1702(a)(1)(B) of IEEPA to impose ad valorem tariffs on articles that are products of Mexico.

**Sec. 2**. *Immediate Steps.* Pursuant to section 3 of my Executive Order of February 1, 2025, titled ''Imposing Duties to Address the Situation at Our Southern Border'' (''the Executive Order of February 1, 2025''), I have determined that the Government of Mexico has taken immediate steps designed to alleviate the illegal migration and illicit drug crisis through cooperative actions. Further time is needed, however, to assess whether these steps constitute sufficient action to alleviate the crisis and resolve the unusual and extraordinary threat beyond our southern border.

**Sec. 3**. *Pause.* (a) In recognition of the steps taken by the Government of Mexico, and in order to assess whether the threat described in section 1 of this order has abated, the additional 25 percent ad valorem rate of duty shall be paused and will not take effect until March 4, 2025, at 12:01 a.m. eastern time. Accordingly, sections 2(a), section 2(d), and section 2(e) of the Executive Order of February 1, 2025, are amended by striking the term ''February 4, 2025,'' where it appears in those sections and inserting in lieu thereof the term ''March, 4, 2025.'' The exceptions set forth in section 2(a) of the Executive Order of February 1, 2025, related to covered goods loaded onto a vessel at a port of entry or in transit on the final mode of transport prior to entry into the United States are, hereby, withdrawn.

(b) During this pause, the Secretary of Homeland Security, in consultation with the Secretary of State, the Attorney General, the Assistant to the President for National Security Affairs, and the Assistant to the President for Homeland Security, shall continue to assess the situation at our southern border, as provided in section 3 of the Executive Order of February 1, 2025.

(c) If the illegal migration and illicit drug crises worsen, and if the Government of Mexico fails to take sufficient steps to alleviate these crises, the President shall take necessary steps to address the situation, including by immediate implementation of the tariffs described in the Executive Order of February 1, 2025.

**Sec. 4**. *Severability.* If any provision of this order, or the application of any provision to any person or circumstance, is held to be invalid, the remainder of this order and the application of its provisions to any other persons or circumstances shall not be affected thereby.

**Sec. 5**. *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
*February 3, 2025.*

[FR Doc. 2025–02479
Filed 2–7–25; 8:45 am]
Billing code 3395–F4–P

Exhibit 12

| Beginning date | Ending date | Underpayments (percent) | Overpayments (percent) | Corporate overpayments (eff. 1–1–99) (percent) |
|---|---|---|---|---|
| 100123 ............................................................................. | 123124 | 8 | 8 | 7 |
| 010125 ............................................................................. | 033125 | 7 | 7 | 6 |

**Crinley S. Hoover,**
*Acting Chief Financial Officer, U.S. Customs and Border Protection.*

[FR Doc. 2025–02228 Filed 2–4–25; 8:45 am]

**BILLING CODE 9111–14–P**

---

## DEPARTMENT OF HOMELAND SECURITY

### U.S. Customs and Border Protection

### Implementation of Additional Duties on Products of the People's Republic of China Pursuant to the President's February 1, 2025 Executive Order Imposing Duties To Address the Synthetic Opioid Supply Chain in the People's Republic of China

**AGENCY:** U.S. Customs and Border Protection, Department of Homeland Security.

**ACTION:** Notice.

**SUMMARY:** In order to effectuate the President's February 1, 2025 Executive Order "Imposing Duties to Address the Synthetic Opioid Supply Chain in the People's Republic of China," which imposes specified rates of duty on imports of articles that are products of the People's Republic of China (PRC or China), the Secretary of Homeland Security has determined that appropriate action is needed to modify the Harmonized Tariff Schedule of the United States (HTSUS) as set out in the annex to this notice.

**DATES:** The duties set out in the annex to this document are effective with respect to products of the PRC that are entered for consumption, or withdrawn from warehouse for consumption, on or after 12:01 a.m. eastern standard time on February 4, 2025.

**FOR FURTHER INFORMATION CONTACT:** Brandon Lord, Executive Director, Trade Policy and Programs, Office of Trade, U.S. Customs and Border Protection, (202) 325–6432 or by email at *traderemedy@cbp.dhs.gov.* Susan Thomas, Executive Director, Cargo and Conveyance Security, Office of Field Operations, U.S. Customs and Border Protection, (202) 344–3401 or by email at *traderemedy@cbp.dhs.gov.*

**SUPPLEMENTARY INFORMATION:** On January 20, 2025, the President declared a national emergency with respect to the grave threat to the United States posed by the influx of illegal aliens and drugs into the United States in Proclamation 10886 (Declaring a National Emergency at the Southern Border). *See* National Emergencies Act (50 U.S.C. 1601 *et seq.*) (NEA).

On February 1, 2025, the President expanded the scope of the national emergency declared in that proclamation to cover the failure of the People's Republic of China (PRC or China) government to arrest, seize, detain, or otherwise intercept, chemical precursor suppliers, money launderers, other transnational criminal organizations, criminals at large, and drugs. In addition, the President determined that this failure to act on the part of the PRC constitutes an unusual and extraordinary threat, which has its source in substantial part outside the United States, to the national security, foreign policy, and economy of the United States.

To address this threat, pursuant to the International Emergency Economic Powers Act (50 U.S.C. 1701 *et seq.*) (IEEPA), the NEA, section 604 of the Trade Act of 1974, as amended (19 U.S.C. 2483), and 3 U.S.C. 301, the President imposed ad valorem tariffs on all imports that are products of the PRC, excluding those encompassed by 50 U.S.C. 1702(b). Specifically, the February 1, 2025 Executive Order adjusted duties on imported products of the PRC, by imposing, consistent with law, an additional 10 percent ad valorem rate of duty as described in the annex to this notice.

The Executive Order directed the Secretary of Homeland Security, to determine and implement the necessary modifications to the Harmonized Tariff Schedule of the United States (HTSUS), consistent with law, in order to effectuate the Executive Order.

In order to implement the rates of duty imposed by the Executive Order, effective on 12:01 a.m. eastern standard time on February 4, 2025, subchapter III of chapter 99 of the HTSUS is modified by the annex to this notice.

Articles that are the products of China, which hereinafter will include products of Hong Kong in accordance with Executive Order 13936 on Hong Kong Normalization (*See* 85 FR 43413 (July 17, 2020)), excluding those encompassed by 50 U.S.C. 1702(b), that are entered for consumption, or withdrawn from warehouse for consumption, on or after 12:01 a.m. eastern standard time on February 4, 2025, will be subject to the additional ad valorem rate of duty provided for in new HTSUS heading 9903.01.20, except that goods entered for consumption, or withdrawn from warehouse for consumption, after 12:01 a.m. eastern standard time on February 4, 2025, that were loaded onto a vessel at the port of loading, or in transit on the final mode of transport prior to entry into the United States, before 12:01 a.m. eastern time on February 1, 2025, shall not be subject to such additional duty only if the importer certifies to CBP that the goods so qualify by declaring new HTSUS heading 9903.01.23 as described in the annex to this notice. The exception for goods that were in transit before February 1, 2025 is time limited, to prevent importers from abusing this provision when it is no longer realistic due to the passage of time, as provided in new HTSUS heading 9903.01.23 that is described the annex to this notice, and will only apply to goods entered for consumption, or withdrawn from warehouse for consumption, on or after 12:01 a.m. eastern standard time on February 4, 2025, and before 12:01 a.m. eastern standard time on March 7, 2025.

Imported products of China that are encompassed by 50 U.S.C. 1702(b) will not be subject to the additional ad valorem duty provided for in new HTSUS heading 9903.01.20, but such qualifying products, other than products for personal use included in accompanied baggage of persons arriving in the United States, must be declared and entered under new HTSUS heading 9903.01.21 or new HTSUS heading 9903.01.22. Specifically, new HTSUS heading 9903.01.21 covers products encompassed by 50 U.S.C. 1702(b)(2) and new HTSUS heading 9903.01.22 covers products encompassed by 50 U.S.C. 1702(b)(3).[1]

---

[1] 50 U.S.C. 1702(b)(1) covers "postal, telegraphic, telephonic, or other personal communication[s], which do[ ] not involve a transfer of anything of value," and hence does not encompass any imported articles of merchandise. 50 U.S.C. 1702(b)(4) covers "transactions ordinarily incident to travel to or from any country, including [1] importation of accompanied baggage for personal use, [2] maintenance within any country including payment of living expenses and acquisition of

The additional ad valorem duty provided for in new HTSUS heading 9903.01.20 applies in addition to all other applicable duties, taxes, fees, exactions, and charges. Further, the February 1, 2025 Executive Order clarifies that duty-free *de minimis* treatment under 19 U.S.C. 1321 shall not be available for the articles of China subject to the additional 10 percent ad valorem rate of duty. Accordingly, articles covered by heading 9903.01.20 shall not be eligible for the administrative exemption from duty and certain taxes at 19 U.S.C. 1321(a)(2)(C)—the so-called ''de minimis'' exemption.

In order to protect the revenue of the United States and effectively carry out the Executive Order's instruction to exclude such articles from eligibility for the *de minimis* exemption, including with respect to shipments arriving by international mail from China, CBP has determined that, in accordance with 19 CFR 145.12(a)(1), it is necessary to require formal entry for all mail shipments from China. Without regard to their value, no mail shipments from China will be cleared or released by CBP unless and until formal entry is properly filed.

Products of China that are eligible for temporary duty exemptions or reductions under subchapter II to chapter 99 shall be subject to the additional ad valorem rate of duty imposed by heading 9903.01.20.

The additional duties imposed by heading 9903.01.20 shall not apply to goods for which entry is properly claimed under a provision of chapter 98 of the tariff schedule pursuant to applicable regulations of U.S. Customs and Border Protection (''CBP''), and whenever CBP agrees that entry under such a provision is appropriate, except for goods entered under heading 9802.00.80; and subheadings 9802.00.40, 9802.00.50, and 9802.00.60. For subheadings 9802.00.40, 9802.00.50, and 9802.00.60, the additional duties apply to the value of repairs, alterations, or processing performed (in the PRC), as described in the applicable subheading. For heading 9802.00.80, the additional duties apply to the value of the article assembled abroad (in the PRC), less the cost or value of such products of the United States, as described.

Articles that are products of the PRC, excluding those encompassed by 50 U.S.C. 1702(b), except those that are eligible for admission to a foreign trade zone under ''domestic status'' as defined in 19 CFR 146.43, and are admitted into a United States foreign trade zone on or after 12:01 a.m. eastern standard time on February 4, 2025, must be admitted as ''privileged foreign status'' as defined in 19 CFR 146.41. Such articles will be subject, upon entry for consumption, to the duties imposed by the Executive Order and the rates of duty related to the classification under the applicable HTSUS subheading in effect at the time of admission into the United States foreign trade zone.

No drawback shall be available with respect to the additional duties imposed pursuant to the Executive Order.

**Kristi Noem,**
*Secretary.*

## Annex

### To Modify Chapter 99 of the Harmonized Tariff Schedule of the United States

Effective with respect to goods entered for consumption, or withdrawn from warehouse for consumption, on or after 12:01 a.m. eastern standard time on February 4, 2025, subchapter III of chapter 99 of the Harmonized Tariff Schedule of the United States (HTSUS) is modified:

1. by inserting the following new heading 9903.01.20 in numerical sequence, with the material in the new heading inserted in the columns of the HTSUS labeled ''Heading/Subheading'', ''Article Description'', ''Rates of Duty 1—General'', ''Rates of Duty 1—Special'' and ''Rates of Duty 2'', respectively:

| Heading/subheading | Article description | Rates of duty | | |
| | | 1 | | 2 |
| | | General | Special | |
| ''9903.01.20 .................. | Except for products described in headings 9903.01.21, 9903.01.22, or 9903.01.23 articles the product of China and Hong Kong, as provided for in U.S. note 2(s) to this subchapter. | The duty provided in the applicable subheading + 10%. | The duty provided in the applicable subheading + 10%. | No change''. |

2. by inserting the following new heading 9903.01.21 in numerical sequence, with the material inserted in the columns of the HTSUS labeled ''Heading/Subheading'', ''Article Description'', ''Rates of Duty 1—General'', ''Rates of Duty 1—Special'' and ''Rates of Duty 2'', respectively:

| Heading/subheading | Article description | Rates of duty | | |
| | | 1 | | 2 |
| | | General | Special | |
| ''9903.01.21 .................. | Articles the product of China and Hong Kong that are donations, by persons subject to the jurisdiction of the United States, of articles, such as food, clothing, and medicine, intended to be used to relieve human suffering, as provided for in U.S. note 2(t) to this subchapter. | The duty provided in the applicable subheading. | The duty provided in the applicable subheading. | No change''. |

3. by inserting the following new heading 9903.01.22 in numerical sequence, with the material inserted in the columns of the HTSUS labeled ''Heading/Subheading'', ''Article Description'', ''Rates of Duty 1—General'', ''Rates of Duty 1—Special'' and ''Rates of Duty 2'', respectively:

---

goods or services for personal use, and [3] arrangement or facilitation of such travel including

nonscheduled air, sea, or land voyages,'' only the

first of which encompasses imported articles of merchandise.

| Heading/ subheading | Article description | Rates of duty | | |
|---|---|---|---|---|
| | | 1 | | 2 |
| | | General | Special | |
| "9903.01.22 .................. | Articles the product of China and Hong Kong that are informational materials, including but not limited to, publications, films, posters, phonograph records, photographs, microfilms, microfiche, tapes, compact disks, CD ROMs, artworks, and news wire feeds. | The duty provided in the applicable subheading. | The duty provided in the applicable subheading. | No change". |

4. by inserting the following new heading 9903.01.23 in numerical sequence, with the material in the new heading inserted in the columns of the HTSUS labeled "Heading/ Subheading", "Article Description", "Rates of Duty 1—General", "Rates of Duty 1— Special" and "Rates of Duty 2", respectively:

| Heading/ subheading | Article description | Rates of duty | | |
|---|---|---|---|---|
| | | 1 | | 2 |
| | | General | Special | |
| "9903.01.23 .................. | Except for products described in headings 9903.01.21 and 9903.01.22, and other than products for personal use included in accompanied baggage of persons arriving in the United States, articles the product of China and Hong Kong that: (1) were loaded onto a vessel at the port of loading, or in transit on the final mode of transport prior to entry into the United States, before 12:01 a.m. eastern standard time on February 1, 2025; and (2) are entered for consumption, or withdrawn from warehouse for consumption, on or after 12:01 a.m. eastern standard time on February 4, 2025, and before 12:01 a.m. eastern standard time on March 7, 2025. | The duty provided in the applicable subheading. | The duty provided in the applicable subheading. | No change". |

5. by inserting the following new U.S. note 2(s) to subchapter III of chapter 99 of the HTSUS in numerical sequence:

"2. (s) For the purposes of heading 9903.01.20, products of China and Hong Kong, other than products described in heading 9903.01.21, heading 9903.01.22, heading 9903.01.23, and other than products for personal use included in accompanied baggage of persons arriving in the United States, shall be subject to an additional 10% *ad valorem* rate of duty. Notwithstanding U.S. note 1 to this subchapter, all products of China and Hong Kong that are subject to the additional *ad valorem* rate of duty imposed by heading 9903.01.20 shall also be subject to the general rates of duty imposed on products of China and Hong Kong entered under subheadings in chapters 1 to 97 of the tariff schedule. Products of China and Hong Kong that are eligible for temporary duty exemptions or reductions under subchapter II to chapter 99 shall be subject to the additional *ad valorem* rate of duty imposed by heading 9903.01.20.

The additional duties imposed by heading 9903.01.20 shall not apply to goods for which entry is properly claimed under a provision of chapter 98 of the tariff schedule pursuant to applicable regulations of U.S. Customs and Border Protection ("CBP"), and whenever CBP agrees that entry under such a provision is appropriate, except for goods entered under heading 9802.00.80; and subheadings 9802.00.40, 9802.00.50, and 9802.00.60. For subheadings 9802.00.40, 9802.00.50, and 9802.00.60, the additional duties apply to the value of repairs, alterations, or processing performed (in China and Hong Kong), as described in the applicable subheading. For heading 9802.00.80, the additional duties apply to the value of the article assembled abroad (in China and Hong Kong), less the cost or value of such products of the United States, as described.

Products of China and Hong Kong that are provided for in heading 9903.01.20 shall continue to be subject to antidumping, countervailing, or other duties, taxes, fees, exactions and charges that apply to such products, as well as to the additional *ad valorem* rate of duty imposed by heading 9903.01.20.

Products of China and Hong Kong that are provided for in heading 9903.01.20 shall not be eligible for the administrative exemption from duty and certain taxes at 19 U.S.C. 1321(a)(2)(C)—the so-called "de minimis" exemption.

(t) Heading 9903.01.21 covers only products of China and Hong Kong, that are donations, by persons subject to the jurisdiction of the United States, of articles, such as food, clothing, and medicine, intended to be used to relieve human suffering, except to the extent that the President determines that such donations (A) would seriously impair his ability to deal with any national emergency declared under section 1701 of title 19 of the U.S. Code, (B) are in response to coercion against the proposed recipient or donor, or (C) would endanger Armed Forces of the United States which are engaged in hostilities or are in a situation where imminent involvement in hostilities is clearly indicated by the circumstances."

[FR Doc. 2025–02293 Filed 2–3–25; 1:15 pm]

**BILLING CODE 9111–14–P**

## DEPARTMENT OF HOMELAND SECURITY

### U.S. Citizenship and Immigration Services

[CIS No. 2804–25]

### Termination of the October 3, 2023 Designation of Venezuela for Temporary Protected Status

**AGENCY:** U.S. Citizenship and Immigration Services, U.S. Department of Homeland Security.

**ACTION:** Notice.

**SUMMARY:** On October 3, 2023, Venezuela was newly designated for Temporary Protected Status (TPS) based on the determination that there were extraordinary and temporary conditions in that country that prevented the safe return of Venezuelan nationals, and that permitting such Venezuelan nationals to remain temporarily in the United States is not contrary to the U.S. national interest. The 2023 designation of Venezuela for TPS is set to expire on April 2, 2025. After reviewing country

Exhibit 13

## FEDERAL FINANCIAL INSTITUTIONS EXAMINATION COUNCIL

[Docket No. AS25–02]

### Appraisal Subcommittee; Notice of Meeting

**AGENCY:** Appraisal Subcommittee of the Federal Financial Institutions Examination Council.

**ACTION:** Notice of special closed meeting.

*Description:* In accordance with section 1104(b) of Title XI of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, codified at 12 U.S.C. 3333(b), notice is hereby given that the Appraisal Subcommittee (ASC) met for a Special Closed Meeting on this date.

*Location:* Virtual meeting via Webex.
*Date:* February 5, 2025.
*Time:* 10:30 a.m. ET.

**Discussion Items**

1. State Compliance Reviews
2. Personnel Matter

The ASC convened a Special Closed Meeting to discuss State Compliance Reviews and a personnel matter pursuant to section 1104(b) of Title XI (12 U.S.C. 3333(b)). No action was taken by the ASC.

**Loretta Schuster,**
*Management & Program Analyst.*
[FR Doc. 2025–02538 Filed 2–11–25; 8:45 am]
**BILLING CODE 6700–01–P**

## FEDERAL RESERVE SYSTEM

### Change in Bank Control Notices; Acquisitions of Shares of a Bank or Bank Holding Company

The notificants listed below have applied under the Change in Bank Control Act (Act) (12 U.S.C. 1817(j)) and § 225.41 of the Board's Regulation Y (12 CFR 225.41) to acquire shares of a bank or bank holding company. The factors that are considered in acting on the applications are set forth in paragraph 7 of the Act (12 U.S.C. 1817(j)(7)).

The public portions of the applications listed below, as well as other related filings required by the Board, if any, are available for immediate inspection at the Federal Reserve Bank(s) indicated below and at the offices of the Board of Governors. This information may also be obtained on an expedited basis, upon request, by contacting the appropriate Federal Reserve Bank and from the Board's Freedom of Information Office at *https://www.federalreserve.gov/foia/*

*request.htm.* Interested persons may express their views in writing on the standards enumerated in paragraph 7 of the Act.

Comments received are subject to public disclosure. In general, comments received will be made available without change and will not be modified to remove personal or business information including confidential, contact, or other identifying information. Comments should not include any information such as confidential information that would not be appropriate for public disclosure.

Comments regarding each of these applications must be received at the Reserve Bank indicated or the offices of the Board of Governors, Ann E. Misback, Secretary of the Board, 20th Street and Constitution Avenue NW, Washington, DC 20551–0001, not later than February 27, 2025.

*A. Federal Reserve Bank of Dallas* (Karen Smith, Assistant Vice President, Mergers & Acquisitions and Enforcement) 2200 North Pearl Street, Dallas, Texas 75201–2272. Comments can also be sent electronically to *Comments.applications@dal.frb.org:*

1. *Pratt Family PFBS Irrevocable Trust, Brian L. Pratt and Kenneth William Pratt, as trustees, all of Dallas, Texas;* to join the Pratt Family Control Group, a group acting in concert, to acquire voting shares of PFBS Holdings, Inc., Dallas, Texas, and thereby indirectly acquire voting shares of Lakeside Bank, Rockwall, Texas.

Board of Governors of the Federal Reserve System.

**Michele Taylor Fennell,**
*Associate Secretary of the Board.*
[FR Doc. 2025–02521 Filed 2–11–25; 8:45 am]
**BILLING CODE 6210–01–P**

## DEPARTMENT OF HOMELAND SECURITY

### U.S. Customs and Border Protection

### Amended Notice of Implementation of Additional Duties on Products of the People's Republic of China Pursuant to the President's February 1, 2025 Executive Order Imposing Duties To Address the Synthetic Opioid Supply Chain in the People's Republic of China

**AGENCY:** U.S. Customs and Border Protection, Department of Homeland Security.

**ACTION:** Amended notice.

**SUMMARY:** In order to effectuate the President's February 1, 2025 Executive order "Imposing Duties to Address the

Synthetic Opioid Supply Chain in the People's Republic of China," as amended by the President's February 5, 2025 Executive order "Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China," which imposed specified rates of duty on imports of articles that are products of the People's Republic of China (PRC or China), the Secretary of Homeland Security is amending its February 5, 2025 notice in the **Federal Register**, "Implementation of Additional Duties on Products of the People's Republic of China Pursuant to the President's February 1, 2025 Executive Order Imposing Duties to Address the Synthetic Opioid Supply Chain in the People's Republic of China," to reflect that appropriate action was needed to modify the Harmonized Tariff Schedule of the United States (HTSUS) as set out in the Annex to this notice as well as changes to treatment of goods under what is commonly known as the *de minimis* exemption.

**DATES:** The duties set out in the Annex to this document are effective with respect to products of the PRC that are entered for consumption, or withdrawn from warehouse for consumption, on or after 12:01 a.m. eastern standard time on February 5, 2025.

**FOR FURTHER INFORMATION CONTACT:** Brandon Lord, Executive Director, Trade Policy and Programs, Office of Trade, U.S. Customs and Border Protection, (202) 325–6432 or by email at *traderemedy@cbp.dhs.gov.* Susan Thomas, Executive Director, Cargo and Conveyance Security, Office of Field Operations, U.S. Customs and Border Protection, (202) 344–3401 or by email at *traderemedy@cbp.dhs.gov.*

**SUPPLEMENTARY INFORMATION:** On January 20, 2025, the President declared a national emergency with respect to the grave threat to the United States posed by the influx of illegal aliens and drugs into the United States in Proclamation 10886 (Declaring a National Emergency at the Southern Border) (90 FR 8327 (January 29, 2025)). *See* National Emergencies Act (50 U.S.C. 1601 *et seq.*) (NEA).

On February 1, 2025, the President expanded the scope of the national emergency declared in that proclamation to cover the failure of the People's Republic of China (PRC or China) government to arrest, seize, detain, or otherwise intercept, chemical precursor suppliers, money launderers, other transnational criminal organizations, criminals at large, and drugs. In addition, the President determined that this failure to act on the part of the PRC constitutes an unusual

**9432**    **Federal Register**/Vol. 90, No. 28/Wednesday, February 12, 2025/Notices

and extraordinary threat, which has its source in substantial part outside the United States, to the national security, foreign policy, and economy of the United States. To address this threat, pursuant to the International Emergency Economic Powers Act (50 U.S.C. 1701 *et seq.*) (IEEPA), the NEA, section 604 of the Trade Act of 1974, as amended (19 U.S.C. 2483), and 3 U.S.C. 301, the President imposed ad valorem tariffs on all imports that are products of the PRC, excluding those encompassed by 50 U.S.C. 1702(b). Specifically, the February 1, 2025 Executive order (E.O. 14195) (90 FR 9121 (February 7, 2025)) adjusted duties on imported products of the PRC, by imposing, consistent with law, an additional 10 percent ad valorem rate of duty as described in the Annex to this notice.

On February 5, 2025, the Secretary of Homeland Security issued a notice in the **Federal Register** (90 FR 9038), ''Implementation of Additional Duties on Products of the People's Republic of China Pursuant to the President's February 1, 2025 Executive Order Imposing Duties to Address the Synthetic Opioid Supply Chain in the People's Republic of China'' (hereinafter referred to as the ''China Duties Notice''), to reflect the appropriate action was needed to modify the Harmonized Tariff Schedule of the United States (HTSUS) as set out in the Annex to this notice. Subsequently, on February 5, 2025, the President amended subsection (g) of section 2 of the February 1, 2025 Executive order, to modify the application of 19 U.S.C. 1321 to goods covered by subsection (a) of section 2 of the President's February 1, 2025 Executive order. *See* ''Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China'' (February 5, 2025) (E.O. 14200). Specifically, as amended, subsection (g) of section 2 of the February 1, 2025 Executive order provides that duty-free *de minimis* treatment under 19 U.S.C. 1321 is available for otherwise eligible covered articles described in the Executive order, but shall cease to be available for such articles upon notification by the Secretary of Commerce, in consultation with the Secretary of the Treasury, to the President that adequate systems are in place to fully and expediently process and collect tariff revenue applicable pursuant to subsection (a) of section 2 of the Executive order for covered articles otherwise eligible for *de minimis* treatment.

To effectuate the changes made by the February 5, 2025 Executive order, DHS is republishing its China Duties Notice

in its entirety with changes to reflect both Executive orders.

The February 1, 2025 Executive order directed the Secretary of Homeland Security, to determine and implement the necessary modifications to the Harmonized Tariff Schedule of the United States (HTSUS), consistent with law, to effectuate the Executive order.

In order to implement the rates of duty imposed by the Executive order, effective on 12:01 a.m. eastern standard time on February 4, 2025, subchapter III of chapter 99 of the HTSUS is modified by the Annex to this notice.

Articles that are the products of China, which hereinafter will include products of Hong Kong in accordance with Executive Order 13936 on Hong Kong Normalization (*see* 85 FR 43413 (July 17, 2020)), excluding those encompassed by 50 U.S.C. 1702(b), that are entered for consumption, or withdrawn from warehouse for consumption, on or after 12:01 a.m. eastern standard time on February 4, 2025, will be subject to the additional ad valorem rate of duty provided for in new HTSUS heading 9903.01.20, except that goods entered for consumption, or withdrawn from warehouse for consumption, after 12:01 a.m. eastern standard time on February 4, 2025, that were loaded onto a vessel at the port of loading, or in transit on the final mode of transport prior to entry into the United States, before 12:01 a.m. eastern time on February 1, 2025, shall not be subject to such additional duty only if the importer certifies to CBP that the goods so qualify by declaring new HTSUS heading 9903.01.23 as described in the Annex to this notice. The exception for goods that were in transit before February 1, 2025, is time limited, to prevent importers from abusing this provision when it is no longer realistic due to the passage of time, as provided in new HTSUS heading 9903.01.23 that is described the Annex to this notice, and will only apply to goods entered for consumption, or withdrawn from warehouse for consumption, on or after 12:01 a.m. eastern standard time on February 4, 2025, and before 12:01 a.m. eastern standard time on March 7, 2025.

Imported products of China that are encompassed by 50 U.S.C. 1702(b) will not be subject to the additional ad valorem duty provided for in new HTSUS heading 9903.01.20, but such qualifying products, other than products for personal use included in accompanied baggage of persons arriving in the United States, must be declared and entered under new HTSUS heading 9903.01.21 or new HTSUS heading 9903.01.22. Specifically, new HTSUS heading 9903.01.21 covers

products encompassed by 50 U.S.C. 1702(b)(2) and new HTSUS heading 9903.01.22 covers products encompassed by 50 U.S.C. 1702(b)(3).[1]

The additional ad valorem duty provided for in new HTSUS heading 9903.01.20 applies in addition to all other applicable duties, taxes, fees, exactions, and charges.

Further, pursuant to the February 5, 2025 Executive order, the administrative exemption from duty and certain taxes at 19 U.S.C. 1321(a)(2)(C)—known as the *de minimis* exemption—continues to be available for articles covered by heading 9903.01.20 that are otherwise eligible for the exemption, including for eligible articles sent to the United States through the international postal network, and shall cease to be available for such articles upon notification by the Secretary of Commerce, in consultation with the Secretary of the Treasury, to the President that adequate systems are in place to fully and expediently process and collect tariff revenue applicable to articles covered by heading 9903.01.20 otherwise eligible for the *de minimis* exemption. Accordingly, articles that are the product of China, including products of Hong Kong, that are eligible for the *de minimis* exemption and are covered by heading 9903.01.20 may continue to request *de minimis* entry and clearance until such time as the Secretary of Commerce, in consultation with the Secretary of the Treasury, so notifies the President and further guidance is provided.

As of February 10, 2025, there will be no retroactive application of these changes for any shipments that would have otherwise qualified for de minimis treatment based on the February 5, 2025 Executive order ''Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China.''

Products of China that are eligible for temporary duty exemptions or reductions under subchapter II to chapter 99 shall be subject to the additional ad valorem rate of duty imposed by heading 9903.01.20.

---

[1] 50 U.S.C. 1702(b)(1) covers ''postal, telegraphic, telephonic, or other personal communication[s], which do [ ] not involve a transfer of anything of value,'' and hence does not encompass any imported articles of merchandise. 50 U.S.C. 1702(b)(4) covers ''transactions ordinarily incident to travel to or from any country, including [1] importation of accompanied baggage for personal use, [2] maintenance within any country including payment of living expenses and acquisition of goods or services for personal use, and [3] arrangement or facilitation of such travel including nonscheduled air, sea, or land voyages,'' only the first of which encompasses imported articles of merchandise.

The additional duties imposed by heading 9903.01.20 shall not apply to goods for which entry is properly claimed under a provision of chapter 98 of the tariff schedule pursuant to applicable regulations of U.S. Customs and Border Protection ("CBP"), and whenever CBP agrees that entry under such a provision is appropriate, except for goods entered under heading 9802.00.80; and subheadings 9802.00.40, 9802.00.50, and 9802.00.60. For subheadings 9802.00.40, 9802.00.50, and 9802.00.60, the additional duties apply to the value of repairs, alterations, or processing performed (in the PRC), as described in the applicable subheading. For heading 9802.00.80, the additional duties apply to the value of the article assembled abroad (in the PRC), less the cost or value of such products of the United States, as described.

Articles that are products of the PRC, excluding those encompassed by 50 U.S.C. 1702(b), except those that are eligible for admission to a foreign trade zone under "domestic status" as defined in 19 CFR 146.43, and are admitted into a United States foreign trade zone on or after 12:01 a.m. eastern standard time on February 4, 2025, must be admitted as "privileged foreign status" as defined in 19 CFR 146.41. Such articles will be subject, upon entry for consumption, to the duties imposed by the Executive order and the rates of duty related to the classification under the applicable HTSUS subheading in effect at the time of admission into the United States foreign trade zone.

No drawback shall be available with respect to the additional duties imposed pursuant to the Executive order.

**Kristi Noem,**
*Secretary.*

**Annex**

**To Modify Chapter 99 of the Harmonized Tariff Schedule of the United States**

Effective with respect to goods entered for consumption, or withdrawn from warehouse for consumption, on or after 12:01 a.m. eastern standard time on February 5, 2025, subchapter III of chapter 99 of the Harmonized Tariff Schedule of the United States (HTSUS) is modified:

1. by inserting the following new heading 9903.01.20 in numerical sequence, with the material in the new heading inserted in the columns of the HTSUS labeled "Heading/Subheading", "Article Description", "Rates of Duty 1-General", "Rates of Duty 1-Special" and "Rates of Duty 2", respectively:

| Heading/ subheading | Article description | Rates of duty | | |
| | | 1 | | 2 |
| | | General | Special | |
|---|---|---|---|---|
| "9903.01.20 ....... | Except for products described in headings 9903.01.21, 9903.01.22, or 9903.01.23 articles the product of China and Hong Kong, as provided for in U.S. note 2(s) to this subchapter. | The duty provided in the applicable subheading +10%. | The duty provided in the applicable subheading +10%. | No change". |

2. by inserting the following new heading 9903.01.21 in numerical sequence, with the material in the new heading inserted in the columns of the HTSUS labeled "Heading/Subheading", "Article Description", "Rates of Duty 1-General", "Rates of Duty 1-Special" and "Rates of Duty 2", respectively:

| Heading/ subheading | Article description | Rates of duty | | |
| | | 1 | | 2 |
| | | General | Special | |
|---|---|---|---|---|
| "9903.01.21 ....... | Articles the product of China and Hong Kong that are donations, by persons subject to the jurisdiction of the United States, of articles, such as food, clothing, and medicine, intended to be used to relieve human suffering, as provided for in U.S. note 2(t) to this subchapter. | The duty provided in the applicable subheading. | The duty provided in the applicable subheading. | No change". |

3. by inserting the following new heading 9903.01.22 in numerical sequence, with the material in the new heading inserted in the columns of the HTSUS labeled "Heading/Subheading", "Article Description", "Rates of Duty 1-General", "Rates of Duty 1-Special" and "Rates of Duty 2", respectively:

| Heading/ subheading | Article description | Rates of duty | | |
| | | 1 | | 2 |
| | | General | Special | |
|---|---|---|---|---|
| "9903.01.22 ....... | Articles the product of China and Hong Kong that are informational materials, including but not limited to, publications, films, posters, phonograph records, photographs, microfilms, microfiche, tapes, compact disks, CD ROMs, artworks, and news wire feeds. | The duty provided in the applicable subheading. | The duty provided in the applicable subheading. | No change". |

4. by inserting the following new heading 9903.01.23 in numerical sequence, with the material in the new heading inserted in the columns of the HTSUS labeled "Heading/Subheading", "Article Description", "Rates of Duty 1-General", "Rates of Duty 1-Special" and "Rates of Duty 2", respectively:

| Heading/ subheading | Article description | Rates of duty | | |
|---|---|---|---|---|
| | | 1 | | 2 |
| | | General | Special | |
| "9903.01.23 ....... | Except for products described in headings 9903.01.21 and 9903.01.22, and other than products for personal use included in accompanied baggage of persons arriving in the United States, articles the product of China and Hong Kong that: (1) were loaded onto a vessel at the port of loading, or in transit on the final mode of transport prior to entry into the United States, before 12:01 a.m. eastern standard time on February 1, 2025; and (2) are entered for consumption, or withdrawn from warehouse for consumption, on or after 12:01 a.m. eastern standard time on February 4, 2025, and before 12:01 a.m. eastern standard time on March 7, 2025. | The duty provided in the applicable subheading. | The duty provided in the applicable subheading. | No change". |

5. by inserting the following new U.S. note 2(s) to subchapter III of chapter 99 of the HTSUS in numerical sequence:

"2. (s) For the purposes of heading 9903.01.20, products of China and Hong Kong, other than products described in heading 9903.01.21, heading 9903.01.22, heading 9903.01.23, and other than products for personal use included in accompanied baggage of persons arriving in the United States, shall be subject to an additional 10% *ad valorem* rate of duty. Notwithstanding U.S. note 1 to this subchapter, all products of China and Hong Kong that are subject to the additional *ad valorem* rate of duty imposed by heading 9903.01.20 shall also be subject to the general rates of duty imposed on products of China and Hong Kong entered under subheadings in chapters 1 to 97 of the tariff schedule. Products of China and Hong Kong that are eligible for temporary duty exemptions or reductions under subchapter II to chapter 99 shall be subject to the additional *ad valorem* rate of duty imposed by heading 9903.01.20.

The additional duties imposed by heading 9903.01.20 shall not apply to goods for which entry is properly claimed under a provision of chapter 98 of the tariff schedule pursuant to applicable regulations of U.S. Customs and Border Protection ("CBP"), and whenever CBP agrees that entry under such a provision is appropriate, except for goods entered under heading 9802.00.80; and subheadings 9802.00.40, 9802.00.50, and 9802.00.60. For subheadings 9802.00.40, 9802.00.50, and 9802.00.60, the additional duties apply to the value of repairs, alterations, or processing performed (in China and Hong Kong), as described in the applicable subheading. For heading 9802.00.80, the additional duties apply to the value of the article assembled abroad (in China and Hong Kong), less the cost or value of such products of the United States, as described.

Products of China and Hong Kong that are provided for in heading 9903.01.20 shall continue to be subject to antidumping, countervailing, or other duties, taxes, fees, exactions and charges that apply to such products, as well as to the additional *ad valorem* rate of duty imposed by heading 9903.01.20.

Products of China and Hong Kong that are provided for in heading 9903.01.20 and that are otherwise eligible for the administrative exemption from duty and certain taxes at 19 U.S.C. 1321(a)(2)(C)—known as "*de minimis*" exemption—may continue to qualify for the exemption, but the *de minimis* exemption shall cease to be available for such articles upon notification by the Secretary of Commerce, in consultation with the Secretary of the Treasury, to the President that adequate systems are in place to fully and expediently process and collect tariff revenue applicable for covered articles otherwise eligible for the *de minimis* exemption.

(t) Heading 9903.01.21 covers only products of China and Hong Kong, that are donations, by persons subject to the jurisdiction of the United States, of articles, such as food, clothing, and medicine, intended to be used to relieve human suffering, except to the extent that the President determines that such donations (A) would seriously impair his ability to deal with any national emergency declared under section 1701 of title 19 of the U.S. Code, (B) are in response to coercion against the proposed recipient or donor, or (C) would endanger Armed Forces of the United States which are engaged in hostilities or are in a situation where imminent involvement in hostilities is clearly indicated by the circumstances."

[FR Doc. 2025–02576 Filed 2–10–25; 11:15 am]

BILLING CODE 9111–14–P

## DEPARTMENT OF THE INTERIOR

### Bureau of Indian Affairs

**[256A2100DD AAKP300000 A0A501010.000000]**

### Presidential Memorandum; Lumbee Tribe of North Carolina

**AGENCY:** Bureau of Indian Affairs, Interior.

**ACTION:** Notice.

**SUMMARY:** This notice publishes the Presidential Memorandum titled "Federal Recognition of the Lumbee Tribe of North Carolina."

**DATES:** The Presidential memorandum was issued on January 23, 2025.

**FOR FURTHER INFORMATION CONTACT:** Oliver Whaley, Director, Office of Regulatory Affairs and Collaborative Action, Office of the Assistant Secretary—Indian Affairs, (202) 738–6065.

**SUPPLEMENTARY INFORMATION:** On January 23, 2025, the President of the United States issued a Presidential memorandum (PM) to the Secretary of the Interior (Secretary) titled "Federal Recognition of the Lumbee Tribe of North Carolina," which directs the Secretary to review "all applicable authorities regarding the recognition or acknowledgement of Indian tribes" and, in consultation with the leadership of the Lumbee Tribe of North Carolina, "submit to the President a plan to assist the Lumbee Tribe in obtaining full Federal recognition through legislation or other available mechanisms, including the right to receive full Federal benefits" within 90 days of the date of the PM. The PM further authorizes and directs the Secretary to publish the PM in the **Federal Register**.

**Bryan Mercier,**
*Director, Bureau of Indian Affairs, Exercising the delegated authority of the Assistant Secretary—Indian Affairs.*

### Federal Recognition of the Lumbee Tribe of North Carolina

*January 23, 2025*

Memorandum for the Secretary of the Interior

Subject: Federal Recognition of the Lumbee Tribe of North Carolina

Section 1. Purpose and Policy. The Lumbee Tribe of North Carolina, known as the People of the Dark Water, have a long and storied history. The tribe's members were descendants of several tribal nations from the Algonquian, Iroquoian, and Siouan language families, including the Hatteras, the Tuscarora, and the Cheraw. The waters of the Lumbee River and lands that surround it have protected and provided for the Lumbee people for centuries despite war, disease, and many other perils.

Exhibit 14

Federal Register

Vol. 90, No. 44

Friday, March 7, 2025

# Presidential Documents

Title 3—

The President

Executive Order 14228 of March 3, 2025

## Further Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the International Emergency Economic Powers Act (50 U.S.C. 1701 *et seq.*) (IEEPA), the National Emergencies Act (50 U.S.C. 1601 *et seq.*), section 604 of the Trade Act of 1974, as amended (19 U.S.C. 2483), and section 301 of title 3, United States Code, I hereby determine and order:

**Section 1**. *Background.* With Executive Order 14195 of February 1, 2025 (Imposing Duties to Address the Synthetic Opioid Supply Chain in the People's Republic of China), I determined that the failure of the Government of the People's Republic of China (PRC) to act to blunt the sustained influx of synthetic opioids, including fentanyl, flowing from the PRC to the United States constituted an unusual and extraordinary threat, which has its source in substantial part outside the United States, to the national security, foreign policy, and economy of the United States. To address that threat, I invoked my authority under section 1702(a)(1)(B) of IEEPA to impose ad valorem tariffs on articles that are products of the PRC, as defined by the *Federal Register* notice described in section 2(d) of Executive Order 14195, as amended by Executive Order 14200 of February 5, 2025 (Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China).

Pursuant to section 3 of Executive Order 14195, I have determined that the PRC has not taken adequate steps to alleviate the illicit drug crisis through cooperative enforcement actions, and that the crisis described in Executive Order 14195 has not abated.

**Sec. 2**. *Amendment.* In recognition of the fact that the PRC has not taken adequate steps to alleviate the illicit drug crisis, section 2(a) of Executive Order 14195 is hereby amended by striking the words ''10 percent'' and inserting in lieu thereof the words ''20 percent''.

**Sec. 3**. *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department, agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
*March 3, 2025.*

[FR Doc. 2025–03775
Filed 3–6–25; 8:45 am]
Billing code 3395–F4–P

Exhibit 15

| Heading/subheading | Article description | Rates of duty | | |
|---|---|---|---|---|
| | | 1 | | 2 |
| | | General | Special | |
| "9903.01.13 ................. | Except for products described in headings 9903.01.11 and 9903.01.12, and other than products for personal use included in accompanied baggage of persons arriving in the United States, articles the product of Canada: Crude oil, natural gas, lease condensates, natural gas liquids, refined petroleum products, uranium, coal, biofuels, geothermal heat, the kinetic movement of flowing water, and critical minerals, as defined by 30 U.S.C. 1606(a)(3) | The duty provided in the applicable subheading + 10%. | The duty provided in the applicable subheading + 10%. | No change". |

5. by inserting the following new U.S. note 2(j) to subchapter III of chapter 99 of the HTSUS in numerical sequence:

"2. (j) For the purposes of heading 9903.01.10, products of Canada, other than products described in headings 9903.01.11, 9903.01.12, and 9903.11.13, and other than products for personal use included in accompanied baggage of persons arriving in the United States, shall be subject to an additional 25% *ad valorem* rate of duty. For the purposes of heading 9903.01.13, the covered products of Canada shall be subject to an additional 10% *ad valorem* rate of duty. Notwithstanding U.S. note 1 to this subchapter, all products of Canada that are subject to the additional *ad valorem* rate of duty imposed by headings 9903.01.10 and 9903.01.13 shall also be subject to the general rates of duty imposed on products of Canada entered under subheadings in chapters 1 to 97 of the tariff schedule.

The additional duties imposed by headings 9903.01.10 and 9903.01.13 that apply to products of Canada include both goods of Canada under the rules set forth in part 102, title 19 of the Code of Federal Regulations, as applicable, as well as goods for which Canada was the last country of substantial transformation prior to importation into the United States.

Products of Canada that are eligible for special tariff treatment under general note 3(c)(i) to the tariff schedule, or that are eligible for temporary duty exemptions or reductions under subchapter II to chapter 99, shall be subject to the additional *ad valorem* rate of duty imposed by headings 9903.01.10 and 9903.01.13.

The additional duties imposed by headings 9903.01.10 and 9903.01.13 shall not apply to goods for which entry is properly claimed under a provision of chapter 98 of the tariff schedule pursuant to applicable regulations of U.S. Customs and Border Protection ("CBP"), and whenever CBP agrees that entry under such a provision is appropriate, except for goods entered under heading 9802.00.80; and subheadings 9802.00.40, 9802.00.50, and 9802.00.60. For subheadings 9802.00.40, 9802.00.50, and 9802.00.60, the additional duties apply to the value of repairs, alterations, or processing performed (in Canada), as described in the applicable subheading. For heading 9802.00.80, the additional duties apply to the value of the article assembled abroad (in Canada), less the cost or value of such products of the United States, as described.

Products of Canada that are provided for in headings 9903.01.10 or 9903.01.13 shall continue to be subject to antidumping,

countervailing, or other duties, taxes, fees, exactions and charges that apply to such products, as well as to the additional *ad valorem* rate of duty imposed by headings 9903.01.10 and 9903.01.13.

Products of Canada that are provided for in headings 9903.01.10 and 9903.01.13 and that are otherwise eligible for the administrative exemption from duty and certain taxes at 19 U.S.C. 1321(a)(2)(C)—known as ''*de minimis*'' exemption—may continue to qualify for the exemption, but the *de minimis* exemption shall cease to be available for such articles upon notification by the Secretary of Commerce, in consultation with the Secretary of the Treasury, to the President that adequate systems are in place to fully and expediently process and collect tariff revenue applicable for covered articles otherwise eligible for the *de minimis* exemption.

(k) Heading 9903.01.11 covers only products of Canada, that are donations, by persons subject to the jurisdiction of the United States, of articles, such as food, clothing, and medicine, intended to be used to relieve human suffering, except to the extent that the President determines that such donations (A) would seriously impair his ability to deal with any national emergency declared under section 1701 of title 19 of the U.S. Code, (B) are in response to coercion against the proposed recipient or donor, or (C) would endanger Armed Forces of the United States which are engaged in hostilities or are in a situation where imminent involvement in hostilities is clearly indicated by the circumstances.''

[FR Doc. 2025–03664 Filed 3–3–25; 4:30 pm]

BILLING CODE 9111–14–P

## DEPARTMENT OF HOMELAND SECURITY

### U.S. Customs and Border Protection

### Further Amended Notice of Implementation of Additional Duties on Products of the People's Republic of China Pursuant to the President's Executive Order 14195, Imposing Duties To Address the Synthetic Opioid Supply Chain in the People's Republic of China

**AGENCY:** U.S. Customs and Border Protection, Department of Homeland Security.

**ACTION:** Amended notice.

**SUMMARY:** In order to effectuate the President's Executive Order 14195, ''Imposing Duties to Address the Synthetic Opioid Supply Chain in the People's Republic of China,'' as amended by the President's Executive Order 14200, ''*Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China,''* and further amended by the President's March 3, 2025 Executive Order, ''*Further Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China,''* which imposed an increase in the specified rates of duty on imports of articles that are products of the People's Republic of China (PRC or China), the Secretary of Homeland Security is amending its February 12, 2025 Notice in the **Federal Register**, *Amended Notice of Implementation of Additional Duties on Products of the People's Republic of China Pursuant to the President's February 1, 2025 Executive Order Imposing Duties to Address the Synthetic Opioid Supply Chain in the People's Republic of China,* to reflect that appropriate action was needed to modify the Harmonized Tariff Schedule of the United States (HTSUS) as set out in the Annex to this notice.

**DATES:** The duties set out in the Annex to this document are effective with respect to products of the PRC (which include products of Hong Kong) that are entered for consumption, or withdrawn from warehouse for consumption, on or after 12:01 a.m. eastern standard time on March 4, 2025.

**FOR FURTHER INFORMATION CONTACT:** Brandon Lord, Executive Director, Trade Policy and Programs, Office of Trade, U.S. Customs and Border Protection, (202) 325–6432 or by email at *traderemedy@cbp.dhs.gov*. Susan Thomas, Executive Director, Cargo and Conveyance Security, Office of Field Operations, U.S. Customs and Border Protection, (202) 344–3401 or by email at *traderemedy@cbp.dhs.gov*.

**SUPPLEMENTARY INFORMATION:** On January 20, 2025, the President declared

a national emergency with respect to the grave threat to the United States posed by the influx of illegal aliens and drugs into the United States in Proclamation 10886 (Declaring a National Emergency at the Southern Border). *See* National Emergencies Act (50 U.S.C. 1601 *et seq.*) (NEA).

On February 1, 2025, the President expanded the scope of the national emergency declared in that proclamation to cover the failure of the People's Republic of China (PRC or China) government to arrest, seize, detain, or otherwise intercept, chemical precursor suppliers, money launderers, other transnational criminal organizations, criminals at large, and drugs. In addition, the President determined that this failure to act on the part of the PRC constitutes an unusual and extraordinary threat, which has its source in substantial part outside the United States, to the national security, foreign policy, and economy of the United States. To address this threat, pursuant to the International Emergency Economic Powers Act (50 U.S.C. 1701 *et seq.*) (IEEPA), the NEA, section 604 of the Trade Act of 1974, as amended (19 U.S.C. 2483), and 3 U.S.C. 301, the President imposed ad valorem tariffs on all imports that are products of the PRC, excluding those encompassed by 50 U.S.C. 1702(b). *See* Executive Order 14195 (90 FR 9121) of February 1, 2025. Specifically, Executive Order 14195 adjusted duties on imported products of the PRC, by imposing, consistent with law, an additional 10 percent ad valorem rate of duty.

On February 5, 2025, the Secretary of Homeland Security issued a notice in the **Federal Register**, *Implementation of Additional Duties on Products of the People's Republic of China Pursuant to the President's February 1, 2025 Executive Order Imposing Duties To Address the Synthetic Opioid Supply Chain in the People's Republic of China* (hereinafter referred to as the "China Duties Notice") (90 FR 9038) to reflect the appropriate action that was needed to modify the Harmonized Tariff Schedule of the United States (HTSUS), as set out in the Annex to that notice, to implement the additional duties imposed by Executive Order 14195.

Subsequently, on February 5, 2025, the President amended subsection (g) of section 2 of Executive Order 14195, to modify the application of 19 U.S.C. 1321 to goods covered by subsection (a) of section 2 of Executive Order 14195. *See* Executive Order 14200, *Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China* (February 5, 2025). Specifically, as amended, subsection (g)

of section 2 of Executive Order 14195 provides that duty-free *de minimis* treatment under 19 U.S.C. 1321 is available for otherwise eligible covered articles described in the Executive Order, but shall cease to be available for such articles upon notification by the Secretary of Commerce, in consultation with the Secretary of the Treasury, to the President that adequate systems are in place to fully and expediently process and collect tariff revenue applicable pursuant to subsection (a) of section 2 of the Executive Order for covered articles otherwise eligible for *de minimis* treatment.

To effectuate the changes made by Executive Order 14200, DHS republished its China Duties Notice in its entirety with changes as needed to implement Executive Order 14195 as amended by Executive Order 14200. *See Amended Notice of Implementation of Additional Duties on Products of the People's Republic of China Pursuant to the President's February 1, 2025 Executive Order Imposing Duties To Address the Synthetic Opioid Supply Chain in the People's Republic of China* (90 FR 9431 February 12, 2025) (hereinafter "the February 12, 2025 CBP Notice").

Executive Order 14195 directed the Secretary of Homeland Security, to determine and implement the necessary modifications to the Harmonized Tariff Schedule of the United States (HTSUS), consistent with law, to effectuate the Executive Order.

In order to implement the rates of duty imposed by Executive Order 14195, as amended by Executive Order 14200, effective on 12:01 a.m. eastern standard time on February 4, 2025, subchapter III of chapter 99 of the HTSUS was modified by the Annex to the February 12, 2025 CBP Notice.

Executive Order 14195, as amended by Executive Order 14200 and implemented by modifications to the HTSUS announced in the Annex to the February 12, 2025 CBP Notice, has been further modified by the President's March 3, 2025 Executive Order, "*Further Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China*". The new E.O. increases the additional tariff rate from 10 percent to 20 percent for covered products of the PRC (which include products of Hong Kong) that are entered for consumption, or withdrawn from warehouse for consumption, on or after 12:01 a.m. eastern standard time on March 4, 2025.

The Annex to this notice modifies the Harmonized Tariff Schedule of the United States to provide for the increase of the tariff rate from 10 percent to 20

percent consistent with Executive Order [insert title]. Articles that are the products of China, which include products of Hong Kong in accordance with Executive Order 13936 on Hong Kong Normalization (*See* 85 FR 43413 (July 17, 2020)), excluding those encompassed by 50 U.S.C. 1702(b), that are entered for consumption, or withdrawn from warehouse for consumption, on or after 12:01 a.m. eastern standard time on March 4, 2025, will be subject to the additional *ad valorem* rate of duty provided for in new HTSUS heading 9903.01.24, except that goods entered for consumption, or withdrawn from warehouse for consumption, after 12:01 a.m. eastern standard time on February 4, 2025, and before 12:01 a.m. eastern standard time on March 7, 2025, that were loaded onto a vessel at the port of loading, or in transit on the final mode of transport prior to entry into the United States, before 12:01 a.m. eastern time on February 1, 2025, shall not be subject to such additional duty only if the importer certifies to CBP that the goods so qualify by declaring HTSUS heading 9903.01.23. The exception for goods that were in transit before February 1, 2025 is time limited, to prevent importers from abusing this provision when it is no longer realistic due to the passage of time, as provided in HTSUS heading 9903.01.23, and will only apply to goods entered for consumption, or withdrawn from warehouse for consumption, on or after 12:01 a.m. eastern standard time on February 4, 2025, and before 12:01 a.m. eastern standard time on March 7, 2025.

U.S. note 2(s) is amended to reflect that HTSUS heading 9903.01.20 applies to products of China and Hong Kong entered for consumption, or withdrawn from warehouse for consumption, on or after 12:01 a.m. eastern standard time February 4, 2025, and prior to 12:01 a.m. eastern standard time on March 4, 2025.

Imported products of China that are encompassed by 50 U.S.C. 1702(b) will not be subject to the additional ad valorem duty provided for in new HTSUS heading 9903.01.24, but such qualifying products, other than products for personal use included in accompanied baggage of persons arriving in the United States, must be declared and entered under HTSUS heading 9903.01.21 or HTSUS heading 9903.01.22. Specifically, HTSUS heading 9903.01.21 covers products encompassed by 50 U.S.C. 1702(b)(2) and HTSUS heading 9903.01.22 covers

products encompassed by 50 U.S.C. 1702(b)(3).[1]

The additional *ad valorem* duty provided for in new HTSUS heading 9903.01.24 applies in addition to all other applicable duties, taxes, fees, exactions, and charges.

Further, pursuant to Executive Order 14200, the administrative exemption from duty and certain taxes at 19 U.S.C. 1321(a)(2)(C)—known as the "*de minimis*" exemption—continues to be available for articles covered by heading 9903.01.24 that are otherwise eligible for the exemption, including for eligible articles sent to the United States through the international postal network, but shall cease to be available for such articles upon notification by the Secretary of Commerce, in consultation with the Secretary of the Treasury, to the President that adequate systems are in place to fully and expediently process and collect tariff revenue applicable to articles covered by heading 9903.01.24 otherwise eligible for the "*de minimis*" exemption. Accordingly, articles that are the product of China, including products of Hong Kong, that are eligible for the *de minimis* exemption and are covered by heading 9903.01.24 may continue to request *de minimis* entry and clearance until such time as the Secretary of Commerce, in consultation with the Secretary of the Treasury, so notifies the President and further guidance is provided.

As of February 10, 2025, there will be no retroactive application of these changes for any shipments that would have otherwise qualified for *de minimis* treatment based on Executive Order 14200, "*Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China.*"

Products of China that are eligible for temporary duty exemptions or reductions under subchapter II to chapter 99 shall be subject to the additional *ad valorem* rate of duty imposed by heading 9903.01.24.

The additional duties imposed by heading 9903.01.24 shall not apply to goods for which entry is properly claimed under a provision of chapter 98 of the tariff schedule pursuant to applicable regulations of U.S. Customs and Border Protection ("CBP"), and whenever CBP agrees that entry under such a provision is appropriate, except for goods entered under heading 9802.00.80; and subheadings 9802.00.40, 9802.00.50, and 9802.00.60. For subheadings 9802.00.40, 9802.00.50, and 9802.00.60, the additional duties apply to the value of repairs, alterations, or processing performed (in the PRC), as described in the applicable subheading. For heading 9802.00.80, the additional duties apply to the value of the article assembled abroad (in the PRC), less the cost or value of such products of the United States, as described.

Articles that are products of the PRC, excluding those encompassed by 50

U.S.C. 1702(b), except those that are eligible for admission to a foreign trade zone under "domestic status" as defined in 19 CFR 146.43, and are admitted into a United States foreign trade zone on or after 12:01 a.m. eastern standard time on February 4, 2025, must be admitted as "privileged foreign status" as defined in 19 CFR 146.41. Such articles will be subject, upon entry for consumption, to the duties imposed by the Executive Order and the rates of duty related to the classification under the applicable HTSUS heading or subheading in effect at the time of admission into the United States foreign trade zone.

No drawback shall be available with respect to the additional duties imposed pursuant to the Executive Order.

**Kristi Noem,**
*Secretary.*

**Annex**

### To Modify Chapter 99 of the Harmonized Tariff Schedule of the United States

Effective with respect to goods entered for consumption, or withdrawn from warehouse for consumption, on or after 12:01 a.m. eastern standard time on March 4, 2025, subchapter III of chapter 99 of the Harmonized Tariff Schedule of the United States (HTSUS) is modified:

1. by inserting the following new heading 9903.01.24 in numerical sequence, with the material in the new heading inserted in the columns of the HTSUS labeled "Heading/Subheading", "Article Description", "Rates of Duty 1—General", "Rates of Duty 1—Special" and "Rates of Duty 2", respectively:

2.

| Heading/subheading | Article description | Rates of duty | | |
|---|---|---|---|---|
| | | 1 | | 2 |
| | | General | Special | |
| "9903.01.24 ................. | Except for products described in headings 9903.01.21, 9903.01.22, or 9903.01.23 articles the product of China and Hong Kong, as provided for in U.S. note 2(u) to this sub-chapter. | The duty provided in the applicable subheading + 20%. | The duty provided in the applicable subheading + 20%. | No Change". |

2. by inserting the following new U.S. note 2(u) to subchapter III of chapter 99 of the HTSUS in numerical sequence:

"2. (u) For the purposes of heading 9903.01.24, products of China and Hong Kong entered for consumption, or withdrawn from warehouse for consumption, on or after 12:01 a.m., eastern standard time on March 4, 2025, other than products described in heading 9903.01.21, heading 9903.01.22, heading 9903.01.23, and other than products for personal use included in accompanied

baggage of persons arriving in the United States, shall be subject to an additional 20% *ad valorem* rate of duty. Notwithstanding U.S. note 1 to this subchapter, all products of China and Hong Kong that are subject to the additional ad valorem rate of duty imposed by heading 9903.01.24 shall also be subject to the general rates of duty imposed on products of China and Hong Kong entered under subheadings in chapters 1 to 97 of the tariff schedule. Products of China and Hong Kong that are eligible for temporary duty

exemptions or reductions under subchapter II to chapter 99 shall be subject to the additional *ad valorem* rate of duty imposed by heading 9903.01.24.

The additional duties imposed by heading 9903.01.24 shall not apply to goods for which entry is properly claimed under a provision of chapter 98 of the tariff schedule pursuant to applicable regulations of U.S. Customs and Border Protection ("CBP"), and whenever CBP agrees that entry under such a provision is appropriate, except for goods entered

---

[1] 50 U.S.C. 1702(b)(1) covers "postal, telegraphic, telephonic, or other personal communication[s], which do[ ] not involve a transfer of anything of value," and hence does not encompass any imported articles of merchandise. 50 U.S.C. 1702(b)(4) covers "transactions ordinarily incident to travel to or from any country, including [1] importation of accompanied baggage for personal

use, [2] maintenance within any country including payment of living expenses and acquisition of goods or services for personal use, and [3] arrangement or facilitation of such travel including nonscheduled air, sea, or land voyages." Only the first of the three categories of exceptions covered by 50 U.S.C. 1702(b)(4)—products for personal use included in accompanied baggage of persons

arriving in the United States—encompasses imported articles of merchandise, and such articles are excluded from the scope of the additional *ad valorem* duties provided for in new HTSUS headings 9903.01.20 and 9903.01.24 by the terms of those headings and U.S. note 2(u).

under heading 9802.00.80; and subheadings 9802.00.40, 9802.00.50, and 9802.00.60. For subheadings 9802.00.40, 9802.00.50, and 9802.00.60, the additional duties apply to the value of repairs, alterations, or processing performed (in China and Hong Kong), as described in the applicable subheading. For heading 9802.00.80, the additional duties apply to the value of the article assembled abroad (in China and Hong Kong), less the cost or value of such products of the United States, as described.

Products of China and Hong Kong that are provided for in heading 9903.01.24 shall continue to be subject to antidumping, countervailing, or other duties, taxes, fees, exactions and charges that apply to such products, as well as to the additional *ad valorem* rate of duty imposed by heading 9903.01.24.

Products of China and Hong Kong that are provided for in heading 9903.01.24 and that are otherwise eligible for the administrative exemption from duty and certain taxes at 19 U.S.C. 1321(a)(2)(C)—known as ''*de minimis*'' exemption—may continue to qualify for the exemption, but the *de minimis* exemption shall cease to be available for such articles upon notification by the Secretary of Commerce, in consultation with the Secretary of the Treasury, to the President that adequate systems are in place to fully and expediently process and collect tariff revenue applicable for covered articles otherwise eligible for the *de minimis* exemption.

3. by amending subdivision (s) of note 2 to insert ''which have been entered for consumption, or withdrawn from warehouse for consumption, on or after 12:01 a.m. eastern standard time February 4, 2025, and prior to 12:01 a.m. eastern standard time on March 4, 2025,'' after ''products of China and Hong Kong'' in the first sentence in the first paragraph of the subdivision.

[FR Doc. 2025–03677 Filed 3–3–25; 10:00 pm]

**BILLING CODE 9111–14–P**

---

# DEPARTMENT OF HOMELAND SECURITY

## U.S. Customs and Border Protection

## Notice of Implementation of Additional Duties on Products of Mexico Pursuant to the President's Executive Order 14194, Imposing Duties To Address the Situation at Our Southern Border

**AGENCY:** U.S. Customs and Border Protection, Department of Homeland Security.

**ACTION:** Notice.

**SUMMARY:** In order to effectuate the President's Executive Order 14194, ''Imposing Duties to Address the Situation At Our Southern Border,'' as amended by Executive Order 14198, ''Progress on the Situation at Our Southern Border,'' and subsequently amended by the President's March 2, 2025 Executive Order ''Amendment to

Duties to Address the Situation At Our Southern Border,'' which imposed specified rates of duty on imports of articles that are products of Mexico, the Secretary of Homeland Security has determined that appropriate action is needed to modify the Harmonized Tariff Schedule of the United States (HTSUS) as set out in the Annex to this notice.

**DATES:** The duties set out in the Annex to this document are effective with respect to products of Mexico that are entered for consumption, or withdrawn from warehouse for consumption, on or after 12:01 a.m. eastern standard time on March 4, 2025.

**FOR FURTHER INFORMATION CONTACT:** Brandon Lord, Executive Director, Trade Policy and Programs, Office of Trade, U.S. Customs and Border Protection, (202) 325–6432 or by email at *traderemedy@cbp.dhs.gov.* Susan Thomas, Executive Director, Cargo and Conveyance Security, Office of Field Operations, U.S. Customs and Border Protection, (202) 344–3401 or by email at *traderemedy@cbp.dhs.gov.*

**SUPPLEMENTARY INFORMATION:** On January 20, 2025, the President declared a national emergency with respect to the grave threat to the United States posed by the influx of illegal aliens and drugs into the United States in Proclamation 10886 (Declaring a National Emergency at the Southern Border). *See* National Emergencies Act (50 U.S.C. 1601 *et seq.*) (NEA).

On February 1, 2025, the President expanded the scope of the national emergency declared in that proclamation to cover the public health crisis of deaths due to the use of fentanyl and other illicit drugs and the failure of Mexico to arrest, seize, detain, or otherwise intercept drug trafficking organizations, other drug and human traffickers, criminals at large, and drugs. In addition, the President determined that its failure to act on the part of the Mexican government constitutes an unusual and extraordinary threat, which has its source in substantial part outside the United States, to the national security, foreign policy, and economy of the United States. *See* Executive Order 14194 (90 FR 9117), dated February 1, 2025.

To address this threat, pursuant to the International Emergency Economic Powers Act (50 U.S.C. 1701 *et seq.*) (IEEPA), the NEA, section 604 of the Trade Act of 1974, as amended (19 U.S.C. 2483), and 3 U.S.C. 301, the President imposed ad valorem tariffs on all imports that are products of Mexico, excluding those encompassed by 50 U.S.C. 1702(b). Specifically, Executive Order 14194 adjusted duties on

imported products of Mexico, by imposing, consistent with law, an additional 25 percent ad valorem rate of duty.

On February 3, 2025, the President issued Executive Order 14198, ''Progress on the Situation at Our Southern Border'' (90 FR 9185), which amended Executive Order 14194 by pausing the implementation of the additional duties for 30 days until March 4, 2025, to allow time to assess whether actions taken by Mexico as of that date were sufficient to alleviate the crisis and resolve the unusual and extraordinary threat beyond our southern border. Additionally, Executive Order 14198 withdrew the exceptions in section 2(a) of Executive Order 14194 related to covered goods loaded onto a vessel at a port of entry or in transit on the final mode of transport prior to entry into the United States.

Subsequently, on March 2, 2025, the President amended subsection (g) of section 2 of Executive Order 14194, to modify the application of 19 U.S.C. 1321 to goods covered by subsection (a) of section 2 of Executive Order 14194. *See* Executive Order ''*Amendment to Duties to Address the Situation At Our Southern Border,*'' (March 2, 2025). Specifically, as amended, section 2(g) of Executive Order 14194 provides that duty-free *de minimis* treatment under 19 U.S.C. 1321 is available for otherwise eligible covered articles described in the Executive Order, but shall cease to be available for such articles upon notification by the Secretary of Commerce to the President that adequate systems are in place to fully and expediently process and collect tariff revenue applicable pursuant to subsection (a) of section 2 of the Executive Order for covered articles otherwise eligible for *de minimis* treatment.

Executive Order 14194 directed the Secretary of Homeland Security, to determine and implement the necessary modifications to the Harmonized Tariff Schedule of the United States (HTSUS), consistent with law, in order to effectuate the Executive Order, as amended by Executive Order 14198. In order to implement the rates of duty imposed by the Executive Order, as amended, effective on 12:01 a.m. eastern standard time on March 4, 2025, subchapter III of chapter 99 of the HTSUS is modified by the Annex to this notice.

Articles that are products of Mexico, excluding those encompassed by 50 U.S.C. 1702(b), that are entered for consumption, or withdrawn from warehouse for consumption, on or after 12:01 a.m. eastern standard time on

Exhibit 16

under heading 9802.00.80; and subheadings 9802.00.40, 9802.00.50, and 9802.00.60. For subheadings 9802.00.40, 9802.00.50, and 9802.00.60, the additional duties apply to the value of repairs, alterations, or processing performed (in China and Hong Kong), as described in the applicable subheading. For heading 9802.00.80, the additional duties apply to the value of the article assembled abroad (in China and Hong Kong), less the cost or value of such products of the United States, as described.

Products of China and Hong Kong that are provided for in heading 9903.01.24 shall continue to be subject to antidumping, countervailing, or other duties, taxes, fees, exactions and charges that apply to such products, as well as to the additional *ad valorem* rate of duty imposed by heading 9903.01.24.

Products of China and Hong Kong that are provided for in heading 9903.01.24 and that are otherwise eligible for the administrative exemption from duty and certain taxes at 19 U.S.C. 1321(a)(2)(C)—known as ''*de minimis*'' exemption—may continue to qualify for the exemption, but the *de minimis* exemption shall cease to be available for such articles upon notification by the Secretary of Commerce, in consultation with the Secretary of the Treasury, to the President that adequate systems are in place to fully and expediently process and collect tariff revenue applicable for covered articles otherwise eligible for the *de minimis* exemption.

3. by amending subdivision (s) of note 2 to insert ''which have been entered for consumption, or withdrawn from warehouse for consumption, on or after 12:01 a.m. eastern standard time February 4, 2025, and prior to 12:01 a.m. eastern standard time on March 4, 2025,'' after ''products of China and Hong Kong'' in the first sentence in the first paragraph of the subdivision.

[FR Doc. 2025–03677 Filed 3–3–25; 10:00 pm]

**BILLING CODE 9111–14–P**

---

# DEPARTMENT OF HOMELAND SECURITY

## U.S. Customs and Border Protection

## Notice of Implementation of Additional Duties on Products of Mexico Pursuant to the President's Executive Order 14194, Imposing Duties To Address the Situation at Our Southern Border

**AGENCY:** U.S. Customs and Border Protection, Department of Homeland Security.

**ACTION:** Notice.

**SUMMARY:** In order to effectuate the President's Executive Order 14194, ''Imposing Duties to Address the Situation At Our Southern Border,'' as amended by Executive Order 14198, ''Progress on the Situation at Our Southern Border,'' and subsequently amended by the President's March 2, 2025 Executive Order ''Amendment to

Duties to Address the Situation At Our Southern Border,'' which imposed specified rates of duty on imports of articles that are products of Mexico, the Secretary of Homeland Security has determined that appropriate action is needed to modify the Harmonized Tariff Schedule of the United States (HTSUS) as set out in the Annex to this notice.

**DATES:** The duties set out in the Annex to this document are effective with respect to products of Mexico that are entered for consumption, or withdrawn from warehouse for consumption, on or after 12:01 a.m. eastern standard time on March 4, 2025.

**FOR FURTHER INFORMATION CONTACT:** Brandon Lord, Executive Director, Trade Policy and Programs, Office of Trade, U.S. Customs and Border Protection, (202) 325–6432 or by email at *traderemedy@cbp.dhs.gov*. Susan Thomas, Executive Director, Cargo and Conveyance Security, Office of Field Operations, U.S. Customs and Border Protection, (202) 344–3401 or by email at *traderemedy@cbp.dhs.gov*.

**SUPPLEMENTARY INFORMATION:** On January 20, 2025, the President declared a national emergency with respect to the grave threat to the United States posed by the influx of illegal aliens and drugs into the United States in Proclamation 10886 (Declaring a National Emergency at the Southern Border). *See* National Emergencies Act (50 U.S.C. 1601 *et seq.*) (NEA).

On February 1, 2025, the President expanded the scope of the national emergency declared in that proclamation to cover the public health crisis of deaths due to the use of fentanyl and other illicit drugs and the failure of Mexico to arrest, seize, detain, or otherwise intercept drug trafficking organizations, other drug and human traffickers, criminals at large, and drugs. In addition, the President determined that its failure to act on the part of the Mexican government constitutes an unusual and extraordinary threat, which has its source in substantial part outside the United States, to the national security, foreign policy, and economy of the United States. *See* Executive Order 14194 (90 FR 9117), dated February 1, 2025.

To address this threat, pursuant to the International Emergency Economic Powers Act (50 U.S.C. 1701 *et seq.*) (IEEPA), the NEA, section 604 of the Trade Act of 1974, as amended (19 U.S.C. 2483), and 3 U.S.C. 301, the President imposed ad valorem tariffs on all imports that are products of Mexico, excluding those encompassed by 50 U.S.C. 1702(b). Specifically, Executive Order 14194 adjusted duties on

imported products of Mexico, by imposing, consistent with law, an additional 25 percent ad valorem rate of duty.

On February 3, 2025, the President issued Executive Order 14198, ''Progress on the Situation at Our Southern Border'' (90 FR 9185), which amended Executive Order 14194 by pausing the implementation of the additional duties for 30 days until March 4, 2025, to allow time to assess whether actions taken by Mexico as of that date were sufficient to alleviate the crisis and resolve the unusual and extraordinary threat beyond our southern border. Additionally, Executive Order 14198 withdrew the exceptions in section 2(a) of Executive Order 14194 related to covered goods loaded onto a vessel at a port of entry or in transit on the final mode of transport prior to entry into the United States.

Subsequently, on March 2, 2025, the President amended subsection (g) of section 2 of Executive Order 14194, to modify the application of 19 U.S.C. 1321 to goods covered by subsection (a) of section 2 of Executive Order 14194. *See* Executive Order ''*Amendment to Duties to Address the Situation At Our Southern Border,*'' (March 2, 2025). Specifically, as amended, section 2(g) of Executive Order 14194 provides that duty-free *de minimis* treatment under 19 U.S.C. 1321 is available for otherwise eligible covered articles described in the Executive Order, but shall cease to be available for such articles upon notification by the Secretary of Commerce to the President that adequate systems are in place to fully and expediently process and collect tariff revenue applicable pursuant to subsection (a) of section 2 of the Executive Order for covered articles otherwise eligible for *de minimis* treatment.

Executive Order 14194 directed the Secretary of Homeland Security, to determine and implement the necessary modifications to the Harmonized Tariff Schedule of the United States (HTSUS), consistent with law, in order to effectuate the Executive Order, as amended by Executive Order 14198. In order to implement the rates of duty imposed by the Executive Order, as amended, effective on 12:01 a.m. eastern standard time on March 4, 2025, subchapter III of chapter 99 of the HTSUS is modified by the Annex to this notice.

Articles that are products of Mexico, excluding those encompassed by 50 U.S.C. 1702(b), that are entered for consumption, or withdrawn from warehouse for consumption, on or after 12:01 a.m. eastern standard time on

March 4, 2025, will be subject to the additional *ad valorem* rate of duty provided for in new HTSUS heading 9903.01.01.

Imported products of Mexico that are encompassed by 50 U.S.C. 1702(b) will not be subject to the additional *ad valorem* duty provided for in new HTSUS heading 9903.01.01, but such qualifying products, other than products for personal use included in accompanied baggage of persons arriving in the United States, must be declared and entered under new HTSUS heading 9903.01.02 or new HTSUS heading 9903.01.03, as applicable. Specifically, new HTSUS heading 9903.01.02 covers products encompassed by 50 U.S.C. 1702(b)(2) and new HTSUS heading 9903.01.03 covers products encompassed by 50 U.S.C. 1702(b)(3).[1]

The additional ad valorem duty provided for in new HTSUS heading 9903.01.01 applies in addition to all other applicable duties, taxes, fees, exactions, and charges.

Further, pursuant to the March 2, 2025 Executive Order "Amendment to Duties to Address the Situation At Our Southern Border," the administrative exemption from duty and certain taxes at 19 U.S.C. 1321(a)(2)(C)—known as the "*de minimis*" exemption—continues to be available for articles covered by heading 9903.01.01 that are otherwise eligible for the exemption, including for eligible articles sent to the United States through the international postal network, but shall cease to be available for such articles upon notification by the Secretary of Commerce to the President that adequate systems are in place to fully and expediently process and collect tariff revenue applicable to articles covered by heading 9903.01.01 otherwise eligible for the "*de minimis*" exemption. Accordingly, articles that are the product of Mexico that are

eligible for the *de minimis* exemption and are covered by heading 9903.01.01 may continue to request duty free *de minimis* treatment until such time as the Secretary of Commerce, in consultation with the Secretary of the Treasury, so notifies the President and further guidance is provided.

The additional *ad valorem* duty provided for in new HTSUS heading 9903.01.01 also applies to products of Mexico that are eligible for special tariff treatment under general note 3(c)(i) to the HTSUS, and that are eligible for temporary duty exemptions or reductions under subchapter II to chapter 99. The Annex to this notice includes instructions on the application of the additional duties to goods entered under certain provisions of chapters 98 and 99 of the HTSUS, along with the application of the additional duties to goods qualifying for special tariff treatment under the United States-Mexico-Canada Agreement (USMCA).

The additional duties imposed by heading 9903.01.01 shall not apply to goods for which entry is properly claimed under a provision of chapter 98 of the tariff schedule pursuant to applicable regulations of U.S. Customs and Border Protection ("CBP"), and whenever CBP agrees that entry under such a provision is appropriate, except for goods entered under heading 9802.00.80; and subheadings 9802.00.40, 9802.00.50, and 9802.00.60. For subheadings 9802.00.40, 9802.00.50, and 9802.00.60, the additional duties apply to the value of repairs, alterations, or processing performed (in Mexico), as described in the applicable subheading. For heading 9802.00.80, the additional duties apply to the value of the article assembled abroad (in Mexico), less the cost or value of such products of the United States, as described.

The Annex to this notice also provides that products of Mexico

include both goods of Mexico under the rules set forth in part 102, Title 19 of the Code of Federal Regulations, as applicable, as well as goods for which Mexico was the last country of substantial transformation prior to importation into the United States.

Articles that are products of Mexico, excluding those encompassed by 50 U.S.C. 1702(b), except those that are eligible for admission to a foreign trade zone under "domestic status" as defined in 19 CFR 146.43, and are admitted into a United States foreign trade zone on or after 12:01 a.m. eastern standard time on March 4, 2025, must be admitted as "privileged foreign status" as defined in 19 CFR 146.41. Such articles will be subject, upon entry for consumption, to the duties imposed by the Executive Order, as amended, and the rates of duty related to the classification under the applicable HTSUS heading or subheading in effect at the time of admission into the United States foreign trade zone.

No drawback shall be available with respect to the additional duties imposed pursuant to the Executive Orders.

**Kristi Noem,**
*Secretary.*

## Annex

### To Modify Chapter 99 of the Harmonized Tariff Schedule of the United States

Effective with respect to goods entered for consumption, or withdrawn from warehouse for consumption, on or after 12:01 a.m. eastern standard time on March 4, 2025, subchapter III of chapter 99 of the Harmonized Tariff Schedule of the United States (HTSUS) is modified:

1. by inserting the following new heading 9903.01.01 in numerical sequence, with the material in the new heading inserted in the columns of the HTSUS labeled "Heading/Subheading", "Article Description", "Rates of Duty 1—General", "Rates of Duty 1—Special" and "Rates of Duty 2", respectively:

| Heading/subheading | Article description | Rates of duty | | |
| --- | --- | --- | --- | --- |
| | | 1 | | 2 |
| | | General | Special | |
| "9903.01.01 ................. | Except for products described in heading 9903.01.02 and heading 9903.01.03, articles the product of Mexico, as provided for in U.S. note 2(a) to this subchapter. | The duty provided in the applicable subheading + 25%. | The duty provided in the applicable subheading + 25%. | No change. |

2. by inserting the following new heading 9903.01.02 in numerical sequence, with the

material in the new heading inserted in the columns of the HTSUS labeled "Heading/

Subheading", "Article Description", "Rates

[1] 50 U.S.C. 1702(b)(1) covers "postal, telegraphic, telephonic, or other personal communication[s], which do[ ] not involve a transfer of anything of value," and hence does not encompass any imported articles of merchandise. 50 U.S.C. 1702(b)(4) covers "transactions ordinarily incident to travel to or from any country, including [1] importation of accompanied baggage for personal use, [2] maintenance within any country including payment of living expenses and acquisition of goods or services for personal use, and [3] arrangement or facilitation of such travel including nonscheduled air, sea, or land voyages." Only the first of the three categories of exceptions covered by 50 U.S.C. 1702(b)(4)—products for personal use included in accompanied baggage of persons arriving in the United States—encompasses imported articles of merchandise, and such articles are excluded from the scope of the additional *ad valorem* duty provided for in new HTSUS heading 9903.01.01 by the terms of that heading and new U.S. note 2(a).

of Duty 1—General'', ''Rates of Duty 1—Special'' and ''Rates of Duty 2'', respectively:

| Heading/subheading | Article description | Rates of duty | | |
|---|---|---|---|---|
| | | 1 | | 2 |
| | | General | Special | |
| ''9903.01.02 ................. | Articles the product of Mexico that are donations, by persons subject to the jurisdiction of the United States, of articles, such as food, clothing, and medicine, intended to be used to relieve human suffering, as provided for in U.S. note 2(b) to this sub-chapter. | The duty provided in the applicable subheading. | The duty provided in the applicable subheading. | No change. |

3. by inserting the following new heading 9903.01.03 in numerical sequence, with the material in the new heading inserted in the columns of the HTSUS labeled ''Heading/Subheading'', ''Article Description'', ''Rates of Duty 1—General'', ''Rates of Duty 1—Special'' and ''Rates of Duty 2'', respectively:

| Heading/subheading | Article description | Rates of duty | | |
|---|---|---|---|---|
| | | 1 | | 2 |
| | | General | Special | |
| ''9903.01.03 ................. | Articles the product of Mexico that are informational materials, including but not limited to, publications, films, posters, phono-graph records, photographs, microfilms, microfiche, tapes, compact disks, CD ROMs, artworks, and news wire feeds. | The duty provided in the applicable subheading. | The duty provided in the applicable subheading. | No change. |

4. by inserting the following new U.S. note 2 to subchapter III of chapter 99 of the HTSUS in numerical sequence:

''2. (a) For the purposes of heading 9903.01.01, products of Mexico, other than products described in heading 9903.01.02 and heading 9903.01.03, and other than products for personal use included in accompanied baggage of persons arriving in the United States, shall be subject to an additional 25% *ad valorem* rate of duty. Notwithstanding U.S. note 1 to this subchapter, all products of Mexico that are subject to the additional *ad valorem* rate of duty imposed by heading 9903.01.01 shall also be subject to the general rates of duty imposed on products of Mexico entered under subheadings in chapters 1 to 97 of the tariff schedule.

The additional duties imposed by heading 9903.01.01 apply to products of Mexico including both goods of Mexico under the rules set forth in part 102, title 19 of the Code of Federal Regulations, as applicable, as well as goods for which Mexico was the last country of substantial transformation prior to importation into the United States.

Products of Mexico that are eligible for special tariff treatment under general note 3(c)(i) to the tariff schedule, or that are eligible for temporary duty exemptions or reductions under subchapter II to chapter 99, shall be subject to the additional *ad valorem* rate of duty imposed by heading 9903.01.01.

The additional duties imposed by heading 9903.01.01 shall not apply to goods for which entry is properly claimed under a provision of chapter 98 of the tariff schedule pursuant to applicable regulations of U.S. Customs and Border Protection (''CBP''), and whenever CBP agrees that entry under such a provision is appropriate, except for goods entered under heading 9802.00.80; and subheadings 9802.00.40, 9802.00.50, and 9802.00.60. For subheadings 9802.00.40, 9802.00.50, and 9802.00.60, the additional duties apply to the value of repairs, alterations, or processing performed (in Mexico), as described in the applicable subheading. For heading 9802.00.80, the additional duties apply to the value of the article assembled abroad (in Mexico), less the cost or value of such products of the United States, as described.

Products of Mexico that are provided for in heading 9903.01.01 shall continue to be subject to antidumping, countervailing, or other duties, taxes, fees, exactions and charges that apply to such products, as well as to the additional *ad valorem* rate of duty imposed by heading 9903.01.01.

Products of Mexico that are provided for in heading 9903.01.01 and that are otherwise eligible for the administrative exemption from duty and certain taxes at 19 U.S.C. 1321(a)(2)(C)—known as ''*de minimis*'' exemption—may continue to qualify for the exemption, but the *de minimis* exemption shall cease to be available for such articles upon notification by the Secretary of Commerce, in consultation with the Secretary of the Treasury, to the President that adequate systems are in place to fully and expediently process and collect tariff revenue applicable for covered articles otherwise eligible for the *de minimis* exemption.

(b) Heading 9903.01.02 covers only products of Mexico, that are donations, by persons subject to the jurisdiction of the United States, of articles, such as food, clothing, and medicine, intended to be used to relieve human suffering, except to the extent that the President determines that such donations (A) would seriously impair his ability to deal with any national emergency declared under section 1701 of title 19 of the U.S. Code, (B) are in response to coercion against the proposed recipient or donor, or (C) would endanger Armed Forces of the United States which are engaged in hostilities or are in a situation where imminent involvement in hostilities is clearly indicated by the circumstances.''

[FR Doc. 2025–03665 Filed 3–3–25; 4:30 pm]

BILLING CODE 9111–14–P

# DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

[Docket No. FR–7092–N 10]

## 30-Day Notice of Proposed Information Collection: Manufactured Housing Survey; OMB Control No.: 2528–0029

**AGENCY:** Office of Policy Development and Research, Chief Data Officer, HUD.

**ACTION:** Notice.

**SUMMARY:** HUD is seeking approval from the Office of Management and Budget (OMB) for the information collection described below. In accordance with the Paperwork Reduction Act, HUD is requesting comments from all interested parties on the proposed collection of information. The purpose of this notice is to allow for 30 days of public comment.

**DATES:** *Comments Due Date:* April 7, 2025.

**ADDRESSES:** Interested persons are invited to submit comments regarding this proposal. Written comments and recommendations for the proposed information collection should be sent within 30 days of publication of this notice to *www.reginfo.gov/public/do/PRAMain.* Find this particular information collection by selecting ''Currently under 30-day Review—Open

Exhibit 17

Health, 6701 Rockledge Drive, Bethesda, MD 20892, (301) 402–8559, email: *jimok.kim@nih.gov.*

*Name of Committee:* Applied Immunology and Disease Control Integrated Review Group; Drug Discovery and Molecular Pharmacology A Study Section.

*Date:* April 22–23, 2025.

*Time:* 10:00 a.m. to 8:00 p.m.

*Agenda:* To review and evaluate grant applications.

*Meeting Format:* Virtual Meeting.

*Address:* National Institutes of Health, Rockledge II, 6701 Rockledge Drive, Bethesda, MD 20892.

*Contact Person:* Bidyottam Mittra, Ph.D., Scientific Review Officer, Center for Scientific Review, National Institutes of Health, 6701 Rockledge Drive, Bethesda, MD 20892, (301) 435–0000, email: *bidyottam.mittra@nih.gov.*

*Name of Committee:* Cell Biology Integrated Review Group; Cellular Mechanisms in Aging and Development Study Section.

*Date:* April 29–30, 2025.

*Time:* 9:00 a.m. to 7:00 p.m.

*Agenda:* To review and evaluate grant applications.

*Meeting Format:* Virtual Meeting.

*Address:* National Institutes of Health, 6701 Rockledge Drive, Bethesda, MD 20892.

*Contact Person:* Tami Jo Kingsbury, Ph.D., Scientific Review Officer, Center for Scientific Review, National Institutes of Health, 6701 Rockledge Drive, Room 710Q, Bethesda, MD 20892, (410) 274–1352, email: *tami.kingsbury@nih.gov.*

*Name of Committee:* Applied Immunology and Disease Control Integrated Review Group; Interspecies Microbial Interactions and Infectious Study Section.

*Date:* April 30–May 1, 2025.

*Time:* 11:00 a.m. to 4:30 p.m.

*Agenda:* To review and evaluate grant applications.

*Meeting Format:* Virtual Meeting.

*Address:* National Institutes of Health, Rockledge II, 6701 Rockledge Drive, Bethesda, MD 20892.

*Contact Person:* Irene Ramos Lopez, Scientific Review Officer, Center for Scientific Review, National Institutes of Health, 6701 Rockledge Drive, Bethesda, MD 20892, (301) 480–4891, email: *irene.ramoslopez@nih.gov.*

(Catalogue of Federal Domestic Assistance Program Nos. 93.306, Comparative Medicine; 93.333, Clinical Research, 93.306, 93.333, 93.337, 93.393–93.396, 93.837–93.844, 93.846–93.878, 93.892, 93.893, National Institutes of Health, HHS)

Dated: March 5, 2025.

**Bruce A. George,**

*Program Analyst, Office of Federal Advisory Committee Policy.*

[FR Doc. 2025–03829 Filed 3–10–25; 8:45 am]

**BILLING CODE 4140–01–P**

# DEPARTMENT OF HEALTH AND HUMAN SERVICES

## National Institutes of Health

### Center for Scientific Review; Notice of Closed Meetings

Pursuant to section 1009 of the Federal Advisory Committee Act, as amended, notice is hereby given of the following meetings.

The meetings will be closed to the public in accordance with the provisions set forth in sections 552b(c)(4) and 552b(c)(6), Title 5 U.S.C., as amended. The grant applications and the discussions could disclose confidential trade secrets or commercial property such as patentable material, and personal information concerning individuals associated with the grant applications, the disclosure of which would constitute a clearly unwarranted invasion of personal privacy.

*Name of Committee:* Center for Scientific Review Special Emphasis Panel; Fellowships: Infectious Diseases and Immunology B Review Panel.

*Date:* March 27–28, 2025.

*Time:* 9:00 a.m. to 6:00 p.m.

*Agenda:* To review and evaluate grant applications.

*Address:* National Institutes of Health, Rockledge II, 6701 Rockledge Drive, Bethesda, MD 20892.

*Meeting Format:* Virtual Meeting.

*Contact Person:* Diana Maria Ortiz-Garcia, Ph.D., Scientific Review Officer, Center for Scientific Review, National Institutes of Health, 6701 Rockledge Drive, Bethesda, MD 20892, (301) 594–5614, *diana.ortiz-garcia@nih.gov.*

*Name of Committee:* Center for Scientific Review Special Emphasis Panel; Fellowships: Infectious Diseases and Immunology B Review Panel.

*Date:* April 2–3, 2025.

*Time:* 10:00 a.m. to 7:00 p.m.

*Agenda:* To review and evaluate grant applications.

*Address:* National Institutes of Health, Rockledge II, 6701 Rockledge Drive, Bethesda, MD 20892.

*Meeting Format:* Virtual Meeting.

*Contact Person:* Seyhan Boyoglu-Barnum, Scientific Review Officer, Center for Scientific Review, National Institutes of Health, 6701 Rockledge Drive, Bethesda, MD 20892, *seyhan.boyoglu-barnum@nih.gov.*

(Catalogue of Federal Domestic Assistance Program Nos. 93.306, Comparative Medicine; 93.333, Clinical Research, 93.306, 93.333, 93.337, 93.393–93.396, 93.837–93.844, 93.846–93.878, 93.892, 93.893, National Institutes of Health, HHS)

Dated: March 6, 2025.

**David W. Freeman,**

*Supervisory Program Analyst, Office of Federal Advisory Committee Policy.*

[FR Doc. 2025–03876 Filed 3–10–25; 8:45 am]

**BILLING CODE 4140–01–P**

# DEPARTMENT OF HOMELAND SECURITY

## U.S. Customs and Border Protection

### Amendment to Notice of Implementation of Additional Duties on Products of Canada Pursuant to the President's Executive Order 14193, Imposing Duties To Address the Flow of Illicit Drugs Across our Northern Border

**AGENCY:** U.S. Customs and Border Protection (CBP), Department of Homeland Security.

**ACTION:** Notice.

**SUMMARY:** In order to effectuate the President's Executive Order 14193, ''Imposing Duties to Address the Flow of Illicit Drugs Across Our Northern Border,'' as amended by Executive Order 14197, ''Progress on the Situation at Our Northern Border'', and subsequently amended by Executive Order 14226, ''Amendment to Duties to Address the Flow of Illicit Drugs Across Our Northern Border'', which imposed specified rates of duty on imports of articles that are products of Canada, and further amended by the President's March 6, 2025 Executive order ''Amendment to Duties to Address the Flow of Illicit Drugs Across Our Northern Border,'' the Secretary of Homeland Security has determined that appropriate action is needed to modify the Harmonized Tariff Schedule of the United States (HTSUS) as set out in the Annex to this notice.

**DATES:** The duties set out in the Annex to this document are effective with respect to products of Canada that are entered for consumption, or withdrawn from warehouse for consumption, on or after 12:01 a.m. eastern standard time on March 7, 2025.

**FOR FURTHER INFORMATION CONTACT:** Brandon Lord, Executive Director, Trade Policy and Programs, Office of Trade, U.S. Customs and Border Protection, (202) 325–6432 or by email at *traderemedy@cbp.dhs.gov.* C. Shane Campbell, Acting Executive Director, Cargo and Conveyance Security, Office of Field Operations, U.S. Customs and Border Protection, (202) 344–3401 or by email at *traderemedy@cbp.dhs.gov.*

**SUPPLEMENTARY INFORMATION:** On January 20, 2025, the President declared a national emergency with respect to the grave threat to the United States posed by the influx of illegal aliens and drugs into the United States in Proclamation 10886 (Declaring a National Emergency at the Southern Border) (90 FR 8327, January 29, 2025). *See* National

Emergencies Act (50 U.S.C. 1601 *et seq.*) (NEA).

On February 1, 2025, the President expanded the scope of the national emergency declared in that proclamation to cover the threat to safety and security of Americans, including the public health crisis of deaths due to the use of fentanyl and other illicit drugs and the failure of Canada to do more to arrest, seize, detain, or otherwise intercept drug trafficking organizations, other drug and human traffickers, criminals at large, and drugs. In addition, the President determined that this failure to act on the part of Canada constitutes an unusual and extraordinary threat, which has its source in substantial part outside the United States, to the national security and foreign policy of the United States. *See* Executive Order 14193 (90 FR 9113), dated February 1, 2025.

To address this threat, pursuant to the International Emergency Economic Powers Act (50 U.S.C. 1701 *et seq.*) (IEEPA), the NEA, section 604 of the Trade Act of 1974, as amended (19 U.S.C. 2483), and 3 U.S.C. 301, the President imposed ad valorem tariffs on all imports that are products of Canada, excluding those encompassed by 50 U.S.C. 1702(b). Specifically, Executive Order 14193 adjusted duties on imported products of Canada, except for imports of energy and energy resources that are products of Canada, by imposing, consistent with law, an additional 25 percent ad valorem rate of duty. With respect to imports of energy and energy resources that are products of Canada, the Executive order imposed, consistent with law, an additional 10 percent ad valorem rate of duty.

On February 3, 2025, the President issued Executive Order 14197, "Progress on the Situation at our Northern Border" (90 FR 9183), which amended Executive Order 14193 by pausing the implementation of the additional duties for 30 days until March 4, 2025, to allow time to assess whether actions taken by Canada as of that date were sufficient to alleviate the crisis and resolve the unusual and extraordinary threat beyond our southern border. Additionally, Executive Order 14197 withdrew the exceptions in section 2(a) of Executive Order 14193 related to covered goods loaded onto a vessel at a port of entry or in transit on the final mode of transport prior to entry into the United States.

Subsequently, on March 2, 2025, the President amended subsection (h) of section 2 of Executive Order 14193, to modify the application of 19 U.S.C. 1321 to goods covered by subsection (a)

and subsection (b) of section 2 of Executive Order 14193. *See* Executive Order 14226, "Amendment to Duties to Address the Flow of Illicit Drugs Across Our Northern Border" (March 2, 2025) (90 FR 11369, March 6, 2025). Specifically, as amended, subsection (h) of section 2 of Executive Order 14193 provides that duty-free *de minimis* treatment under 19 U.S.C. 1321 is available for otherwise eligible covered articles described in the Executive order, but shall cease to be available for such articles upon notification by the Secretary of Commerce to the President that adequate systems are in place to fully and expediently process and collect tariff revenue applicable pursuant to subsection (a) and subsection (b) of section 2 of the Executive order for covered articles otherwise eligible for *de minimis* treatment.

On March 6, 2025, the President signed Executive order "Amendment to Duties to Address the Flow of Illicit Drugs Across Our Northern Border." In that Executive order, the President determined that automotive production is a major source of U.S. employment and innovation and integral to U.S. economic and national security. The American automotive industry as currently structured often trades substantial volumes of automotive parts and components across our borders in the interest of bringing supply chains closer to North America. In order to minimize disruption to the U.S. automotive industry and automotive workers, the President determined that it is appropriate to adjust tariffs imposed on articles of Canada. Accordingly, articles that are entered free of duty as originating in Canada under the terms of general note 11 to the Harmonized Tariff Schedule of the United States (HTSUS), including any treatment set forth in subchapter XXIII of chapter 98 and subchapter XXII of chapter 99 of the HTSUS, as related to the Agreement between the United States of America, United Mexican States, and Canada (USMCA), shall not be subject to the additional ad valorem rate of duty described in section 2(a) or section 2(b) of Executive Order 14193.

Furthermore, the additional ad valorem rate of duty described in Executive Order 14193 is reduced from 25% to 10% for potash that does not qualify for duty-free treatment under the USMCA, but is a product of Canada, in accordance with the March 6, 2025 Executive order. All other products of Canada that do not qualify for duty-free treatment under the USMCA shall remain subject to the rates set forth in

Executive Order 14193 (unless otherwise exempted).

Executive Order 14193 directed the Secretary of Homeland Security to determine and implement the necessary modifications to the Harmonized Tariff Schedule of the United States (HTSUS), consistent with law, in order to effectuate the Executive order, as amended by Executive Order 14197, Executive Order 14226, and the March 6, 2025 Executive order.

As such, this notice is revising the March 3, 2025 CBP **Federal Register** Notice titled "Notice of Implementation of Additional Duties on Products of Canada Pursuant to the President's Executive Order 14193, Imposing Duties to Address the Flow of Illicit Drugs Across Our Northern Border" (90 FR 11423, March 6, 2025) to implement the rates of duty imposed by the Executive order, as amended, effective on 12:01 a.m. eastern standard time on March 7, 2025, subchapter III of chapter 99 of the HTSUS is modified by the Annex to this notice.

Articles that are entered free of duty as originating under the terms of general note 11 to the HTSUS, including any treatment set forth in subchapter XXIII of chapter 98 and subchapter XXII of chapter 99 of the HTSUS, as related to USMCA, will not be subject to the additional *ad valorem* rate of duty provided for in HTSUS heading 9903.01.10, as specified in new HTSUS heading 9903.01.14. Potash not qualifying for duty-free treatment under the USMCA, but which is a product of Canada, that is entered for consumption, or withdrawn from warehouse for consumption, on or after 12:01 a.m. eastern standard time on March 7, 2025, will be subject to the reduced additional 10% *ad valorem* rate of duty provided for in HTSUS heading 9903.01.15, instead of the 25% ad valorem rate provided for in HTSUS heading 9903.01.10.

Imported products of Canada that are encompassed by 50 U.S.C. 1702(b) will not be subject to the additional *ad valorem* duty rates provided for in new HTSUS heading 9903.01.15 such qualifying products, other than products for personal use included in accompanied baggage of persons arriving in the United States, must be declared and entered under HTSUS heading 9903.01.11 or HTSUS heading 9903.01.12, as applicable. Specifically, HTSUS heading 9903.01.11 covers products encompassed by 50 U.S.C. 1702(b)(2) and HTSUS heading

9903.01.12 covers products encompassed by 50 U.S.C. 1702(b)(3).[1]

The additional ad valorem duty provided for in new HTSUS heading 9903.01.15 applies in addition to all other applicable duties, taxes, fees, exactions, and charges.

Further, pursuant to Executive Order 14226, the administrative exemption from duty and certain taxes at 19 U.S.C. 1321(a)(2)(C)—known as the ''*de minimis*'' exemption—continues to be available for articles covered by HTSUS headings 9903.01.14 and 9903.01.15 that are otherwise eligible for the exemption, including for eligible articles sent to the United States through the international postal network, but shall cease to be available for such articles upon notification by the Secretary of Commerce to the President that adequate systems are in place to fully and expediently process and collect tariff revenue applicable to articles covered by HTSUS headings 9903.01.14 and 9903.01.15 otherwise eligible for the ''*de minimis*'' exemption. Accordingly, articles that are products of Canada that are eligible for the *de minimis* exemption and are covered by HTSUS headings 9903.01.14 and 9903.01.15 may continue to request *de minimis* entry and clearance until such time as the Secretary of Commerce, in consultation with the Secretary of the Treasury, so notifies the President and further guidance is provided.

The additional ad valorem duty provided for in new HTSUS heading 9903.01.15 also applies to products of Canada that are eligible for temporary duty exemptions or reductions under subchapter II to chapter 99, shall be subject to the additional *ad valorem* rate of duty imposed by HTSUS heading 9903.01.15.

The additional duties imposed by HTSUS heading 9903.01.15 shall not apply to goods for which entry is properly claimed under a provision of chapter 98 of the tariff schedule pursuant to applicable regulations of CBP, and whenever CBP agrees that entry under such a provision is appropriate, except for goods entered under subheading 9802.00.80; and subheadings 9802.00.40, 9802.00.50, and 9802.00.60. For subheadings 9802.00.40, 9802.00.50, and 9802.00.60, the additional duties apply to the value of repairs, alterations, or processing performed (in Canada), as described in the applicable subheading. For heading 9802.00.80, the additional duties apply to the value of the article assembled abroad (in Canada), less the cost or value of such products of the United States, as described.

The Annex to this notice also provides that products of Canada include both goods of Canada under the rules set forth in part 102, title 19 of the Code of Federal Regulations, as applicable, as well as goods for which Canada was the last country of substantial transformation prior to importation into the United States.

Articles that are products of Canada, excluding those encompassed by 50 U.S.C. 1702(b), except those that are eligible for admission to a foreign trade zone under ''domestic status'' as defined in 19 CFR 146.43, and are admitted into a United States foreign trade zone on or after 12:01 a.m. eastern standard time on March 4, 2025, must be admitted as ''privileged foreign status'' as defined in 19 CFR 146.41. Such articles will be subject, upon entry for consumption, to the duties imposed by the Executive order, as amended, and the rates of duty related to the classification under the applicable HTSUS heading or subheading in effect at the time of admission into the United States foreign trade zone.

No drawback shall be available with respect to the additional duties imposed pursuant to the Executive orders.

**Kristi Noem,**

*Secretary.*

## Annex

### To Modify Chapter 99 of the Harmonized Tariff Schedule of the United States

1. Effective with respect to goods entered for consumption, or withdrawn from warehouse for consumption, on or after 12:01 a.m. eastern standard time on March 7, 2025, subdivision (j) of note 2 to subchapter III of chapter 99 of the Harmonized Tariff Schedule of the United States (HTSUS) is modified by deleting ''and heading 9903.11.13,'' and by inserting ''9903.01.13, 9903.01.14, and 9902.01.15'' in lieu thereof. Subdivision (j) of note 2 to subchapter III of chapter 99 of HTSUS is also modified with respect to heading 9903.01.10 by deleting ''other than products described in headings 9903.01.11, 9903.01.12 and 9903.01.13,'' and by inserting ''other than products described in headings 9903.01.11, 9903.01.12, 9903.01.13, 9903.01.14, and 9903.01.15,'' in lieu thereof.

2. The heading 9903.01.10 is modified by deleting ''except for products described in headings 9903.01.11, 9903.01.12, and heading 9903.01.13,'' and by inserting ''except for products described in headings 9903.01.11, 9903.01.12, 9903.01.13, 9903.01.14, and 9903.01.15,'' in lieu thereof.

3. The heading 9903.01.13 is modified by deleting ''except for products described in headings 9903.01.11 and 9903.01.12,'' and by inserting ''except for products described in headings 9903.01.11, 9903.01.12, 9903.01.14 and 9903.01.15.''

4. Effective with respect to goods entered for consumption, or withdrawn from warehouse for consumption on or after 12:01 a.m. eastern standard time on March 7, 2025, note 2 to subchapter III of chapter 99 of the HTSUS is modified by inserting the following new subdivision (l):

''(l) For the purposes of heading 9903.01.15, products of Canada, other than products described in headings 9903.01.11, 9903.01.12, and 9903.01.14, and other than products for personal use included in accompanied baggage of persons arriving in the United States, shall be subject to an additional 10% *ad valorem* rate of duty. Notwithstanding U.S. note 1 to this subchapter, all products of Canada that are subject to the additional *ad valorem* rate of duty imposed by heading 9903.01.15 shall also be subject to the general rates of duty imposed on products of Canada entered under subheadings in chapters 1 to 97 of the tariff schedule.

The additional duties imposed by heading 9903.01.15 apply to products of Canada including both goods of Canada under the rules set forth in part 102, title 19 of the Code of Federal Regulations, as applicable, as well as goods for which Canada was the last country of substantial transformation prior to importation into the United States.

Products of Canada that are eligible for temporary duty exemptions or reductions under subchapter II to chapter 99, shall be subject to the additional *ad valorem* rate of duty imposed by heading 9903.01.15.

The additional duties imposed by heading 9903.01.15 shall not apply to goods for which entry is properly claimed under a provision of chapter 98 of the tariff schedule pursuant to applicable regulations of U.S. Customs and Border Protection (''CBP''), and whenever CBP agrees that entry under such a provision is appropriate, except for goods entered under heading 9802.00.80; and subheadings 9802.00.40, 9802.00.50, and 9802.00.60. For subheadings 9802.00.40, 9802.00.50, and 9802.00.60, the additional duties apply to the value of repairs, alterations, or processing performed (in Canada), as described in the applicable subheading. For heading 9802.00.80, the additional duties apply to the value of the article assembled abroad (in Canada), less the cost or value of such products of the United States, as described.

Products of Canada that are provided for in heading 9903.01.15 shall continue to be subject to antidumping, countervailing, or

[1] 50 U.S.C. 1702(b)(1) covers ''postal, telegraphic, telephonic, or other personal communication[s], which do[ ] not involve a transfer of anything of value,'' and hence does not encompass any imported articles of merchandise. 50 U.S.C. 1702(b)(4) covers ''transactions ordinarily incident to travel to or from any country, including [1] importation of accompanied baggage for personal use, [2] maintenance within any country including payment of living expenses and acquisition of goods or services for personal use, and [3] arrangement or facilitation of such travel including nonscheduled air, sea, or land voyages.'' Only the first of the three categories of exceptions covered by 50 U.S.C. 1702(b)(4)—products for personal use included in accompanied baggage of persons arriving in the United States—encompasses imported articles of merchandise, and such articles are excluded from the scope of the additional *ad valorem* duties provided for in new HTSUS headings 9903.01.14 and 9903.01.15 by the terms of those headings and new U.S. note 2(j).

other duties, taxes, fees, exactions and charges that apply to such products, as well as to the additional *ad valorem* rate of duty imposed by heading 9903.01.15.

Products of Canada that are provided for in headings 9903.01.14 and 9903.01.15 that are otherwise eligible for the administrative exemption from duty and certain taxes at 19 U.S.C. 1321(a)(2)(C)—known as the "*de minimis*" exemption—may continue to qualify for the exemption, but the *de minimis* exemption shall cease to be available for such articles upon notification by the Secretary of Commerce, in consultation with the Secretary of the Treasury, to the President

that adequate systems are in place to fully and expediently process and collect tariff revenue applicable for covered articles otherwise eligible for the *de minimis* exemption."

5. Effective with respect to goods entered for consumption, or withdrawn from warehouse for consumption, on or after 12:01 a.m. eastern standard time on March 7, 2025, the article description of heading 9903.01.10 is modified by deleting "9903.01.12 or, 9903.01.13," and by inserting "9903.01.12, 9903.01.13, 9903.01.14 or 9903.01.15," in lieu thereof.

6. Effective with respect to goods entered for consumption, or withdrawn from warehouse for consumption, on or after 12:01 a.m. eastern standard time on March 7, 2025, subchapter III of chapter 99 of the HTSUS is modified by inserting new headings 9903.01.14 and 9903.01.15 in numerical sequence, with the material in the new heading inserted in the columns of the HTSUS labeled "Heading/Subheading", "Article Description", "Rates of Duty 1—General", "Rates of Duty 1—Special" and "Rates of Duty 2", respectively:

| Heading/ subheading | Article description | Rates of duty | | |
| | | 1 | | 2 |
| | | General | Special | |
| "9903.01.14 | Articles that are entered free of duty under the terms of general note 11 to the HTSUS, including any treatment set forth in subchapter XXIII of chapter 98 and subchapter XXII of chapter 99 of the HTS, as related to the USMCA. | No change ................... | The duty provided in the applicable subheading. | No change. |
| 9903.01.15 | Potash that is a product of Canada, as provided for in U.S. note 2(l) to this subchapter. | The duty provided in the applicable subheading + 10%. | No change ................... | No change". |

[FR Doc. 2025–03901 Filed 3–6–25; 7:00 pm]

**BILLING CODE 9111–14–P**

---

## DEPARTMENT OF HOMELAND SECURITY

### U.S. Customs and Border Protection

### Amendment to Notice of Implementation of Additional Duties on Products of Mexico Pursuant to the President's Executive Order 14194, Imposing Duties To Address the Situation at Our Southern Border

**AGENCY:** U.S. Customs and Border Protection (CBP), Department of Homeland Security.

**ACTION:** Notice.

**SUMMARY:** In order to effectuate the President's Executive Order 14194, "Imposing Duties to Address the Situation At Our Southern Border," as amended by Executive Order 14198, "Progress on the Situation at Our Southern Border," and subsequently amended by Executive Order 14227, "Amendment to Duties to Address the Situation At Our Southern Border," which imposed specified rates of duty on imports of articles that are products of Mexico, and further amended by the President's March 6, 2025 Executive order "Amendment to Duties to Address the Flow of Illicit Drugs Across Our Southern Border," the Secretary of Homeland Security has determined that appropriate action is needed to modify

the Harmonized Tariff Schedule of the United States (HTSUS) as set out in the Annex to this notice.

**DATES:** The duties set out in the Annex to this document are effective with respect to products of Mexico that are entered for consumption, or withdrawn from warehouse for consumption, on or after 12:01 a.m. eastern standard time on March 7, 2025.

**FOR FURTHER INFORMATION CONTACT:** Brandon Lord, Executive Director, Trade Policy and Programs, Office of Trade, U.S. Customs and Border Protection, (202) 325–6432 or by email at *traderemedy@cbp.dhs.gov.* C. Shane Campbell, Acting Executive Director, Cargo and Conveyance Security, Office of Field Operations, U.S. Customs and Border Protection, (202) 344–3401 or by email at *traderemedy@cbp.dhs.gov.*

**SUPPLEMENTARY INFORMATION:** On January 20, 2025, the President declared a national emergency with respect to the grave threat to the United States posed by the influx of illegal aliens and drugs into the United States in Proclamation 10886 (Declaring a National Emergency at the Southern Border) (90 FR 8327, January 29, 2025). *See* National Emergencies Act (50 U.S.C. 1601 *et seq.*) (NEA).

On February 1, 2025, the President expanded the scope of the national emergency declared in that proclamation to cover the public health crisis of deaths due to the use of fentanyl and other illicit drugs and the

failure of Mexico to arrest, seize, detain, or otherwise intercept drug trafficking organizations, other drug and human traffickers, criminals at large, and drugs. In addition, the President determined that this failure to act on the part of the Mexican government constitutes an unusual and extraordinary threat, which has its source in substantial part outside the United States, to the national security, foreign policy, and economy of the United States. *See* Executive Order 14194 (90 FR 9117), dated February 1, 2025.

To address this threat, pursuant to the International Emergency Economic Powers Act (50 U.S.C. 1701 *et seq.*) (IEEPA), the NEA, section 604 of the Trade Act of 1974, as amended (19 U.S.C. 2483), and 3 U.S.C. 301, the President imposed ad valorem tariffs on all imports that are products of Mexico, excluding those encompassed by 50 U.S.C. 1702(b). Specifically, Executive Order 14194 adjusted duties on imported products of Mexico, by imposing, consistent with law, an additional 25 percent ad valorem rate of duty.

On February 3, 2025, the President issued Executive Order 14198, "Progress on the Situation at Our Southern Border" (90 FR 9185), which amended the implementation of the additional duties for 30 days until March 4, 2025, to allow time to assess whether actions taken by Mexico as of that date were sufficient to alleviate the crisis and resolve the

Exhibit 18

Federal Register

Vol. 90, No. 65

Monday, April 7, 2025

# Presidential Documents

Title 3—

The President

Executive Order 14257 of April 2, 2025

## Regulating Imports With a Reciprocal Tariff To Rectify Trade Practices That Contribute to Large and Persistent Annual United States Goods Trade Deficits

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the International Emergency Economic Powers Act (50 U.S.C. 1701 *et seq.*)(IEEPA), the National Emergencies Act (50 U.S.C. 1601 *et seq.*)(NEA), section 604 of the Trade Act of 1974, as amended (19 U.S.C. 2483), and section 301 of title 3, United States Code,

I, DONALD J. TRUMP, President of the United States of America, find that underlying conditions, including a lack of reciprocity in our bilateral trade relationships, disparate tariff rates and non-tariff barriers, and U.S. trading partners' economic policies that suppress domestic wages and consumption, as indicated by large and persistent annual U.S. goods deficits, constitute an unusual and extraordinary threat to the national security and economy of the United States. That threat has its source in whole or substantial part outside the United States in the domestic economic policies of key trading partners and structural imbalances in the global trading system. I hereby declare a national emergency with respect to this threat.

On January 20, 2025, I signed the America First Trade Policy Presidential Memorandum directing my Administration to investigate the causes of our country's large and persistent annual trade deficits in goods, including the economic and national security implications and risks resulting from such deficits, and to undertake a review of, and identify, any unfair trade practices by other countries. On February 13, 2025, I signed a Presidential Memorandum entitled ''Reciprocal Trade and Tariffs,'' that directed further review of our trading partners' non-reciprocal trading practices, and noted the relationship between non-reciprocal practices and the trade deficit. On April 1, 2025, I received the final results of those investigations, and I am taking action today based on those results.

Large and persistent annual U.S. goods trade deficits have led to the hollowing out of our manufacturing base; inhibited our ability to scale advanced domestic manufacturing capacity; undermined critical supply chains; and rendered our defense-industrial base dependent on foreign adversaries. Large and persistent annual U.S. goods trade deficits are caused in substantial part by a lack of reciprocity in our bilateral trade relationships. This situation is evidenced by disparate tariff rates and non-tariff barriers that make it harder for U.S. manufacturers to sell their products in foreign markets. It is also evidenced by the economic policies of key U.S. trading partners insofar as they suppress domestic wages and consumption, and thereby demand for U.S. exports, while artificially increasing the competitiveness of their goods in global markets. These conditions have given rise to the national emergency that this order is intended to abate and resolve.

For decades starting in 1934, U.S. trade policy has been organized around the principle of reciprocity. The Congress directed the President to secure reduced reciprocal tariff rates from key trading partners first through bilateral trade agreements and later under the auspices of the global trading system. Between 1934 and 1945, the executive branch negotiated and signed 32 bilateral reciprocal trade agreements designed to lower tariff rates on a

reciprocal basis. After 1947 through 1994, participating countries engaged in eight rounds of negotiation, which resulted in the General Agreements on Tariffs and Trade (GATT) and seven subsequent tariff reduction rounds.

However, despite a commitment to the principle of reciprocity, the trading relationship between the United States and its trading partners has become highly unbalanced, particularly in recent years. The post-war international economic system was based upon three incorrect assumptions: first, that if the United States led the world in liberalizing tariff and non-tariff barriers the rest of the world would follow; second, that such liberalization would ultimately result in more economic convergence and increased domestic consumption among U.S. trading partners converging towards the share in the United States; and third, that as a result, the United States would not accrue large and persistent goods trade deficits.

This framework set in motion events, agreements, and commitments that did not result in reciprocity or generally increase domestic consumption in foreign economies relative to domestic consumption in the United States. Those events, in turn, created large and persistent annual U.S. goods trade deficits as a feature of the global trading system.

Put simply, while World Trade Organization (WTO) Members agreed to bind their tariff rates on a most-favored-nation (MFN) basis, and thereby provide their best tariff rates to all WTO Members, they did not agree to bind their tariff rates at similarly low levels or to apply tariff rates on a reciprocal basis. Consequently, according to the WTO, the United States has among the lowest simple average MFN tariff rates in the world at 3.3 percent, while many of our key trading partners like Brazil (11.2 percent), China (7.5 percent), the European Union (EU) (5 percent), India (17 percent), and Vietnam (9.4 percent) have simple average MFN tariff rates that are significantly higher.

Moreover, these average MFN tariff rates conceal much larger discrepancies across economies in tariff rates applied to particular products. For example, the United States imposes a 2.5 percent tariff on passenger vehicle imports (with internal combustion engines), while the European Union (10 percent), India (70 percent), and China (15 percent) impose much higher duties on the same product. For network switches and routers, the United States imposes a 0 percent tariff, but for similar products, India (10 percent) levies a higher rate. Brazil (18 percent) and Indonesia (30 percent) impose a higher tariff on ethanol than does the United States (2.5 percent). For rice in the husk, the U.S. MFN tariff is 2.7 percent (*ad valorem* equivalent), while India (80 percent), Malaysia (40 percent), and Turkey (an average of 31 percent) impose higher rates. Apples enter the United States duty-free, but not so in Turkey (60.3 percent) and India (50 percent).

Similarly, non-tariff barriers also deprive U.S. manufacturers of reciprocal access to markets around the world. The 2025 National Trade Estimate Report on Foreign Trade Barriers (NTE) details a great number of non-tariff barriers to U.S. exports around the world on a trading-partner by trading-partner basis. These barriers include import barriers and licensing restrictions; customs barriers and shortcomings in trade facilitation; technical barriers to trade (e.g., unnecessarily trade restrictive standards, conformity assessment procedures, or technical regulations); sanitary and phytosanitary measures that unnecessarily restrict trade without furthering safety objectives; inadequate patent, copyright, trade secret, and trademark regimes and inadequate enforcement of intellectual property rights; discriminatory licensing requirements or regulatory standards; barriers to cross-border data flows and discriminatory practices affecting trade in digital products; investment barriers; subsidies; anticompetitive practices; discrimination in favor of domestic state-owned enterprises, and failures by governments in protecting labor and environment standards; bribery; and corruption.

Moreover, non-tariff barriers include the domestic economic policies and practices of our trading partners, including currency practices and value-added taxes, and their associated market distortions, that suppress domestic

consumption and boost exports to the United States. This lack of reciprocity is apparent in the fact that the share of consumption to Gross Domestic Product (GDP) in the United States is about 68 percent, but it is much lower in others like Ireland (27 percent), Singapore (31 percent), China (39 percent), South Korea (49 percent), and Germany (50 percent).

At the same time, efforts by the United States to address these imbalances have stalled. Trading partners have repeatedly blocked multilateral and plurilateral solutions, including in the context of new rounds of tariff negotiations and efforts to discipline non-tariff barriers. At the same time, with the U.S. economy disproportionately open to imports, U.S. trading partners have had few incentives to provide reciprocal treatment to U.S. exports in the context of bilateral trade negotiations.

These structural asymmetries have driven the large and persistent annual U.S. goods trade deficit. Even for countries with which the United States may enjoy an occasional bilateral trade surplus, the accumulation of tariff and non-tariff barriers on U.S. exports may make that surplus smaller than it would have been without such barriers. Permitting these asymmetries to continue is not sustainable in today's economic and geopolitical environment because of the effect they have on U.S. domestic production. A nation's ability to produce domestically is the bedrock of its national and economic security.

Both my first Administration in 2017, and the Biden Administration in 2022, recognized that increasing domestic manufacturing is critical to U.S. national security. According to 2023 United Nations data, U.S. manufacturing output as a share of global manufacturing output was 17.4 percent, down from a peak in 2001 of 28.4 percent.

Over time, the persistent decline in U.S. manufacturing output has reduced U.S. manufacturing capacity. The need to maintain robust and resilient domestic manufacturing capacity is particularly acute in certain advanced industrial sectors like automobiles, shipbuilding, pharmaceuticals, technology products, machine tools, and basic and fabricated metals, because once competitors gain sufficient global market share in these sectors, U.S. production could be permanently weakened. It is also critical to scale manufacturing capacity in the defense-industrial sector so that we can manufacture the defense materiel and equipment necessary to protect American interests at home and abroad.

In fact, because the United States has supplied so much military equipment to other countries, U.S. stockpiles of military goods are too low to be compatible with U.S. national defense interests. Furthermore, U.S. defense companies must develop new, advanced manufacturing technologies across a range of critical sectors including bio-manufacturing, batteries, and micro-electronics. If the United States wishes to maintain an effective security umbrella to defend its citizens and homeland, as well as for its allies and partners, it needs to have a large upstream manufacturing and goods-producing ecosystem to manufacture these products without undue reliance on imports for key inputs.

Increased reliance on foreign producers for goods also has compromised U.S. economic security by rendering U.S. supply chains vulnerable to geo-political disruption and supply shocks. In recent years, the vulnerability of the U.S. economy in this respect was exposed both during the COVID–19 pandemic, when Americans had difficulty accessing essential products, as well as when the Houthi rebels later began attacking cargo ships in the Middle East.

The decline of U.S. manufacturing capacity threatens the U.S. economy in other ways, including through the loss of manufacturing jobs. From 1997 to 2024, the United States lost around 5 million manufacturing jobs and experienced one of the largest drops in manufacturing employment in history. Furthermore, many manufacturing job losses were concentrated in specific geographical areas. In these areas, the loss of manufacturing jobs contributed

to the decline in rates of family formation and to the rise of other social trends, like the abuse of opioids, that have imposed profound costs on the U.S. economy.

The future of American competitiveness depends on reversing these trends. Today, manufacturing represents just 11 percent of U.S. gross domestic product, yet it accounts for 35 percent of American productivity growth and 60 percent of our exports. Importantly, U.S. manufacturing is the main engine of innovation in the United States, responsible for 55 percent of all patents and 70 percent of all research and development (R&D) spending. The fact that R&D expenditures by U.S. multinational enterprises in China grew at an average rate of 13.6 percent a year between 2003 and 2017, while their R&D expenditures in the United States grew by an average of just 5 percent per year during the same time period, is evidence of the strong link between manufacturing and innovation. Furthermore, every manufacturing job spurs 7 to 12 new jobs in other related industries, helping to build and sustain our economy.

Just as a nation that does not produce manufactured products cannot maintain the industrial base it needs for national security, neither can a nation long survive if it cannot produce its own food. Presidential Policy Directive 21 of February 12, 2013 (Critical Infrastructure Security and Resilience), designates food and agriculture as a ''critical infrastructure sector'' because it is one of the sectors considered ''so vital to the United States that [its] incapacity or destruction . . . would have a debilitating impact on security, national economic security, national public health or safety, or any combination of those matters.'' Furthermore, when I left office, the United States had a trade surplus in agricultural products, but today, that surplus has vanished. Eviscerated by a slew of new non-tariff barriers imposed by our trading partners, it has been replaced by a projected $49 billion annual agricultural trade deficit.

For these reasons, I hereby declare and order:

**Section 1.** *National Emergency.* As President of the United States, my highest duty is ensuring the national and economic security of the country and its citizens.

I have declared a national emergency arising from conditions reflected in large and persistent annual U.S. goods trade deficits, which have grown by over 40 percent in the past 5 years alone, reaching $1.2 trillion in 2024. This trade deficit reflects asymmetries in trade relationships that have contributed to the atrophy of domestic production capacity, especially that of the U.S. manufacturing and defense-industrial base. These asymmetries also impact U.S. producers' ability to export and, consequentially, their incentive to produce.

Specifically, such asymmetry includes not only non-reciprocal differences in tariff rates among foreign trading partners, but also extensive use of non-tariff barriers by foreign trading partners, which reduce the competitiveness of U.S. exports while artificially enhancing the competitiveness of their own goods. These non-tariff barriers include technical barriers to trade; non-scientific sanitary and phytosanitary rules; inadequate intellectual property protections; suppressed domestic consumption (*e.g.,* wage suppression); weak labor, environmental, and other regulatory standards and protections; and corruption. These non-tariff barriers give rise to significant imbalances even when the United States and a trading partner have comparable tariff rates.

The cumulative effect of these imbalances has been the transfer of resources from domestic producers to foreign firms, reducing opportunities for domestic manufacturers to expand and, in turn, leading to lost manufacturing jobs, diminished manufacturing capacity, and an atrophied industrial base, including in the defense-industrial sector. At the same time, foreign firms are better positioned to scale production, reinvest in innovation, and compete

in the global economy, to the detriment of U.S. economic and national security.

The absence of sufficient domestic manufacturing capacity in certain critical and advanced industrial sectors—another outcome of the large and persistent annual U.S. goods trade deficits—also compromises U.S. economic and national security by rendering the U.S. economy less resilient to supply chain disruption. Finally, the large, persistent annual U.S. goods trade deficits, and the concomitant loss of industrial capacity, have compromised military readiness; this vulnerability can only be redressed through swift corrective action to rebalance the flow of imports into the United States. Such impact upon military readiness and our national security posture is especially acute with the recent rise in armed conflicts abroad. I call upon the public and private sector to make the efforts necessary to strengthen the international economic position of the United States.

**Sec. 2**. *Reciprocal Tariff Policy.* It is the policy of the United States to rebalance global trade flows by imposing an additional *ad valorem* duty on all imports from all trading partners except as otherwise provided herein. The additional *ad valorem* duty on all imports from all trading partners shall start at 10 percent and shortly thereafter, the additional *ad valorem* duty shall increase for trading partners enumerated in Annex I to this order at the rates set forth in Annex I to this order. These additional *ad valorem* duties shall apply until such time as I determine that the underlying conditions described above are satisfied, resolved, or mitigated.

**Sec. 3**. *Implementation.* (a) Except as otherwise provided in this order, all articles imported into the customs territory of the United States shall be, consistent with law, subject to an additional *ad valorem* rate of duty of 10 percent. Such rates of duty shall apply with respect to goods entered for consumption, or withdrawn from warehouse for consumption, on or after 12:01 a.m. eastern daylight time on April 5, 2025, except that goods loaded onto a vessel at the port of loading and in transit on the final mode of transit before 12:01 a.m. eastern daylight time on April 5, 2025, and entered for consumption or withdrawn from warehouse for consumption after 12:01 a.m. eastern daylight time on April 5, 2025, shall not be subject to such additional duty.

Furthermore, except as otherwise provided in this order, at 12:01 a.m. eastern daylight time on April 9, 2025, all articles from trading partners enumerated in Annex I to this order imported into the customs territory of the United States shall be, consistent with law, subject to the country-specific *ad valorem* rates of duty specified in Annex I to this order. Such rates of duty shall apply with respect to goods entered for consumption, or withdrawn from warehouse for consumption, on or after 12:01 a.m. eastern daylight time on April 9, 2025, except that goods loaded onto a vessel at the port of loading and in transit on the final mode of transit before 12:01 a.m. eastern daylight time on April 9, 2025, and entered for consumption or withdrawn from warehouse for consumption after 12:01 a.m. eastern daylight time on April 9, 2025, shall not be subject to these country-specific *ad valorem* rates of duty set forth in Annex I to this order. These country-specific *ad valorem* rates of duty shall apply to all articles imported pursuant to the terms of all existing U.S. trade agreements, except as provided below.

(b) The following goods as set forth in Annex II to this order, consistent with law, shall not be subject to the *ad valorem* rates of duty under this order: (i) all articles that are encompassed by 50 U.S.C. 1702(b); (ii) all articles and derivatives of steel and aluminum subject to the duties imposed pursuant to section 232 of the Trade Expansion Act of 1962 and proclaimed in Proclamation 9704 of March 8, 2018 (Adjusting Imports of Aluminum Into the United States), as amended, Proclamation 9705 of March 8, 2018 (Adjusting Imports of Steel Into the United States), as amended, and Proclamation 9980 of January 24, 2020 (Adjusting Imports of Derivative Aluminum Articles and Derivative Steel Articles Into the United States), as amended, Proclamation 10895 of February 10, 2025 (Adjusting Imports of Aluminum

Into the United States), and Proclamation 10896 of February 10, 2025 (Adjusting Imports of Steel into the United States); (iii) all automobiles and automotive parts subject to the additional duties imposed pursuant to section 232 of the Trade Expansion Act of 1962, as amended, and proclaimed in Proclamation 10908 of March 26, 2025 (Adjusting Imports of Automobiles and Automobile Parts Into the United States); (iv) other products enumerated in Annex II to this order, including copper, pharmaceuticals, semiconductors, lumber articles, certain critical minerals, and energy and energy products; (v) all articles from a trading partner subject to the rates set forth in Column 2 of the Harmonized Tariff Schedule of the United States (HTSUS); and (vi) all articles that may become subject to duties pursuant to future actions under section 232 of the Trade Expansion Act of 1962.

(c) The rates of duty established by this order are in addition to any other duties, fees, taxes, exactions, or charges applicable to such imported articles, except as provided in subsections (d) and (e) of this section below.

(d) With respect to articles from Canada, I have imposed additional duties on certain goods to address a national emergency resulting from the flow of illicit drugs across our northern border pursuant to Executive Order 14193 of February 1, 2025 (Imposing Duties To Address the Flow of Illicit Drugs Across Our Northern Border), as amended by Executive Order 14197 of February 3, 2025 (Progress on the Situation at Our Northern Border), and Executive Order 14231 of March 2, 2025 (Amendment to Duties To Address the Flow of Illicit Drugs Across Our Northern Border). With respect to articles from Mexico, I have imposed additional duties on certain goods to address a national emergency resulting from the flow of illicit drugs and illegal migration across our southern border pursuant to Executive Order 14194 of February 1, 2025 (Imposing Duties To Address the Situation at Our Southern Border), as amended by Executive Order 14198 of February 3, 2025 (Progress on the Situation at Our Southern Border), and Executive Order 14227 of March 2, 2025 (Amendment to Duties To Address the Situation at Our Southern Border). As a result of these border emergency tariff actions, all goods of Canada or Mexico under the terms of general note 11 to the HTSUS, including any treatment set forth in subchapter XXIII of chapter 98 and subchapter XXII of chapter 99 of the HTSUS, as related to the Agreement between the United States of America, United Mexican States, and Canada (USMCA), continue to be eligible to enter the U.S. market under these preferential terms. However, all goods of Canada or Mexico that do not qualify as originating under USMCA are presently subject to additional *ad valorem* duties of 25 percent, with energy or energy resources and potash imported from Canada and not qualifying as originating under USMCA presently subject to the lower additional *ad valorem* duty of 10 percent.

(e) Any *ad valorem* rate of duty on articles imported from Canada or Mexico under the terms of this order shall not apply in addition to the *ad valorem* rate of duty specified by the existing orders described in subsection (d) of this section. If such orders identified in subsection (d) of this section are terminated or suspended, all items of Canada and Mexico that qualify as originating under USMCA shall not be subject to an additional *ad valorem* rate of duty, while articles not qualifying as originating under USMCA shall be subject to an *ad valorem* rate of duty of 12 percent. However, these *ad valorem* rates of duty on articles imported from Canada and Mexico shall not apply to energy or energy resources, to potash, or to an article eligible for duty-free treatment under USMCA that is a part or component of an article substantially finished in the United States.

(f) More generally, the *ad valorem* rates of duty set forth in this order shall apply only to the non-U.S. content of a subject article, provided at least 20 percent of the value of the subject article is U.S. originating. For the purposes of this subsection, "U.S. content" refers to the value of an article attributable to the components produced entirely, or substantially transformed in, the United States. U.S. Customs and Border Protection (CBP),

to the extent permitted by law, is authorized to require the collection of such information and documentation regarding an imported article, including with the entry filing, as is necessary to enable CBP to ascertain and verify the value of the U.S. content of the article, as well as to ascertain and verify whether an article is substantially finished in the United States.

(g) Subject articles, except those eligible for admission under ''domestic status'' as defined in 19 CFR 146.43, which are subject to the duty specified in section 2 of this order and are admitted into a foreign trade zone on or after 12:01 a.m. eastern daylight time on April 9, 2025, must be admitted as ''privileged foreign status'' as defined in 19 CFR 146.41.

(h) Duty-free *de minimis* treatment under 19 U.S.C. 1321(a)(2)(A)-(B) shall remain available for the articles described in subsection (a) of this section. Duty-free *de minimis* treatment under 19 U.S.C. 1321(a)(2)(C) shall remain available for the articles described in subsection (a) of this section until notification by the Secretary of Commerce to the President that adequate systems are in place to fully and expeditiously process and collect duty revenue applicable pursuant to this subsection for articles otherwise eligible for *de minimis* treatment. After such notification, duty-free *de minimis* treatment under 19 U.S.C. 1321(a)(2)(C) shall not be available for the articles described in subsection (a) of this section.

(i) The Executive Order of April 2, 2025 (Further Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China as Applied to Low-Value Imports), regarding low-value imports from China is not affected by this order, and all duties and fees with respect to covered articles shall be collected as required and detailed therein.

(j) To reduce the risk of transshipment and evasion, all *ad valorem* rates of duty imposed by this order or any successor orders with respect to articles of China shall apply equally to articles of both the Hong Kong Special Administrative Region and the Macau Special Administrative Region.

(k) In order to establish the duty rates described in this order, the HTSUS is modified as set forth in the Annexes to this order. These modifications shall enter into effect on the dates set forth in the Annexes to this order.

(l) Unless specifically noted herein, any prior Presidential Proclamation, Executive Order, or other Presidential directive or guidance related to trade with foreign trading partners that is inconsistent with the direction in this order is hereby terminated, suspended, or modified to the extent necessary to give full effect to this order.

**Sec. 4**. *Modification Authority.* (a) The Secretary of Commerce and the United States Trade Representative, in consultation with the Secretary of State, the Secretary of the Treasury, the Secretary of Homeland Security, the Assistant to the President for Economic Policy, the Senior Counselor for Trade and Manufacturing, and the Assistant to the President for National Security Affairs, shall recommend to me additional action, if necessary, if this action is not effective in resolving the emergency conditions described above, including the increase in the overall trade deficit or the recent expansion of non-reciprocal trade arrangements by U.S. trading partners in a manner that threatens the economic and national security interests of the United States.

(b) Should any trading partner retaliate against the United States in response to this action through import duties on U.S. exports or other measures, I may further modify the HTSUS to increase or expand in scope the duties imposed under this order to ensure the efficacy of this action.

(c) Should any trading partner take significant steps to remedy non-reciprocal trade arrangements and align sufficiently with the United States on economic and national security matters, I may further modify the HTSUS to decrease or limit in scope the duties imposed under this order.

(d) Should U.S. manufacturing capacity and output continue to worsen, I may further modify the HTSUS to increase duties under this order.

**Sec. 5**. *Implementation Authority*. The Secretary of Commerce and the United States Trade Representative, in consultation with the Secretary of State, the Secretary of the Treasury, the Secretary of Homeland Security, the Assistant to the President for Economic Policy, the Senior Counselor for Trade and Manufacturing, the Assistant to the President for National Security Affairs, and the Chair of the International Trade Commission are hereby authorized to employ all powers granted to the President by IEEPA as may be necessary to implement this order. Each executive department and agency shall take all appropriate measures within its authority to implement this order.

**Sec. 6**. *Reporting Requirements*. The United States Trade Representative, in consultation with the Secretary of State, the Secretary of the Treasury, the Secretary of Commerce, the Secretary of Homeland Security, the Assistant to the President for Economic Policy, the Senior Counselor for Trade and Manufacturing, and the Assistant to the President for National Security Affairs, is hereby authorized to submit recurring and final reports to the Congress on the national emergency declared in this order, consistent with section 401(c) of the NEA (50 U.S.C. 1641(c)) and section 204(c) of IEEPA (50 U.S.C. 1703(c)).

**Sec. 7**. *General Provisions*. (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department, agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
*April 2, 2025.*

**ANNEX I**

| Country | Reciprocal Tariff, Adjusted |
| --- | --- |
| Algeria | 30% |
| Angola | 32% |
| Bangladesh | 37% |
| Bosnia and Herzegovina | 35% |
| Botswana | 37% |
| Brunei | 24% |
| Cambodia | 49% |
| Cameroon | 11% |
| Chad | 13% |
| China | 34% |
| Côte d`Ivoire | 21% |
| Democratic Republic of the Congo | 11% |
| Equatorial Guinea | 13% |
| European Union | 20% |
| Falkland Islands | 41% |
| Fiji | 32% |
| Guyana | 38% |
| India | 26% |
| Indonesia | 32% |
| Iraq | 39% |
| Israel | 17% |
| Japan | 24% |
| Jordan | 20% |
| Kazakhstan | 27% |
| Laos | 48% |
| Lesotho | 50% |
| Libya | 31% |
| Liechtenstein | 37% |
| Madagascar | 47% |
| Malawi | 17% |
| Malaysia | 24% |
| Mauritius | 40% |
| Moldova | 31% |
| Mozambique | 16% |
| Myanmar (Burma) | 44% |
| Namibia | 21% |

| Country | Reciprocal Tariff, Adjusted |
|---|---|
| Nauru | 30% |
| Nicaragua | 18% |
| Nigeria | 14% |
| North Macedonia | 33% |
| Norway | 15% |
| Pakistan | 29% |
| Philippines | 17% |
| Serbia | 37% |
| South Africa | 30% |
| South Korea | 25% |
| Sri Lanka | 44% |
| Switzerland | 31% |
| Syria | 41% |
| Taiwan | 32% |
| Thailand | 36% |
| Tunisia | 28% |
| Vanuatu | 22% |
| Venezuela | 15% |
| Vietnam | 46% |
| Zambia | 17% |
| Zimbabwe | 18% |

## ANNEX II

Note: All products that are classified in the 8-digit subheadings of the Harmonized Tariff Schedule of the United States (HTSUS) that are listed in this Annex are covered by the action. The product descriptions that are contained in this Annex are provided for informational purposes only, and are not intended to delimit in any way the scope of the action. In all cases, the formal language in Annex III governs the tariff treatment of products covered by the action. Any questions regarding the scope of particular HTSUS subheadings should be referred to U.S. Customs and Border Protection. In the product descriptions, the abbreviation "nesoi" means "not elsewhere specified or included".

| HTSUS | Description |
|---|---|
| 05080000 | Coral, shells, cuttlebone and similar materials, unworked or simply prepared, but not cut to shape; powder and waste thereof |
| 25041050 | Natural graphite, in powder or flakes (other than crystalline flake) |
| 25049000 | Natural graphite, other than in powder or in flakes |
| 25101000 | Natural calcium phosphates, natural aluminum calcium phosphates, unground |
| 25102000 | Natural calcium phosphates, natural aluminum |
| 25111010 | Natural barium sulfate (barytes), ground |
| 25111050 | Natural barium sulfate (barytes), not ground |
| 25191000 | Natural magnesium carbonate (magnesite) |
| 25199010 | Fused magnesia; dead-burned (sintered) magnesia, whether or not cont. small quant. of other oxides added before sintering |
| 25199020 | Caustic calcined magnesite |
| 25249000 | Asbestos other than Crocidolite |
| 25292100 | Fluorspar, containing by weight 97 percent or less of calcium fluoride |
| 25292200 | Fluorspar, containing by weight more than 97 percent of calcium fluoride |
| 25302010 | Kieserite |
| 25302020 | Epsom salts (natural magnesium sulfates) |
| 25309010 | Natural cryolite; natural chiolite |
| 25309020 | Natural micaceous iron oxides |
| 25309080 | Other mineral substances, not elsewhere specified or included |
| 26020000 | Manganese ores and concentrates including ferruginous manganese ores & concentrates, with manganese content over 20%, calculated on dry weight |
| 26030000 | Copper ores and concentrates |
| 26050000 | Cobalt ores and concentrates |
| 26060000 | Aluminum ores and concentrates |
| 26080000 | Zinc ores and concentrates |
| 26100000 | Chromium ores and concentrates |
| 26110030 | Tungsten ores |
| 26110060 | Tungsten concentrates |
| 26121000 | Uranium ores and concentrates |
| 26140030 | Synthetic rutile |

| HTSUS | Description |
|---|---|
| 26140060 | Titanium ores and concentrates, other than synthetic rutile |
| 26159030 | Synthetic tantalum-niobium concentrates |
| 26159060 | Niobium, tantalum or vanadium ores and concentrates, nesoi |
| 26161000 | Silver ores and concentrates |
| 26171000 | Antimony ores and concentrates |
| 26203000 | Ash and residues (other than from the manufacture of iron or steel), containing mainly copper |
| 26209950 | Slag (other than from the manufacture of iron or steel), containing by weight over 40% titanium, and which if containing over 2% by weight of copper, lead, or zinc is not to be treated for the recovery thereof |
| 27011100 | Coal, anthracite, whether or not pulverized, but not agglomerated |
| 27011200 | Coal, bituminous, whether or not pulverized, but not agglomerated |
| 27011900 | Coal, other than anthracite or bituminous, whether or not pulverized, but not agglomerated |
| 27012000 | Coal, briquettes, ovoids and similar solid fuels manufactured from coal |
| 27021000 | Lignite (excluding jet), whether or not pulverized, but not agglomerated |
| 27022000 | Lignite (excluding jet), agglomerated |
| 27030000 | Peat (including peat litter), whether or not agglomerated |
| 27040000 | Coke and semicoke of coal, lignite or peat, whether or not agglomerated; retort carbon |
| 27050000 | Coal gas, water gas, producer gas and similar gases, other than petroleum gases and other gaseous hydrocarbons |
| 27060000 | Tars (including reconstituted tars), distilled from coal, lignite or peat, and other mineral tars, whether dehydrated or partially distilled |
| 27071000 | Benzene, from the distillation of high-temperature coal tar, or in which the weight of the aromatic constituents exceeds that of the nonaromatic constituents |
| 27072000 | Toluene, from the distillation of high-temperature coal tar, or in which the weight of aromatic constituents exceeds that of the nonaromatic constituents |
| 27073000 | Xylenes, from the distillation of high-temperature coal tar, or in which the weight of the aromatic constituents exceeds that of the nonaromatic constituents |
| 27074000 | Naphthalene, from the distillation of high-temperature coal tar, or in which the weight of the aromatic constituents exceeds that of the nonaromatic constituents |
| 27075000 | Aromatic hydrocarbon mixtures (from the distillation of high-temperature coal tar, or similar products in which the weight of the aromatic constituents exceeds that of the nonaromatic constituents), other than Benzene, Toluene, Xylenes, and Naphathalene, in which 65% or more by volume (including losses) distills at 250 C by the ISO 3405 method (equivalent to the ASTM D 86 method) |
| 27079100 | Creosote oils, from the distillation of high-temperature coal tar or similar products in which the weight of the aromatic constituents exceeds that of the nonaromatic constituents |
| 27079910 | Light oil, from the distillation of high-temperature coal tar or similar products in which the weight of the aromatic constituents exceeds that of the nonaromatic constituents |

| HTSUS | Description |
|---|---|
| 27079920 | Picolines, from the distillation of high-temperature coal tar or similar products in which the weight of the aromatic constituents exceeds that of the nonaromatic constituents |
| 27079940 | Carbazole, from the distillation of high-temperature coal tar or similar products in which the weight of the aromatic constituents exceeds that of the nonaromatic constituents, having a purity of 65% or more by weight |
| 27079951 | Phenols, from the distillation of high-temperature coal tar or similar products in which the weight of aromatic constituents exceeds that of nonaromatic constituents, containing more than 50% by weight of hydroxybenzene |
| 27079955 | Metacresol, orthocresol, paracresol, and metaparacresol, from the distillation of high-temperature coal tar or similar products where the weight of the aromatic constituents exceeds that of the nonaromatic constituents, having a purity of 75% or more by weight |
| 27079959 | Phenols, nesoi |
| 27079990 | Other products of the distillation of high-temperature coal tar and similar products in which the weight of the aromatic constituents exceed that of the nonaromatic constituents, nesoi |
| 27081000 | Pitch, obtained from coal tar or other mineral tars |
| 27082000 | Pitch coke, obtained from coal tar or other mineral tars |
| 27090010 | Petroleum oils and oils from bituminous minerals, crude, testing under 25 degrees A.P.I. |
| 27090020 | Petroleum oils and oils from bituminous minerals, crude, testing 25 degrees A.P.I. or more |
| 27101215 | Light oil motor fuel from petroleum oils and oils from bituminous minerals (other than crude) and containing by weight 70% or more of petroleum oils or oils from bituminous minerals |
| 27101218 | Light oil motor fuel blending stock from petroleum oils and oils from bituminous minerals (other than crude) containing by weight 70% or more from petroleum oils or oils from bituminous minerals |
| 27101225 | Naphthas (except motor fuel or motor fuel blending stock) |
| 27101245 | Light oil mixtures of hydrocarbons nesoi which contain by weight not over 50% of any single hydrocarbon compound |
| 27101290 | Light oils and preparations, from petroleum oils and oils from bituminous minerals or preparations nesoi containing by weight 70% or more of petroleum oils or oils obtained from bituminous minerals |
| 27101906 | Distillate and residual fuel oils (including blended fuel oils), derived from petroleum or oils from bituminous minerals, testing < 25 degrees A.P.I. |
| 27101911 | Distillate and residual fuel oils (including blended fuel oils), derived from petroleum oils or oils from bituminous minerals, testing 25 degrees A.P.I. or > |
| 27101916 | Kerosene-type jet fuel, from petroleum oils and oils of bituminous minerals (other than crude) or preparations containing by weight 70%+ of petroleum oils or oils obtained from bituminous minerals |
| 27101924 | Kerosene motor fuel (except kerosene-type jet fuel), from petroleum oils and oils of bituminous minerals (other than crude) or preparations containing by weight 70%+ of petroleum oils or oils obtained from bituminous minerals |

**15054**    **Federal Register** / Vol. 90, No. 65 / Monday, April 7, 2025 / Presidential Documents

| HTSUS | Description |
|---|---|
| 27101925 | Kerosene motor fuel blending stock (except kerosene-type jet fuel), from petroleum oils and oils of bituminous minerals (other than crude) or preparations containing by weight 70%+ of petroleum oils or oils obtained from bituminous minerals |
| 27101926 | Kerosene (except kerosene-type jet fuel, kerosene motor fuel, and kerosene motor fuel blending stock), from petroleum oils and oils of bituminous minerals (other than crude) or preparations containing by weight 70%+ of petroleum oils or oils obtained from bituminous minerals |
| 27101930 | Lubricating oils, with or without additives, from petroleum oils and oils of bituminous minerals (other than crude) or preparations containing by weight 70%+ of petroleum oils or oils obtained from bituminous minerals |
| 27101935 | Lubricating greases, containing not over 10% by weight of salts of fatty acids of animal or vegetable origin, from petroleum oils and oils of bituminous minerals (other than crude) or preparations containing by weight 70%+ of petroleum oils or oils obtained from bituminous minerals |
| 27101940 | Lubricating greases, containing 10% or more by weight of salts of fatty acids of animal or vegetable origin, from petroleum oils and oils of bituminous minerals (other than crude) or preparations containing by weight 70%+ of petroleum oils or oils obtained from bituminous minerals |
| 27101945 | Mixture of hydrocarbons nesoi, which contain by weight not over 50% of any single hydrocarbon compound, from petroleum oils and oils of bituminous minerals (other than crude) or preparations containing by weight 70%+ of petroleum oils or oils obtained from bituminous minerals |
| 27101990 | Petroleum oils and oils from bituminous minerals or preparations nesoi containing by weight 70% or more of petroleum oils or oils obtained from bituminous minerals |
| 27102005 | Distillate and residual fuel oils (including blended fuel oils), testing under 25 degrees A.P.I., from petroleum oils and oils of bituminous minerals (other than crude) or preparations nesoi containing by weight 70%+ of petroleum oils or oils obtained from bituminous minerals, containing biodiesel, other than waste oils |
| 27102010 | Dist and resid fuel oil (including blends) derived from petro or oils fr bitum min testing 25 degree A.P.I. or >, contng biodiesel |
| 27102015 | Kerosene-type jet fuel/mtr ful/mtr ful blend stck fr pet oils & bitumin min (o/th crude), or preps. 70%+ by w fr pet oils, ctg biodiesel |
| 27102025 | Kerosene (ex jet fuel,mtr ful/mtr ful blend stck/jet), fr pet oils and bitumin. min (o/th crude) or preps 70%+ by wt fr pet oils, ctg biodie |
| 27109100 | Waste oils from petro oils/bitum minerals/preps 70%+ by wt. fr. petro oils/bitum minerals containing PCBs, PCTs or PBBs |
| 27109905 | Wastes of distillate and residual fuel oil (including blends) derived from petroleum oil/bituminous minerals, testing under 25 degree A.P.I. |
| 27109910 | Wastes of distillate and residual fuel oil (including blends) derived from petroleum oil/bituminous minerals, testing 25 degrees A.P.I. or > |
| 27109916 | Waste motor fuel or motor fuel blending stock from petro oils and bitumin. minerals (o/than crude) or preps. 70%+ by wt. from petro oils |
| 27109921 | Waste kerosene or naphthas from petro oils and bitumin minerals (o/than crude) or preps. 70%+ by wt. From petro oils/bitumin minerals |

4

Federal Register / Vol. 90, No. 65 / Monday, April 7, 2025 / Presidential Documents **15055**

| HTSUS | Description |
|---|---|
| 27109931 | Waste lubricating oils, w/or w/o additives, from petro oils and bitumin minerals (o/than crude) or preps. 70%+ by wt. from petro oils |
| 27109932 | Waste lubricating greases from petro oil/bitum min/70%+ by wt. fr petro oils but n/o 10% by wt. of fatty acid salts animal/vegetable origin |
| 27109939 | Waste lubricating greases from petro oil/bitum min/70%+ by wt. fr petro oils but over 10% by wt. of fatty acid salts animal/vegetable origin |
| 27109945 | Waste mixtures of hydrocarbons from petro oils & bitum. min. or preps.70%+ by wt. fr. petro oils, nesoi, n/o 50% any single hydrocarbon |
| 27109990 | Waste petroleum oils & oils from bitum. min. or preps nesoi 70%+ by wt. from petro. oils or bitum. min., nesoi |
| 27111100 | Natural gas, liquefied |
| 27111200 | Propane, liquefied |
| 27111300 | Butanes, liquefied |
| 27111400 | Ethylene, propylene, butylene and butadiene, liquefied |
| 27111900 | Liquefied petroleum gases and other gaseous hydrocarbons, nesoi |
| 27112100 | Natural gas, in gaseous state |
| 27112900 | Petroleum gases and other gaseous hydrocarbons, except natural gas |
| 27121000 | Petroleum jelly |
| 27122000 | Paraffin wax (whether or not colored), obtained by synthesis or other process and less than 0.75% oil by wt. |
| 27129010 | Montan wax (whether or not colored), obtained by synthesis or other process |
| 27129020 | Mineral waxes (i.e.,paraffin w/0.75%+ oil, microcrystall. wax, slack lignite & peat waxes, ozokerite), obtained by synthesis |
| 27131100 | Coke, petroleum, not calcined |
| 27131200 | Coke, petroleum coke, calcined |
| 27132000 | Petroleum bitumen |
| 27139000 | Residues (except petroleum coke or petroleum bitumen) of petroleum oils or of oils obtained from bituminous materials |
| 27141000 | Bituminous or oil shale and tar sands |
| 27149000 | Bitumen and asphalt, natural; asphaltites and asphaltic rocks |
| 27150000 | Bituminous mixtures based on natural asphalt, natural bitumen, petroleum bitumen, mineral tar or mineral tar pitch |
| 27160000 | Electrical energy |
| 28012000 | Iodine |
| 28042900 | Rare gases, other than argon |
| 28045000 | Boron; tellurium |
| 28046100 | Silicon containing by weight not less than 99.99 percent of silicon |
| 28048000 | Arsenic |
| 28049000 | Selenium |
| 28051910 | Strontium |
| 28051920 | Barium |
| 28051990 | Alkali metals, other than sodium |

| HTSUS | Description |
|-------|-------------|
| 28053000 | Rare-earth metals, scandium and yttrium, whether or not intermixed or interalloyed |
| 28111100 | Hydrogen fluoride (Hydrofluoric acid) |
| 28111910 | Arsenic acid |
| 28112910 | Arsenic trioxide |
| 28112920 | Selenium dioxide |
| 28121900 | Other chlorides and chloride oxides |
| 28139010 | Arsenic sulfides |
| 28152000 | Potassium hydroxide (Caustic potash) |
| 28161000 | Hydroxide and peroxide of magnesium |
| 28164010 | Oxides, hydroxides and peroxides of strontium |
| 28164020 | Oxides, hydroxides and peroxides of barium |
| 28170000 | Zinc oxide; zinc peroxide |
| 28181010 | Artificial corundum, crude |
| 28181020 | Artificial corundum, in grains, or ground, pulverized or refined |
| 28182000 | Aluminum oxide, other than artificial corundum |
| 28183000 | Aluminum hydroxide |
| 28201000 | Manganese dioxide |
| 28211000 | Iron oxides and hydroxides |
| 28212000 | Earth colors containing 70 percent or more by weight of combined iron evaluated as Fe2O3 |
| 28220000 | Cobalt oxides and hydroxides; commercial cobalt oxides |
| 28230000 | Titanium oxides |
| 28252000 | Lithium oxide and hydroxide |
| 28255030 | Copper hydroxides |
| 28256000 | Germanium oxides and zirconium dioxide |
| 28258000 | Antimony oxides |
| 28259015 | Niobium oxide |
| 28259030 | Tungsten oxides |
| 28259090 | Other inorganic bases; other metal oxides, hydroxides and peroxides, nesoi |
| 28261000 | Fluorides of aluminum |
| 28263000 | Sodium hexafluoroaluminate (Synthetic cryolite) |
| 28269090 | Other complex fluorine salts, nesoi |
| 28273100 | Magnesium chloride |
| 28273945 | Barium chloride |
| 28273960 | Cobalt chlorides |
| 28273990 | Chlorides, nesoi |
| 28274100 | Chloride oxides and chloride hydroxides of copper |
| 28274950 | Chloride oxides and chloride hydroxides other than of copper or of vanadium |
| 28275951 | Other bromides and bromide oxides, other than ammonium, calcium or zinc |
| 28276010 | Iodide and iodide oxide of calcium or copper |

| HTSUS | Description |
|---|---|
| 28276051 | Iodides and iodide oxides, other than of calcium, copper or potassium |
| 28332100 | Magnesium sulfate |
| 28332500 | Copper sulfate |
| 28332700 | Barium sulfate |
| 28332910 | Cobalt sulfate |
| 28332945 | Zinc sulfate |
| 28332951 | Other sulfates nesoi |
| 28342100 | Potassium nitrate |
| 28342920 | Strontium nitrate |
| 28342951 | Nitrates, nesoi |
| 28366000 | Barium carbonate |
| 28369100 | Lithium carbonates |
| 28369200 | Strontium carbonate |
| 28369910 | Cobalt carbonates |
| 28369950 | Carbonates nesoi, and peroxocarbonates (percarbonates) |
| 28418000 | Tungstates (wolframates) |
| 28419020 | Ammonium perrhenate |
| 28419040 | Aluminates |
| 28432901 | Silver compounds, other than silver nitrate |
| 28433000 | Gold compounds |
| 28439000 | Inorganic or organic compounds of precious metals, excluding those of silver and gold; amalgams of precious metals |
| 28441010 | Natural uranium metal |
| 28441020 | Natural uranium compounds |
| 28442000 | Uranium enriched in U235 and plutonium and their compounds; alloys, dispersions, ceramic products and mixtures containing these products |
| 28443020 | Compounds of uranium depleted in U235 |
| 28443050 | Uranium depleted in U235, thorium; alloys, dispersions, ceramic products and mixtures of these products and their compounds |
| 28444300 | Other radioactive elements, isotopes, compounds, nesoi; alloys, dispersions, ceramic products and mixtures thereof |
| 28459001 | Isotopes not in heading 2844 and their compounds other than boron, lithium and helium |
| 28461000 | Cerium compounds |
| 28469020 | Mixtures of rare-earth oxides or of rare-earth chlorides |
| 28469040 | Yttrium materials and compounds containing by wt. >19% But < 85% yttrium oxide equivalent |
| 28469080 | Compounds, inorganic or organic, of rare-earth metals, of yttrium or of scandium, or of mixtures of these metals, nesoi |
| 28492010 | Silicon carbide, crude |
| 28492020 | Silicon carbide, in grains, or ground, pulverized or refined |

**15058**    **Federal Register** / Vol. 90, No. 65 / Monday, April 7, 2025 / Presidential Documents

| HTSUS | Description |
|---|---|
| 28499030 | Tungsten carbide |
| 28539010 | Phosphor copper containing more than 15% by weight of phosphorus, excluding ferrosphosphorus |
| 28539090 | Other phosphides, excl ferrophosphorous, nesoi |
| 29034510 | 1,2,1,2-Tetrafluoroethane (HFC-134a) and 1,1,2,2-tetrafluoroethane (HFC-134) |
| 29035990 | Other unsaturated fluorinated derivatives of acyclic hydrocarbons |
| 29036990 | Other brominated or iodinated derivatives of acyclic hydrocarbons |
| 29037800 | Other perhalogenated acyclic hydrocarbon derivatives, nesoi |
| 29037990 | Other halogenated derivatives of acyclic hydrocarbons containing two or more different halogens, nesoi |
| 29038915 | Halogenated products derived in whole or in part from benzene or other aromatic hydrocarbon, described in additional U.S. note 3 to sec. VI |
| 29038920 | Halogenated derivatives derived in whole or in part from benzene or other aromatic hydrocarbon, nesoi |
| 29038970 | Other halogenated derivatives of cyclanic etc hydrocarbons not deriv from benzene or other aromatic hydrocarbons |
| 29039200 | Hexachlorobenzene (ISO) and DDT (clofenatone (INN), (1,1,1-Trichloro-2,2-bis(p-chlorophenyl)ethane)) |
| 29049940 | Sulfonated, nitrated or nitrosated derivatives of aromatic products described in additional US note 3 to section 6 |
| 29052990 | Unsaturated monohydric alcohols, other than allyl alcohol or acyclic terpene alcohols |
| 29053990 | Dihydric alcohols (diols), nesoi |
| 29055910 | Halogenated, sulfonated, nitrated or nitrosated derivatives of monohydric alcohols |
| 29055990 | Halogenated, sulfonated, nitrated or nitrosated derivatives of acyclic alcohols, nesoi |
| 29061950 | Other cyclanic, cyclenic or cycloterpenic alcohols and their halogenated, sulfonated, nitrated or nitrosated derivatives |
| 29062960 | Other aromatic alcohols and their halogenated, sulfonated, nitrated or nitrosated derivatives |
| 29072990 | Other polyphenols, nesoi |
| 29081960 | Other halogenated, sulfonated, nitrated or nitrosated derivatives of phenol or phenol-alcohols |
| 29091918 | Ethers of acyc monohydric alcohols & deriv, nesoi |
| 29092000 | Cyclanic, cyclenic or cycloterpenic ethers and their halogenated, sulfonated, nitrated or nitrosated derivatives |
| 29093060 | Other aromatic ethers and their halogenated, sulfonated, nitrated, or nitrosated derivatives, nesoi |
| 29094910 | Other aromatic ether-alcohols, their halogenated, sulfonated, nitrated or nitrosated derivatives described in add. US note 3 to section VI |
| 29094915 | Aromatic ether-alcohols and their halogenated, sulfonated, nitrated or nitrosated derivatives, nesoi |
| 29094920 | Nonaromatic glycerol ethers |
| 29094960 | Other non-aromatic ether-alcohols and their halogenated, sulfonated, nitrated or nitrosated derivatives |

| HTSUS | Description |
|---|---|
| 29095040 | Odoriferous or flavoring compounds of ether-phenols, ether-alcohol-phenols & their halogenated, sulfonated, nitrated, nitrosated derivatives |
| 29095045 | Ether-phenols, ether-alcohol-phenols & their halogenated, sulfonated, nitrated, nitrosated derivatives nesoi, in add. U.S. note 3 to sec. VI |
| 29095050 | Ether-phenols, ether-alcohol-phenols and their halogenated, sulfonated, nitrated or nitrosated derivatives, nesoi |
| 29121950 | Acyclic aldehydes without other oxygen function, nesoi |
| 29124926 | Other aromatic aldehyde-alcohols, aldehyde-ethers, aldehyde-phenols and aldehydes with other oxygen function |
| 29141900 | Acyclic ketones without other oxygen function, nesoi |
| 29144090 | Nonaromatic ketone-alcohols and ketone-aldehydes, nesoi |
| 29145030 | Aromatic ketone-phenols and ketones with other oxygen function |
| 29145050 | Nonaromatic ketone-phenols and ketones with other oxygen function |
| 29146200 | Coenzyme Q10 (ubidecarenone (INN) |
| 29146921 | Quinone drugs |
| 29146990 | Quinones, nesoi |
| 29147940 | Other halogenated, sulfonated, nitrated, etc derivatives of aromatic ketones and quinones whether or not with other oxygen function |
| 29152930 | Cobalt acetates |
| 29153931 | Aromatic esters of acetic acid described in additional U.S. note 3 to section VI |
| 29153935 | Aromatic esters of acetic acid, nesoi |
| 29153947 | Acetates of polyhydric alcohols or of polyhydric alcohol ethers |
| 29153990 | Other non-aromatic esters of acetic acid |
| 29159010 | Fatty acids of animal or vegetable origin, nesoi |
| 29159014 | Valproic acid |
| 29159018 | Saturated acyclic monocarboxylic acids, nesoi |
| 29159020 | Aromatic anhydrides, halides, peroxides and peroxyacids, of saturated acyclic monocarboxylic acids, and their derivatives, nesoi |
| 29159050 | Nonaromatic anhydrides, halides, peroxides and peroxyacids, of saturated acyclic monocarboxylic acids, and their derivatives, nesoi |
| 29161930 | Unsaturated acyclic monocarboxylic acids, nesoi |
| 29161950 | Unsaturated acyclic monocarboxylic acid anhydrides, halides, peroxides, peroxyacids and their derivatives, nesoi |
| 29162050 | Cyclanic, cyclenic or cycloterpenic monocarboxylic acids, their anhydrides, halides, peroxides, peroxyacids and their derivatives |
| 29163150 | Benzoic acid esters, nesoi |
| 29163946 | Aromatic monocarboxylic acids, their anhydrides, halides, peroxides, peroxyacids and derivatives described in add'l US note 3 to section VI |
| 29163979 | Other aromatic monocarboxylic acids, their anhydrides, halides, peroxides, peroxyacids and their derivatives |
| 29171300 | Azelaic acid, sebacic acid, their salts and esters |
| 29171910 | Ferrous fumarate |

**15060**    **Federal Register** / Vol. 90, No. 65 / Monday, April 7, 2025 / Presidential Documents

| HTSUS | Description |
|---|---|
| 29171970 | Acyclic polycarboxylic acids and derivative (excluding plasticizers) |
| 29173401 | Esters of orthophthalic acid, nesoi |
| 29173930 | Aromatic polycarboxylic acids, their anhydrides, halides, peroxides, peroxyacids and their derivatives nesoi, in add. U.S. note 3 to sec. VI |
| 29181151 | Salts and esters of lactic acid |
| 29181350 | Salts and esters of tartaric acid, nesoi |
| 29181650 | Salts and esters of gluconic acid |
| 29181960 | Malic acid |
| 29181990 | Nonaromatic carboxylic acids with alcohol function, without other oxygen function, and their derivatives, nesoi |
| 29182210 | O-Acetylsalicylic acid (Aspirin) |
| 29182250 | Salts and esters Of O-acetylsalicylic acid |
| 29182330 | Esters of salicylic acid and their salts, described in additional U.S. note 3 to section VI |
| 29182350 | Esters of salicylic acid and their salts, nesoi |
| 29182920 | Gentisic acid; and hydroxycinnamic acid and its salts |
| 29182965 | Carboxylic acids with phenol function but w/o other oxygen function, described in add'l. U.S. note 3 to section VI |
| 29182975 | Other carboxylic acids w/phenol function but w/o other oxygen function & their derivatives (excluding goods of add. US note 3 to section VI) |
| 29183025 | Aromatic carboxylic acids w/aldehyde or ketone function but w/o other oxygen function & their deriv desc. in add US note 3 to sec VI, nesoi |
| 29183030 | Aromatic carboxylic acids with aldehyde or ketone function, but without other oxygen function, and derivatives, nesoi |
| 29183090 | Non-aromatic carboxylic acids w/aldehyde or ketone function but w/o other oxygen func. their anhydrides, halides, peroxides, etc derivatives |
| 29189930 | Aromatic drugs derived from carboxylic acids with additional oxygen function, and their derivatives, nesoi |
| 29189943 | Aromatic carboxylic acids with add'l oxygen function and their anhydrides, halide, etc deriv described in add US note 3 to sect VI, nesoi |
| 29189947 | Other aromatic carboxylic acids with add'l oxygen function and their anhydrides, halide, etc deriv (exclud goods in add US note 3 to sec VI) |
| 29189950 | Nonaromatic carboxylic acids with additional oxygen function, and their derivatives, nesoi |
| 29199030 | Aromatic phosphoric esters and their salts, including lactophosphates, and their derivatives, not used as plasticizers |
| 29199050 | Nonaromatic phosphoric esters and their salts, including lactophosphates, and their derivatives |
| 29209051 | Nonaromatic esters of inorganic acids of nonmetals and their salts and derivatives, excluding esters of hydrogen halides, nesoi |
| 29211911 | Mono- and triethylamines; mono-, di-, and tri(propyl- and butyl-) monoamines; salts of any of the foregoing |
| 29211961 | N,N-Dialkyl (methyl, ethyl, N-Propyl or Isopropyl)-2-Chloroethylamines and their protonated salts; Acylcic monoamines and their derivatives, nesoi |

| HTSUS | Description |
|---|---|
| 29212900 | Acyclic polyamines, their derivatives and salts, other than ethylenediamine or hexamethylenediamine and their salts |
| 29213010 | Cyclanic, cyclenic, cycloterpenic mono- or polyamines, derivatives and salts, from any aromatic compound desc in add US note 3, sec. VI |
| 29213050 | Cyclanic, cyclenic or cycloterpenic mono- or polyamines, and their derivatives and salts, from any nonaromatic compounds |
| 29214290 | Other aniline derivatives and their salts |
| 29214600 | Amfetamine (INN), benzfetamine (INN), dexamfetamine (INN), etilamfetamine (INN), and other specified INNs; salts thereof |
| 29214938 | Aromatic monoamine antidepressants, tranquilizers and other psychotherapeutic agents, nesoi |
| 29214943 | Aromatic monoamine drugs, nesoi |
| 29214945 | Aromatic monoamines and their derivatives nesoi; salts thereof, described in additional U.S. note 3 to section VI |
| 29214950 | Aromatic monoamines and their derivatives and salts thereof, nesoi |
| 29215980 | Aromatic polyamines and their derivatives; salts thereof nesoi |
| 29221100 | Monoethanolamine and its salts |
| 29221400 | Dextropropoxyphene (INN) and its salts |
| 29221909 | Aromatic amino-alcohols drugs, their ethers and esters, other than those containing > one kind of oxygen function; salts thereof; nesoi |
| 29221920 | 4,4'-Bis(dimethylamino)benzhydrol (Michler's hydrol) and other specified aromatic amino-alcohols, their ethers and esters; salts thereof |
| 29221933 | N1-(2-Hydroxyethyl-2-nitro-1,4-phenylendiamine; N1,N4,N4-tris(2-hydroxyethyl)-2-nitro-1,4-phenylenediamine; and other specified chemicals |
| 29221960 | Aromatic amino-alcohols, their ethers and esters, other than those containing more than one oxy func described in add. US note 3 to sect VI |
| 29221970 | Other aromatic amino-alcohols, their ethers & esters, other than those contain more than one oxy func (exc goods of add. US note 3 sect VI) |
| 29221990 | Salts of triethanolamine |
| 29221996 | Amino-alcohols, other than those containing more than one kind of oxygen function, their ethers and esters and salts thereof, nesoi |
| 29222927 | Drugs of amino-naphthols and -phenols, their ethers and esters, except those cont. more than one oxygen function; salts thereof, nesoi |
| 29222961 | Amino-naphthols and other amino-phenols and their derivatives of products described in add'l U.S. note 3 to section VI |
| 29222981 | Amino-naphthols and other amino-phenols; their ethers, esters & salts (not containing more than one oxygen function) thereof nesoi |
| 29223100 | Amfepramone (INN), methadone (INN) and normethadone (INN); salts thereof |
| 29223925 | Aromatic amino-aldehydes, -ketones and -quinones, other than those with more than one oxygen function; salts; desc in add US note 3 sec VI |
| 29223945 | Aromatic amino-aldehydes, -ketones and -quinones, other than those with more than one oxygen function; salts thereof; nesoi |
| 29223950 | Nonaromatic amino-aldehydes, -ketones and -quinones, other than those with more than one kind of oxygen function, salts thereof; nesoi |

11

| HTSUS | Description |
|---|---|
| 29224100 | Lysine and its esters and salts thereof |
| 29224250 | Glutamic acid and its salts, other than monosodium glutamate |
| 29224400 | Tildine (INN) and its salts |
| 29224910 | m-Aminobenzoic acid, technical; and other specified aromatic amino-acids and their esters, except those with more than one oxygen function |
| 29224926 | Aromatic amino-acids drugs and their esters, not containing more than one kind of oxygen function, nesoi |
| 29224930 | Aromatic amino-acids and their esters, excl. those with more than one oxygen function; salts; described in add. U.S. note 3 to sect VI |
| 29224937 | Aromatic amino-acids and their esters, not contng more than 1 kind of oxygen function (excluding goods in add U.S. note 3 to sec VI), nesoi |
| 29224949 | Nonaromatic amino-acids, other than those containing more than one kind of oxygen function, other than glycine |
| 29224980 | Non-aromatic esters of amino-acids, other than those containing more than one kind of oxygen function; salts thereof |
| 29225007 | 3,4-Diaminophenetole dihydrogen sulfate; 2-nitro-5-[(2,3-dihydroxy)propoxy]-N-methylaniline; and other specified aromatic chemicals |
| 29225010 | Specified aromatic amino-alcohol-phenols, amino-acid-phenols and other amino-compounds with oxygen function |
| 29225011 | Salts of d(underscored)-(-)-p-Hydroxyphenylglycine |
| 29225013 | Isotharine hydrochloride and other specified aromatic drugs of amino-compounds with oxygen function |
| 29225014 | Other aromatic cardiovascular drugs of amino-compounds with oxygen function |
| 29225017 | Aromatic dermatological agents and local anesthetics of amino-compounds with oxygen function |
| 29225025 | Aromatic drugs of amino-compounds with oxygen function, nesoi |
| 29225035 | Aromatic amino-alcohol-phenols, amino-acid-phenols and other amino-compounds with oxygen function described in add. US note 3 to section VI |
| 29225040 | Aromatic amino-alcohol-phenols, amino-acid-phenols and other amino-compounds with oxygen function, nesoi |
| 29225050 | Nonaromatic amino-alcohol-phenols, amino-acid-phenols and other amino-compounds with oxygen function |
| 29231000 | Choline and its salts |
| 29232020 | Lecithins and other phosphoaminolipids, nesoi |
| 29239001 | Quaternary ammonium salts and hydroxides, whether or not chemically defined, nesoi |
| 29241100 | Meprobamate (INN) |
| 29241911 | Acyclic amides (including acyclic carbamates) |
| 29241980 | Acyclic amide derivatives; salts thereof; nesoi |
| 29242116 | Aromatic ureines and their derivatives pesticides, nesoi |
| 29242150 | Nonaromatic ureines and their derivatives; and salts thereof |
| 29242910 | Acetanilide; N-acetylsulfanilyl chloride; aspartame; and 2-methoxy-5-acetamino-N,N-bis(2-acetoxyethyl)aniline |

**Federal Register** / Vol. 90, No. 65 / Monday, April 7, 2025 / Presidential Documents    **15063**

| HTSUS | Description |
|-------|-------------|
| 29242962 | Other aromatic cyclic amides and derivatives for use as drugs |
| 29242971 | Aromatic cyclic amides and their derivatives of products described in additional U.S. note 3 to section VI, nesoi |
| 29242977 | Aromatic cyclic amides (incl cyclic carbamates) and their derivatives and salts thereof, nesoi |
| 29242995 | Other nonaromatic cyclic amides and their derivatives; salts thereof; nesoi |
| 29251200 | Glutethimide (INN) |
| 29251942 | Other aromatic imides and their derivatives; salts thereof; nesoi |
| 29251991 | Other non-aromatic imides and their derivatives |
| 29252100 | Chlordimeform (ISO) |
| 29252920 | Aromatic drugs of imines and their derivatives, nesoi |
| 29252960 | Aromatic imines and their derivatives; salts thereof (excluding drugs); nesoi |
| 29252990 | Non-aromatic imines and their derivatives; salts thereof |
| 29263010 | Fenproporex (INN) and its salts |
| 29264000 | alpha-Phenylacetoacetonitrile |
| 29269014 | p-Chlorobenzonitrile and verapamil hydrochloride |
| 29269043 | Aromatic nitrile-function compounds, nesoi, described in additional U.S. note 3 to section VI |
| 29269048 | Aromatic nitrile-function compounds other than those products in additional U.S. note 3 to section VI, nesoi |
| 29270040 | Diazo-, azo- or azoxy-compounds, nesoi, described in additional U.S. note 3 to section VI |
| 29270050 | Other diazo-, azo- or azoxy-compounds, nesoi |
| 29280025 | Aromatic organic derivatives of hydrazine or of hydroxylamine |
| 29280030 | Nonaromatic drugs of organic derivatives of hydrazine or of hydroxylamine, other than Methyl ethyl ketoxime |
| 29280050 | Nonaromatic organic derivatives of hydrazine or of hydroxylamine, nesoi |
| 29299020 | Aromatic compounds with other nitrogen function, nesoi |
| 29299050 | Nonaromatic compounds with other nitrogen functions, except isocyanates |
| 29302020 | Aromatic compounds of thiocarbamates and dithiocarbamates, excluding pesticides |
| 29302090 | Other non-aromatic thiocarbamates and dithiocarbamates |
| 29303060 | Thiuram mono-, di- or tetrasulfides, other than tetramethylthiuram monosulfide |
| 29309029 | Other aromatic organo-sulfur compounds (excluding pesticides) |
| 29309049 | Nonaromatic organo-sulfur acids, nesoi |
| 29309092 | Other non-aromatic organo-sulfur compounds |
| 29314900 | Other non-halogenated organo-phosphorous derivatives |
| 29315300 | O-(3-chloropropyl) O-[4-nitro-3-(trifluoromethyl)phenyl] methylphosphonothionate |
| 29319022 | Drugs of aromatic organo-inorganic compounds |
| 29319090 | Other non-aromatic organo-inorganic compounds |
| 29321400 | Sucralose |

13

| HTSUS | Description |
|---|---|
| 29321951 | Nonaromatic compounds containing an unfused furan ring (whether or not hydrogenated) in the ring |
| 29322020 | Aromatic drugs of lactones |
| 29322030 | Aromatic lactones, nesoi, described in additional U.S. note 3 to section VI |
| 29322050 | Nonaromatic lactones |
| 29329961 | Aromatic heterocyclic compounds with oxygen hetero-atom(s) only described in additional U.S. note 3 to section VI, nesoi |
| 29329970 | Aromatic heterocyclic compounds with oxygen hetero-atom(s) only, nesoi |
| 29329990 | Nonaromatic heterocyclic compounds with oxygen hetero-atom(s) only, nesoi |
| 29331100 | Phenazone (Antipyrine) and its derivatives |
| 29331935 | Aromatic or modified aromatic drugs of heterocyclic compounds with nitrogen hetero-atom(s) only containing an unfused pyrazole ring |
| 29331945 | Nonaromatic drugs of heterocyclic compounds with nitrogen hetero-atom(s) only containing an unfused pyrazole ring |
| 29331990 | Other compound (excluding aromatic, modified aromatic & drugs) containing unfused pyrazole ring (whether or n/hydrogenated) in the structure |
| 29332100 | Hydantoin and its derivatives |
| 29332920 | Aromatic or modified aromatic drugs of heterocyclic compounds with nitrogen hetero-atom(s) only cont. an unfused imidazole ring |
| 29332935 | Aromatic or mod. aromatic goods in add US note 3 to sect VI containing an unfused imidazole ring (whether or n/hydrogenated) in structure |
| 29332943 | Aromatic or mod aromatic goods contng unfused imidazole ring (whether or n/hydrogenated) in the structure (exc prod in add US note 3 sec VI) |
| 29332945 | Nonaromatic drugs of heterocyclic compounds with nitrogen hetero-atom(s) only, containing an unfused imidazole ring, nesoi |
| 29332990 | Other compounds (excluding drugs, aromatic and modified aromatic compounds) containing an unfused imidazole ring (whether or n/hydrogenated) |
| 29333301 | Alfentanil (INN), anileridine (INN), bezitramide (INN), bromazepam (INN), difenoxin (INN), and other specified INNs; salts thereof |
| 29333400 | Other fentanyls and their derivatives, containing an unfused pyrazole ring |
| 29333500 | 3-Quinuclidinol |
| 29333700 | N-Phenethyl-4-piperidone (NPP) |
| 29333908 | 1-(3-Sulfapropyl)pryidinium hydroxide; N,N-bis(2,2,6,6-tetramethyl-4-piperidinyl)-1,6-hexanediamine; and 5 other specified chemicals |
| 29333910 | Collidines, lutidines and picolines |
| 29333920 | p-Chloro-2-benzylpyridine & other specified heterocyclic compounds, w nitrogen hetero-atom(s) only cont. an unfused pyridine ring |
| 29333921 | Fungicides of heterocyclic compounds with nitrogen hetero-atom(s) only, containing an unfused pyridine ring |
| 29333923 | o-Paraquat dichloride |
| 29333925 | Herbicides nesoi, of heterocyclic compounds with nitrogen hetero-atom(s) only, containing an unfused pyridine ring |
| 29333927 | Pesticides nesoi, of heterocyclic compounds with nitrogen hetero-atom(s) only, containing an unfused pyridine ring |

14

| HTSUS | Description |
|---|---|
| 29333931 | Psychotherapeutic agents of heterocyclic compounds with nitrogen hetero-atom(s) only, containing an unfused pyridine ring, nesoi |
| 29333941 | Drugs containing an unfused pyridine ring (whether or not hydrogenated) in the structure, nesoi |
| 29333961 | Heterocyclic compounds with nitrogen hetero-atom(s) only containing an unfused pyridine ring, described in add. US note 3 to sec. VI |
| 29333992 | Heterocyclic compounds with nitrogen hetero-atom(s) only containing an unfused pyridine ring, nesoi |
| 29334100 | Levorphenol (INN) and its salts |
| 29334908 | 4,7-Dichloroquinoline |
| 29334910 | Ethoxyquin (1,2-Dihydro-6-ethoxy-2,2,4-trimethylquinoline) |
| 29334915 | 8-Methylquinoline and Isoquinoline |
| 29334917 | Ethyl ethyl-6,7,8-trifluoro-1,4-dihydro-4-oxo-3-quinoline carboxylate |
| 29334920 | 5-Chloro-7-iodo-8-quinolinol (Iodochlorhydroxyquin); Decoquinate; Diiodohydroxyquin; and Oxyquinoline sulfate |
| 29334926 | Drugs containing a quinoline or isoquinoline ring-system (whether or not hydrogenated) not further fused, nesoi |
| 29334930 | Pesticides of heterocyclic compounds with nitrogen hetero-atom(s) only, cont. a quinoline or isoquinoline ring-system, not further fused |
| 29334960 | Products described in add. US note 3 to sec VI containing quinoline or isoquinoline ring-system (whether or n/hydrogenated), n/further fused |
| 29334970 | Heterocyclic compounds with nitrogen hetero-atom(s) only, containing a quinoline ring-system, not further fused, nesoi |
| 29335210 | Malonylurea (barbituric acid) |
| 29335290 | Salts of barbituric acid |
| 29335300 | Allobarbital (INN), amobarbital (INN), barbital (INN), butalbital (INN), butobarbital, and other specified INNs; salts thereof |
| 29335400 | Other derivatives of malonylurea (barbituric acid); salts thereof |
| 29335910 | Aromatic or modified aromatic herbicides of heterocyclic compounds with nitrogen hetero-atom(s) only, cont. a pyrimidine or piperazine ring |
| 29335915 | Aromatic or mod. aromatic pesticides nesoi, of heterocyclic compounds with nitrogen hetero-atom(s) only cont. pyrimidine or piperazine ring |
| 29335918 | Nonaromatic pesticides of heterocyclic compounds with nitrogen hetero-atom(s) only, cont. pyrimidine or piperazine ring, nesoi |
| 29335921 | Antihistamines, including those principally used as antinauseants |
| 29335922 | Nicarbazin and trimethoprim |
| 29335936 | Anti-infective agents nesoi, of heterocyclic compounds with nitrogen hetero-atom(s) only, cont. pyrimidine, piperazine ring |
| 29335946 | Psychotherapeutic agents of heterocyclic compounds with nitrogen hetero-atom(s) only, cont. pyrimidine or piperazine ring, nesoi |
| 29335953 | Other aromatic or modified aromatic drugs containing a pyrimidine ring (whether or not hydrogenated) or piperazine ring in the structure |
| 29335959 | Nonaromatic drugs of heterocyclic compounds nesoi, with nitrogen hetero-atom(s) only, cont. a pyrimidine or piperazine ring |

**15066**    **Federal Register** / Vol. 90, No. 65 / Monday, April 7, 2025 / Presidential Documents

| HTSUS | Description |
|-------|------------|
| 29335970 | Aromatic heterocyclic compounds nesoi, with nitrogen hetero-atom(s) only, cont. pyrimidine or piperazine ring, in add. U.S. note 3, sec. VI |
| 29335980 | Aromatic or modified aromatic heterocyclic compounds nesoi, with nitrogen hetero-atom(s) only, cont. pyrimidine or piperazine ring |
| 29335985 | 2-Amino-4-chloro-6-methoxypyrimidine; 2-amino-4,6-dimethoxypyrimidine; and 6-methyluracil |
| 29335995 | Other (excluding aromatic or mod aromatic) compds containing pyrimidine ring (whether or n/hydrogenated) or piperazine ring in the structure |
| 29336960 | Other compounds containing an unfused triazine ring (whether or not hydrogenated) in the structure |
| 29337200 | Clobazam (INN) and methyprylon (INN) |
| 29337908 | Aromatic or modified aromatic lactams with nitrogen hetero-atoms only described in additional U.S. note 3 to section VI |
| 29337915 | Aromatic or modified aromatic lactams, nesoi |
| 29337985 | Aromatic or modified aromatic lactams with nitrogen hetero-atoms only, nesoi |
| 29339100 | Alprazolam (INN), camazepam (INN), chlordiazepoxide (INN), clonazepam (INN), clorazepate, and other specified INNs; salts thereof |
| 29339901 | Butyl (R)-2-[4-(5-triflouromethyl-2-pyridinyloxy)phenoxy]propanoate |
| 29339902 | 2-[4-[(6-Chloro-2-quinoxalinyl)oxy]phenoxy]propionic acid, ethyl ester; and 1 other specified aromatic chemical |
| 29339905 | Acridine and indole |
| 29339906 | alpha-Butyl-alpha-(4-chlorophenyl)-1H-1,2,4-triazole-1-propanenitrile (Mycolbutanil); and one other specified aromatic chemical |
| 29339908 | Acetoacetyl-5-aminobenzimidazolone; 1,3,3-Trimethyl-2-methyleneindoline; and two other specified aromatic chemicals |
| 29339911 | Carbazole |
| 29339912 | 6-Bromo-5-methyl-1H-imidazo-(4,5-b)pyridine; 2-sec-butyl-4-tert-butyl-6-(benzotriazol-2-yl)phenol; 2-methylindoline; and other specific |
| 29339916 | o-Diquat dibromide (1,1-Ethylene-2,2-dipyridylium dibromide) |
| 29339917 | Aromatic or modified aromatic insecticides with nitrogen hetero-atom(s) only, nesoi |
| 29339922 | Other heterocyclic aromatic or modified aromatic pesticides with nitrogen hetero-atom(s) only, nesoi |
| 29339924 | Aromatic or modified aromatic photographic chemicals with nitrogen hetero-atom(s) only |
| 29339926 | Aromatic or modified aromatic antihistamines of heterocyclic compounds with nitrogen hetero-atom(s) only |
| 29339942 | Acriflavin; Acriflavin hydrochloride; Carbadox; Pyrazinamide |
| 29339946 | Aromatic or modified aromatic anti-infective agents of heterocyclic compounds with nitrogen hetero-atom(s) only, nesoi |
| 29339951 | Hydralazine hydrochloride |
| 29339953 | Aromatic or modified aromatic cardiovascular drugs of heterocyclic compounds with nitrogen hetero-atom(s) only, nesoi |
| 29339955 | Aromatic or modified aromatic analgesics and certain like affecting chemicals, of heterocyclic compounds with nitrogen hetero-atom(s) only |

Federal Register / Vol. 90, No. 65 / Monday, April 7, 2025 / Presidential Documents    15067

| HTSUS | Description |
|---|---|
| 29339958 | Droperidol; and Imipramine hydrochloride |
| 29339961 | Aromatic/modified aromatic psychotherapeutic agents, affecting the CNS, of heterocyclic compounds with nitrogen hetero-atom(s) only, nesoi |
| 29339965 | Aromatic or modified aromatic anticonvulsants, hypnotics and sedatives, of heterocyclic compounds with nitrogen hetero-atom(s) only, nesoi |
| 29339970 | Aromatic or modified aromatic drugs affecting the central nervous system, of heterocyclic compounds with nitrogen atom(s) only, nesoi |
| 29339975 | Aromatic or modified aromatic drugs of heterocyclic compounds with nitrogen hetero-atom(s) only, nesoi |
| 29339979 | Aromatic or modified aromatic compounds with nitrogen hetero-atom(s) only described in additional U.S. note 3 to section VI |
| 29339982 | Aromatic or mod. aromatic compounds with nitrogen hetero-atom(s) only other than products described in add. U.S. note 3 to section VI, nesoi |
| 29339985 | 3-Amino-1,2,4-triazole |
| 29339989 | Hexamethyleneimine |
| 29339990 | Nonaromatic drugs of heterocyclic compounds with nitrogen hetero-atom(s) only, nesoi |
| 29339997 | Nonaromatic heterocyclic compounds with nitrogen hetero-atom(s) only, nesoi |
| 29341010 | Aromatic or modified aromatic heterocyclic compounds cont. an unfused thiazole ring, described in add. U.S. note 3 to section VI |
| 29341020 | Aromatic or modified aromatic heterocyclic compounds, nesoi, containing an unfused thiazole ring |
| 29341090 | Other compounds (excluding aromatic or modified aromatic) containing an unfused thiazole ring (whether or not hydrogenated) in the structure |
| 29342040 | Heterocyclic compounds containing a benzothiazole ring-system, not further fused, described in add. U.S. note 3 to section VI |
| 29342080 | Other compounds containing a benzothiazole ring system (whether or not hydrogenated), not further fused |
| 29343023 | Antidepressants, tranquilizers and other pschotherapeutic agents containing a phenothiazine ring-system, not further fused |
| 29343027 | Other drugs containing a phenothiazine ring system (whether or not hydrogenated), not further fused, nesoi |
| 29343043 | Products described in add. US note 3 to section VI containing a phenothiazine ring system (whether or not hydrogenated), not further fused |
| 29343050 | Heterocyclic compounds containing a phenothiazine ring-system (whether or not hydrogenated), not further fused, nesoi |
| 29349100 | Aminorex (INN), brotizolam (INN), clotiazepam (INN), cloxazolam (INN), dextromoramide (INN), and other specified INNs; salts thereof |
| 29349200 | Other fentanyls and their derivatives, containing an unfused thiazole ring |
| 29349901 | Mycophenolate mofetil |
| 29349903 | 2-Acetylbenzo(b)thiophene; and 2 other specified aromatic or modified aromatic compounds |
| 29349905 | 5-Amino-3-phenyl-1,2,4-thiadiazole(3-Phenyl-5-amino-1,2,4-thiadiazole); and 3 other specified aromatic/mod. aromatic heterocyclic compounds |

17

**15068**    **Federal Register** / Vol. 90, No. 65 / Monday, April 7, 2025 / Presidential Documents

| HTSUS | Description |
|---|---|
| 29349906 | 7-Nitronaphth[1,2]oxadiazole-5-sulfonic acid and its salts |
| 29349907 | Ethyl 2-[4-[(6-chloro-2-benzoxazoyl)oxy]phenoxy]propanoate (Fenoxaprop- ethyl) |
| 29349908 | 2,5-Diphenyloxazole |
| 29349909 | 1,2-Benzisothiazolin-3-one |
| 29349911 | 2-tert-Butyl-4-(2,4-dichloro-5-isopropoxyphenyl)-delta(squared)-1,3,4-oxadiazolin-5-one; Bentazon; Phosalone |
| 29349912 | Aromatic or modified aromatic fungicides of other heterocyclic compounds, nesoi |
| 29349915 | Aromatic or modified aromatic herbicides of other heterocyclic compounds, nesoi |
| 29349916 | Aromatic or modified aromatic insecticides of other heterocyclic compounds, nesoi |
| 29349918 | Aromatic or modified aromatic pesticides nesoi, of other heterocyclic compounds, nesoi |
| 29349920 | Aromatic or modified aromatic photographic chemicals of other heterocyclic compounds, nesoi |
| 29349930 | Aromatic or modified aromatic drugs of other heterocyclic compounds, nesoi |
| 29349939 | Aromatic or modified aromatic other heterocyclic compounds described in additional U.S. note 3 to section VI |
| 29349944 | Aromatic or modified aromatic other heterocyclic compounds, nesoi |
| 29349947 | Nonaromatic drugs of other heterocyclic compounds, nesoi |
| 29349970 | Morpholinethyl chloride hydrochloride; 2-methyl-2,5-dioxo-1-oxa-2-phospholan; and 1 other specified nonaromatic chemical |
| 29349990 | Nonaromatic other heterocyclic compounds, nesoi |
| 29355000 | Other perfluorooctane sulfonamides |
| 29359006 | 4-Amino-6-chloro-m-benzenedisulfonamide and Methyl-4-aminobenzenesulfonylcarbamate (Asulam) |
| 29359010 | 2-Amino-N-Ethylbenzenesulfonanilide etc |
| 29359013 | (5-[2-Chloro-4-(Trifluoromeythyl)phenoxy]-N-(Methylsulfonyl)-2-Nitrobenzamide)(fomesafen); etc |
| 29359015 | ortho-Toluenesulfonamide |
| 29359020 | Sulfonamides used as fast color bases and fast color salts |
| 29359030 | Sulfamethazine |
| 29359032 | Acetylsulfisoxazole; Sulfacetamide, sodium; and Sulfamethazine, sodium |
| 29359033 | Sulfathiazole and Sulfathiazole, sodium |
| 29359042 | Salicylazosulfapyridine (Sulfasalazine); Sulfadiazine; Sulfaguanidine; Sulfamerizine; and Sulfapyridine |
| 29359048 | Other sulfonamides used as anti-infective agents |
| 29359060 | Other sulfonamide drugs (excluding anti-infective agents) |
| 29359075 | Other sulfonamides (excluding drugs, etc) of products descibed in US note 3 to section 6 |
| 29359095 | Other sulfonamides, excluding drugs, excluding products described in US note 4 to section 6 |
| 29362100 | Vitamins A and their derivatives, unmixed, natural or synthesized |
| 29362200 | Vitamin B1 (Thiamine) and its derivatives, unmixed, natural or synthesized |

| HTSUS | Description |
|---|---|
| 29362300 | Vitamin B2 (Riboflavin) and its derivatives, unmixed, natural or synthesized |
| 29362401 | Vitamin B5 (D- or DL-Pantothenic acid) and its derivatives, unmixed, natural or synthesized |
| 29362500 | Vitamin B6 (Pyridoxine and related compounds with Vitamin B6 activity) and its derivatives, unmixed, natural or synthesized |
| 29362600 | Vitamin B12 (Cyanocobalamin and related compounds with Vitamin B12 activity) and its derivatives, unmixed, natural or synthesized |
| 29362700 | Vitamin C (Ascorbic acid) and its derivatives, unmixed, natural or synthesized |
| 29362800 | Vitamin E (Tocopherols and related compounds with Vitamin E activity) and its derivatives, unmixed, natural or synthesized |
| 29362910 | Folic acid and its derivatives, unmixed |
| 29362916 | Niacin and niacinamide |
| 29362920 | Aromatic or modified aromatic vitamins and their derivatives, nesoi |
| 29362950 | Other vitamins and their derivatives, nesoi |
| 29369001 | Vitamins or provitamins (including natural concentrates) and intermixtures of the foregoing, whether or not in any solvent |
| 29371100 | Somatotropin, its derivatives and structural analogues |
| 29371200 | Insulin and its salts |
| 29371900 | Polypeptide hormones, protein hormones and glycoprotein hormones, their derivatives and structural analogues, nesoi |
| 29372100 | Cortisone, hydrocortisone, prednisone (Dehydrocortisone) and prednisolone (Dehydrohydrocortisone) |
| 29372200 | Halogenated derivatives of corticosteroidal hormones |
| 29372310 | Estrogens and progestins obtained directly or indirectly from animal or vegetable materials |
| 29372325 | Estradiol benzoate; and Estradiol cyclopentylpropionate (estradiol cypionate) |
| 29372350 | Other estrogens and progestins not derived from animal or vegetable materials, nesoi |
| 29372910 | Desonide; and Nandrolone phenpropionate |
| 29372990 | Steroidal hormones, their derivatives and structural analogues, nesoi |
| 29375000 | Prostaglandins, thromboxanes and leukotrienes, their derivatives and structural analogues |
| 29379005 | Epinephrine |
| 29379010 | Epinephrine hydrochloride |
| 29379020 | Catecholamine hormones, their derivatives and structural analogues, nesoi |
| 29379040 | l-Thyroxine(Levothyroxine), sodium |
| 29379045 | Amino-acid derivatives of hormones and their derivatives, nesoi |
| 29379090 | Other hormones,their derivatives and structural analogues,other steroid derivatives and structural analogue used primarily as hormones,nesoi |
| 29381000 | Rutoside (Rutin) and its derivatives |
| 29389000 | Glycosides, natural or synthesized, and their salts, ethers, esters, and other derivatives other than rutoside and its derivatives |

19

**15070**    **Federal Register** / Vol. 90, No. 65 / Monday, April 7, 2025 / Presidential Documents

| HTSUS | Description |
|---|---|
| 29391100 | Concentrates of poppy straw; buprenorphine (INN), codeine, dihydrocodeine (INN), ethylmorphine, and other specified INNs; salts thereof |
| 29391910 | Papaverine and its salts |
| 29391920 | Synthetic alkaloids of opium and their derivatives; salts thereof; nesoi |
| 29391950 | Nonsynthetic alkaloids of opium and their derivatives; salts thereof; nesoi |
| 29392000 | Alkaloids of cinchona, and their derivatives; salts thereof, other than quinine and its salts |
| 29393000 | Caffeine and its salts |
| 29394100 | Ephedrine and its salts |
| 29394200 | Pseudoephedrine and its salts |
| 29394400 | Norephedrine & its salts |
| 29394500 | Levometamfetamine, metamfetamine (INN), metamfetamine racemate and their salts |
| 29394903 | Alkaloids of ephedra and their salts, other than ephedrine, pseudoephedrine, cathine, norephedrine, levometamfetamine and their salts |
| 29395900 | Theophylline aminophylline (Theophylline-ethylenediamine) and their derivatives; salts thereof; nesoi |
| 29396200 | Ergotamine and its salts |
| 29396300 | Lysergic acid and its salts |
| 29396900 | Alkaloids of rye ergot and their derivatives, nesoi; salts thereof |
| 29397200 | Cocaine, ecgonine; salts, esters and other derivatives thereof |
| 29397900 | Vegetable alkaloids, natural or reproduced by synthesis, their salts and other derivatives, nesoi |
| 29398000 | Other alkaloids, natural or reproduced by synthesis and their salts, ethers, esters & other derivatives, nesoi |
| 29400060 | Other sugars, nesoi excluding d-arabinose |
| 29411010 | Ampicillin and its salts |
| 29411020 | Penicillin G salts |
| 29411030 | Carfecillin, sodium; cloxacillin, sodium; dicloxacillin, sodium; flucloxacillin (Floxacillin); and oxacillin, sodium |
| 29411050 | Penicillins and their derivatives nesoi, with a penicillanic acid structure; salts thereof |
| 29412010 | Dihydrostreptomycins and its derivatives; salts thereof |
| 29412050 | Streptomycins and their derivatives; salts thereof, nesoi |
| 29413000 | Tetracyclines and their derivatives; salts thereof |
| 29414000 | Chloramphenicol and their derivatives; salts thereof |
| 29415000 | Erythromycin and their derivatives; salts thereof |
| 29419010 | Natural antibiotics, nesoi |
| 29419030 | Antibiotics, nesoi, aromatic or modified aromatic, other than natural |
| 29419050 | Antibiotics nesoi, other than aromatic or modified aromatic antibiotics |
| 29420005 | Aromatic or modified aromatic drugs of other organic compounds, nesoi |
| 29420035 | Other aromatic or modified aromatic organic compounds (excluding products described in additional U.S. note 3 to section VI) |

20

| HTSUS | Description |
|---|---|
| 29420050 | Nonaromatic organic compounds, nesoi |
| 30012000 | Extracts of glands or other organs or of their secretions for organotherapeutic uses |
| 30019001 | Glands and other organs for organotherapeutic uses, dried, whether or not powdered |
| 30021200 | Antisera and other blood fractions including human blood and fetal bovine serum |
| 30021300 | Immunological products, unmixed, not put up in measured doses or in forms or packings for retail sale |
| 30021400 | Immunological products, mixed, not put up in measured doses or in forms or packings for retail sale |
| 30021500 | Immunological products, put up in measured doses or in forms or packings for retail sale |
| 30024100 | Vaccines for human medicine |
| 30024200 | Vaccines for veterinary medicine |
| 30024900 | Toxins or cultures of micro-organisms (excluding yeasts) |
| 30025100 | Cell therapy products |
| 30025900 | Other cell cultures, other than cell therapy products |
| 30029010 | Ferments, excluding yeasts |
| 30029052 | Human blood; animal blood prepared for therapeutic, prophylactic, diagnostic uses; antisera; antiallergenic preparations nesoi & like products |
| 30031000 | Medicaments, cont. penicillins or streptomycins, not dosage form and not packed for retail |
| 30032000 | Medicaments containing antibiotics, nesoi, not dosage form and not packaged for retail |
| 30033910 | Medicaments containing artificial mixtures of natural hormones, but not antibiotics, not dosage form and not packed for retail |
| 30033950 | Medicaments containing products of heading 2937, nesoi, but not antibiotics, not dosage form and not packed for retail |
| 30034100 | Medicaments containing ephedrine or its salts, not dosage form and not packed for retail |
| 30034200 | Medicaments containing pseudoephedrine (INN) or its salts, not dosage form and not packed for retail |
| 30034900 | Other medicaments containing alkaloids or derivatives thereof, nesoi, not dosage form and not packed for retail |
| 30039001 | Other medicaments excl goods of heading 3002, 3005, 3006 consist of two or more consituents mixed together, not dosage form and not packed for retail |
| 30041010 | Medicaments containing penicillin G salts, in dosage form and packed for retail |
| 30041050 | Medicaments cont. penicillins or streptomycins, nesoi, in dosage form or packed for retail |
| 30042000 | Medicaments containing antibiotics, nesoi, in dosage form or packed for retail |
| 30043100 | Medicaments containing insulin, in dosage form or packed for retail |
| 30043200 | Medicaments, containing adrenal cortical hormones, in dosage form or packed for retail |
| 30043900 | Medicaments, containing products of heading 2937 nesoi, in dosage form or packed for retail |

| HTSUS | Description |
|---|---|
| 30044100 | Medicaments containing ephedrine or its salts, in dosage form and packed for retail |
| 30044200 | Medicaments containing pseudoephedrine (INN) or its salts, in dosage form and packed for retail |
| 30044900 | Other medicaments containing alkaloids or derivatives thereof, nesoi, in dosage form and packed for retail |
| 30045010 | Medicaments containing vitamin B2 synthesized from aromatic or mod. aromatic compounds, in dosage form or packed for retail |
| 30045020 | Medicaments containing vitamin B12 synthesized from aromatic or mod. Aromatic compounds, in dosage form or packed for retail |
| 30045030 | Medicaments containing vitamin E synthesized from aromatic or mod. aromatic compounds, in dosage form or packed for retail |
| 30045040 | Medicaments containing vitamins nesoi, synthesized from aromatic or mod. aromatic compounds, in dosage form or packed for retail |
| 30045050 | Medicaments containing vitamins or other products of heading 2936, nesoi, in dosage form or packed for retail |
| 30046000 | Other medicaments containing antimalarial active principles described in subheading note 2 to this chapter, in dosage form and packed for retail |
| 30049010 | Medicaments containing antigens or hyaluronic acid or its sodium salt, nesoi, in dosage form or packed for retail |
| 30049092 | Medicaments nesoi, in dosage form and packed for retail |
| 30063010 | Opacifying preparation for X-ray examination; diagnostic reagent designed to be administered to the patient; all cont. antigens or antisera |
| 30063050 | Opacifying preparations for X-ray examinations; diagnostic reagents designed to be administered to the patient, nesoi |
| 30066000 | Chemical contraceptive preparations based on hormones or spermicides |
| 30067000 | Gel preparation use human/veterinary medicine lubricant in surgical operation, physical exam or coupling agent tween body & med instrument |
| 30069310 | Placebos and blinded clinical trial kits, put up in measured doses, packaged with medicinal preparations |
| 30069320 | Placebos and blinded clinical trial kits, put up in measured doses, containing over 10% by dry weight of sugar |
| 30069350 | Placebos and blinded clinical trial kits, put up in measured doses, containing ingredients having nutritional value |
| 30069360 | Placebos and blinded clinical trial kits, put up in measured doses, in liquid form for oral intake |
| 30069380 | Placebos and blinded clinical trial kits, put up in measured doses, containing other chemicals other than medicaments |
| 31042000 | Potassium chloride |
| 31043000 | Potassium sulfate |
| 31049001 | Mineral or chemical fertilizers, potassic, nesoi |
| 31051000 | Fertilizers of chapter 31 in tablets or similar for |
| 31052000 | Mineral or chemical fertilizers nesoi, containin |
| 31056000 | Mineral or chemical fertilizers nesoi, containin |
| 32030080 | Coloring matter of vegetable or animal origin, nesoi |

22

| HTSUS | Description |
|---|---|
| 32041380 | Basic dyes and preparations based thereon, nesoi |
| 32041720 | Copper phthalocyanine ([Phthalocyanato(2-)]copper) not ready for use as a pigment |
| 32041800 | Carotenoid coloring matters and preparations based thereon |
| 32061100 | Pigments & preparations based on titanium dioxide containing 80 percent or more by weight off titanium dioxide calculated on the dry weight |
| 32061900 | Pigments and preparations based on titanium dioxide, nesoi |
| 34024210 | Non-ionic organic surface-active agents, aromatic or modified aromatic |
| 34024220 | Fatty substances of animal, vegetable or microbial origin; non-ionic organic surface-active agents, other than aromatic or modified aromatic |
| 34024290 | Non-ionic organic surface-active agents, other than fatty substances of animal, vegetable or microbial origin, other than aromatic / modified aromatic |
| 36069030 | Ferrocerium and other pyrophoric alloys in all forms |
| 38089410 | Disinfectants, containing any aromatic or modified aromatic disinfectant |
| 38089450 | Disinfectants not subject to subheading note 1 of chapter 38, nesoi |
| 38180000 | Chemical elements doped for use in electronics, in the form of discs, wafers etc., chemical compounds doped for electronic use |
| 38249100 | Mixtures consisting mainly of methylphosphonate etc. |
| 38249929 | Mixtures containing 5% or more by weight of one or more aromatic or modified aromatic substance, nesoi |
| 38249949 | Mixtures that are in whole or in part of hydrocarbons derived in whole or in part from petroleum, shale oil or natural gas |
| 38249955 | Mixtures of halogenated hydrocarbons, nesoi |
| 38249993 | Chemical products and preparations and residual products of the chemical or allied industries, nesoi |
| 39019090 | Polymers of ethylene, nesoi, in primary forms, other than elastomeric |
| 39029000 | Polymers of propylene or of other olefins, nesoi, in primary forms |
| 39046100 | Polytetrafluoroethylene (PTFE), in primary forms |
| 39059110 | Copolymers of vinyl esters or other vinyls, in primary forms, containing by weight 50% or more of derivatives of vinyl acetate |
| 39059980 | Polymers of vinyl esters or other vinyl polymers, in primary forms, nesoi |
| 39069050 | Acrylic polymers (except plastics or elastomers), in primary forms, nesoi |
| 39071000 | Polyacetals in primary forms |
| 39072100 | Bis(polyoxyethylene) methylphosphonate |
| 39072900 | Polyethers, other than polyacetals or bis(polyoxyethylene) methylphosphonate, in primary forms |
| 39073000 | Epoxide resins in primary forms |
| 39076100 | Polyethylene terephthalate, having a viscosity number of 78 ml/g or higher |
| 39076900 | Polyethylene terephthalate, having a viscosity number less than 78 ml/g |
| 39077000 | Poly(lactic acid) |
| 39079950 | Other polyesters nesoi, saturated, in primary forms |
| 39081000 | Polyamide-6, -11, -12, -6,6, -6,9, -6,10 or -6,12 in primary form |
| 39100000 | Silicones in primary forms |

23

**15074**    **Federal Register** / Vol. 90, No. 65 / Monday, April 7, 2025 / Presidential Documents

| HTSUS | Description |
|---|---|
| 39119025 | Thermoplastic polysulfides, polysulfones & oth products spec in note 3, chapt 39, cont aromatic monomer units or derived therefrom |
| 39119091 | Polysulfides, polysulfones & other products specified in note 3 to chapter 39, nesoi |
| 39123100 | Carboxymethylcellulose and its salts |
| 39123900 | Cellulose ethers, other than carboxymethylcellulose and its salts, in primary forms |
| 39129000 | Cellulose and its chemical derivatives nesoi, in primary forms |
| 39139020 | Polysaccharides and their derivatives, nesoi, in primary forms |
| 39139050 | Natural polymers and modified natural polymers, nesoi, in primary forms |
| 39140060 | Ion-exchangers based on polymers of headings 3901 to 3913, in primary forms, nesoi |
| 40011000 | Natural rubber latex, whether or not prevulcanized |
| 40012100 | Natural rubber smoked sheets |
| 40012200 | Technically specified natural rubber (TSNR), in primary forms |
| 40012900 | Natural rubber in primary forms other than latex, smoked sheets or technically specified natural rubber (TSNR) |
| 40013000 | Balata, gutta-percha, guayule, chicle and similar natural rubber gums, in primary forms |
| 44011100 | Coniferous fuel wood, in logs, in billets, in twigs, in faggots or similar forms |
| 44011200 | Nonconiferous fuel wood, in logs, in billets, in twigs, in faggots or similar forms |
| 44012100 | Coniferous wood in chips or particles |
| 44012200 | Nonconiferous wood in chips or particles |
| 44013100 | Sawdust and wood waste and scrap,  pellets |
| 44013200 | Wood briquettes |
| 44013942 | Sawdust and wood waste and scrap, agglomerated, excluding wood pellets, wood briquettes and artificial fire logs |
| 44014100 | Sawdust, not agglomerated |
| 44014900 | Other wood waste and scrap, not agglomerated, other than sawdust |
| 44021000 | Wood charcoal (including shell or nut charcoal), whether or not agglomerated, of bamboo |
| 44022000 | Wood charcoal (including shell or nut charcoal), whether or not agglomerated, of shell or nut |
| 44029001 | Wood charcoal (including shell or nut charcoal), whether or not agglomerated, other than of bamboo or shell or nut |
| 44031100 | Coniferous wood in the rough whether or not stripped of bark or sapwood, or roughly squared, treated with preservatives |
| 44031200 | Nonconiferous wood in the rough whether or not stripped of bark or sapwood, or roughly squared, treated with preservatives |
| 44032101 | Pine wood in the rough/roughly squared, the smallest dimension greater than or equal to 15 cm, not treated with preservatives |
| 44032201 | Pine wood in the rough/roughly squared, the smallest dimension less than 15 cm, not treated with preservatives |
| 44032301 | Fir and spruce wood in the rough/roughly squared, the smallest dimension greater than or equal to 15 cm, not treated with preservatives |

**Federal Register** / Vol. 90, No. 65 / Monday, April 7, 2025 / Presidential Documents    **15075**

| HTSUS | Description |
|---|---|
| 44032401 | Fir and spruce wood in the rough/roughly squared, the smallest dimension less than 15 cm, not treated with preservatives |
| 44032501 | Other coniferous wood, except pine, fir and spruce, in the rough/roughly squared, greater than or equal to 15 cm, not treated with preservatives |
| 44032601 | Other coniferous wood, except pine, fir and spruce, in the rough/roughly squared, less than 15 cm, not treated with preservatives |
| 44034200 | Wood in the rough/roughly squared, of teak, not treated with paint/stain/creosote/other preserv |
| 44034902 | Wood in the rough/roughly squared, of tropical wood other than Teak or Meranti, not treated with paint/stain/creosote/other preserv |
| 44039100 | Oak wood in the rough, whether or not stripped of bark or sapwood, or roughly squared, not treated with preservatives |
| 44039301 | Beech wood in the rough/roughly squared, the smallest dimension greater than or equal to 15 cm, not treated with preservatives |
| 44039401 | Beech wood in the rough/roughly squared, the smallest dimension less than 15 cm, not treated with preservatives |
| 44039501 | Birch wood in the rough/roughly squared, the smallest dimension greater than or equal to 15 cm, not treated with preservatives |
| 44039601 | Birch wood in the rough/roughly squared, the smallest dimension less than 15 cm, not treated with preservatives |
| 44039700 | Poplar and aspen wood in the rough/roughly squared, not treated with preservatives |
| 44039800 | Eucalyptus wood in the rough/roughly squared, not treated with preservatives |
| 44039901 | Wood in the rough/roughly squared, not treated with preservatives, nesoi |
| 44041000 | Coniferous wood, roughly shaped into poles, pickets, stakes, sticks and other forms, to be finished into specific articles or products |
| 44042000 | Nonconiferous wood, roughly shaped into poles, pickets, stakes, sticks and other forms, to be finished into specific articles or products |
| 44050000 | Wood wool (excelsior); wood flour |
| 44061100 | Railway or tramway sleepers (cross-ties) of coniferous wood, not impregnated |
| 44061200 | Railway or tramway sleepers (cross-ties) of nonconiferous wood, not impregnated |
| 44069100 | Railway or tramway sleepers (cross-ties) of coniferous wood, impregnated |
| 44069200 | Railway or tramway sleepers (cross-ties) of nonconiferous wood, impregnated |
| 44071100 | Pine wood sawn or chipped lengthwise, sliced or peeled, over 6 mm thick |
| 44071200 | Fir and spruce wood sawn or chipped lengthwise, sliced or peeled, over 6 mm thick |
| 44071300 | Mixtures of spruce, pine and fir (S-P-F) wood sawn or chipped lengthwise, sliced or peeled, over 6 mm thick |
| 44071400 | Mixtures of hemlock and fir (hem-fir) wood sawn or chipped lengthwise, sliced or peeled, over 6 mm thick |
| 44071900 | Other coniferous wood, nesoi, sawn or chipped lengthwise, sliced or peeled, over 6 mm thick |
| 44072100 | Dark Red Meranti, Light Red Meranti and other specified tropical woods, sawn or chipped lengthwise, sliced or peeled, over 6 mm thick |
| 44072200 | Okoume, Obeche, Sapelli and other specified tropical woods, sawn or chipped lengthwise, sliced or peeled, over 6 mm thick |

| HTSUS | Description |
|---|---|
| 44072301 | Teak, sawn or chipped lengthwise, sliced or peeled, over 6 mm thick |
| 44072500 | Dark Red Meranti, Light Red Meranti and Meranti Bakau wood sawn or chipped lengthwise, sliced or peeled, over 6 mm thick |
| 44072600 | White Lauan, White Meranti, White Seraya, Yellow Meranta and Alan wood sawn or chipped lengthwise, sliced or peeled, over 6 mm thick |
| 44072700 | Sapelli wood sawn or chipped lengthwise, sliced or peeled, over 6 mm thick |
| 44072800 | Iroko wood sawn or chipped lengthwise, sliced or peeled, over 6 mm thick |
| 44072902 | Tropical wood, nesoi, sawn or chipped lengthwise, sliced or peeled, over 6 mm thick |
| 44079100 | Oak wood, sawn or chipped lengthwise, sliced or peeled, over 6 mm thick |
| 44079200 | Beech wood, sawn or chipped lengthwise, sliced or peeled, over 6 mm thick |
| 44079300 | Maple wood sawn or chipped lengthwise, sliced or peeled, over 6 mm thick |
| 44079400 | Cherry wood sawn or chipped lengthwise, sliced or peeled, over 6 mm thick |
| 44079500 | Ash wood sawn or chipped lengthwise, sliced or peeled, over 6 mm thick |
| 44079600 | Birch wood, sawn or chipped lengthwise, sliced or peeled, over 6 mm thick |
| 44079700 | Poplar and aspen wood, sawn or chipped lengthwise, sliced or peeled, over 6 mm thick |
| 44079902 | Nonconiferous wood, nesoi, sawn or chipped lengthwise, sliced or peeled, over 6 mm thick |
| 44081001 | Coniferous veneer sheets and sheets for plywood & coniferous wood sawn/sliced/peeled not over 6 mm thick |
| 44083101 | Dark Red Meranti, Light Red Meranti and Meranti Bakau veneer sheets and sheets for plywood and other wood sawn/sliced/peeled, n/o 6 mm thick |
| 44083902 | Other tropical wood veneer sheets and sheets for plywood, and wood sawn/sliced/peeled n/o 6 mm thick |
| 44089001 | Nontropical nonconiferous veneer sheets and sheets for plywood and other wood sawn/sliced/peeled, not over 6 mm thick |
| 44091005 | Coniferous wood continuously shaped along any of its ends, whether or not also continuously shaped along any its edges or faces |
| 44091010 | Coniferous wood siding continuously shaped along any of its edges or faces but not on its ends |
| 44091020 | Coniferous wood flooring continuously shaped along any of its edges or faces but not on its ends |
| 44091040 | Standard wood moldings of pine (Pinus spp.) continuously shaped along any of its edges or faces but not on its ends |
| 44091045 | Standard coniferous wood moldings, other than of pine, continuously shaped along any of its edges or faces but not on its ends |
| 44091050 | Coniferous wood moldings, other than standard type, continuously shaped along any of its edges or faces but not on its ends |
| 44091060 | Coniferous wood dowel rods, plain, continuously shaped along any of its edges or faces but not on its ends |
| 44091065 | Coniferous wood dowel rod, sanded/grooved/otherwise advanced in condition, continuously shaped along any of edges or faces but not its ends |
| 44091090 | Coniferous wood, other than siding, flooring, moldings or dowel rod, continuously shaped along any of its edges or faces but not on its ends |

| HTSUS | Description |
|---|---|
| 44092105 | Nonconiferous wood (bamboo) continuously shaped along any of its ends, wether or not also continuously shaped along any its edges or faces |
| 44092190 | Bamboo, other than continuously shaped along any of its ends |
| 44092205 | Nonconiferous tropical wood continuously shaped along any ends, whether or not also continuously shaped along any edges or faces |
| 44092210 | Nonconiferous tropical wood siding, whether or not continuously shaped along its edges or faces but not its ends |
| 44092225 | Nonconiferous tropical wood flooring, whether or not continuously shaped along its edges or faces but not its ends |
| 44092240 | Nonconiferous tropical wood standard moldings, whether or not continuously shaped along its edges or faces but not its ends |
| 44092250 | Other nonconiferous tropical wood moldings, whether or not continuously shaped along its edges or faces but not its ends |
| 44092260 | Plain nonconiferous tropical wood dowel rods, whether or not continuously shaped along its edges or faces but not its ends |
| 44092265 | Nonconif. tropical wood dowel rods, sanded/grooved/otherwise advanced in condition, whether or not continuous. along edges or faces but not ends |
| 44092290 | Other nonconiferous tropical wood, whether or not continuously shaped along its edges or faces but not its ends |
| 44092906 | Other nonconiferous wood, continuously shaped along any ends, whether or not also continuously shaped along any edges or faces |
| 44092911 | Other nonconiferous wood siding, whether or not continuously shaped along its edges or faces but not its ends |
| 44092926 | Other nonconiferous wood flooring, whether or not continuously shaped along its edges or faces but not its ends |
| 44092941 | Other nonconiferous standard wood moldings, whether or not continuously shaped along its edges or faces but not its ends |
| 44092951 | Other nonconiferous wood moldings, whether or not continuously shaped along its edges or faces but not its ends |
| 44092961 | Plain other nonconif. wood dowel rods, whether or not continuously shaped along edges or faces but not ends |
| 44092966 | Other nonconif. wood dowel rods, sanded/grooved/otherwise advanced in condition, whether or not continuously shaped along edges or faces but not ends |
| 44092991 | Other nonconiferous wood, whether or not continuously shaped along its edges or faces but not its ends |
| 44101100 | Waferboard, including oriented strand board, of wood |
| 44101200 | Oriented strand board and waferboard, of wood, unworked or not further worked than sanded |
| 44101900 | Particle board and similar board of wood, other than waferboard |
| 44109000 | Particle board and similar board of ligneous materials other than wood |
| 44111210 | MDF , <= 5mm thick,  not mechanically worked or surface covered |
| 44111220 | MDF, <= 5mm thick, for construction,  laminated |
| 44111230 | MDF , <= 5mm thick, for construction,   not laminated, nesoi |

27

| HTSUS | Description |
|---|---|
| 44111260 | Fiberboard of a density over 0.5 g/cm3 but not over 0.8 g/cm3, not mechanically worked surface covered (Except for oil treatment) |
| 44111290 | MDF, <= 5mm thick, not for construction, nesoi |
| 44111310 | MDF, >5mm but <= 9 mm thick, not mechanically worked or surface covered |
| 44111320 | MDF, >5mm but <= 9 mm thick,, for construction, laminated |
| 44111330 | MDF , >5mm but <= 9 mm thick, for construction, not laminated, nesoi |
| 44111360 | Fiberboard of a density over 0.5 g/cm3 but not over 0.8 g/cm3, not mechanically worked surface covered(except for oil treatment) |
| 44111390 | MDF, >5mm but <= 9 mm thick, not for construction, nesoi |
| 44111410 | Fiberboard of a thickness exceeding 9 mm, not mechanically worked or surface covered |
| 44111420 | Fiberboard of a thickness exceeding 9 mm, edgeworked continuously, laminated, for construction uses |
| 44111430 | Fiberboard of a thickness exceeding 9 mm , tongued, grooved or rabbetted continuously, for construction uses, nesoi |
| 44111460 | Fiberboard of a thickness exceeding 9 mm, not mechanically worked surface covered (except for oil treatment) |
| 44111490 | Fiberboard nesoi,of a thickness exceeding 9 mm |
| 44119210 | Fiberboard of a density exceeding 0.8 g/cm3, not mechanically worked or surface covered |
| 44119220 | Fiberboard, of a density exceeding 0.8 g/cm3, mechanically worked, not surface covered (except for oil treatment) |
| 44119230 | Fiberboard, of a density exceeding 0.8 g/cm3, mechanically edged-worked, for construction uses |
| 44119240 | Fiberboard nesoi, density exceeding 0.8 g/cm3 |
| 44119310 | Fiberboard, not MDF, of a density >0.5 but <=0.8 g/cm3, not mechanically worked or surface covered |
| 44119320 | Fiberboard, not MDF, of a density >0.5 but <=0.8 g/cm3, edgeworked continuously, laminated, for construction uses |
| 44119330 | Fiberboard, not MDF, of a density >0.5 but <=0.8 g/cm3, tongued, grooved or rabbetted continuously, for construction, nesoi |
| 44119360 | Fiberboard of a density over 0.5 g/cm3 but not over 0.8 g/cm3, not mechanically worked surface covered (Except for oil) |
| 44119390 | Fiberboard, not MDF, of a density >0.5 but <=0.8 g/cm3, nesoi |
| 44119400 | Fiberboard of a density exceeding 0.35 g/cm3 but not exceeding 0.5 g/cm3, not mechanically worked or surface covered |
| 44121005 | Plywood, veneered panels and similar laminated wood, of bamboo |
| 44121090 | Veneered panels and similar laminated wood, of bamboo, other than plywood |
| 44123106 | Plywood sheets n/o 6mm thick, tropical wood outer ply, birch face ply, not surface covered beyond clear/transparent |
| 44123126 | Plywood sheets n/o 6mm thick,, tropical wood outer ply, Spanish cedar or walnut face ply, not surface covered beyond clear/transparent |
| 44123142 | Plywood sheets n/o 6mm thick, tropical wood outer ply, with mahogany face ply, not surface covered beyond clear/transparent |

Federal Register / Vol. 90, No. 65 / Monday, April 7, 2025 / Presidential Documents   15079

| HTSUS | Description |
|-------|-------------|
| 44123145 | Plywood sheets n/o 6mm thick tropical wood outer ply not mahogany face ply not surfact covered beyond clear/transparent of spec. thick, width, length |
| 44123148 | Plywood sheets n/o 6mm thick, tropical wood outer ply, not mahogany face ply, not surface covered beyond clear/transparent, nesoi |
| 44123152 | Plywood sheets n/o 6mm thick, tropical wood nesoi at least one outer ply, with face ply nesoi, not surface covered beyond clear/transparent |
| 44123161 | Plywood sheets n/o 6mm thick, with certain specified tropical wood outer ply, surface covered beyond clear or transparent |
| 44123192 | Plywood sheets n/o 6mm thick, tropical wood nesoi at least one outer ply, surface covered beyond clear or transparent |
| 44123306 | Plywood sheets n/o 6mm thick, birch face ply, not surface covered beyond clear/transparent |
| 44123326 | Plywood sheets n/o 6mm thick, walnut face ply, not surface covered beyond clear/transparent |
| 44123332 | Plywood sheets n/o 6mm thick, outerply of specified nonconiferous wood excluding walnut and birch, not surface covered beyond clear/transparent |
| 44123357 | Plywood sheets n/o 6mm thick, outerply of specified nonconiferous wood including birch and walnut, surface covered beyond clear/transparent |
| 44123426 | Plywood sheets n/o 6mm thick, outerply of nonconiferous wood not in 4412.33, spanish cedar face ply, not surface covered beyond clear/transparent |
| 44123432 | Plywood sheets n/o 6mm thick, outerply of nonconiferous wood not in 4412.33, face ply nesoi, not surface covered beyond clear/transparent |
| 44123457 | Plywood sheets n/o 6mm thick, outerply of nonconiferous wood not in 4412.33, face ply nesoi, surface covered beyond clear/transparent |
| 44123910 | Plywood of wood sheets, n/o 6 mm thick each, with outer plies of coniferous wood, face ply of Parana pine, not or clear surface covered |
| 44123930 | Plywood of wood sheets, n/o 6 mm thick each, with outer plies of coniferous wood, European red pine face ply, not or clear surface covered |
| 44123940 | Plywood of wood sheets, n/o 6 mm thick each, with outer plies of coniferous wood, with face ply nesoi, not or clear surface covered |
| 44123950 | Plywood of wood sheets, n/o 6 mm thick each, with outer plies of coniferous wood, nesoi, surface covered, nesoi |
| 44124100 | Laminated veneered lumber with at least one outer ply of tropical wood |
| 44124200 | Laminated veneered lumber with at least one outer ply of nonconiferous wood |
| 44124900 | Laminated veneered lumber with both outer plies of coniferous wood |
| 44125110 | Blockboard etc: plywood nesoi, at least one tropical outer ply, not surface-covered beyond clear/transparent, w/face ply of birch |
| 44125131 | Blockboard etc: plywood nesoi, at least one tropical outer ply, not surface-covered beyond clear/transparent, not w/face ply of birch |
| 44125141 | Blockboard etc: plywood nesoi, at least one tropical outer ply, surface covered other than clear or transparent |
| 44125151 | Blockboard etc: other than plywood nesoi, at least one tropical outer ply |
| 44125210 | Blockboard etc: plywood nesoi, at least one nonconiferous outer ply, not surface-covered beyond clear/transparent, w/face ply of birch |

29

| HTSUS | Description |
|---|---|
| 44125231 | Blockboard etc: plywood nesoi, at least one nonconiferous outer ply, not surface-covered beyond clear/transparent, not w/face ply of birch |
| 44125241 | Blockboard etc: plywood nesoi, at least one nonconiferous outer ply, surface covered other than clear or transparent |
| 44125251 | Blockboard etc: other than plywood nesoi, at least one nonconiferous outer ply |
| 44125980 | Blockboard etc: plywood nesoi, at least one conif. outer ply, not surface-covered beyond transparent, not w/face ply of Europe red pine or Parana pine |
| 44125990 | Blockboard etc: plywood nesoi, at least one coniferous outer ply, surface covered other than clear or transparent |
| 44125995 | Blockboard etc: other than plywood nesoi, at least one coniferous outer ply |
| 44129106 | Not blockboard: plywood/veneered panel/sim. w/at least one outer ply of tropical wood containing at least one layer of particle board |
| 44129110 | Not blockboard: plywood w/at least one outer play of tropical wood, no particle board, not surface-covered beyond clear/transparent, w/face ply birch |
| 44129131 | Not blockboard: plywood w/at least one outer play of tropical wood, no particle board, not surface-covered beyond transparent, not w/face ply of birch |
| 44129141 | Not blockboard: plywood w/at least one outer ply of tropical, surface covered other than clear or transparent |
| 44129151 | Not blockboard: veneered panels and similar laminated wood w/ at least one tropical outer ply, nesoi |
| 44129207 | Not blockboard: plywood/veneered panel/sim. w/at least one nonconiferous outer ply, at least one layer of particle board |
| 44129211 | Not blockboard: plywood w/at least one outer ply of nonconif wood, no particle board, not surface-covered beyond clear/transparent, w/face ply birch |
| 44129231 | Not blockboard: plywood w/at least one outer play of nonconif wood, no particle board, not surface-covered beyond transparent, not w/face ply of birch |
| 44129242 | Not blockboard: plywood w/at least one outer ply of nonconiferous, surface covered other than clear or transparent |
| 44129252 | Not blockboard: veneered panels and similar laminated wood, not plywood, w/ at least one nonconiferous outer ply, nesoi |
| 44129958 | Not blockboard: plywood/veneered panel/sim. w/both outer plies of coniferous, containing at least one layer of particle board |
| 44129961 | Not blockboard: plywood w/both outer plies of conif, no particle board, not surf.-cov. beyond clear/transp., face ply Parana pine |
| 44129971 | Not blockboard: plywood w/ both outer plies of conif, no particle board, not surf.-cov. beyond clear/transp., face ply Europe red pine |
| 44129981 | Not blockboard: plywood w/both outer plies of conif, no particle board, not surf-cov. beyond clear/transparent, face ply nesoi |
| 44129991 | Not blockboard: plywood w/ both outer plies of conif, no particle board, surface covered other than clear or transparent |
| 44129997 | Not blockboard: veneered panels and similar laminated wood w/ both outer plies of conif, nesoi |
| 44130000 | Densified wood, in blocks, plates, strips or profile shapes |
| 48202000 | Exercise books of paper or paperboard |

Federal Register / Vol. 90, No. 65 / Monday, April 7, 2025 / Presidential Documents    15081

| HTSUS | Description |
|---|---|
| 49011000 | Printed books, brochures, leaflets and similar printed matter in single sheets, whether or not folded |
| 49019100 | Printed dictionaries and encyclopedias and serial installments thereof |
| 49019900 | Printed books, brochures, leaflets and similar printed matter, other than in single sheets |
| 49021000 | Newspapers, journals and periodicals, appearing at least four times a week |
| 49029010 | Newspaper supplements printed by a gravure process |
| 49029020 | Newspaper, journals and periodicals, except those appearing at least four times a week |
| 49030000 | Children's picture, drawing or coloring books |
| 49040000 | Music, printed or in manuscript, whether or not bound or illustrated |
| 49052000 | Maps and hydrographic or similar charts of all kinds, including atlases and topographical plans, printed in book form |
| 49059020 | Globes, printed |
| 49059060 | Other printed maps and hydrographic or similar charts, not globes and not in book form, nesoi |
| 49060000 | Hand-drawn original plans and drawings; hand-written texts;  photo reproductions on sensitized paper and carbon copies of the foregoing |
| 49111000 | Printed trade advertising material, commercial catalogs and the like |
| 49119960 | Printed matter, nesoi, printed on paper in whole or in part by a lithographic process |
| 49119980 | Printed matter, nesoi |
| 71069110 | Silver bullion and dore |
| 71081210 | Gold, nonmonetary, bullion and dore |
| 71101100 | Platinum, unwrought or in powder form |
| 71101900 | Platinum, in semimanufactured forms |
| 71102100 | Palladium, unwrought or in powder form |
| 71102900 | Palladium, in semimanufactured forms |
| 71103100 | Rhodium, unwrought or in powder form |
| 71103900 | Rhodium, in semimanufactured forms |
| 71104100 | Iridium, osmium and ruthenium, unwrought or in powder form |
| 71104900 | Iridium, osmium and ruthenium, in semimanufactured forms |
| 71129201 | Platinum waste and scrap, incl. metal clad w/ platinum, excluding sweepings containing other precious metals, other than goods of e-waste heading 8549 |
| 71189000 | Coins, nesoi |
| 72021110 | Ferromanganese containing by weight more than 2 percent but not more than 4 percent of carbon |
| 72021150 | Ferromanganese containing by weight more than 4 percent of carbon |
| 72021910 | Ferromanganese containing by weight not more than 1 percent of carbon |
| 72021950 | Ferromanganese containing by weight more than 1 percent but not more than 2 percent of carbon |
| 72023000 | Ferrosilicon manganese |
| 72024100 | Ferrochromium containing by weight more than 4 percent of carbon |

**15082**    **Federal Register** / Vol. 90, No. 65 / Monday, April 7, 2025 / Presidential Documents

| HTSUS | Description |
|---|---|
| 72024910 | Ferrochromium containing by weight more than 3 percent but not more than 4 percent of carbon |
| 72024950 | Ferrochromium containing by weight 3 percent or less of carbon |
| 72025000 | Ferrosilicon chromium |
| 72028000 | Ferrotungsten and ferrosilicon tungsten |
| 72029100 | Ferrotitanium and ferrosilicon titanium |
| 72029340 | Ferroniobium containing by weight less than 0.02 percent of phosphorus or sulfur or less than 0.4 percent of silicon |
| 72029380 | Ferroniobium, nesoi |
| 72042100 | Stainless steel waste and scrap |
| 74010000 | Copper mattes; cement copper (precipitated copper) |
| 74020000 | Unrefined copper; copper anodes for electrolytic refining |
| 74031100 | Refined copper cathodes and sections of cathodes |
| 74031200 | Refined copper, wire bars |
| 74031300 | Refined copper, billets |
| 74031900 | Refined copper, unwrought articles nesoi |
| 74032100 | Copper-zinc base alloys (brass), unwrought nesoi |
| 74032200 | Copper-tin base alloys (bronze), unwrought nesoi |
| 74032901 | Copper alloys (o/than copper-zinc, copper-tin alloys), unwrought nesoi |
| 74040030 | Copper spent anodes; copper waste & scrap containing less than 94% by weight of copper |
| 74040060 | Copper, waste and scrap containing 94% or more by weight of copper |
| 74050010 | Copper master alloys, containing 5% or more but n/more than 15% by weight of phosphorus |
| 74050060 | Copper master alloys, not containing 5% or more but n/more than 15% by weight of phosphorus |
| 74061000 | Copper, powders of non-lamellar structure |
| 74062000 | Copper, powders of lamellar structure; copper flakes |
| 74071015 | Refined copper, hollow profiles |
| 74071030 | Refined copper, profiles (o/than hollow profiles) |
| 74071050 | Refined copper, bars and rods |
| 74072115 | Copper-zinc base alloys (brass), hollow profiles |
| 74072130 | Copper-zinc base alloys (brass), profiles (o/than hollow profiles) |
| 74072150 | Copper-zinc base alloys (brass), low fuming brazing rods |
| 74072170 | Copper-zinc base alloys (brass), bars & rods nesoi, having a rectangular cross section |
| 74072190 | Copper-zinc base alloys (brass), bars & rods nesoi, not having a rectangular cross section |
| 74072916 | Copper alloys , hollow profiles |
| 74072934 | Copper-nickel base alloys (cupro-nickel) or copper-nickel-zinc base alloys (nickel silver), profiles (o/than hollow profiles) |
| 74072938 | Copper alloys (o/than cupro-nickel or nickel silver), profiles (o/than hollow profiles) |

32

Federal Register / Vol. 90, No. 65 / Monday, April 7, 2025 / Presidential Documents      15083

| HTSUS | Description |
|---|---|
| 74072940 | Copper-nickel base alloys (cupro-nickel) or copper-nickel-zinc base alloys (nickel silver), bars & rods |
| 74072950 | Copper alloys (o/than brass, cupro-nickel or nickel silver), bars and rods |
| 74081130 | Refined copper, wire, w/maximum cross-sectional dimension over 9.5 mm |
| 74081160 | Refined copper, wire, w/maximum cross-sectional dimension over 6 mm but not over 9.5 mm |
| 74081900 | Refined copper, wire, w/maximum cross-sectional dimension of 6 mm or less |
| 74082100 | Copper-zinc base alloys (brass), wire |
| 74082210 | Copper-nickel base alloys (cupro-nickel) or copper-nickel-zinc base alloys (nickel silver), wire, coated or plated with metal |
| 74082250 | Copper-nickel base alloys (cupro-nickel) or copper-nickel-zinc base alloys (nickel silver), wire, not coated or plated w/metal |
| 74082910 | Copper alloys (o/than brass, cupro-nickel or nickel-silver), wire, coated or plated with metal |
| 74082950 | Copper alloys (o/than brass, cupro-nickel or nickel-silver), wire, not coated or plated with metal |
| 74091110 | Refined copper, plates, sheets and strip, in coils, with a thickness of 5 mm or more |
| 74091150 | Refined copper, plates, sheets and strip, in coils, with a thickness over 0.15mm but less than 5 mm |
| 74091910 | Refined copper, plates, sheets and strip, not in coils, with a thickness of 5 mm or more |
| 74091950 | Refined copper, plates, sheets and strip, not in coils, with a thickness o/0.15mm but less than 5 mm & a width of 500 mm or more |
| 74091990 | Refined copper, plates, sheets and strip, not in coils, with a thickness o/0.15mm but less than 5 mm & a width of less than 500 mm |
| 74092100 | Copper-zinc base alloys (brass), plates, sheets and strip, in coils |
| 74092900 | Copper-zinc base alloys (brass), plates, sheets and strip, not in coils |
| 74093110 | Copper-tin base alloys (bronze), plates, sheets and strip, in coils. with a thickness of 5 mm or more |
| 74093150 | Copper-tin base alloys (bronze), plates, sheets and strip, in coils, with a thickness o/0.15mm but less than 5mm & a width of 500mm or more |
| 74093190 | Copper-tin base alloys (bronze), plates, sheets and strip, in coils, w/thickness o/0.15mm but less than 5mm & a width of less than 500mm |
| 74093910 | Copper-tin base alloys (bronze), plates, sheets and strip, with a thickness of 5 mm or more |
| 74093950 | Copper-tin base alloys (bronze), plates, sheets and strip, with a thickness o/0.15 but less than 5 mm & of a width of 500 mm or more |
| 74093990 | Copper-tin base alloys (bronze), plates, sheets and strip, with a thickness o/0.15 but less than 5 mm & of a width of less than 500 mm |
| 74094000 | Copper-nickel base alloys (cupro-nickel) or copper-nickel-zinc base alloys (nickel silver), plates, sheets and strip, w/thickness o/0.15mm |
| 74099010 | Copper alloys (o/than brass/bronze/cupro-nickel/nickel silver), plates, sheets & strip, with thickness of 5 mm or more |

**15084**    **Federal Register** / Vol. 90, No. 65 / Monday, April 7, 2025 / Presidential Documents

| HTSUS | Description |
|-------|-------------|
| 74099050 | Copper alloys (o/than brass/bronze/cupro-nickel/nickel silver), plates, sheets & strip, w/thick. o/0.15mm but less th/5mm & width 500mm+ |
| 74099090 | Copper alloys (o/than brass/bronze/cupro-nickel/nickel silver), plates, sheets & strip, w/thick. o/0.15mm but less th/5mm & width less 500mm |
| 74101100 | Refined copper, foil, w/thickness of 0.15 mm or less, not backed |
| 74101200 | Copper alloys, foil, w/thickness of 0.15 mm or less, not backed |
| 74102130 | Refined copper, clad laminates, w/thickness of 0.15 mm or less, backed |
| 74102160 | Refined copper, foil, w/thickness of 0.15 mm or less, backed |
| 74102200 | Copper alloys, foil, w/thickness of 0.15 mm or less, backed |
| 74111010 | Refined copper, tubes and pipes, seamless |
| 74111050 | Refined copper, tubes and pipes, other than seamless |
| 74112110 | Copper-zinc base alloys (brass), tubes and pipes, seamless |
| 74112150 | Copper-zinc base alloys (brass), tubes and pipes, other than seamless |
| 74112200 | Copper-nickel base alloys (cupro-nickel) or copper-nickel-zinc base alloys (nickel-silver), tubes and pipes |
| 74112910 | Copper alloys (o/than brass/cupro-nickel/nickel-silver), pipes and tubes, seamless |
| 74112950 | Copper alloys (o/than brass/cupro-nickel/nickel-silver), pipes and tubes, other than seamless |
| 74121000 | Refined copper, fittings for tubes and pipes |
| 74122000 | Copper alloys, fittings for tubes and pipes |
| 74130010 | Copper, stranded wire, not electrically insulated, not fitted with fittings and not made up into articles |
| 74130050 | Copper, cables, plaited bands and the like, not fitted with fittings and not made up into articles |
| 74130090 | Copper, stranded wire, cables, plaited bands and the like, not electrically insulated, fitted with fittings or made up into articles |
| 74151000 | Copper or iron/steel w/heads of copper, nails and tacks, drawing pins, staples and similar articles |
| 74152100 | Copper, washers (including spring washers) |
| 74152900 | Copper, rivets, cotters, cotter pins and similar non-threaded articles (o/than washers) |
| 74153305 | Copper screws for wood |
| 74153310 | Muntz or yellow metal copper bolts |
| 74153380 | Screws (other than wood screws), bolts (other than Muntz or yellow metal) and nuts, of copper, threaded, nesoi |
| 74153900 | Copper, screw hooks and other threaded articles, nesoi |
| 74181000 | Copper & copper alloy table, kitchen, household articles & parts; pot scourers, scouring & polishing pads, gloves, etc |
| 74182010 | Copper-zinc base alloys (brass), sanitary ware and parts thereof |
| 74182050 | Copper (o/than brass), sanitary ware and parts thereof |
| 74192000 | Copper, articles nesoi, cast, molded, stamped, or forged but not further worked |
| 74198003 | Copper, Fourdrinier wires, for use in papermaking machines, w/94 or more wires to the lineal cm |

Federal Register / Vol. 90, No. 65 / Monday, April 7, 2025 / Presidential Documents    15085

| HTSUS | Description |
|---|---|
| 74198006 | Copper cloth, other than Fourdrinier wires, nesoi |
| 74198009 | Copper, wire grill and netting; expanded metal of copper |
| 74198015 | Copper, containers a kind normally carried on the person, in the pocket or in the handbag |
| 74198016 | Copper, springs |
| 74198017 | Copper, chain and parts thereof |
| 74198030 | Copper, articles nesoi, coated or plated with precious metal |
| 74198050 | Copper, articles nesoi, not coated or plated with precious metal |
| 75089050 | Nickel, articles of nesoi |
| 79011100 | Zinc (o/than alloy), unwrought, containing o/99.99% by weight of zinc |
| 79011210 | Zinc (o/than alloy), unwrought, casting-grade zinc, containing at least 97.5% but less than 99.99% by weight of zinc |
| 79011250 | Zinc (o/than alloy), unwrought, o/than casting-grade zinc, containing at least 97.5% but less than 99.99% by wt. of zinc |
| 79012000 | Zinc alloy, unwrought |
| 79020000 | Zinc, waste and scrap |
| 79070060 | Zinc, articles (o/than for household, table or kitchen use), nesoi |
| 80011000 | Tin (o/than alloy), unwrought |
| 80012000 | Tin alloy, unwrought |
| 80020000 | Tin, waste and scrap |
| 80070050 | Tin, articles nesoi |
| 81011000 | Tungsten, powders |
| 81019700 | Tungsten waste and scrap |
| 81032000 | Tantalum, unwrought (including bars and rods obtained simply by sintering); tantalum powders |
| 81033000 | Tantalum waste and scrap |
| 81039100 | Tantalum, crucibles |
| 81039900 | Tantalum, articles other than crucibles, nesoi |
| 81041100 | Magnesium, unwrought, containing at least 99.8 percent by weight of magnesium |
| 81041900 | Magnesium, unwrought, nesoi |
| 81042000 | Magnesium, waste and scrap |
| 81043000 | Magnesium, raspings, turnings and granules graded according to size; magnesium powders |
| 81049000 | Magnesium, articles nesoi |
| 81052030 | Cobalt alloys, unwrought |
| 81052060 | Cobalt (other than alloys), unwrought |
| 81052090 | Cobalt, mattes and other intermediate products of cobalt metallurgy; cobalt powders |
| 81053000 | Cobalt waste and scrap |
| 81059000 | Cobalt, articles thereof nesoi |

**15086**    **Federal Register** / Vol. 90, No. 65 / Monday, April 7, 2025 / Presidential Documents

| HTSUS | Description |
|---|---|
| 81061000 | Bismuth (including waste and scrap) and articles thereof, containing more than 99.99 percent of bismuth by weight |
| 81069000 | Bismuth (including waste and scrap) and articles thereof, containing 99.99 percent of bismuth or less, nesoi |
| 81082000 | Titanium, unwrought; titanium powders |
| 81083000 | Titanium waste and scrap |
| 81089030 | Titanium, articles nesoi |
| 81089060 | Titanium, wrought nesoi |
| 81101000 | Antimony, unwrought; antimony powders |
| 81102000 | Antimony waste and scrap |
| 81109000 | Articles of antimony, nesoi |
| 81110047 | Unwrought manganese flake containing at least 99.5 percent by weight manganese |
| 81110049 | Unwrought manganese, nesoi |
| 81122100 | Chromium, unwrought; chromium powders |
| 81122200 | Chromium waste and scrap |
| 81122900 | Articles of chromium, nesoi |
| 81124110 | Rhenium, waste and scrap |
| 81124150 | Rhenium, unwrought; rhenium powders |
| 81124900 | Rhenium, articles, nesoi |
| 81125900 | Articles of thallium, nesoi |
| 81129210 | Gallium, unwrought; gallium powders |
| 81129230 | Indium, unwrought; indium powders |
| 81129240 | Niobium (columbium), unwrought; niobium powders |
| 81129260 | Germanium, unwrought |
| 81129265 | Germanium powder, wrought |
| 81129910 | Germanium nesoi and articles thereof |
| 81129991 | Articles of gallium, indium, or niobium, nesoi |
| 85411000 | Diodes, other than photosensitive or light-emitting diodes |
| 85412100 | Transistors, other than photosensitive transistors, with a dissipation rating of less than 1 W |
| 85412900 | Transistors, other than photosensitive transistors, with a dissipation rating of 1 W or more |
| 85413000 | Thyristors, diacs and triacs, other than photosensitive devices |
| 85414910 | Other photosensitive semiconductor diodes, other than light-emitting |
| 85414970 | Other photosensitive semiconductor transistors |
| 85414980 | Optical coupled isolators |
| 85414995 | Other photosensitive semiconductor devices, other than diodes or transistors, nesoi |
| 85415100 | Other semiconductor-based transducers, other than photosensitive transducers |
| 85415900 | Other semiconductor devices, other than semiconductor-based transducers, other than photosensitive devices, nesoi |

| HTSUS | Description |
|---|---|
| 85419000 | Parts of diodes, transistors, similar semiconductor devices, photosensitive semiconductor devices, LED's and mounted piezoelectric crystals |
| 85423100 | Electronic integrated circuits: processors and controllers |
| 85423200 | Electronic integrated circuits: memories |
| 85423300 | Electronic intergrated circuits: amplifiers |
| 85423900 | Electronic integrated circuits: other |
| 85429000 | Parts of electronic integrated circuits and microassemblies |

# ANNEX III

1. Effective with respect to goods entered for consumption, or withdrawn from warehouse for consumption, on or after 12:01 a.m. eastern daylight time on April 5, 2025, subchapter III of chapter 99 of the Harmonized Tariff Schedule of the United States (HTSUS) is modified by inserting the following new headings in numerical sequence, with the material in the new heading inserted in the columns of the HTSUS labeled "Heading/Subheading", "Article Description", "Rates of Duty 1-General", "Rates of Duty 1-Special" and "Rates of Duty 2", respectively:

| Heading/ Subheading | Article Description | Rates of Duty | | |
|---|---|---|---|---|
| | | 1 | | 2 |
| | | General | Special | |
| "9903.01.25 | Except for products described in headings 9903.01.26-9903.01.33, and except as provided for in heading 9903.01.34, articles the product of any country, except for articles the product of a country enumerated in subdivision (v)(xiii) of U.S. note 2 to this subchapter that are entered for consumption, or withdrawn from warehouse for consumption, after 12:01 a.m. eastern daylight time on April 9, 2025, and that were not in transit on the final mode of transit prior to 12:01 a.m. eastern daylight time on April 9, 2025, as provided for in subdivision (v) of U.S. note 2 to this subchapter . . . . . . . | The duty provided in the applicable subheading + 10% | The duty provided in the applicable subheading + 10% | The duty provided in the applicable subheading |
| 9903.01.26 | Articles the product of Canada, as provided for in subdivision (v)(iv) of U.S. note 2 to this subchapter. . . . . . . | The duty provided in the applicable subheading | The duty provided in the applicable subheading | The duty provided in the applicable subheading |
| 9903.01.27 | Articles the product of Mexico, as provided for in subdivision (v)(v) of U.S. note 2 to this subchapter. . . . . . . | The duty provided in the applicable subheading | The duty provided in the applicable subheading | The duty provided in the applicable subheading |
| 9903.01.28 | Articles the product of any country that (1) were loaded onto a vessel at the port of loading and in transit on the final mode of transit prior to entry into the United States, before 12:01 a.m. eastern daylight time on April 5, 2025; and (2) are entered for consumption, or withdrawn from | The duty provided in the applicable subheading | The duty provided in the applicable subheading | The duty provided in the applicable subheading |

Federal Register / Vol. 90, No. 65 / Monday, April 7, 2025 / Presidential Documents    **15089**

| | | | | |
|---|---|---|---|---|
| | warehouse for consumption after 12:01 a.m. eastern daylight time on April 5, 2025 . . . . . . . . . | | | |
| 9903.01.29 | Articles the product of any country identified in general note 3(b) | | | The duty provided in the applicable subheading |
| 9903.01.30 | Articles that are donations, by persons subject to the jurisdiction of the United States, such as food, clothing, and medicine, intended to be used to relieve human suffering, as provided for in subdivision (v)(ii) of U.S. note 2 to this subchapter . . . . . . . | The duty provided in the applicable subheading | The duty provided in the applicable subheading | The duty provided in the applicable subheading |
| 9903.01.31 | Articles that are informational materials, including but not limited to, publications, films, posters, phonograph records, photographs, microfilms, microfiche, tapes, compact disks, CD ROMs, artworks, and news wire feeds . . . . . . . . . . | The duty provided in the applicable subheading | The duty provided in the applicable subheading | The duty provided in the applicable subheading |
| 9903.01.32 | Articles the product of any country, classified in the subheadings enumerated in subdivision (v)(iii) of U.S. note 2 to this subchapter . . . . . | The duty provided in the applicable subheading | The duty provided in the applicable subheading | The duty provided in the applicable subheading |
| 9903.01.33 | Articles of iron or steel, derivative articles of iron or steel, articles of aluminum, derivative articles of aluminum, passenger vehicles (sedans, sport utility vehicles, crossover utility vehicles, minivans, and cargo vans) and light trucks and parts of passenger vehicles (sedans, sport utility vehicles, crossover utility vehicles, minivans, and cargo vans) and light trucks, of any country, as provided in subdivision (v)(vi) through (v)(xi) of note 2 to this subchapter . . . . . | The duty provided in the applicable subheading | The duty provided in the applicable subheading | The duty provided in the applicable subheading |
| 9903.01.34 | The U.S. content of articles the product of any country, in which the U.S. content of the article provides at least 20 percent of the Customs value of the imported article, as provided | The duty provided in the applicable subheading | The duty provided in the applicable subheading | The duty provided in the applicable subheading" |

**15090**    **Federal Register** / Vol. 90, No. 65 / Monday, April 7, 2025 / Presidential Documents

| | for in subdivision (v)(xii) of U.S. note 2 to this subchapter . . . . . . . | | | |
|---|---|---|---|---|

2.  Effective with respect to goods of countries enumerated in subdivision (v)(xiii) of U.S. note 2 to this subchapter entered for consumption, or withdrawn from warehouse for consumption, on or after 12:01 a.m. eastern daylight time on April 9, 2025, subchapter III of chapter 99 of the Harmonized Tariff Schedule of the United States (HTSUS) is modified by inserting the following new headings in numerical sequence, with the material in the new heading inserted in the columns of the HTSUS labeled "Heading/Subheading", "Article Description", "Rates of Duty 1-General", "Rates of Duty 1-Special" and "Rates of Duty 2", respectively:

| Heading/ Subheading | Article Description | Rates of Duty | | |
|---|---|---|---|---|
| | | 1 | | 2 |
| | | **General** | **Special** | |
| "9903.01.43 | Except for goods loaded onto a vessel at the port of loading and in transit on the final mode of transit before 12:01 a.m. eastern daylight time on April 9, 2025, except for products described in headings 9903.01.28-9903.01.33, and except as provided for in heading 9903.01.34, articles the product of Cameroon or the Democratic Republic of the Congo, as provided for in subdivision (v) of U.S. note 2 to this subchapter . . . . . . . | The duty provided in the applicable subheading + 11% | The duty provided in the applicable subheading + 11% | The duty provided in the applicable subheading |
| 9903.01.44 | Except for goods loaded onto a vessel at the port of loading and in transit on the final mode of transit before 12:01 a.m. eastern daylight time on April 9, 2025, except for products described in headings 9903.01.28-9903.01.33, and except as provided for in heading 9903.01.34, articles the product of Chad or Equatorial Guinea, as provided for in subdivision (v) of U.S. note 2 to this subchapter. . . . . . . | The duty provided in the applicable subheading + 13% | The duty provided in the applicable subheading + 13% | The duty provided in the applicable subheading |

3

| 9903.01.45 | Except for goods loaded onto a vessel at the port of loading and in transit on the final mode of transit before 12:01 a.m. eastern daylight time on April 9, 2025, except for products described in headings 9903.01.28-9903.01.33, and except as provided for in heading 9903.01.34, articles the product of Nigeria, as provided for in subdivision (v) of U.S. note 2 to this subchapter. . . . . . . | The duty provided in the applicable subheading + 14% | The duty provided in the applicable subheading + 14% | The duty provided in the applicable subheading |
|---|---|---|---|---|
| 9903.01.46 | Except for goods loaded onto a vessel at the port of loading and in transit on the final mode of transit before 12:01 a.m. eastern daylight time on April 9, 2025, except for products described in headings 9903.01.28-9903.01.33, and except as provided for in heading 9903.01.34, articles the product of Norway or Venezuela, as provided for in subdivision (v) of U.S. note 2 to this subchapter. . . . . . . | The duty provided in the applicable subheading + 15% | The duty provided in the applicable subheading + 15% | The duty provided in the applicable subheading |
| 9903.01.47 | Except for goods loaded onto a vessel at the port of loading and in transit on the final mode of transit before 12:01 a.m. eastern daylight time on April 9, 2025, except for products described in headings 9903.01.28-9903.01.33, and except as provided for in heading 9903.01.34, articles the product of Mozambique, as provided for in subdivision (v) of U.S. note 2 to this subchapter. . . . . . . | The duty provided in the applicable subheading + 16% | The duty provided in the applicable subheading + 16% | The duty provided in the applicable subheading |
| 9903.01.48 | Except for goods loaded onto a vessel at the port of loading and in transit on the final mode of transit before 12:01 a.m. eastern daylight time on April 9, 2025, except for products described in headings 9903.01.28-9903.01.33, and except as provided for in heading 9903.01.34, articles the product of Israel, Malawi, Philippines, or Zambia, as provided for in subdivision (v) of U.S. note 2 to this subchapter. . . . . . . | The duty provided in the applicable subheading + 17% | The duty provided in the applicable subheading + 17% | The duty provided in the applicable subheading |

**15092**   **Federal Register**/Vol. 90, No. 65/Monday, April 7, 2025/Presidential Documents

| 9903.01.49 | Except for goods loaded onto a vessel at the port of loading and in transit on the final mode of transit before 12:01 a.m. eastern daylight time on April 9, 2025, except for products described in headings 9903.01.28-9903.01.33, and except as provided for in heading 9903.01.34, articles the product of Nicaragua or Zimbabwe, as provided for in subdivision (v) of U.S. note 2 to this subchapter. . . . . . . | The duty provided in the applicable subheading + 18% | The duty provided in the applicable subheading + 18% | The duty provided in the applicable subheading |
|---|---|---|---|---|
| 9903.01.50 | Except for goods loaded onto a vessel at the port of loading and in transit on the final mode of transit before 12:01 a.m. eastern daylight time on April 9, 2025, except for products described in headings 9903.01.28-9903.01.33, and except as provided for in heading 9903.01.34, articles the product of the European Union or Jordan as provided for in subdivision (v) of U.S. note 2 to this subchapter. . . . . . . | The duty provided in the applicable subheading + 20% | The duty provided in the applicable subheading + 20% | The duty provided in the applicable subheading |
| 9903.01.51 | Except for goods loaded onto a vessel at the port of loading and in transit on the final mode of transit before 12:01 a.m. eastern daylight time on April 9, 2025, except for products described in headings 9903.01.28-9903.01.33, and except as provided for in heading 9903.01.34, articles the product of Côte d`Ivoire or Namibia, as provided for in subdivision (v) of U.S. note 2 to this subchapter. . . . . . . | The duty provided in the applicable subheading + 21% | The duty provided in the applicable subheading + 21% | The duty provided in the applicable subheading |
| 9903.01.52 | Except for goods loaded onto a vessel at the port of loading and in transit on the final mode of transit before 12:01 a.m. eastern daylight time on April 9, 2025, except for products described in headings 9903.01.28-9903.01.33, and except as provided for in heading 9903.01.34, articles the product of Vanuatu, as provided for in subdivision (v) of U.S. note 2 to this subchapter. . . . . . . | The duty provided in the applicable subheading + 22% | The duty provided in the applicable subheading + 22% | The duty provided in the applicable subheading |

| | | | | |
|---|---|---|---|---|
| 9903.01.53 | Except for goods loaded onto a vessel at the port of loading and in transit on the final mode of transit before 12:01 a.m. eastern daylight time on April 9, 2025, except for products described in headings 9903.01.28-9903.01.33, and except as provided for in heading 9903.01.34, articles the product of Brunei, Japan, or Malaysia, as provided for in subdivision (v) of U.S. note 2 to this subchapter. . . . . . . | The duty provided in the applicable subheading + 24% | The duty provided in the applicable subheading + 24% | The duty provided in the applicable subheading |
| 9903.01.54 | Except for goods loaded onto a vessel at the port of loading and in transit on the final mode of transit before 12:01 a.m. eastern daylight time on April 9, 2025, except for products described in headings 9903.01.28-9903.01.33, and except as provided for in heading 9903.01.34, articles the product of South Korea, as provided for in subdivision (v) of U.S. note 2 to this subchapter. . . . . . . | The duty provided in the applicable subheading + 25% | The duty provided in the applicable subheading + 25% | The duty provided in the applicable subheading |
| 9903.01.55 | Except for goods loaded onto a vessel at the port of loading and in transit on the final mode of transit before 12:01 a.m. eastern daylight time on April 9, 2025, except for products described in headings 9903.01.28-9903.01.33, and except as provided for in heading 9903.01.34, articles the product of India, as provided for in subdivision (v) of U.S. note 2 to this subchapter. . . . . . . | The duty provided in the applicable subheading + 26% | The duty provided in the applicable subheading + 26% | The duty provided in the applicable subheading |
| 9903.01.56 | Except for goods loaded onto a vessel at the port of loading and in transit on the final mode of transit before 12:01 a.m. eastern daylight time on April 9, 2025, except for products described in headings 9903.01.28-9903.01.33, and except as provided for in heading 9903.01.34, articles the product of Kazakhstan, as provided for in subdivision (v) of U.S. note 2 to this subchapter. . . . . . . | The duty provided in the applicable subheading + 27% | The duty provided in the applicable subheading + 27% | The duty provided in the applicable subheading |

| | | | | |
|---|---|---|---|---|
| 9903.01.57 | Except for goods loaded onto a vessel at the port of loading and in transit on the final mode of transit before 12:01 a.m. eastern daylight time on April 9, 2025, except for products described in headings 9903.01.28-9903.01.33, and except as provided for in heading 9903.01.34, articles the product of Tunisia, as provided for in subdivision (v) of U.S. note 2 to this subchapter. . . . . . . | The duty provided in the applicable subheading + 28% | The duty provided in the applicable subheading + 28% | The duty provided in the applicable subheading |
| 9903.01.58 | Except for goods loaded onto a vessel at the port of loading and in transit on the final mode of transit before 12:01 a.m. eastern daylight time on April 9, 2025, except for products described in headings 9903.01.28-9903.01.33, and except as provided for in heading 9903.01.34, articles the product of Pakistan, as provided for in subdivision (v) of U.S. note 2 to this subchapter. . . . . . . | The duty provided in the applicable subheading + 29% | The duty provided in the applicable subheading + 29% | The duty provided in the applicable subheading |
| 9903.01.59 | Except for goods loaded onto a vessel at the port of loading and in transit on the final mode of transit before 12:01 a.m. eastern daylight time on April 9, 2025, except for products described in headings 9903.01.28-9903.01.33, and except as provided for in heading 9903.01.34, articles the product of Algeria, Nauru, or South Africa, as provided for in subdivision (v) of U.S. note 2 to this subchapter. . . . . . . | The duty provided in the applicable subheading + 30% | The duty provided in the applicable subheading + 30% | The duty provided in the applicable subheading |
| 9903.01.60 | Except for goods loaded onto a vessel at the port of loading and in transit on the final mode of transit before 12:01 a.m. eastern daylight time on April 9, 2025, except for products described in headings 9903.01.28-9903.01.33, and except as provided for in heading 9903.01.34, articles the product of Libya, Moldova, or Switzerland, as provided for in subdivision (v) of U.S. note 2 to this subchapter. . . . . . . | The duty provided in the applicable subheading + 31% | The duty provided in the applicable subheading + 31% | The duty provided in the applicable subheading |

7

| | | | | |
|---|---|---|---|---|
| 9903.01.61 | Except for goods loaded onto a vessel at the port of loading and in transit on the final mode of transit before 12:01 a.m. eastern daylight time on April 9, 2025, except for products described in headings 9903.01.28-9903.01.33, and except as provided for in heading 9903.01.34, articles the product of Angola, Fiji, Indonesia, or Taiwan, as provided for in subdivision (v) of U.S. note 2 to this subchapter. . . . . . . | The duty provided in the applicable subheading + 32% | The duty provided in the applicable subheading + 32% | The duty provided in the applicable subheading |
| 9903.01.62 | Except for goods loaded onto a vessel at the port of loading and in transit on the final mode of transit before 12:01 a.m. eastern daylight time on April 9, 2025, except for products described in headings 9903.01.28-9903.01.33, and except as provided for in heading 9903.01.34, articles the product of North Macedonia, as provided for in subdivision (v) of U.S. note 2 to this subchapter. . . . . . . | The duty provided in the applicable subheading + 33% | The duty provided in the applicable subheading + 33% | The duty provided in the applicable subheading |
| 9903.01.63 | Except for goods loaded onto a vessel at the port of loading and in transit on the final mode of transit before 12:01 a.m. eastern daylight time on April 9, 2025, except for products described in headings 9903.01.28-9903.01.33, and except as provided for in heading 9903.01.34, articles the product of China, including Hong Kong and Macau, as provided for in subdivision (v) of U.S. note 2 to this subchapter. . . . . . . | The duty provided in the applicable subheading + 34% | The duty provided in the applicable subheading + 34% | The duty provided in the applicable subheading |
| 9903.01.64 | Except for goods loaded onto a vessel at the port of loading and in transit on the final mode of transit before 12:01 a.m. eastern daylight time on April 9, 2025, except for products described in headings 9903.01.28-9903.01.33, and except as provided for in heading 9903.01.34, articles the product of Bosnia and Herzegovina, as provided for in subdivision (v) of U.S. note 2 to this subchapter. . . . . . . | The duty provided in the applicable subheading + 35% | The duty provided in the applicable subheading + 35% | The duty provided in the applicable subheading |

| 9903.01.65 | Except for goods loaded onto a vessel at the port of loading and in transit on the final mode of transit before 12:01 a.m. eastern daylight time on April 9, 2025, except for products described in headings 9903.01.28-9903.01.33, and except as provided for in heading 9903.01.34, articles the product of Thailand, as provided for in subdivision (v) of U.S. note 2 to this subchapter. . . . . . . | The duty provided in the applicable subheading + 36% | The duty provided in the applicable subheading + 36% | The duty provided in the applicable subheading |
|---|---|---|---|---|
| 9903.01.66 | Except for goods loaded onto a vessel at the port of loading and in transit on the final mode of transit before 12:01 a.m. eastern daylight time on April 9, 2025, except for products described in headings 9903.01.28-9903.01.33, and except as provided for in heading 9903.01.34, articles the product of Bangladesh, Botswana, Liechtenstein, or Serbia, as provided for in subdivision (v) of U.S. note 2 to this subchapter. . . . . . . | The duty provided in the applicable subheading + 37% | The duty provided in the applicable subheading + 37% | The duty provided in the applicable subheading |
| 9903.01.67 | Except for goods loaded onto a vessel at the port of loading and in transit on the final mode of transit before 12:01 a.m. eastern daylight time on April 9, 2025, except for products described in headings 9903.01.28-9903.01.33, and except as provided for in heading 9903.01.34, articles the product of Guyana, as provided for in subdivision (v) of U.S. note 2 to this subchapter. . . . . . . | The duty provided in the applicable subheading + 38% | The duty provided in the applicable subheading + 38% | The duty provided in the applicable subheading |
| 9903.01.68 | Except for goods loaded onto a vessel at the port of loading and in transit on the final mode of transit before 12:01 a.m. eastern daylight time on April 9, 2025, except for products described in headings 9903.01.28-9903.01.33, and except as provided for in heading 9903.01.34, articles the product of Iraq, as provided for in subdivision (v) of U.S. note 2 to this subchapter. . . . . . . | The duty provided in the applicable subheading + 39% | The duty provided in the applicable subheading + 39% | The duty provided in the applicable subheading |

**Federal Register** / Vol. 90, No. 65 / Monday, April 7, 2025 / Presidential Documents **15097**

| | | | | |
|---|---|---|---|---|
| 9903.01.69 | Except for goods loaded onto a vessel at the port of loading and in transit on the final mode of transit before 12:01 a.m. eastern daylight time on April 9, 2025, except for products described in headings 9903.01.28-9903.01.33, and except as provided for in heading 9903.01.34, articles the product of Mauritius, as provided for in subdivision (v) of U.S. note 2 to this subchapter. . . . . . . | The duty provided in the applicable subheading + 40% | The duty provided in the applicable subheading + 40% | The duty provided in the applicable subheading |
| 9903.01.70 | Except for goods loaded onto a vessel at the port of loading and in transit on the final mode of transit before 12:01 a.m. eastern daylight time on April 9, 2025, except for products described in headings 9903.01.28-9903.01.33, and except as provided for in heading 9903.01.34, articles the product of Falkland Islands or Syria, as provided for in subdivision (v) of U.S. note 2 to this subchapter. . . . . . . | The duty provided in the applicable subheading + 41% | The duty provided in the applicable subheading + 41% | The duty provided in the applicable subheading |
| 9903.01.71 | Except for goods loaded onto a vessel at the port of loading and in transit on the final mode of transit before 12:01 a.m. eastern daylight time on April 9, 2025, except for products described in headings 9903.01.28-9903.01.33, and except as provided for in heading 9903.01.34, articles the product of Myanmar (Burma) or Sri Lanka, as provided for in subdivision (v) of U.S. note 2 to this subchapter. . . . . . . | The duty provided in the applicable subheading + 44% | The duty provided in the applicable subheading + 44% | The duty provided in the applicable subheading |
| 9903.01.72 | Except for goods loaded onto a vessel at the port of loading and in transit on the final mode of transit before 12:01 a.m. eastern daylight time on April 9, 2025, except for products described in headings 9903.01.28-9903.01.33, and except as provided for in heading 9903.01.34, articles the product of Vietnam, as provided for in subdivision (v) of U.S. note 2 to this subchapter. . . . . . . | The duty provided in the applicable subheading + 46% | The duty provided in the applicable subheading + 46% | The duty provided in the applicable subheading |

10

| 9903.01.73 | Except for goods loaded onto a vessel at the port of loading and in transit on the final mode of transit before 12:01 a.m. eastern daylight time on April 9, 2025, except for products described in headings 9903.01.28-9903.01.33, and except as provided for in heading 9903.01.34, articles the product of Madagascar, as provided for in subdivision (v) of U.S. note 2 to this subchapter. . . . . . . | The duty provided in the applicable subheading + 47% | The duty provided in the applicable subheading + 47% | The duty provided in the applicable subheading |
|---|---|---|---|---|
| 9903.01.74 | Except for goods loaded onto a vessel at the port of loading and in transit on the final mode of transit before 12:01 a.m. eastern daylight time on April 9, 2025, except for products described in headings 9903.01.28-9903.01.33, and except as provided for in heading 9903.01.34, articles the product of Laos, as provided for in subdivision (v) of U.S. note 2 to this subchapter. . . . . . | The duty provided in the applicable subheading + 48% | The duty provided in the applicable subheading + 48% | The duty provided in the applicable subheading |
| 9903.01.75 | Except for goods loaded onto a vessel at the port of loading and in transit on the final mode of transit before 12:01 a.m. eastern daylight time on April 9, 2025, except for products described in headings 9903.01.28-9903.01.33, and except as provided for in heading 9903.01.34, articles the product of Cambodia, as provided for in subdivision (v) of U.S. note 2 to this subchapter. . . . . . . | The duty provided in the applicable subheading + 49% | The duty provided in the applicable subheading + 49% | The duty provided in the applicable subheading |
| 9903.01.76 | Except for goods loaded onto a vessel at the port of loading and in transit on the final mode of transit before 12:01 a.m. eastern daylight time on April 9, 2025, except for products described in headings 9903.01.28-9903.01.33, and except as provided for in heading 9903.01.34, articles the product of Lesotho, as provided for in subdivision (v) of U.S. note 2 to this subchapter. . . . . . . | The duty provided in the applicable subheading + 50% | The duty provided in the applicable subheading + 50% | The duty provided in the applicable subheading |

3.  (a) In the event of the termination of actions pursuant to Executive Order 14193 of February 1, 2025 (Imposing Duties To Address the Flow of Illicit Drugs Across Our Northern Border), as amended by Executive Order 14197 of February 3, 2025 (Progress on the Situation at Our Northern Border), and Executive Order 14231 of March 2, 2025 (Amendment to Duties To Address the Flow of Illicit Drugs Across Our Northern Border), effective with respect to goods entered for consumption, or withdrawn from warehouse for consumption, on or after 12:01 a.m. eastern daylight time on the date after such termination, subchapter III of chapter 99 of the Harmonized Tariff Schedule of the United States (HTSUS) is modified by inserting the following new headings in numerical sequence, with the material in the new heading inserted in the columns of the HTSUS labeled "Heading/Subheading", "Article Description", "Rates of Duty 1-General", "Rates of Duty 1-Special" and "Rates of Duty 2", respectively:

| Heading/ Subheading | Article Description | Rates of Duty | | |
|---|---|---|---|---|
| | | 1 | | 2 |
| | | **General** | **Special** | |
| "9903.01.35 | Except for products described in headings 9903.01.28-9903.01.33, except as provided for in heading 9903.01.34, and except as provided in headings 9903.01.37 and 9903.01.38, articles the product of Canada that are not eligible for duty-free treatment under the United States-Mexico-Canada Agreement, pursuant to the terms of general note 11 to the HTSUS. . . . . . . | The duty provided in the applicable subheading + 12% | The duty provided in the applicable subheading | The duty provided in the applicable subheading |
| 9903.01.36 | Articles the product of Canada that are entered free of duty under the United States-Mexico-Canada Agreement, pursuant to the terms of general note 11 to the HTSUS . . . . . | The duty provided in the applicable subheading | The duty provided in the applicable subheading | The duty provided in the applicable subheading |
| 9903.01.37 | Except for articles described in heading 9903.01.32, which include potash, energy products of Canada, including crude oil, natural gas, lease condensates, natural gas liquids, refined petroleum products, uranium, coal, biofuels, geothermal heat, the kinetic movement of flowing water, and critical minerals, as defined by 30 U.S.C. 1606(a)(3). . . . | The duty provided in the applicable subheading | The duty provided in the applicable subheading | The duty provided in the applicable subheading |

| 9903.01.38 | Except for products described in heading 9903.01.32, articles the products of Canada eligible for duty-free treatment under the United States-Mexico-Canada Agreement that are parts or components that will be substantially finished in the United States . . . . . . | The duty provided in the applicable subheading | The duty provided in the applicable subheading | The duty provided in the applicable subheading" |

(b) Therefore, with respect to goods entered for consumption, or withdrawn from warehouse for consumption, on or after 12:01 a.m. eastern daylight time on the date after such termination, heading 9903.01.26 is ineffective.

4. (a) In the event of the termination of actions pursuant to Executive Order 14194 of February 1, 2025 (Imposing Duties To Address the Situation at Our Southern Border), as amended by Executive Order 14198 of February 3, 2025 (Progress on the Situation at Our Southern Border) and Executive Order 14227 of March 2, 2025 (Amendment to Duties To Address the Situation at Our Southern Border), effective with respect to goods entered for consumption, or withdrawn from warehouse for consumption, on or after 12:01 a.m. eastern daylight time on the date after such termination, subchapter III of chapter 99 of the Harmonized Tariff Schedule of the United States (HTSUS) is modified by inserting the following new headings in numerical sequence, with the material in the new heading inserted in the columns of the HTSUS labeled "Heading/Subheading", "Article Description", "Rates of Duty 1-General", "Rates of Duty 1-Special" and "Rates of Duty 2", respectively:

| Heading/ Subheading | Article Description | Rates of Duty | | |
| | | 1 | | 2 |
| | | General | Special | |
| "9903.01.39 | Except for products described in headings 9903.01.28-9903.01.33, except as provided for in heading 9903.01.34, and except as provided in headings 9903.01.41 and 9903.01.42, articles the product of Mexico that are not eligible for duty-free treatment under the United States-Mexico-Canada Agreement, pursuant to the terms of general note 11 to the HTSUS. . . . . . . | The duty provided in the applicable subheading + 12% | The duty provided in the applicable subheading | The duty provided in the applicable subheading |

13

| 9903.01.40 | Articles the product of Mexico that are entered free of duty under the United States-Mexico-Canada Agreement, pursuant to the terms of general note 11 to the HTSUS . . . . . | The duty provided in the applicable subheading | The duty provided in the applicable subheading | The duty provided in the applicable subheading |
| 9903.01.41 | Except for articles described in heading 9903.01.32, which include potash, energy products of Mexico, including crude oil, natural gas, lease condensates, natural gas liquids, refined petroleum products, uranium, coal, biofuels, geothermal heat, the kinetic movement of flowing water, and critical minerals, as defined by 30 U.S.C. 1606(a)(3). . . . | The duty provided in the applicable subheading | The duty provided in the applicable subheading | The duty provided in the applicable subheading |
| 9903.01.42 | Except for products described in heading 9903.01.32, articles the products of Mexico eligible for duty-free treatment under the United States-Mexico-Canada Agreement that are parts or components that will be substantially finished in the United States . . . . . . | The duty provided in the applicable subheading | The duty provided in the applicable subheading | The duty provided in the applicable subheading" |

(b) Therefore, with respect to goods entered for consumption, or withdrawn from warehouse for consumption, on or after 12:01 a.m. eastern daylight time on the date after such termination, heading 9903.01.27 is ineffective.

5.  Effective with respect to goods entered for consumption, or withdrawn from warehouse for consumption, on or after 12:01 a.m. eastern daylight time on April 5, 2025, subchapter III of chapter 99 of the HTSUS is modified by inserting the following new subdivision (v) to U.S. note 2 to subchapter III of chapter 99 of the HTSUS in numerical sequence:

"(v) (i) Except as provided in headings 9903.01.26-9903.01.33, in heading 9903.01.34, and in subdivisions (v)(ii) through (v)(xii) of this note, and other than products for personal use included in accompanied baggage of persons arriving in the United States, headings 9903.01.25, 9903.01.35, 9903.01.39, and 9903.01.43-9903.01.76 impose additional *ad valorem* rates of duty on imports of all products. Notwithstanding U.S. note 1 to this subchapter, all products that are subject to the additional *ad valorem* rate of duty imposed by these headings shall also be subject to the general rates of duty imposed under subheadings in chapters 1 to 97 of the tariff schedule. Except as provided in subdivisions (v)(ii) through (v)(xii) of this note, all products that are subject to the additional *ad valorem* rates of duty imposed by these headings shall also be subject to any additional duty provided for in this subchapter or subchapter IV of chapter 99. Products

14

that are eligible for special tariff treatment under general note 3(c)(i) to the tariff schedule, or that are eligible for temporary duty exemptions or reductions under subchapter II to chapter 99, shall be subject to the additional *ad valorem* rate of duty imposed by these headings.

The additional duties imposed by these headings shall not apply to goods for which entry is properly claimed under a provision of chapter 98 of the tariff schedule pursuant to applicable regulations of U.S. Customs and Border Protection ("CBP"), and whenever CBP agrees that entry under such a provision is appropriate, except for goods entered under heading 9802.00.80; and subheadings 9802.00.40, 9802.00.50, and 9802.00.60. For subheadings 9802.00.40, 9802.00.50, and 9802.00.60, the additional duties apply to the value of repairs, alterations, or processing performed, as described in the applicable subheading. For heading 9802.00.80, the additional duties apply to the value of the article assembled abroad, less the cost or value of such products of the United States, as described.

Products that are provided for in headings 9903.01.25, 9903.01.35, 9903.01.39, and 9903.01.43-9903.01.76 shall continue to be subject to antidumping, countervailing, or other duties, taxes, fees, exactions and charges that apply to such products, as well as to the additional *ad valorem* rate of duty imposed by these headings.

(ii) Heading 9903.01.30 covers only products that are donations, by persons subject to the jurisdiction of the United States, of articles, such as food, clothing, and medicine, intended to be used to relieve human suffering, except to the extent that the President determines that such donations (A) would seriously impair his ability to deal with any national emergency declared under section 1701 of title 19 of the U.S. Code, (B) are in response to coercion against the proposed recipient or donor, or (C) would endanger Armed Forces of the United States which are engaged in hostilities or are in a situation where imminent involvement in hostilities is clearly indicated by the circumstances.

(iii) As provided in heading 9903.01.32, the additional duties imposed by headings 9903.01.25, 9903.01.35, 9903.01.39, and 9903.01.43-9903.01.76 shall not apply to products classified in the following subheadings of the HTSUS:

| | | | | | |
|---|---|---|---|---|---|
| 0508.00.00 | 2841.80.00 | 2926.90.48 | 2937.23.10 | 4403.96.01 | 7202.19.10 |
| 2504.10.50 | 2841.90.20 | 2927.00.40 | 2937.23.25 | 4403.97.00 | 7202.19.50 |
| 2504.90.00 | 2841.90.40 | 2927.00.50 | 2937.23.50 | 4403.98.00 | 7202.30.00 |
| 2510.10.00 | 2843.29.01 | 2928.00.25 | 2937.29.10 | 4403.99.01 | 7202.41.00 |
| 2510.20.00 | 2843.30.00 | 2928.00.30 | 2937.29.90 | 4404.10.00 | 7202.49.10 |
| 2511.10.10 | 2843.90.00 | 2928.00.50 | 2937.50.00 | 4404.20.00 | 7202.49.50 |
| 2511.10.50 | 2844.10.10 | 2929.90.20 | 2937.90.05 | 4405.00.00 | 7202.50.00 |
| 2519.10.00 | 2844.10.20 | 2929.90.50 | 2937.90.10 | 4406.11.00 | 7202.80.00 |
| 2519.90.10 | 2844.20.00 | 2930.20.20 | 2937.90.20 | 4406.12.00 | 7202.91.00 |
| 2519.90.20 | 2844.30.20 | 2930.20.90 | 2937.90.40 | 4406.91.00 | 7202.93.40 |
| 2524.90.00 | 2844.30.50 | 2930.30.60 | 2937.90.45 | 4406.92.00 | 7202.93.80 |
| 2529.21.00 | 2844.43.00 | 2930.90.29 | 2937.90.90 | 4407.11.00 | 7204.21.00 |
| 2529.22.00 | 2845.90.01 | 2930.90.49 | 2938.10.00 | 4407.12.00 | 7401.00.00 |

| | | | | | |
|---|---|---|---|---|---|
| 2530.20.10 | 2846.10.00 | 2930.90.92 | 2938.90.00 | 4407.13.00 | 7402.00.00 |
| 2530.20.20 | 2846.90.20 | 2931.49.00 | 2939.11.00 | 4407.14.00 | 7403.11.00 |
| 2530.90.10 | 2846.90.40 | 2931.53.00 | 2939.19.10 | 4407.19.00 | 7403.12.00 |
| 2530.90.20 | 2846.90.80 | 2931.90.22 | 2939.19.20 | 4407.21.00 | 7403.13.00 |
| 2530.90.80 | 2849.20.10 | 2931.90.90 | 2939.19.50 | 4407.22.00 | 7403.19.00 |
| 2602.00.00 | 2849.20.20 | 2932.14.00 | 2939.20.00 | 4407.23.01 | 7403.21.00 |
| 2603.00.00 | 2849.90.30 | 2932.19.51 | 2939.30.00 | 4407.25.00 | 7403.22.00 |
| 2605.00.00 | 2853.90.10 | 2932.20.20 | 2939.41.00 | 4407.26.00 | 7403.29.01 |
| 2606.00.00 | 2853.90.90 | 2932.20.30 | 2939.42.00 | 4407.27.00 | 7404.00.30 |
| 2608.00.00 | 2903.45.10 | 2932.20.50 | 2939.44.00 | 4407.28.00 | 7404.00.60 |
| 2610.00.00 | 2903.59.90 | 2932.99.61 | 2939.45.00 | 4407.99.02 | 7405.00.10 |
| 2611.00.30 | 2903.69.90 | 2932.99.70 | 2939.49.03 | 4407.91.00 | 7405.00.60 |
| 2611.00.60 | 2903.78.00 | 2932.99.90 | 2939.59.00 | 4407.92.00 | 7406.10.00 |
| 2612.10.00 | 2903.79.90 | 2933.11.00 | 2939.62.00 | 4407.93.00 | 7406.20.00 |
| 2614.00.30 | 2903.89.15 | 2933.19.35 | 2939.63.00 | 4407.94.00 | 7407.10.15 |
| 2614.00.60 | 2903.89.20 | 2933.19.45 | 2939.69.00 | 4407.95.00 | 7407.10.30 |
| 2615.90.30 | 2903.89.70 | 2933.19.90 | 2939.72.00 | 4407.96.00 | 7407.10.50 |
| 2615.90.60 | 2903.92.00 | 2933.21.00 | 2939.79.00 | 4407.97.00 | 7407.21.15 |
| 2616.10.00 | 2904.99.40 | 2933.29.20 | 2939.80.00 | 4407.99.02 | 7407.21.30 |
| 2617.10.00 | 2905.29.90 | 2933.29.35 | 2940.00.60 | 4408.10.01 | 7407.21.50 |
| 2620.30.00 | 2905.39.90 | 2933.29.43 | 2941.10.10 | 4408.31.01 | 7407.21.70 |
| 2620.99.50 | 2905.59.10 | 2933.29.45 | 2941.10.20 | 4408.39.02 | 7407.21.90 |
| 2701.11.00 | 2905.59.90 | 2933.29.90 | 2941.10.30 | 4408.90.01 | 7407.29.16 |
| 2701.12.00 | 2906.19.50 | 2933.33.01 | 2941.10.50 | 4409.10.05 | 7407.29.34 |
| 2701.19.00 | 2906.29.60 | 2933.34.00 | 2941.20.10 | 4409.10.10 | 7407.29.38 |
| 2701.20.00 | 2907.29.90 | 2933.35.00 | 2941.20.50 | 4409.10.20 | 7407.29.40 |
| 2702.10.00 | 2908.19.60 | 2933.37.00 | 2941.30.00 | 4409.10.40 | 7407.29.50 |
| 2702.20.00 | 2909.19.18 | 2933.39.08 | 2941.40.00 | 4409.10.45 | 7408.11.30 |
| 2703.00.00 | 2909.20.00 | 2933.39.10 | 2941.50.00 | 4409.10.50 | 7408.11.60 |
| 2704.00.00 | 2909.30.60 | 2933.39.20 | 2941.90.10 | 4409.10.60 | 7408.19.00 |
| 2705.00.00 | 2909.49.10 | 2933.39.21 | 2941.90.30 | 4409.10.65 | 7408.21.00 |
| 2706.00.00 | 2909.49.15 | 2933.39.23 | 2941.90.50 | 4409.10.90 | 7408.22.10 |
| 2707.10.00 | 2909.49.20 | 2933.39.25 | 2942.00.05 | 4409.21.05 | 7408.22.50 |
| 2707.20.00 | 2909.49.60 | 2933.39.27 | 2942.00.35 | 4409.21.90 | 7408.29.10 |
| 2707.30.00 | 2909.50.40 | 2933.39.31 | 2942.00.50 | 4409.22.05 | 7408.29.50 |
| 2707.40.00 | 2909.50.45 | 2933.39.41 | 3001.20.00 | 4409.22.10 | 7409.11.10 |
| 2707.50.00 | 2909.50.50 | 2933.39.61 | 3001.90.01 | 4409.22.25 | 7409.11.50 |
| 2707.91.00 | 2912.19.50 | 2933.39.92 | 3002.12.00 | 4409.22.40 | 7409.19.10 |
| 2707.99.10 | 2912.49.26 | 2933.41.00 | 3002.13.00 | 4409.22.50 | 7409.19.50 |
| 2707.99.20 | 2914.19.00 | 2933.49.08 | 3002.14.00 | 4409.22.60 | 7409.19.90 |
| 2707.99.40 | 2914.40.90 | 2933.49.10 | 3002.15.00 | 4409.22.65 | 7409.21.00 |
| 2707.99.51 | 2914.50.30 | 2933.49.15 | 3002.41.00 | 4409.22.90 | 7409.29.00 |
| 2707.99.55 | 2914.50.50 | 2933.49.17 | 3002.42.00 | 4409.29.06 | 7409.31.10 |

| | | | | | |
|---|---|---|---|---|---|
| 2707.99.59 | 2914.62.00 | 2933.49.20 | 3002.49.00 | 4409.29.11 | 7409.31.50 |
| 2707.99.90 | 2914.69.21 | 2933.49.26 | 3002.51.00 | 4409.29.26 | 7409.31.90 |
| 2708.10.00 | 2914.69.90 | 2933.49.30 | 3002.59.00 | 4409.29.41 | 7409.39.10 |
| 2708.20.00 | 2914.79.40 | 2933.49.60 | 3002.90.10 | 4409.29.51 | 7409.39.50 |
| 2709.00.10 | 2915.29.30 | 2933.49.70 | 3002.90.52 | 4409.29.61 | 7409.39.90 |
| 2709.00.20 | 2915.39.31 | 2933.52.10 | 3003.10.00 | 4409.29.66 | 7409.40.00 |
| 2710.12.15 | 2915.39.35 | 2933.52.90 | 3003.20.00 | 4409.29.91 | 7409.90.10 |
| 2710.12.18 | 2915.39.47 | 2933.53.00 | 3003.39.10 | 4410.11.00 | 7409.90.50 |
| 2710.12.25 | 2915.39.90 | 2933.54.00 | 3003.39.50 | 4410.12.00 | 7409.90.90 |
| 2710.12.45 | 2915.90.10 | 2933.59.10 | 3003.41.00 | 4410.19.00 | 7410.11.00 |
| 2710.12.90 | 2915.90.14 | 2933.59.15 | 3003.42.00 | 4410.90.00 | 7410.12.00 |
| 2710.19.06 | 2915.90.18 | 2933.59.18 | 3003.49.00 | 4411.12.10 | 7410.21.30 |
| 2710.19.11 | 2915.90.20 | 2933.59.21 | 3003.90.01 | 4411.12.20 | 7410.21.60 |
| 2710.19.16 | 2915.90.50 | 2933.59.22 | 3004.10.10 | 4411.12.30 | 7410.22.00 |
| 2710.19.24 | 2916.19.30 | 2933.59.36 | 3004.10.50 | 4411.12.60 | 7411.10.10 |
| 2710.19.25 | 2916.19.50 | 2933.59.46 | 3004.20.00 | 4411.12.90 | 7411.10.50 |
| 2710.19.26 | 2916.20.50 | 2933.59.53 | 3004.31.00 | 4411.13.10 | 7411.21.10 |
| 2710.19.30 | 2916.31.50 | 2933.59.59 | 3004.32.00 | 4411.13.20 | 7411.21.50 |
| 2710.19.35 | 2916.39.46 | 2933.59.70 | 3004.39.00 | 4411.13.30 | 7411.22.00 |
| 2710.19.40 | 2916.39.79 | 2933.59.80 | 3004.41.00 | 4411.13.60 | 7411.29.10 |
| 2710.19.45 | 2917.13.00 | 2933.59.85 | 3004.42.00 | 4411.13.90 | 7411.29.50 |
| 2710.19.90 | 2917.19.10 | 2933.59.95 | 3004.49.00 | 4411.14.10 | 7412.10.00 |
| 2710.20.05 | 2917.19.70 | 2933.69.60 | 3004.50.10 | 4411.14.20 | 7412.20.00 |
| 2710.20.10 | 2917.34.01 | 2933.72.00 | 3004.50.20 | 4411.14.30 | 7413.00.10 |
| 2710.20.15 | 2917.39.30 | 2933.79.08 | 3004.50.30 | 4411.14.60 | 7413.00.50 |
| 2710.20.25 | 2918.11.51 | 2933.79.15 | 3004.50.40 | 4411.14.90 | 7413.00.90 |
| 2710.91.00 | 2918.13.50 | 2933.79.85 | 3004.50.50 | 4411.92.10 | 7415.10.00 |
| 2710.99.05 | 2918.16.50 | 2933.91.00 | 3004.60.00 | 4411.92.20 | 7415.21.00 |
| 2710.99.10 | 2918.19.60 | 2933.99.01 | 3004.90.10 | 4411.92.30 | 7415.29.00 |
| 2710.99.16 | 2918.19.90 | 2933.99.02 | 3004.90.92 | 4411.92.40 | 7415.33.05 |
| 2710.99.21 | 2918.22.10 | 2933.99.05 | 3006.30.10 | 4411.93.10 | 7415.33.10 |
| 2710.99.31 | 2918.22.50 | 2933.99.06 | 3006.30.50 | 4411.93.20 | 7415.33.80 |
| 2710.99.32 | 2918.23.30 | 2933.99.08 | 3006.60.00 | 4411.93.30 | 7415.39.00 |
| 2710.99.39 | 2918.23.50 | 2933.99.11 | 3006.70.00 | 4411.93.60 | 7418.10.00 |
| 2710.99.45 | 2918.29.20 | 2933.99.12 | 3006.93.10 | 4411.93.90 | 7418.20.10 |
| 2710.99.90 | 2918.29.65 | 2933.99.16 | 3006.93.20 | 4411.94.00 | 7418.20.50 |
| 2711.11.00 | 2918.29.75 | 2933.99.17 | 3006.93.50 | 4412.10.05 | 7419.20.00 |
| 2711.12.00 | 2918.30.25 | 2933.99.22 | 3006.93.60 | 4412.10.90 | 7419.80.03 |
| 2711.13.00 | 2918.30.30 | 2933.99.24 | 3006.93.80 | 4412.31.06 | 7419.80.06 |
| 2711.14.00 | 2918.30.90 | 2933.99.26 | 3104.20.00 | 4412.31.26 | 7419.80.09 |
| 2711.19.00 | 2918.99.30 | 2933.99.42 | 3104.30.00 | 4412.31.42 | 7419.80.15 |
| 2711.21.00 | 2918.99.43 | 2933.99.46 | 3104.90.01 | 4412.31.45 | 7419.80.16 |
| 2711.29.00 | 2918.99.47 | 2933.99.51 | 3105.10.00 | 4412.31.48 | 7419.80.17 |

| | | | | | |
|---|---|---|---|---|---|
| 2712.10.00 | 2918.99.50 | 2933.99.53 | 3105.20.00 | 4412.31.52 | 7419.80.30 |
| 2712.20.00 | 2919.90.30 | 2933.99.55 | 3105.60.00 | 4412.31.61 | 7419.80.50 |
| 2712.90.10 | 2919.90.50 | 2933.99.58 | 3203.00.80 | 4412.31.92 | 7508.90.50 |
| 2712.90.20 | 2920.90.51 | 2933.99.61 | 3204.13.80 | 4412.33.06 | 7901.11.00 |
| 2713.11.00 | 2921.19.11 | 2933.99.65 | 3204.17.20 | 4412.33.26 | 7901.12.10 |
| 2713.12.00 | 2921.19.61 | 2933.99.70 | 3204.18.00 | 4412.33.32 | 7901.12.50 |
| 2713.20.00 | 2921.29.00 | 2933.99.75 | 3206.11.00 | 4412.33.57 | 7901.20.00 |
| 2713.90.00 | 2921.30.10 | 2933.99.79 | 3206.19.00 | 4412.34.26 | 7902.00.00 |
| 2714.10.00 | 2921.30.50 | 2933.99.82 | 3402.42.10 | 4412.34.32 | 7907.00.60 |
| 2714.90.00 | 2921.42.90 | 2933.99.85 | 3402.42.20 | 4412.34.57 | 8001.10.00 |
| 2715.00.00 | 2921.46.00 | 2933.99.89 | 3402.42.90 | 4412.39.10 | 8001.20.00 |
| 2716.00.00 | 2921.49.38 | 2933.99.90 | 3606.90.30 | 4412.39.30 | 8002.00.00 |
| 2801.20.00 | 2921.49.43 | 2933.99.97 | 3808.94.10 | 4412.39.40 | 8007.00.50 |
| 2804.29.00 | 2921.49.45 | 2934.10.10 | 3808.94.50 | 4412.39.50 | 8101.10.00 |
| 2804.50.00 | 2921.49.50 | 2934.10.20 | 3818.00.00 | 4412.41.00 | 8101.97.00 |
| 2804.61.00 | 2921.59.80 | 2934.10.90 | 3824.91.00 | 4412.42.00 | 8103.20.00 |
| 2804.80.00 | 2922.11.00 | 2934.20.40 | 3824.99.29 | 4412.49.00 | 8103.30.00 |
| 2804.90.00 | 2922.14.00 | 2934.20.80 | 3824.99.49 | 4412.51.10 | 8103.91.00 |
| 2805.19.10 | 2922.19.09 | 2934.30.23 | 3824.99.55 | 4412.51.31 | 8103.99.00 |
| 2805.19.20 | 2922.19.20 | 2934.30.27 | 3824.99.93 | 4412.51.41 | 8104.11.00 |
| 2805.19.90 | 2922.19.33 | 2934.30.43 | 3901.90.90 | 4412.51.51 | 8104.19.00 |
| 2805.30.00 | 2922.19.60 | 2934.30.50 | 3902.90.00 | 4412.52.10 | 8104.20.00 |
| 2811.11.00 | 2922.19.70 | 2934.91.00 | 3904.61.00 | 4412.52.31 | 8104.30.00 |
| 2811.19.10 | 2922.19.90 | 2934.92.00 | 3905.91.10 | 4412.52.41 | 8104.90.00 |
| 2811.29.10 | 2922.19.96 | 2934.99.01 | 3905.99.80 | 4412.52.51 | 8105.20.30 |
| 2811.29.20 | 2922.29.27 | 2934.99.03 | 3906.90.50 | 4412.59.80 | 8105.20.60 |
| 2812.19.00 | 2922.29.61 | 2934.99.05 | 3907.10.00 | 4412.59.90 | 8105.20.90 |
| 2813.90.10 | 2922.29.81 | 2934.99.06 | 3907.21.00 | 4412.59.95 | 8105.30.00 |
| 2815.20.00 | 2922.31.00 | 2934.99.07 | 3907.29.00 | 4412.91.06 | 8105.90.00 |
| 2816.10.00 | 2922.39.25 | 2934.99.08 | 3907.30.00 | 4412.91.10 | 8106.10.00 |
| 2816.40.10 | 2922.39.45 | 2934.99.09 | 3907.61.00 | 4412.91.31 | 8106.90.00 |
| 2816.40.20 | 2922.39.50 | 2934.99.11 | 3907.69.00 | 4412.91.41 | 8108.20.00 |
| 2817.00.00 | 2922.41.00 | 2934.99.12 | 3907.70.00 | 4412.91.51 | 8108.30.00 |
| 2818.10.10 | 2922.42.50 | 2934.99.15 | 3907.99.50 | 4412.92.07 | 8108.90.30 |
| 2818.10.20 | 2922.44.00 | 2934.99.16 | 3908.10.00 | 4412.92.11 | 8108.90.60 |
| 2818.20.00 | 2922.49.10 | 2934.99.18 | 3910.00.00 | 4412.92.31 | 8110.10.00 |
| 2818.30.00 | 2922.49.26 | 2934.99.20 | 3911.90.25 | 4412.92.42 | 8110.20.00 |
| 2820.10.00 | 2922.49.30 | 2934.99.30 | 3911.90.91 | 4412.92.52 | 8110.90.00 |
| 2821.10.00 | 2922.49.37 | 2934.99.39 | 3912.31.00 | 4412.99.58 | 8111.00.47 |
| 2821.20.00 | 2922.49.49 | 2934.99.44 | 3912.39.00 | 4412.99.61 | 8111.00.49 |
| 2822.00.00 | 2922.49.80 | 2934.99.47 | 3912.90.00 | 4412.99.71 | 8112.21.00 |
| 2823.00.00 | 2922.50.07 | 2934.99.70 | 3913.90.20 | 4412.99.81 | 8112.22.00 |
| 2825.20.00 | 2922.50.10 | 2934.99.90 | 3913.90.50 | 4412.99.91 | 8112.29.00 |

| | | | | | |
|---|---|---|---|---|---|
| 2825.50.30 | 2922.50.11 | 2935.50.00 | 3914.00.60 | 4412.99.97 | 8112.41.10 |
| 2825.60.00 | 2922.50.13 | 2935.90.06 | 4001.10.00 | 4413.00.00 | 8112.41.50 |
| 2825.80.00 | 2922.50.14 | 2935.90.10 | 4001.21.00 | 4820.20.00 | 8112.49.00 |
| 2825.90.15 | 2922.50.17 | 2935.90.13 | 4001.22.00 | 4901.10.00 | 8112.59.00 |
| 2825.90.30 | 2922.50.25 | 2935.90.15 | 4001.29.00 | 4901.91.00 | 8112.92.10 |
| 2825.90.90 | 2922.50.35 | 2935.90.20 | 4001.30.00 | 4901.99.00 | 8112.92.30 |
| 2826.12.00 | 2922.50.40 | 2935.90.30 | 4401.11.00 | 4902.10.00 | 8112.92.40 |
| 2826.30.00 | 2922.50.50 | 2935.90.32 | 4401.12.00 | 4902.90.10 | 8112.92.60 |
| 2826.90.90 | 2923.10.00 | 2935.90.33 | 4401.21.00 | 4902.90.20 | 8112.92.65 |
| 2827.31.00 | 2923.20.20 | 2935.90.42 | 4401.22.00 | 4903.00.00 | 8112.99.10 |
| 2827.39.45 | 2923.90.01 | 2935.90.48 | 4401.31.00 | 4904.00.00 | 8112.99.91 |
| 2827.39.60 | 2924.11.00 | 2935.90.60 | 4401.32.00 | 4905.20.00 | 8541.10.00 |
| 2827.39.90 | 2924.19.11 | 2935.90.75 | 4401.39.42 | 4905.90.20 | 8541.21.00 |
| 2827.41.00 | 2924.19.80 | 2935.90.95 | 4401.41.00 | 4905.90.60 | 8541.29.00 |
| 2827.49.50 | 2924.21.16 | 2936.21.00 | 4401.49.00 | 4906.00.00 | 8541.30.00 |
| 2827.59.51 | 2924.21.50 | 2936.22.00 | 4402.10.00 | 4911.10.00 | 8541.49.10 |
| 2827.60.10 | 2924.29.10 | 2936.23.00 | 4402.20.00 | 4911.99.60 | 8541.49.70 |
| 2827.60.51 | 2924.29.62 | 2936.24.01 | 4402.90.01 | 4911.99.80 | 8541.49.80 |
| 2833.21.00 | 2924.29.71 | 2936.25.00 | 4403.11.00 | 7106.91.10 | 8541.49.95 |
| 2833.25.00 | 2924.29.77 | 2936.26.00 | 4403.12.00 | 7108.12.10 | 8541.51.00 |
| 2833.27.00 | 2924.29.95 | 2936.27.00 | 4403.21.01 | 7110.11.00 | 8541.59.00 |
| 2833.29.10 | 2925.12.00 | 2936.28.00 | 4403.22.01 | 7110.19.00 | 8541.90.00 |
| 2833.29.45 | 2925.19.42 | 2936.29.10 | 4403.23.01 | 7110.21.00 | 8542.31.00 |
| 2833.29.51 | 2925.19.91 | 2936.29.16 | 4403.24.01 | 7110.29.00 | 8542.32.00 |
| 2834.21.00 | 2925.21.00 | 2936.29.20 | 4403.25.01 | 7110.31.00 | 8542.33.00 |
| 2834.29.20 | 2925.29.20 | 2936.29.50 | 4403.26.01 | 7110.39.00 | 8542.39.00 |
| 2834.29.51 | 2925.29.60 | 2936.90.01 | 4403.42.00 | 7110.41.00 | 8542.90.00 |
| 2836.60.00 | 2925.29.90 | 2937.11.00 | 4403.49.02 | 7110.49.00 | |
| 2836.91.00 | 2926.30.10 | 2937.12.00 | 4403.91.00 | 7112.92.01 | |
| 2836.92.00 | 2926.40.00 | 2937.19.00 | 4403.93.01 | 7118.90.00 | |
| 2836.99.10 | 2926.90.14 | 2937.21.00 | 4403.94.01 | 7202.11.10 | |
| 2836.99.50 | 2926.90.43 | 2937.22.00 | 4403.95.01 | 7202.11.50 | |

(iv) As provided in 9903.01.26, the additional duties imposed by heading 9903.01.25 shall not apply to any products of Canada, including those products of Canada entered free of duty as under the United States-Mexico-Canada Agreement, including any treatment set forth in subchapter XXIII of chapter 98 and subchapter XXII of chapter 99 of the HTSUS.

(v) As provided in 9903.01.27, the additional duties imposed by heading 9903.01.25 shall not apply to any products of Mexico, including those products of Mexico entered free of duty as under the United States-Mexico-Canada Agreement, including any treatment set forth in subchapter XXIII of chapter 98 and subchapter XXII of chapter 99 of the HTSUS.

(vi) The additional duties imposed by headings 9903.01.25, 9903.01.35, 9903.01.39, and 9903.01.43-9903.01.76 shall not apply to products of iron or steel provided for in headings 9903.81.87 and 9903.81.88.

(vii) The additional duties imposed by headings 9903.01.25, 9903.01.35, 9903.01.39, and 9903.01.43-9903.01.76 shall not apply to derivative iron or steel products provided for in headings 9903.81.89, 9903.81.90, 9903.81.91, 9903.81.92 and 9903.81.93.

(viii) The additional duties imposed by headings 9903.01.25, 9903.01.35, 9903.01.39, and 9903.01.43-9903.01.76 shall not apply to products of aluminum provided for in heading 9903.85.02.

(ix) The additional duties imposed by headings 9903.01.25, 9903.01.35, 9903.01.39, and 9903.01.43-9903.01.76 shall not apply to derivative aluminum products provided for in headings 9903.85.04, 9903.85.07, 9903.85.08 and 9903.85.09.

(x) The additional duties imposed by headings 9903.01.25, 9903.01.35, 9903.01.39, and 9903.01.43-9903.01.76 shall not apply to passenger vehicles (sedans, sport utility vehicles, crossover utility vehicles, minivans, and cargo vans) and light trucks provided for in headings 9903.94.01 and 9903.94.03.

(xi) The additional duties imposed by headings 9903.01.25, 9903.01.35, 9903.01.39, and 9903.01.43-9903.01.76 shall not apply to parts of passenger vehicles (sedans, sport utility vehicles, crossover utility vehicles, minivans, and cargo vans) and parts of light trucks provided for in heading 9903.94.05.

(xii) The additional duties imposed by headings 9903.01.25, 9903.01.35, 9903.01.39, and 9903.01.43-9903.01.76 shall not apply to the U.S. content of an article, provided at least 20% of the customs value, as determined under 19 U.S.C. 1401a, of the product is U.S. originating, consistent with heading 9903.01.34.  For greater certainty, with respect to an article for which at least 20% of the customs value is U.S. originating, consistent with 9903.01.34, the additional duties imposed by headings 9903.01.25, 9903.01.35, 9903.01.39, and 9903.01.43-9903.01.76, shall apply only to the non-U.S. content of such article.  Heading 9903.01.34 covers only the U.S. content portion of articles described by that heading. The term "U.S. content" refers to the value of an article attributable to the components wholly obtained, produced entirely, or substantially transformed in the United States.

(xiii) Heading 9903.01.25 shall not apply to articles the product of the following countries entered for consumption, or withdrawn from warehouse for consumption, on or after 12:01 a.m. eastern daylight time on April 9, 2025, and that were not in transit on the final mode of transit prior to 12:01 a.m. eastern daylight time on April 9, 2025:

    1)       Algeria, subject to an additional duty of 30%
    2)       Angola, subject to an additional duty of 32%
    3)       Bangladesh, subject to an additional duty of 37%
    4)       Bosnia and Herzegovina, subject to an additional duty of 35%

5)    Botswana, subject to an additional duty of 37%
6)    Brunei, subject to an additional duty of 24%
7)    Cambodia, subject to an additional duty of 49%
8)    Cameroon, subject to an additional duty of 11%
9)    Chad, subject to an additional duty of 13%
10)    China, including Hong Kong and Macau, subject to an additional duty of 34%
11)    Côte d`Ivoire, subject to an additional duty of 21%
12)    Democratic Republic of the Congo, subject to an additional duty of 11%
13)    Equatorial Guinea, subject to an additional duty of 13%
14)    European Union, subject to an additional duty of 20%
15)    Falkland Islands, subject to an additional duty of 41%
16)    Fiji, subject to an additional duty of 32%
17)    Guyana, subject to an additional duty of 38%
18)    India, subject to an additional duty of 26%
19)    Indonesia, subject to an additional duty of 32%
20)    Iraq, subject to an additional duty of 39%
21)    Israel, subject to an additional duty of 17%
22)    Japan, subject to an additional duty of 24%
23)    Jordan, subject to an additional duty of 20%
24)    Kazakhstan, subject to an additional duty of 27%
25)    Laos, subject to an additional duty of 48%
26)    Lesotho, subject to an additional duty of 50%
27)    Libya, subject to an additional duty of 31%
28)    Liechtenstein, subject to an additional duty of 37%
29)    Madagascar, subject to an additional duty of 47%
30)    Malawi, subject to an additional duty of 17%
31)    Malaysia, subject to an additional duty of 24%
32)    Mauritius, subject to an additional duty of 40%
33)    Moldova, subject to an additional duty of 31%
34)    Mozambique, subject to an additional duty of 16%
35)    Myanmar (Burma), subject to an additional duty of 44%
36)    Namibia, subject to an additional duty of 21%
37)    Nauru, subject to an additional duty of 30%
38)    Nicaragua, subject to an additional duty of 18%
39)    Nigeria, subject to an additional duty of 14%
40)    North Macedonia, subject to an additional duty of 33%
41)    Norway, subject to an additional duty of 15%
42)    Pakistan, subject to an additional duty of 29%
43)    Philippines, subject to an additional duty of 17%
44)    Serbia, subject to an additional duty of 37%
45)    South Africa, subject to an additional duty of 30%
46)    South Korea, subject to an additional duty of 25%
47)    Sri Lanka, subject to an additional duty of 44%
48)    Switzerland, subject to an additional duty of 31%
49)    Syria, subject to an additional duty of 41%
50)    Taiwan, subject to an additional duty of 32%

51)    Thailand, subject to an additional duty of 36%
52)    Tunisia, subject to an additional duty of 28%
53)    Vanuatu, subject to an additional duty of 22%
54)    Venezuela, subject to an additional duty of 15%
55)    Vietnam, subject to an additional duty of 46%
56)    Zambia, subject to an additional duty of 17%
57)    Zimbabwe, subject to an additional duty of 18%"

22

[FR Doc. 2025–06063

Filed 4–4–25; 11:15 am]

Billing code 7020–02–C

Exhibit 19

*The* WHITE HOUSE

FACT SHEETS

Fact Sheet: President Donald J. Trump Declares National Emergency to Increase our
Competitive Edge, Protect our Sovereignty, and Strengthen our National and Economic Security

The White House

April 2, 2025

**PURSUING RECIPROCITY TO REBUILD THE ECONOMY AND RESTORE NATIONAL
AND ECONOMIC SECURITY:** Today, President Donald J. Trump declared that foreign
trade and economic practices have created a national emergency, and his order imposes
responsive tariffs to strengthen the international economic position of the United States
and protect American workers.

- Large and persistent annual U.S. goods trade deficits have led to the hollowing out
  of our manufacturing base; resulted in a lack of incentive to increase advanced
  domestic manufacturing capacity; undermined critical supply chains; and
  rendered our defense-industrial base dependent on foreign adversaries.

- President Trump is invoking his authority under the International Emergency
  Economic Powers Act of 1977 (IEEPA) to address the national emergency posed by
  the large and persistent trade deficit that is driven by the absence of reciprocity in
  our trade relationships and other harmful policies like currency manipulation and
  exorbitant value-added taxes (VAT) perpetuated by other countries.

- Using his IEEPA authority, President Trump will impose a 10% tariff on all countries.
  - This will take effect April 5, 2025 at 12:01 a.m. EDT.

- President Trump will impose an individualized reciprocal higher tariff on the
  countries with which the United States has the largest trade deficits. All other
  countries will continue to be subject to the original 10% tariff baseline.
  - This will take effect April 9, 2025 at 12:01 a.m. EDT.

- These tariffs will remain in effect until such a time as President Trump determines
  that the threat posed by the trade deficit and underlying nonreciprocal treatment

5/5/25, 9:46 AM    Fact Sheet: President Donald J. Trump Declares National Emergency to Increase our Competitive Edge, Protect our Sovereignty, an…

Case 3:25-cv-00464-TKW-ZCB    Document 20-1    Filed 05/05/25    Page 166 of 291

is satisfied, resolved, or mitigated.

- Today's IEEPA Order also contains modification authority, allowing President Trump to increase the tariff if trading partners retaliate or decrease the tariffs if trading partners take significant steps to remedy non-reciprocal trade arrangements and align with the United States on economic and national security matters.

- Some goods will not be subject to the Reciprocal Tariff. These include: (1) articles subject to 50 USC 1702(b); (2) steel/aluminum articles and autos/auto parts already subject to Section 232 tariffs; (3) copper, pharmaceuticals, semiconductors, and lumber articles; (4) all articles that may become subject to future Section 232 tariffs; (5) bullion; and (6) energy and other certain minerals that are not available in the United States.

- For Canada and Mexico, the existing fentanyl/migration IEEPA orders remain in effect, and are unaffected by this order. This means USMCA compliant goods will continue to see a 0% tariff, non-USMCA compliant goods will see a 25% tariff, and non-USMCA compliant energy and potash will see a 10% tariff. In the event the existing fentanyl/migration IEEPA orders are terminated, USMCA compliant goods would continue to receive preferential treatment, while non-USMCA compliant goods would be subject to a 12% reciprocal tariff.

**TAKING BACK OUR ECONOMIC SOVEREIGNTY:** President Trump refuses to let the United States be taken advantage of and believes that tariffs are necessary to ensure fair trade, protect American workers, and reduce the trade deficit—this is an emergency.

- He is the first President in modern history to stand strong for hardworking Americans by asking other countries to follow the golden rule on trade: Treat us like we treat you.

- Pernicious economic policies and practices of our trading partners undermine our ability to produce essential goods for the public and the military, threatening national security.

- U.S. companies, according to internal estimates, pay over $200 billion per year in value-added taxes (VAT) to foreign governments—a "double-whammy" on U.S.

5/5/25, 9:46 AM    Fact Sheet: President Donald J. Trump Declares National Emergency to Increase our Competitive Edge, Protect our Sovereignty, an…

Case 3:25-cv-00464-TKW-ZCB    Document 20-1    Filed 05/05/25    Page 167 of 201

companies who pay the tax at the European border, while European companies don't pay tax to the United States on the income from their exports to the U.S.

- The annual cost to the U.S. economy of counterfeit goods, pirated software, and theft of trade secrets is between $225 billion and $600 billion. Counterfeit products not only pose a significant risk to U.S. competitiveness, but also threaten the security, health, and safety of Americans, with the global trade in counterfeit pharmaceuticals estimated at $4.4 billion and linked to the distribution of deadly fentanyl-laced drugs.
    - This imbalance has fueled a large and persistent trade deficit in both industrial and agricultural goods, led to offshoring of our manufacturing base, empowered non-market economies like China, and hurt America's middle class and small towns.
    - President Biden squandered the agricultural trade surplus inherited from President Trump's first term, turning it into a projected all-time high deficit of $49 billion.

- The current global trading order allows those using unfair trade practices to get ahead, while those playing by the rules get left behind.

- In 2024, our trade deficit in goods exceeded $1.2 trillion—an unsustainable crisis ignored by prior leadership.

- "Made in America" is not just a tagline—it's an economic and national security priority of this Administration. The President's reciprocal trade agenda means better-paying American jobs making beautiful American-made cars, appliances, and other goods.

- These tariffs seek to address the injustices of global trade, re-shore manufacturing, and drive economic growth for the American people.

- Reciprocal trade is America First trade because it increases our competitive edge, protects our sovereignty, and strengthens our national and economic security.

- These tariffs adjust for the unfairness of ongoing international trade practices, balance our chronic goods trade deficit, provide an incentive for re-shoring production to the United States, and provide our foreign trading partners with an opportunity to rebalance their trade relationships with the United States.

5/5/25, 9:46 AM    Fact Sheet: President Donald J. Trump Declares National Emergency to Increase our Competitive Edge, Protect our Sovereignty, an…

Case 3:25-cv-00464-TKW-ZCB    Document 20-1    Filed 05/05/25    Page 168 of 201

**REPRIORITIZING U.S. MANUFACTURING:** President Trump recognizes that increasing domestic manufacturing is critical to U.S. national security.

- In 2023, U.S. manufacturing output as a share of global manufacturing output was 17.4%, down from 28.4% in 2001.

- The decline in manufacturing output has reduced U.S. manufacturing capacity.
  - The need to maintain a resilient domestic manufacturing capacity is particularly acute in advanced sectors like autos, shipbuilding, pharmaceuticals, transport equipment, technology products, machine tools, and basic and fabricated metals, where loss of capacity could permanently weaken U.S. competitiveness.

- U.S. stockpiles of military goods are too low to be compatible with U.S. national defense interests.
  - If the U.S. wishes to maintain an effective security umbrella to defend its citizens and homeland, as well as allies and partners, it needs to have a large upstream manufacturing and goods-producing ecosystem.
  - This includes developing new manufacturing technologies in critical sectors like bio-manufacturing, batteries, and microelectronics to support defense needs.

- Increased reliance on foreign producers for goods has left the U.S. supply chain vulnerable to geopolitical disruption and supply shocks.
  - This vulnerability was exposed during the COVID-19 pandemic, and later with Houthi attacks on Middle East shipping.

- From 1997 to 2024, the U.S. lost around 5 million manufacturing jobs and experienced one of the largest drops in manufacturing employment in history.

**ADDRESSING TRADE IMBALANCES:** President Trump is working to level the playing field for American businesses and workers by confronting the unfair tariff disparities and non-tariff barriers imposed by other countries.

- For generations, countries have taken advantage of the United States, tariffing us at higher rates. For example:

5/5/25, 9:46 AM    Fact Sheet: President Donald J. Trump Declares National Emergency to Increase our Competitive Edge, Protect our Sovereignty, an…

Case 3:25-cv-00464-TKW-ZCB    Document 20-1    Filed 05/05/25    Page 169 of 201

- The United States imposes a 2.5% tariff on passenger vehicle imports (with internal combustion engines), while the European Union (10%) and India (70%) impose much higher duties on the same product.

- For networking switches and routers, the United States imposes a 0% tariff, but India (10-20%) levies higher rates.

- Brazil (18%) and Indonesia (30%) impose a higher tariff on ethanol than does the United States (2.5%).

- For rice in the husk, the U.S. imposes a tariff of 2.7%, while India (80%), Malaysia (40%), and Turkey (31%) impose higher rates.

- Apples enter the United States duty-free, but not so in Turkey (60.3%) and India (50%).

- The United States has one of the lowest simple average most-favored-nation (MFN) tariff rates in the world at 3.3%, while many of our key trading partners like Brazil (11.2%), China (7.5%), the European Union (5%), India (17%), and Vietnam (9.4%) have simple average MFN tariff rates that are significantly higher.

- Similarly, non-tariff barriers—meant to limit the quantity of imports/exports and protect domestic industries—also deprive U.S. manufacturers of reciprocal access to markets around the world. For example:

  - China's non-market policies and practices have given China global dominance in key manufacturing industries, decimating U.S. industry. Between 2001 and 2018, these practices contributed to the loss of 3.7 million U.S. jobs due to the growth of the U.S.-China trade deficit, displacing workers and undermining American competitiveness while threatening U.S. economic and national security by increasing our reliance on foreign-controlled supply chains for critical industries as well as everyday goods.

  - India imposes their own uniquely burdensome and/or duplicative testing and certification requirements in sectors such as chemicals, telecom products, and medical devices that make it difficult or costly for American companies to sell their products in India. If these barriers were removed, it is estimated that U.S. exports would increase by at least $5.3 billion annually.

- Countries including China, Germany, Japan, and South Korea have pursued policies that suppress the domestic consumption power of their own citizens to artificially boost the competitiveness of their export products. Such policies include regressive tax systems, low or unenforced penalties for environmental degradation, and policies intended to suppress worker wages relative to productivity.

- Certain countries, like Argentina, Brazil, Ecuador, and Vietnam, restrict or prohibit the importation of remanufactured goods, restricting market access for U.S. exporters while also stifling efforts to promote sustainability by discouraging trade in like-new and resource-efficient products. If these barriers were removed, it is estimated that U.S. exports would increase by at least $18 billion annually.

- The UK maintains non-science-based standards that severely restrict U.S. exports of safe, high-quality beef and poultry products.

- Indonesia maintains local content requirements across a broad range of sectors, complex import licensing regimes, and, starting this year, will require natural resource firms to onshore all export revenue for transactions worth $250,000 or more.

- Argentina has banned imports of U.S. live cattle since 2002 due to unsubstantiated concerns regarding bovine spongiform encephalopathy. The United States has a $223 million trade deficit with Argentina in beef and beef products.

- For decades, South Africa has imposed animal health restrictions that are not scientifically justified on U.S. pork products, permitting a very limited list of U.S. pork exports to enter South Africa. South Africa also heavily restricts U.S. poultry exports through high tariffs, anti-dumping duties, and unjustified animal health restrictions. These barriers have contributed to a 78% decline in U.S. poultry exports to South Africa, from $89 million in 2019 to $19 million 2024.

- U.S. automakers face a variety of non-tariff barriers that impede access to the Japanese and Korean automotive markets, including non-acceptance of certain U.S. standards, duplicative testing and certification requirements,

5/5/25, 9:46 AM    Fact Sheet: President Donald J. Trump Declares National Emergency to Increase our Competitive Edge, Protect our Sovereignty, an…

Case 3:25-cv-00464-TKW-ZCB    Document 20-1    Filed 05/05/25    Page 171 of 201

and transparency issues. Due to these non-reciprocal practices, the U.S. automotive industry loses out on an additional $13.5 billion in annual exports to Japan and access to a larger import market share in Korea—all while the U.S. trade deficit with Korea more than tripled from 2019 to 2024.

- Monetary tariffs and non-monetary tariffs are two distinct types of trade barriers that governments use to regulate imports and exports. President Trump is countering both through reciprocal tariffs to protect American workers and industries from these unfair practices.

**THE GOLDEN RULE FOR OUR GOLDEN AGE:** Today's action simply asks other countries to treat us like we treat them. It's the Golden Rule for Our Golden Age.

- Access to the American market is a privilege, not a right.

- The United States will no longer put itself last on matters of international trade in exchange for empty promises.

- Reciprocal tariffs are a big part of why Americans voted for President Trump—it was a cornerstone of his campaign from the start.
  - Everyone knew he'd push for them once he got back in office; it's exactly what he promised, and it's a key reason he won the election.

- These tariffs are central to President Trump's plan to reverse the economic damage left by President Biden and put America on a path to a new golden age.
  - This builds on his broader economic agenda of energy competitiveness, tax cuts, no tax on tips, no tax on Social Security benefits, and deregulation to boost American prosperity.

**TARIFFS WORK:** Studies have repeatedly shown that tariffs can be an effective tool for reducing or eliminating threats that impair U.S. national security and achieving economic and strategic objectives.

- A 2024 study on the effects of President Trump's tariffs in his first term found that they "strengthened the U.S. economy" and "led to significant reshoring" in industries like manufacturing and steel production.

- A 2023 report by the U.S. International Trade Commission that analyzed the effects of Section 232 and 301 tariffs on more than $300 billion of U.S. imports

5/5/25, 9:46 AM    Fact Sheet: President Donald J. Trump Declares National Emergency to Increase our Competitive Edge, Protect our Sovereignty, an…

Case 3:25-cv-00464-TKW-ZCB    Document 20-1    Filed 05/05/25    Page 172 of 201

found that the tariffs reduced imports from China and effectively stimulated more U.S. production of the tariffed goods, with very minor effects on prices.

- According to the Economic Policy Institute, the tariffs implemented by President Trump during his first term "clearly show[ed] no correlation with inflation" and only had a temporary effect on overall price levels.

- An analysis from the Atlantic Council found that "tariffs would create new incentives for US consumers to buy US-made products."

- Former Biden Treasury Secretary Janet Yellen affirmed last year that tariffs do not raise prices: "I don't believe that American consumers will see any meaningful increase in the prices that they face."

- A 2024 economic analysis found that a global tariff of 10% would grow the economy by $728 billion, create 2.8 million jobs, and increase real household incomes by 5.7%.

NEWS

ADMINISTRATION

ISSUES

CONTACT

EOP

VISIT

GALLERY

VIDEO LIBRARY

AMERICA 250

FOUNDING FATHERS

Case 3:25-cv-00464-TKW-ZCB    Document 20-1    Filed 05/05/25    Page 173 of 201



## Subscribe to The White House newsletter

| Your email | SIGN UP |
| --- | --- |

THE WHITE HOUSE

1600 Pennsylvania Ave NW
Washington, DC 20500

WH.GOV

Copyright

Privacy



Exhibit 20

Federal Register

Vol. 90, No. 70

Monday, April 14, 2025

# Presidential Documents

Title 3—

The President

**Executive Order 14259 of April 8, 2025**

## Amendment to Reciprocal Tariffs and Updated Duties as Applied to Low-Value Imports From the People's Republic of China

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the International Emergency Economic Powers Act (50 U.S.C. 1701 *et seq.*) (IEEPA), the National Emergencies Act (50 U.S.C. 1601 *et seq.*), section 604 of the Trade Act of 1974, as amended (19 U.S.C. 2483), and section 301 of title 3, United States Code, I hereby determine and order:

**Section 1.** *Background.* In Executive Order 14257 of April 2, 2025 (Regulating Imports with a Reciprocal Tariff to Rectify Trade Practices that Contribute to Large and Persistent Annual United States Goods Trade Deficits), I declared a national emergency arising from conditions reflected in large and persistent annual U.S. goods trade deficits, and imposed additional *ad valorem* duties that I deemed necessary and appropriate to deal with that unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security and economy of the United States. Section 4(b) of Executive Order 14257 provided that "[s]hould any trading partner retaliate against the United States in response to this action through import duties on U.S. exports or other measures, I may further modify the [Harmonized Tariff Schedule of the United States] to increase or expand in scope the duties imposed under this order to ensure the efficacy of this action." I further declared pursuant to Executive Order 14256 of April 2, 2025 (Further Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China as Applied to Low-Value Imports) that duty-free *de minimis* treatment on articles described in section 2(a) of Executive Order 14195 is no longer available effective at 12:01 a.m. eastern daylight time on May 2, 2025.

On April 4, 2025, the State Council Tariff Commission of the People's Republic of China (PRC) announced that in response to Executive Order 14257, effective at 12:01 a.m. eastern daylight time on April 10, 2025, a 34 percent tariff would be imposed on all goods imported into the PRC originating from the United States. Pursuant to section 4(b) of Executive Order 14257, I am ordering modification of the Harmonized Tariff Schedule of the United States (HTSUS) and taking other actions to increase the duties imposed on the PRC in response to this retaliation. In my judgment, this modification is necessary and appropriate to effectively address the threat to the national security and economy of the United States.

**Sec. 2.** *Tariff Increase.* In recognition of the fact that the PRC has announced that it will retaliate against the United States in response to Executive Order 14257, the HTSUS shall be modified as follows. Effective with respect to goods entered for consumption, or withdrawn from warehouse for consumption, on or after 12:01 a.m. eastern daylight time on April 9, 2025:

(a) heading 9903.01.63 of the HTSUS shall be amended by deleting "34%" each place that it appears and by inserting "84%" in lieu thereof; and

(b) subdivision (v)(xiii)(10) of U.S. note 2 to subchapter III of chapter 99 of the HTSUS shall be amended by deleting "34%", and inserting "84%" in lieu thereof.

**Sec. 3.** *De Minimis Tariff Increase.* To ensure that the imposition of tariffs pursuant to section 2 of this order is not circumvented and that the purpose

of Executive Order 14257 and this action is not undermined, I also deem it necessary and appropriate to:

(a) increase the *ad valorem* rate of duty set forth in section 2(c)(i) of Executive Order 14256 from 30 percent to 90 percent;

(b) increase the per postal item containing goods duty in section 2(c)(ii) of Executive Order 14256 that is in effect on or after 12:01 a.m. eastern daylight time on May 2, 2025, and before 12:01 a.m. eastern daylight time on June 1, 2025, from 25 dollars to 75 dollars; and

(c) increase the per postal item containing goods duty in section 2(c)(ii) of Executive Order 14256 that is in effect on or after 12:01 a.m. eastern daylight time on June 1, 2025, from 50 dollars to 150 dollars.

**Sec. 4**. *Implementation*. The Secretary of Commerce, the Secretary of Homeland Security, and the United States Trade Representative, as applicable, in consultation with the Secretary of State, the Secretary of the Treasury, the Assistant to the President for Economic Policy, the Senior Counselor for Trade and Manufacturing, the Assistant to the President for National Security Affairs, and the Chair of the International Trade Commission, are directed to take all necessary actions to implement and effectuate this order, consistent with applicable law, including through temporary suspension or amendment of regulations or notices in the *Federal Register* and adopting rules and regulations, and are authorized to take such actions, and to employ all powers granted to the President by IEEPA, as may be necessary to implement this order. Each executive department and agency shall take all appropriate measures within its authority to implement this order.

**Sec. 5**. *General Provisions*. (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department, agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
*April 8, 2025.*

[FR Doc. 2025–06378
Filed 4–11–25; 8:45 am]
Billing code 3395–F4–P

Exhibit 21

# Presidential Documents

Executive Order 14266 of April 9, 2025

## Modifying Reciprocal Tariff Rates To Reflect Trading Partner Retaliation and Alignment

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the International Emergency Economic Powers Act (50 U.S.C. 1701 *et seq.*) (IEEPA), the National Emergencies Act (50 U.S.C. 1601 *et seq.*), section 604 of the Trade Act of 1974, as amended (19 U.S.C. 2483), and section 301 of title 3, United States Code, I hereby determine and order:

**Section 1.** *Background.* In Executive Order 14257 of April 2, 2025 (Regulating Imports With a Reciprocal Tariff to Rectify Trade Practices that Contribute to Large and Persistent Annual United States Goods Trade Deficits), I declared a national emergency arising from conditions reflected in large and persistent annual U.S. goods trade deficits, and imposed additional *ad valorem* duties that I deemed necessary and appropriate to deal with that unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security and economy of the United States. Section 4(b) of Executive Order 14257 provided that ''[s]hould any trading partner retaliate against the United States in response to this action through import duties on U.S. exports or other measures, I may further modify the [Harmonized Tariff Schedule of the United States] to increase or expand in scope the duties imposed under this order to ensure the efficacy of this action.''

In the Executive Order dated April 8, 2025 (Amendment to Reciprocal Tariffs and Updated Duties As Applied to Low-Value Imports from the People's Republic of China), pursuant to section 4(b) of Executive Order 14257, I ordered modification of the Harmonized Tariff Schedule of the United States (HTSUS) to raise the applicable *ad valorem* duty rate for imports from the People's Republic of China (PRC) established in Executive Order 14257, in recognition of the fact that the PRC announced that it would retaliate against the United States in response to Executive Order 14257.

On April 9, 2025, the State Council Tariff Commission of the PRC announced that, in response to the Executive Order dated April 8, 2025, an 84 percent tariff would be imposed on all goods imported into the PRC originating from the United States, effective at 12:01 a.m. on April 10, 2025. Pursuant to section 4(b) of Executive Order 14257, I have determined that it is necessary and appropriate to address the national emergency declared in that order by modifying the HTSUS and taking other actions to increase the duties imposed on the PRC in response to this latest retaliation. In my judgment, this modification is necessary and appropriate to effectively address the threat to U.S. national and economic security posed by the PRC's contribution to the conditions reflected in large and persistent trade deficits, including PRC industrial policies that have produced systemic excess manufacturing capacity in the PRC and suppressed U.S. domestic manufacturing capacity, which conditions are made worse by the PRC's recent actions.

Section 4(c) of Executive Order 14257 provided that, ''[s]hould any trading partner take significant steps to remedy non-reciprocal trade arrangements and align sufficiently with the United States on economic and national security matters, I may further modify the HTSUS to decrease or limit in scope the duties imposed under this order.'' Since I signed Executive

Order 14257, in contrast to the PRC's actions, more than 75 other foreign trading partners, including countries enumerated in Annex I to Executive Order 14257, have approached the United States to address the lack of trade reciprocity in our economic relationships and our resulting national and economic security concerns. This is a significant step by these countries toward remedying non-reciprocal trade arrangements and aligning sufficiently with the United States on economic and national security matters.

Pursuant to section 4(c) of Executive Order 14257, I have determined that it is necessary and appropriate to address the national emergency declared in that order by modifying the HTSUS to temporarily suspend, for a period of 90 days, except with respect to the PRC, application of the individual *ad valorem* duties imposed for foreign trading partners listed in Annex I to Executive Order 14257, and to instead impose on articles of all such trading partners an additional *ad valorem* rate of duty as set forth herein, pursuant to the terms of, and except as otherwise provided in, Executive Order 14257, as modified by this order.

**Sec. 2.** *Suspension of Country-Specific Ad Valorem Rates of Duty.* Effective with respect to goods entered for consumption, or withdrawn from warehouse for consumption, on or after 12:01 a.m. eastern daylight time on April 10, 2025, enforcement of the second paragraph of section 3(a) of Executive Order 14257 is suspended until 12:01 a.m. eastern daylight time on July 9, 2025. Effective at 12:01 a.m. eastern daylight time on April 10, 2025, and until 12:01 a.m. eastern daylight time on July 9, 2025, all articles imported into the customs territory of the United States from the trading partners enumerated in Annex I to Executive Order 14257 shall be, consistent with law, subject to an additional *ad valorem* rate of duty of 10 percent, subject to all applicable exceptions set forth in Executive Order 14257.

**Sec. 3.** *Tariff Modifications.* In recognition of the fact that the PRC has announced that it will retaliate again against the United States in response to the Executive Order dated April 8, 2025, which amended Executive Order 14257, and in recognition of the sincere intentions by many other trading partners to facilitate a resolution to the national emergency declared in Executive Order 14257, the HTSUS shall be modified as follows:

Effective with respect to goods entered for consumption, or withdrawn from warehouse for consumption, on or after 12:01 a.m. eastern daylight time on April 10, 2025:

(a) heading 9903.01.25 of the HTSUS shall be amended by deleting the article description and by inserting "Articles the product of any country, except for products described in headings 9903.01.26–9903.01.33, and except as provided for in heading 9903.01.34, and except for articles the product of China, including Hong Kong and Macau, as described in heading 9903.01.63 that are entered for consumption, or withdrawn from warehouse for consumption, after 12:01 a.m. eastern daylight time on April 10, 2025, and that were not in transit on the final mode of transit prior to 12:01 a.m. eastern daylight time on April 10, 2025, as provided for in subdivision (v) of U.S. note 2 to this subchapter . . . . . . ." in lieu thereof;

(b) heading 9903.01.63 of the HTSUS shall be amended by deleting "84%" each place that it appears and by inserting "125%" in lieu thereof, and by deleting "April 9, 2025," and by inserting "April 10, 2025" in lieu thereof;

(c) subdivision (v)(xiii)(10) of U.S. note 2 to subchapter III of chapter 99 of the HTSUS shall be amended by deleting "84%", and inserting "125%" in lieu thereof, and subdivision (v)(xiii) of U.S. note 2 to subchapter III of chapter 99 of the HTSUS shall be amended by deleting "April 9, 2025," and by inserting "April 10, 2025," in lieu thereof; and

(d) headings 9903.01.43–9903.01.62 and 9903.01.64–9903.01.76 are hereby suspended, and subdivisions (v)(xiii)(i)–(ix) and (xi)–(lvii) of U.S. note 2 to subchapter III of chapter 99 of the HTSUS are hereby suspended for a period of 90 days beginning at 12:01 a.m. on April 10, 2025.

**Sec. 4.** *De Minimis Tariff Increase.* To ensure that the imposition of tariffs pursuant to section 3 of this order is not circumvented and that the purpose of Executive Order 14257, as modified by the Executive Order dated April 8, 2025, and this order are not undermined, I also deem it necessary and appropriate to:

(a) increase the *ad valorem* rate of duty set forth in section 2(c)(i) of Executive Order 14256 of April 2, 2025 (Further Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China as Applied to Low-Value Imports), as modified by the Executive Order dated April 8, 2025, from 90 percent to 120 percent;

(b) increase the per postal item containing goods duty in section 2(c)(ii) of Executive Order 14256, as modified by the Executive Order dated April 8, 2025, that is in effect on or after 12:01 a.m. eastern daylight time on May 2, 2025, and before 12:01 a.m. eastern daylight time on June 1, 2025, from 75 dollars to 100 dollars; and

(c) increase the per postal item containing goods duty in section 2(c)(ii) of Executive Order 14256, as modified by the Executive Order dated April 8, 2025, that is in effect on or after 12:01 a.m. eastern daylight time on June 1, 2025, from 150 dollars to 200 dollars.

**Sec. 5.** *Implementation.* The Secretary of Commerce, the Secretary of Homeland Security, and the United States Trade Representative, as applicable, in consultation with the Secretary of State, the Secretary of the Treasury, the Assistant to the President for Economic Policy, the Senior Counselor for Trade and Manufacturing, the Assistant to the President for National Security Affairs, and the Chair of the International Trade Commission, are directed to take all necessary actions to implement and effectuate this order, consistent with applicable law, including through temporary suspension or amendment of regulations or notices in the *Federal Register* and adopting rules and regulations, and are authorized to take such actions, and to employ all powers granted to the President by IEEPA, as may be necessary to implement this order. Each executive department and agency shall take all appropriate measures within its authority to implement this order.

**Sec. 6.** *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department, agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
*April 9, 2025.*

[FR Doc. 2025–06462
Filed 4–14–25; 8:45 am]
Billing code 3395–F4–P

Exhibit 22

# RR Donnelley Asia Printing Solutions Limited

**Unit 2010-11, 20/F, C-Bons International Center,108 Wai Yip Street,Kwun Tong,Kowloon,Hong Kong**

**FSC Certification No.:NC-COC-032126**                    **INVOICE No**                    **24035398**

EMILY LEY PAPER INC.

555 WINDROSE CIR PENSACOLA, FL 32507-3573          **INVOICE DATE:**                 **December 20,2024**

**PAYMENT TERMS:**          60 days of invoice date          **SHIPMENT DATE:**          **December 19,2024**

**Currency:**                 **USD**                              **DUE DATE:**                    **February 18,2025**

**PLEASE REMIT TO OUR BANK ACCOUNT BY TELEGRAPH TRANSFER:**          **Customer Code:**          **1473261**
**Bank Name: UNITED OVERSEAS BANK LTD HONG KONG BRANCH**
**Bank Address: 23/F, 3 Garden Road, Central, Hong Kong**
**Beneficiary Name: RR Donnelley Asia Printing Solutions Ltd.**
**SWIFT CODE: UOVBHKHH**
**Bank code (for HK local transfer): 071-919**
**USD A/C: 0819229707**
**Intermediary Bank name: JPMorgan Chase Bank NA New York, United States**
**Intermediary Bank swift code: CHASUS33XXX**

| DESCRITPIN | ISBN | P/O NO. | P/O QUANTITY | SHIPPED QUANTITY PO RANGE | U/P PO RANGE | AMOUNT | FSC |
|---|---|---|---|---|---|---|---|
| NBK010 Wire-O Notebook - Seren | 815438027303 | Q24015313-1 | 1,003 | 1,003 | 2.4700 | 2,477.41 | Non FSC |
| NBK010 Wire-O Notebook - Seren | 815438027303 | Q24015313-1 | 0 | 50 | 2.0700 | 103.50 | Non FSC |
| NBK009 Wire-O Notebook - Faraw | 815438027297 | Q24015313-1 | 1,003 | 1,003 | 2.4700 | 2,477.41 | Non FSC |
| NBK009 Wire-O Notebook - Faraw | 815438027297 | Q24015313-1 | 0 | 50 | 2.0700 | 103.50 | Non FSC |
| Tariff 25% | | Q24015313-1 | 2,100 | 2,100 | 0.5800 | 1,218.00 | Non FSC |
| DDP cost DDP cost | | Q24015313-1 | 2,100 | 2,100 | 0.4000 | 840.00 | Non FSC |
| Wet proofs cost Wet proofs cost | | Q24015313-1 | 2 | 2 | 250.0000 | 500.00 | Non FSC |
| | | | | | TOTAL: | 7,719.82 | |

*** SAY TOTAL UNITED STATES DOLLARS SEVEN THOUSAND SEVEN HUNDRED AND NINETEEN AND CENTS EIGHTY TWO ONLY

***WE RESERVE THE RIGHT TO CHARGE INTEREST ON ANY LATE PAYMENT AT A RATE EQUAL TO SIX PERCENT (6%) ABOVE THE ANNUAL BASE RATE PUBLISHED BY HONG KONG MONETARY AUTHORITY. WE WILL GIVE THE CLIENT PRIOR NOTICE FOR ANY LATE PAYMENT WHEN SUCH PAYMENT IS DUE AND PAYABLE. THE INTEREST WILL START TO BE CALCULATED IF THE PAYMENT STILL CAN NOT BE RECEIVED AFTER SUCH 30 DAYS NOTICE.

Exhibit 23

# PROFORMA INVOICE

SELLER: CHENGDU FREEDOM

ADD:

TEL:

BUYER: KILO BRAVA
4045 S TAMIAMI TRAIL
SARASOTA, FL 34231
ADD: USA
TEL: 9177041920

Invoice Number: FDA2502103
Date: 2025/3/20

| ITEM NO. | DESCRIPTION | | | | | QTY | UNITE PRICE | UNITE PRICE |
|---|---|---|---|---|---|---|---|---|
| | Photo | Material | Color | HS Code | SIZE | PCS | FOB Guangzhou | FOB Guangzhou |
| 14094AN (16094 & 12169 AS SET)做套装一起打包 |  | tulle/embroidery lace | AS SAMPLE | 6212101000 | XS | 12 | $16.71 | $200.52 |
| | | | | | S | 80 | $16.71 | $1,336.80 |
| | | | | | M | 65 | $16.71 | $1,086.15 |
| | | | | | L | 30 | $16.71 | $501.30 |
| | | | | | XL | 9 | $16.71 | $150.39 |
| | | | | | XXL | 7 | $16.71 | $116.97 |
| | | | | | XXXL | 5 | $16.71 | $83.55 |
| total | | | | | | **208** | | **$3,475.68** |
| |  | tulle/e | AS | 62121 | XS | 12 | $0.00 | $0.00 |
| | | | | | S | 80 | $0.00 | $0.00 |
| | | | | | M | 65 | $0.00 | $0.00 |

| Item | Image | Material | Color | Code | Size | Qty | Unit Price | Total |
|---|---|---|---|---|---|---|---|---|
| 12169 | | mbroidery lace | SAMPLE | 62121 01000 | L | 30 | $0.00 | $0.00 |
| | | | | | XL | 9 | $0.00 | $0.00 |
| | | | | | XXL | 7 | $0.00 | $0.00 |
| | | | | | XXXL | 5 | $0.00 | $0.00 |
| total | | | | | | 208 | | $0.00 |
| 11172 | | tulle/embroidery lace | white | 62121 01000 | XS | 23 | $8.57 | $197.14 |
| | | | | | S | 37 | $8.57 | $317.14 |
| | | | | | M | 68 | $8.57 | $582.86 |
| | | | | | L | 38 | $8.57 | $325.71 |
| | | | | | XL | 15 | $8.57 | $128.57 |
| | | | | | XXL | 9 | $8.57 | $77.14 |
| | | | | | XXXL | 10 | $8.57 | $85.71 |
| total | | | | | | 200 | | $1,714.29 |
| 12172 | | tulle/embroidery lace | white | 62121 01000 | XS | 16 | $11.50 | $184.00 |
| | | | | | S | 43 | $11.50 | $494.50 |
| | | | | | M | 47 | $11.50 | $540.50 |
| | | | | | L | 41 | $11.50 | $471.50 |
| | | | | | XL | 29 | $11.50 | $333.50 |
| | | | | | XXL | 14 | $11.50 | $161.00 |
| | | | | | XXXL | 10 | $11.50 | $115.00 |
| total | | | | | | 200 | | $2,300.00 |
| TOTAL | | | | | | 816 | | $7,489.97 |
| 14122AN（16122+12217组合套装） | | tulle/embroidery lace | white/白色 | 62121 01000 | S | 81 | $7.38 | $597.86 |
| | | | | | M | 76 | $7.38 | $560.95 |
| | | | | | L | 38 | $7.38 | $280.48 |
| | | | | | XL | 5 | $7.38 | $36.90 |
| total | | | | | | 200 | | $1,476.19 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 12217 | | tulle/embroidery lace | white/白色 | 6212101000 | S | 81 | $4.05 | $327.86 |
| | | | | | M | 76 | $4.05 | $307.62 |
| | | | | | L | 38 | $4.05 | $153.81 |
| | | | | | XL | 5 | $4.05 | $20.24 |
| total | | | | | | 200 | | $809.52 |
| 11228 | | tulle/embroidery lace | white/白色 | 6212101000 | XS | 15 | $5.95 | $89.29 |
| | | | | | S | 65 | $5.95 | $386.90 |
| | | | | | M | 58 | $5.95 | $345.24 |
| | | | | | L | 25 | $5.95 | $148.81 |
| | | | | | XL | 15 | $5.95 | $89.29 |
| | | | | | XXL | 12 | $5.95 | $71.43 |
| | | | | | XXXL | 10 | $5.95 | $59.52 |
| total | | | | | | 200 | | $1,190.48 |
| 12219 | | tulle/embroidery lace | white/白色 | 6212101000 | XS | 15 | $4.29 | $64.29 |
| | | | | | S | 60 | $4.29 | $257.14 |
| | | | | | M | 67 | $4.29 | $287.14 |
| | | | | | L | 28 | $4.29 | $120.00 |
| | | | | | XL | 14 | $4.29 | $60.00 |
| | | | | | XXL | 10 | $4.29 | $42.86 |
| | | | | | XXXL | 6 | $4.29 | $25.71 |
| total | | | | | | 200 | | $857.14 |
| TOTAL | | | | | | 1616 | | $11,823.30 |
| SHIPPING COSTS:FEDEX- 5DAYS | | | | | | 6CTNS | 120KG | $1,070.77 |
| IN TOTAL | | | | | | | | $12,894.07 |
| PAID DEPOSIT | | | | | | | | $5,911.65 |
| 1. Packaing: | Per piece packaged in 1 Degradable bag bag |
| 2. Price Terms: | USD/piece FOB Guangzhou, China |

Exhibit 24

**Farris Customs Brokers, Inc.**

# Invoice

**Tel: (239) 481-4500   Fax: (239) 481-4455**
**12244 Treeline Ave., Ste 8**

| DATE | INVOICE # |
|------|-----------|
| 1/8/2025 | 1039261-9 |

| INVOICE TO |
|------------|
| Rokland LLC |
| 2251 NW 41St St |
| Suite 50 |
| Gainesville, FL 32606-6668 |

| TERMS |
|-------|
|  |

| DESCRIPTION | AMOUNT |
|-------------|--------|
| Customs Entry | 125.00 |
| Duties Paid to U.S. Customs Service | 1,748.10 |
| Data Processing Fee | 15.00 |
|  |  |
| Ref:  Importation | |
| Shenzhen Xinyuan Electronic Technology Co Ltd | |
| B/L 02340163815 | |
| 3 pcs., 143 lbs | |

| | **Total** | $1,888.10 |
|--|-----------|-----------|

If you are the importer of record, payment to the broker will not relieve you of liability for Customs charges, (duties, taxes, or other debts owed Customs) in the event the charges are not paid by the broker.  If you pay by check, Customs charges may be paid with seperate checks payable to 'Customs and Border Protection' which shall be delivered to Customs by the broker.  If you decide to pay by check payable to U.S. Customs Service, you must advise us at time of entry.  You will be responsible for any fines, penalties, or interest incurred due to your untimely payment.



ACE Version: 001.00

GBR

**DEPARTMENT OF HOMELAND SECURITY**
**U.S. Customs and Border Protection**
**ENTRY SUMMARY**

OMB APPROVAL NO. 1651-0022
EXPIRATION DATE 03/31/2025

| 1. Filer Code/Entry No. N98 1039261-9 | 2. Entry Type 01 ABI/A | 3. Summary Date 01/22/2025 | 4. Surety No. 054 | 5. Bond Type 8 | 6. Port Code 1803 | 7. Entry Date 01/08/2025 |
|---|---|---|---|---|---|---|

| 8. Importing Carrier FX | 9. Mode of Transport 40 | 10. Country of Origin CN | 11. Import Date 01/03/2025 |
|---|---|---|---|

| 12. B/L or AWB No. 02340163815 | 13. Manufacturer ID CNSHEXIN202LIA | 14. Exporting Country CN | 15. Export Date 01/03/2025 |
|---|---|---|---|

| 16. I.T. No. 547302967 | 17. I.T. Date 01/03/2025 | 18. Missing Docs | 19. Foreign Port of Lading | 20. U.S. Port of Unlading 3195 |
|---|---|---|---|---|

| 21. Location of Goods/G.O. No. O555 FLT: 0014 | 22. Consignee No. SAME | 23. Importer No. 86-108837200 | 24. Reference No. |
|---|---|---|---|

| 25. Ultimate Consignee Name and Address | 26. Importer of Record Name and Address ROKLAND LLC 2251 NW 41ST ST SUITE 50 |
|---|---|
| City          State FL      Zip | City GAINESVILLE     State FL     Zip 326066668 |

| 27. Line No. | 28. Description of Merchandise 29. A. HTSUS No. B. AD/CVD Case No. | 30. A. Gross Weight B. Manifest Qty. | 31. Net Quantity in HTSUS Units | 32. A. Entered Value B. CHGS C. Relationship | 33. A. HTSUS Rate B. AD/CVD Rate C. IRC Rate D. Visa No. | 34. Duty and I.R. Tax Dollars | Cents |
|---|---|---|---|---|---|---|---|
| | M 02340163815 H 771077923833 | | | NOT RELATED | 3 PCS | | |
| 001 | INVOICE 00001 MACHINES FOR RECEPTION, OTHER 9903.88.15 | | | | | | |
| | 8517.62.0090          65 | | 61KG | 22279 C500 | 7.5% | 1670.93 | |
| | MERCHANDISE PROCESSING FEE | | | | 0.3464% | 77.17 | |
| | TOTAL EV INV. 00001      22279.00 | | | | | | |

| Other Fee Summary for Block 39 MPF      499    77.17 | 35. Total Entered Value $          22,279.00 | **CBP USE ONLY** | | **TOTALS** |
|---|---|---|---|---|
| | Total Other Fees $             77.17 | A. LIQ CODE | B. Ascertained Duty | 37. Duty 1670.93 |
| | | REASON CODE | C. Ascertained Tax | 38. Tax |
| 36. DECLARATION OF IMPORTER OF RECORD (OWNER OR PURCHASER) OR AUTHORIZED AGENT | | | D. Ascertained Other | 39. Other 77.17 |

I declare that I am the ☐ importer of record and that the actual owner, purchaser, or consignee for CBP purposes is as shown above,  OR ☒ owner or purchaser or agent thereof.  I further declare that the merchandise ☒ was obtained pursuant to a purchase or agreement to purchase and that the prices set forth in the invoices are true,  OR ☐ was not obtained pursuant to a purchase or agreement to purchase and the statements in the invoices as to value or price are true to the best of my knowledge and belief.  I also declare that the statements in the documents herein filed fully disclose to the be of my knowledge and belief the true prices, values, quantities, rebates, drawbacks, fees, commissions, and royalties are true and correct, and that all goods or services provided to the seller of the merchandise either free or at reduced cost are fully disclosed.

I will immediately furnish to the appropriate CBP officer any information showing a different statement of facts.

| E. Ascertained Total | 40. Total 1748.10 |
|---|---|

| 41. DECLARANT NAME | TITLE | SIGNATURE | DATE |
|---|---|---|---|

| 42. Broker/Filer Information (Name, address, phone number) Farris Customs Brokers,Inc. 12244 Treeline Ave, Unit 8 Fort Myers, FL 33913  239-481-4500 | 43. Broker/Importer File No. 1039261 |
|---|---|

EDITRADE

RECORD

CBP Form 7501 (5/22)

This invoice must be completed in English.

# COMMERCIAL INVOICE

Page __1__ of __2__

| EXPORTER: | |
|---|---|
| Tax ID#: OTHER  ▼ 91441900MABM2PGT52 | |
| Contact Name: ZHONG LIFANG | |
| Telephone No.: +86 15994823428 | |
| E-Mail: marketing@lilygo.cc | |
| Company Name/Address: | |
| Shenzhen Xinyuan Electronic Technology Co.,Ltd | |
| Room 202, floor 2,building D1,Songshan Lake Intelligent Valley,No.7,Yanhe North | |
| Road,Liaobu,523400,Dongguan,Guangdong,China | |

Country/Territory:

Parties to Transaction:
☐ Related      ☐ Non-Related

Ship Date:

Air Waybill No. / Tracking No.:

Invoice No.: LILYGO-202411027        Purchase Order No.:

Payment Terms: Net 30        Bill of Lading:

Purpose of Shipment: COMMERCIAL SALE   ▼

| CONSIGNEE: |
|---|
| Tax ID#: EIN  ▼ 86-1088372 |
| Contact Name: Jason Opdyke |
| Telephone No.: 352-372-9902 |
| E-Mail: jopdyke@rokland.com |
| Company Name/Address: |
| Rokland LLC |
| 2251 NW 41st Street Ste 50 |
| Gainesville Florida 32606 |

Country/Territory: United States of America

SOLD TO / IMPORTER (if different from Consignee):

Tax ID#: ☑ Same as CONSIGNEE:

Tax ID#: SELECT DOWN ARROW FOR OPTIONS

Company Name/Address:

Country/Territory:

If there is a designated broker for this shipment, please provide contact information.

Name of Broker Farris Customs Brokers Inc.    Tel. No. 239 481 4500    Contact Name Brant Wilmot

Duties and Taxes Payable by ☐ Exporter  ☑ Consignee  ☐ Other  If Other, please specify

| No. of Packages | No. of Units | Net Weight (LBS / KGS) | Unit of Measure | Description of Goods | Harmonized Tariff Number | Country of Manufacture | Unit Value | Total Value |
|---|---|---|---|---|---|---|---|---|
| 1 | 150 | 18.8 | kgs | Device to Device Data Transmitter 8517.62.0090 Chapter 99 subheading, 9903.88.15 | 8517.62.0090 | CN | 44.99 | 6,748.50 |
| 1 | 200 | 18 | kgs | Device to Device Data Transmitter 8517.62.0090 Chapter 99 subheading, 9903.88.15 | 8517.62.0090 | CN | 57.26 | 11,452.00 |
| 1 | 150 | 10 | kgs | Device to Device Data Transmitter 8517.62.0090 Chapter 99 subheading, 9903.88.15 | 8517.62.0090 | CN | 16.20 | 2,430.00 |
| 1 | 20 | 6 | kgs | Device to Device Data Transmitter w/ epaper screen | 8517.62.0090 | CN | 63.50 | 1,270.00 |

| Total Pkgs | Total Units | Total Net Weight | (Indicate LBS/KGS) | Total Gross Weight | (Indicate LBS/KGS) | Terms of Sale: | EXW=EX Works ▼ | | Subtotal: | 21,900.50 |
|---|---|---|---|---|---|---|---|---|---|---|
| 5 | 565 | 61 | | 64.75 | | | | | | |

| | Insurance: | 0.00 |
|---|---|---|

Special Instructions:

| | Freight: | 0.00 |
|---|---|---|
| | Packing: | 0.00 |

Declaration Statement(s):

| | Handling: | 0.00 |
|---|---|---|
| | Other: | 0.00 |

I declare that all the information contained in this invoice to be true and correct.

| | Invoice Total: | 22,279.40 |
|---|---|---|

Originator or Name of Company Representative if the invoice is being completed on behalf of a company or individual:

| | Currency Code: | |
|---|---|---|

Signature / Title / Date: Jason Opdyke- Sales Manager- 12/26/2024

REV. 04.10.13-1.08

# COMMERCIAL INVOICE
## CONTINUATION SHEET

This invoice must be completed in English.

Page __2__ of __2__

| EXPORTER: | Air Waybill No. / Tracking No.: | |
|---|---|---|
| Shenzhen Xinyuan Electronic Technology Co.,Ltd | | |
| Room 202, floor 2,building D1,Songshan Lake Intelligent Valley,No.7,Yanhe North Road,Liaobu,523400,Dongguan,Guangdong,China | Invoice No.: LILYGO-202411027 | Purchase Order No.: |
| | Payment Terms: Net 30 | Bill of Lading: |
| Country/Territory: | | |

| CONSIGNEE: | SOLD TO / IMPORTER (If different from Consignee): |
|---|---|
| Rokland LLC | |
| 2251 NW 41st Street Ste 50 | |
| Gainesville Florida 32606 | |
| Country/Territory: United States of America | Country/Territory: |

| No. of Packages | No. of Units | Net Weight (LBS / KGS) | Unit of Measure | Description of Goods | Harmonized Tariff Number | Country of Manufacture | Unit Value | Total Value |
|---|---|---|---|---|---|---|---|---|
| 1 | 45 | 8 | KGS | Device to Device Data Transmitter w/ epaper screen w/ ethernet port | 8517.62.0090 | CN | 8.42 | 378.90 |
| | | | | | | | 0.00 | 0.00 |
| | | | | | | | 0.00 | 0.00 |
| | | | | | | | 0.00 | 0.00 |
| | | | | | | | 0.00 | 0.00 |
| | | | | | | | 0.00 | 0.00 |
| | | | | | | | 0.00 | 0.00 |
| | | | | | | | 0.00 | 0.00 |
| | | | | | | | 0.00 | 0.00 |
| | | | | | | | 0.00 | 0.00 |
| | | | | | | | 0.00 | 0.00 |

SUBTOTAL FOR THIS PAGE: 378.90

REV. 04.10.13-1.08



**Farris Customs Brokers, Inc.**

# Invoice

**Tel: (239) 481-4500   Fax: (239) 481-4455**
**12244 Treeline Ave., Ste 8**
**Fort Myers,  FL  33913**

| DATE | INVOICE # |
|------|-----------|
| 4/9/2025 | 1039830-1 |

| INVOICE TO |
|------------|
| Rokland LLC |
| 2251 NW 41St St |
| Suite 50 |
| Gainesville, FL 32606-6668 |

| | TERMS |
|--|-------|
| | |

| DESCRIPTION | AMOUNT |
|-------------|--------|
| Customs Entry | 125.00 |
| Duties Paid to U.S. Customs Service | 1,418.71 |
| Data Processing Fee | 15.00 |
| | |
| Ref:  Importation | |
| RAK wireless | |
| B/L 13081569515. | |
| Trk #8801 8081 5427 | |

| | **Total** | **$1,558.71** |
|--|-----------|---------------|

If you are the importer of record, payment to the broker will not relieve you of liability for Customs charges, (duties, taxes, or other debts owed Customs) in the event the charges are not paid by the broker.  If you pay by check, Customs charges may be paid with seperate checks payable to 'Customs and Border Protection' which shall be delivered to Customs by the broker.  If you decide to pay by check payable to U.S. Customs Service, you must advise us at time of entry.  You will be responsible for any fines, penalties, or interest incurred due to your untimely payment.

PAPERLESS

**DEPARTMENT OF HOMELAND SECURITY**
U.S. Customs and Border Protection

OMB APPROVAL NO. 1651-0022
EXPIRATION DATE 03/31/2025

# ENTRY SUMMARY

| 1. Filer Code/Entry Number N98-1039830-1 | 2. Entry Type 01 ABI/A | 3. Summary Date 04/23/25   GBR | 4. Surety Number 054 | 5. Bond Type 8 | 6. Port Code 1803 | 7. Entry Date 04/09/25 |
|---|---|---|---|---|---|---|

| 8. Importing Carrier CX | 9. Mode of Transport 40 | 10. Country of Origin CN | 11. Import Date 04/03/25 |
|---|---|---|---|

| 12. B/L or AWB Number 16081569515, 880180815427 | 13. Manufacturer ID CNRAK506SHE | 14. Exporting Country CN | 15. Export Date 04/03/25 |
|---|---|---|---|

| 16. I.T. Number 583354894 | 17. I.T. Date 04/03/25 | 18. Missing Docs | 19. Foreign Port of Lading | 20. U.S. Port of Unlading 2095 |
|---|---|---|---|---|

| 21. Location of Goods/G.O. Number | 22. Consignee Number 86-108837200 | 23. Importer Number 86-108837200 | 24. Reference Number |
|---|---|---|---|

| 25. Ultimate Consignee Name *(Last, First, M.I.)* and Address | 26. Importer of Record Name *(Last, First, M.I.)* and Address |
|---|---|
| ROKLAND LLC<br>Street: 3205 SW 40TH BLVD<br>SUITE A<br><br>Destination: FL<br>City:  GAINESVILLE          State:  FL  Zip: 32608 | ROKLAND LLC<br>Street: 3205 SW 40TH BLVD<br>SUITE A<br><br>City:  GAINESVILLE          State:  FL  Zip: 32608 |

| 27. Line No. | 28. Description of Merchandise | 29. A. HTSUS No. B. AD/CVD No. | 30. A. Gross Weight B. Manifest Qty. | 31. Net Quantity in HTSUS Units | 32. A. Entered Value B. CHGS C. Relationship | 33. A. HTSUS Rate B. AD/CVD Rate C. IRC Rate D. Visa Number | 34. Duty and IR Tax |
|---|---|---|---|---|---|---|---|
| | | | | | | | Dollars   Cents |
| 001 | ARTICLE OF CHINA,US NTE 20(R) | 9903.88.15 | 21 KG | 3 PKGS | | 7.5% | $378.00 |
| | CN/HK EO 20% DUTY | 9903.01.24 | | | | 20% | $1,008.00 |
| | MACHINES FOR RECEPTION, OTHER | 8517.62.0090 | 20.00 KG | | $5,040<br>C $500<br>N | FREE | $0.00 |
| | 499 - Merchandise Processing Fee | | | | | 0.3464% | $17.46 |
| | Totals for Invoice RAKSZ250306537-4 | | Invoice Value 5,040.00 USD | | +/- MMV | Exchange 1.00000 | Entered Value 5,040.00 USD |

| Other Fee Summary *(for Block 39)* 499 - MPF          $32.71 | 35. Total Entered Value $ 5,040 | **CBP USE ONLY** | | TOTALS |
|---|---|---|---|---|
| | Total Other Fees $ 32.71 | A. LIQ Code | B. Ascertained Duty | 37. Duty $1,386.00 |
| | | REASON CODE | C. Ascertained Tax | 38. Tax |
| 36. Declaration of Importer of Record (Owner or Purchaser) or Authorized Agent | | | D. Ascertained Other | 39. Other $32.71 |
| I declare that I am the ☐ Importer of record and that the actual owner, purchaser, or consignee for CBP purposes is as shown above, **OR** ☒ owner | | E. Ascertained Total | | 40. Total $1,418.71 |

or purchaser or agent thereof. I further declare that the merchandise ☒ was obtained pursuant to a purchase or agreement to purchase and that the prices set forth in the invoices are true, **OR** ☐ was not obtained pursuant to a purchase or agreement to purchase and the statements in the invoices as to value or price are true to the best of my knowledge and belief.  I also declare that the statements in the documents herein filed fully disclose to the best of my knowledge and belief the true prices, values, quantities, rebates, drawbacks, fees, commissions, and royalties and are true and correct, and that all goods or services provided to the seller of the merchandise either free or at reduced cost are fully disclosed.
I will immediately furnish to the appropriate CBP officer any information showing a different statement of facts.

| 41. Declarant Name *(Last, First, M.I.)*          Title | Signature | Date |
|---|---|---|
| Brant Wilmot | | 04/09/25 |

| 42. Broker/Filer Information Name *(Last, First, M.I.)* and Phone Number | 43. Broker/Importer File Number |
|---|---|
| Farris Customs Brokers, Inc.<br>12244 Treeline Ave<br>Suite # 8<br>Fort Myers, FL 33913   2394814500 | 1039830 |



## Commercial Invoice #RAKSZ250306537-4

From: 27579053          Origin ID: ZZQA
RAK wireless
C/O CHINA ORIENTAL EXPRESS CO LTD
Unit A G/F Blk 2 Kwai Tak  Ind  Ctr
No.15-33 Kwai Tak St Kwai Fong NT
Kwai Fong, 02
HK

**FedEx**
Express



Ship Date: 31MAR25
ActWgt: 7.00 KG
CAD: 258550649/FAPI2208          Dims: 40 X 22 X 38 CM

TotWgt: 21.00 KG

REF: GDGJ100005851
DESC-1: HANDHELD DATA TRANSMISSION MACHINE HTS: 8517620090
DESC-2:
DESC-3:
DESC-4:

CTRY/TERR MFR: CN
CARRIAGE VALUE:
CUSTOMS VALUE: 5040.00 USD
T/C: S 630995876          D/T: R
SIGN: RAK wireless
EIN/VAT: 86-1088372
PKG:YOUR PKG

SHIP TO: 13523729902          BILL SENDER

**JASON OPDYKE**
**ROKLAND LLC**
**3205 SW 40TH BLVD SUITE A STE 50**

**GAINESVILLE, FL 32608**
**US**

1 of 3                          **AM**
                    **INTL ECONOMY**
TRK#                          **ETD GPN**
     **8801 8081 5427**              **32608**
[0430]                                FL-US
## MASTER ##                          **JAX**

# I6 GNVA



For all commodities, technology or software previously exported from the United States, this was
done in accordance with the Export Administration Regulations.  Diversion of these items contrary to
U.S. law or any other applicable country's law is prohibited.

The Warsaw Convention may apply and will govern and in most cases limit the liability of Federal
Express for loss or delay of or damage to your shipment.  Subject to the conditions of the contract.

FEDEX AWB COPY- PLEASE PLACE BEHIND CONSIGNEE COPY

58CJ3/459E/C6C4

**Farris Customs Brokers, Inc.**

# Invoice

Tel: (239) 481-4500   Fax: (239) 481-4455
12244 Treeline Ave., Ste 8
Fort Myers,  FL  33913

| DATE | INVOICE # |
|------|-----------|
| 5/1/2025 | 1039934-1 |

INVOICE TO

Rokland LLC
2251 NW 41St St
Suite 50
Gainesville, FL 32606-6668

| TERMS |
|-------|
|       |

| DESCRIPTION | AMOUNT |
|-------------|--------|
| Customs Entry | 125.00 |
| Duties Paid to U.S. Customs Service | 1,210.53 |
| Data Processing Fee | 15.00 |
| | |
| Ref:  Importation | |
| Alfa Network Inc | |
| B/L 02340310174 | |
| Trk #8808 0879 9967 | |

| **Total** | $1,350.53 |
|-----------|-----------|

If you are the importer of record, payment to the broker will not relieve you of liability for Customs charges, (duties, taxes, or other debts owed Customs) in the event the charges are not paid by the broker.  If you pay by check, Customs charges may be paid with seperate checks payable to 'Customs and Border Protection' which shall be delivered  to Customs by the broker.  If you decide to pay by check payable to U.S. Customs Service, you must advise us at time of entry.  You will be responsible for any fines, penalties, or interest incurred due to your untimely payment.



PAPERLESS

**DEPARTMENT OF HOMELAND SECURITY**
U.S. Customs and Border Protection

OMB APPROVAL NO. 1651-0022
EXPIRATION DATE 03/31/2025

## ENTRY SUMMARY

| 1. Filer Code/Entry Number N98-1039934-1 | 2. Entry Type 01  ABI/A | 3. Summary Date 05/14/25  GBR | 4. Surety Number 054 | 5. Bond Type 8 | 6. Port Code 1803 | 7. Entry Date 05/01/25 |
|---|---|---|---|---|---|---|

| 8. Importing Carrier FX | 9. Mode of Transport 40 | 10. Country of Origin TW | 11. Import Date 04/28/25 |
|---|---|---|---|

| 12. B/L or AWB Number 02340310174, 880808799967 | 13. Manufacturer ID TWALFNET106TAI | 14. Exporting Country TW | 15. Export Date 04/28/25 |
|---|---|---|---|

| 16. I.T. Number 590852443 | 17. I.T. Date 04/28/25 | 18. Missing Docs | 19. Foreign Port of Lading | 20. U.S. Port of Unlading 2095 |
|---|---|---|---|---|

| 21. Location of Goods/G.O. Number O555 Flight: 5262 | 22. Consignee Number 86-108837200 | 23. Importer Number 86-108837200 | 24. Reference Number |
|---|---|---|---|

| 25. Ultimate Consignee Name *(Last, First, M.I.)* and Address | 26. Importer of Record Name *(Last, First, M.I.)* and Address |
|---|---|
| ROKLAND LLC<br>Street: 3205 SW 40TH BLVD<br>SUITE A<br><br>Destination: FL<br>City: GAINESVILLE            State: FL Zip: 32608 | ROKLAND LLC<br>Street: 3205 SW 40TH BLVD<br>SUITE A<br><br>City: GAINESVILLE          State: FL Zip: 32608 |

| 27. Line No. | 28. Description of Merchandise | | 31. | 32. A. Entered Value B. CHGS C. Relationship | 33. A. HTSUS Rate B. AD/CVD Rate C. IRC Rate D. Visa Number | 34. Duty and IR Tax |
|---|---|---|---|---|---|---|
| | 29. A. HTSUS No. B. AD/CVD No. | 30. A. Gross Weight B. Manifest Qty. | Net Quantity in HTSUS Units | | | Dollars        Cents |
| | | | 9 CTNS | | | |
| 001 | IEEPA-RECIPROCAL 10% 9903.01.25          161 KG OTHER APPARATUS TRANSMION,OTH 8517.69.0000 | | 1,800.00 NO | $11,700 C $4,500 N | 10% FREE | $1,170.00 $0.00 |
| | 499 - Merchandise Processing Fee | | | | 0.3464% | $40.53 |
| | Totals for Invoice 880808799967 | Invoice Value 11,700.00 USD | | +/- MMV | Exchange 1.00000 | Entered Value 11,700.00 USD |

| Other Fee Summary *(for Block 39)* 499 - MPF              $40.53 | 35. Total Entered Value $ 11,700 | **CBP USE ONLY** | | TOTALS |
|---|---|---|---|---|
| | | A. LIQ Code | B. Ascertained Duty | 37. Duty $1,170.00 |
| | Total Other Fees $ 40.53 | REASON CODE | C. Ascertained Tax | 38. Tax |
| 36. Declaration of Importer of Record (Owner or Purchaser) or Authorized Agent | | | D. Ascertained Other | 39. Other $40.53 |
| I declare that I am the ☐ Importer of record and that the actual owner, purchaser, or consignee for CBP purposes is as shown above, **OR** ☒ owner | | E. Ascertained Total | | 40. Total $1,210.53 |

or purchaser or agent thereof.  I further declare that the merchandise ☒ was obtained pursuant to a purchase or agreement to purchase and that the prices set forth in the invoices are true, **OR** ☐ was not obtained pursuant to a purchase or agreement to purchase and the statements in the invoices as to value or price are true to the best of my knowledge and belief.  I also declare that the statements in the documents herein filed fully disclose to the best of my knowledge and belief the true prices, values, quantities, rebates, drawbacks, fees, commissions, and royalties and are true and correct, and that all goods or services provided to the seller of the merchandise either free or at reduced cost are fully disclosed.
I will immediately furnish to the appropriate CBP officer any information showing a different statement of facts.

| 41. Declarant Name *(Last, First, M.I.)*        Title Brant Wilmot | Signature | Date 05/01/25 |
|---|---|---|

| 42. Broker/Filer Information Name *(Last, First, M.I.)* and Phone Number Farris Customs Brokers, Inc. 12244 Treeline Ave Suite # 8 Fort Myers, FL 33913   2394814500 | 43. Broker/Importer File Number 1039934 |
|---|---|

CBP Form 7501 (5/22)

Page 1 of 1

# Commercial Invoice

This invoice must be completed in English.

Page 1 of 1

| EXPORTER: | Ship Date: |
|---|---|
| Tax ID#: | 25 Apr, 2025 |
| Contact Name: Lydia Yang | Air Waybill No. / Tracking No.: |
| Telephone No.: 886227968477 | 860808799967 |
| E-Mail: | Invoice No.:            Purchase Order No.: |
| Company Name/Address: | US041 |
| ALFA Network Inc. | Payment Terms:        Bill of Lading: |
| 4F-1, No.106, Rueiguang Rd., | |
| | Purpose of Shipment: |
| Neihu District  114 | SOLD |
| Country/Territory: Taiwan, China | |
| Parties to Transaction: | |
| [ ] Related    [X] Non-Related | |

| CONSIGNEE: | SOLD TO / IMPORTER (if different from Consignee): |
|---|---|
| Tax ID#: 86-1088372 | |
| Contact Name: Jason Opdyke | [X] Same as CONSIGNEE: |
| Telephone No.: (352) 372-9902 | |
| E-Mail: | Tax ID#: 86-1088372 |
| Company Name/Address: | |
| Rokland LLC | Company Name/Address: |
| 3205 Southwest 40th Boulevard Ste A | |
| | |
| Gainesville FL 32607 | |
| Country/Territory: UNITED STATES OF AMERICA | Country/Territory: UNITED STATES OF AMERICA |

If there is a designated broker for this shipment, please provide contact information.

Name of Broker                    Tel. No.                    Contact Name

Duties and Taxes Payable by  [ ] Exporter  [X] Consignee  [ ] Other    If Other, please specify

| No. of Packages | No. of Units | Net Weight (LBS / KGS) | Unit of Measure | Description of Goods | Harmonized Tariff Number | Country/ Terr. of MFR | Unit Value | Total Value |
|---|---|---|---|---|---|---|---|---|
| 1 | 1,800.00 | 0.07 | EA | AOA-915-5ACM WiFi adapter | 8517690000 | TW | 6.500000 | 11,700.00 |

| Total Pkgs | Total Units | Total Net Weight | (Indicate LBS/KGS) | Total Gross Weight | (Indicate LBS/KGS) | Terms of Sale: | DAP | | |
|---|---|---|---|---|---|---|---|---|---|
| 9 | 1,800.00 | 0.07 KG | | 162.00 KG | | | | Subtotal: | 11,700.00 |
| | | | | | | | | Insurance: | 0.00 |

Special Instructions:

| | |
|---|---|
| Freight: | 1,643.42 |
| Packing: | 0.00 |

Declaration Statement(s):

| | |
|---|---|
| Handling: | 0.00 |
| Other: | 0.00 |

I declare that all the information contained in this invoice to be true and correct.

| Invoice Total: | 13,343.42 |
|---|---|

Originator or Name of Company Representative if the invoice is being completed on behalf of a company or individual:
Lydia Yang

| Currency Code: | USD |
|---|---|

Signature / Title / Date:

25 Apr, 2025

REV. 08-23-22

From: 886227968477          Origin ID: TSAA       **FedEx**
Lydia Yang                                        Express
ALFA Network Inc.
4F-1, No.106, Rueiguang Rd.,

Neihu District, 114
TW

Ship Date: 25APR25
ActWgt: 18.00 KG
CAD: 260544793/FAPI2208          Dims: 49 X 32 X 27 CM

TotWgt: 162.00 KG

REF:
DESC-1: AOA-915-5ACM WiFi adapter
DESC-2:
DESC-3:
DESC-4:

CTRY/TERR MFR: TW
CARRIAGE VALUE:
CUSTOMS VALUE: 11700.00 USD
T/C: S 763153355              D/T: R
SIGN: Lydia Yang
EIN/VAT: 86-1088372
PKG:YOUR PKG

SHIP TO: (352) 372-9902          BILL SENDER
**Jason Opdyke**
**Rokland LLC**
**3205 Southwest 40th Boulevard Ste A**

**Gainesville, FL 32607**
US



1 of 9                          5:00P
                                IP EOD
TRK# **8808 0879 9967**
0430                            DSR ETD
## MASTER ##                    32607

# XH GNVA                       FL-US
                                JAX



For all commodities, technology or software previously exported from the United States, this was
done in accordance with the Export Administration Regulations.  Diversion of these items contrary to
U.S. law or any other applicable country's law is prohibited.

The Warsaw Convention may apply and will govern and in most cases limit the liability of Federal
Express for loss or delay of or damage to your shipment.  Subject to the conditions of the contract

FEDEX AWB COPY- PLEASE PLACE BEHIND CONSIGNEE COPY

58CJ5/1184/C6C4