# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF FLORIDA

EMILY LEY PAPER, INC., d/b/a
SIMPLIFIED,
*et al.*

               *Plaintiffs,*

        v.

DONALD J. TRUMP, in his official
capacity as President of the United States,
*et al*.,

Civil Case No. 3:25-cv-00464

**ORAL ARGUMENT
REQUESTED**

**EXPEDITED DECISION
REQUESTED**

## PLAINTIFFS' MEMORANDUM IN OPPOSITION
## TO DEFENDANTS' MOTION TO TRANSFER
## AND UNOPPOSED MOTION TO EXPEDITE

Andrew J. Morris
*Admitted pro hac vice*
John J. Vecchione
*Admitted pro hac vice*
NEW CIVIL LIBERTIES
ALLIANCE
4250 N. Fairfax Drive,
Suite 300
Arlington, VA 22203
(202) 869-5210
andrew.morris@ncla.legal
john.vecchione@ncla.legal

Bryan S. Gowdy
Florida Bar No. 176631
Creed & Gowdy, P.A.
865 May Street
Jacksonville, FL 32204
(904) 350-0075
bgowdy@appellate-firm.com

i

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................ ii

TABLE OF AUTHORITIES .................................................................. iii

INTRODUCTION ................................................................................ 1

ALLEGATIONS OF THE COMPLAINT ............................................... 3

ARGUMENT ....................................................................................... 6

I.   THE CIT'S JURISDICTION IS LIMITED TO ACTIONS ARISING OUT OF A "LAW OF THE UNITED STATES LAWS PROVIDING FOR … TARIFFS" .............................. 6

II.  THE CIT DOES NOT HAVE JURISDICTION OVER THIS CASE BECAUSE IEEPA DOES NOT PROVIDE FOR TARIFFS ........................................................ 8

   A.  IEEPA's Text Does Not Refer to Tariffs; Context and Historical Understanding Confirm That IEEPA Does Not Authorize Them .............. 8

   B.  IEEPA's Silence on Tariffs Contrasts with the Many Specific References to Tariffs in the Trade Laws That Do Authorize Them .......... 13

      1.  Tariff laws specifically refer to tariffs, and they impose procedural requirements and scope limitations absent from IEEPA ........................ 13

      2.  When Congress has amended tariff laws to harmonize them with trade agreements, it has not amended IEEPA ......................................... 14

   C.  Under the "Major Questions" Precedents, IEEPA's Silence Cannot Be Transmuted into Authority to Impose Tariffs ............................................ 15

   D.  Defendants Offer No Basis for the Court to Construe IEEPA's Silence as Authority to Order Tariffs ............................................................... 20

      1.  Legislative history shows IEEPA's drafters understood it would not authorize tariffs ................................................................................... 20

      2.  *United States v. Yoshida* is not controlling, and it erroneously construed statutory silence as a grant of authority ................................. 20

      3.  Defendants cases—where the CIT had jurisdiction arising from *tariff* statutes—are irrelevant ....................................................................... 23

      4.  Amicus curiae's categorical "embargo" argument is erroneous ............ 26

III. PLAINTIFFS MOTION TO EXPEDITE RESOLUTION OF DEFENDANT'S MOTION ... 29

CONCLUSION ................................................................................... 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.L.A. Schechter Poultry Corp. v. United States*,
295 U.S. 495 (1935) ....................................................................................31

*Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*,
594 U.S. 758 (2021) ....................................................................................17

*Alcan Sales, Division of Alcan Aluminum Corp. v. United States*,
693 F.2d 1089 (Fed. Cir. 1982)...................................................................25

*Arjay Assocs., Inc. v. Bush*,
891 F.2d 894 (Fed. Cir. 1989)......................................................................23

*Axon Enter., Inc. v. Fed. Trade Comm'n*,
598 U.S. 175 (2023) ......................................................................................7

*Biden v. Nebraska*,
600 U.S. 477 (2023) ....................................................................... 15, 16, 22

*City of New York v. FCC*,
486 U.S. 57 (1988) ........................................................................................8

*Coin Center v. Yellen*,
No. 3:22-cv-20375-TKW, 2023 WL 7121095 (N.D. Fla. Oct. 30, 2023) .... 25, 28

*Commodities Export Co. v. U.S. Customs Serv.*,
957 F.2d 223 (6th Cir. 1992).......................................................................23

*Consumers' Rsch. v. FCC*,
109 F.4th 743 (5th Cir. 2024).......................................................................10

*Dames & Moore v. Regan*,
453 U.S. 654 (1981) ....................................................................................25

*Diegelmann v. Yellen*,
No. CV 24-1090, 2024 WL 4880468 (D.D.C. Nov. 25, 2024)..........................26

*Earth Island Institute v. Christopher*,
6 F.3d 648 (9th Cir. 1993) ..................................................................... 25, 27

*FDA v. Brown & Williamson Tobacco Corp.*,
529 U.S. 120 (2000) ....................................................................................12

*Fischer v. United States*,
603 U.S. 480 (2024) ....................................................................................11

*Gibbons v. Ogden*,
  22 U.S. (9 Wheat.) 1 (1824) ...............................................................10

*Int'l Lab. Rts. Fund v. Bush*,
  357 F. Supp. 2d 204 (D.D.C. 2004) ...................................................28

*Kokkonen v. Guardian Life Ins. Co.*,
  511 U.S. 375 (1994) .............................................................................6

*Nat'l Fed'n of Indep. Bus. v. Dep't of Lab.*,
  595 U.S. 109 (2022) ...........................................................................16

*Niz-Chavez v. Garland*,
  593 U.S. 155 (2021) .............................................................................9

*Orleans Int'l Inc. v. United States*,
  334 F.3d 1375 (Fed. Cir.  2003) ........................................................27

*Rosencrans v. United States*,
  165 U.S. 257 (1897) .............................................................................7

*Sprint Commc'ns v. Jacobs*,
  571 U.S. 69 (2013) ...............................................................................6

*Steel Co. v. Citizens for a Better Env't*,
  523 U.S. 83 (1998) ...............................................................................6

*Totes-Isotoner Corp. v. United States*,
  594 F.3d 1346 (Fed. Cir. 2010) .........................................................23

*U.S. Shoe Corp. v. United States*,
  523 U.S. 360 (1998).............................................................................23

*United States v. Yoshida Int'l, Inc.*,
  526 F.2d 560 (C.C.P.A. 1975).............................................. 20, 21, 22

*Util. Air Regul. Grp. v. EPA*,
  573 U.S. 302 (2014) .................................................................. 13, 18

*Van Loon v. Dep't of the Treasury*,
  122 F.4th 549 (5th Cir. 2024)............................................................25

*Yates v. United States*,
  574 U.S. 528 (2015) .................................................................. 11, 12

*Yoshida Int'l, Inc. v. United States*,
  378 F. Supp. 1155 (Cust. Ct. 1974)...................................................21

*Youngstown Sheet & Tube Co v. Sawyer*,
  343 U.S. 579 (1952) .....................................................................8, 17

iv

**Constitutional Provisions**

U.S. Const. art. I, § 8, cl. 1 ...................................................................19

U.S. Const. art. I, § 8, cl. 3 ...................................................................19

U.S. Const. art. II, § 1 ..........................................................................24

**Statutes**

19 U.S.C. § 1862 ...................................................................................13

19 U.S.C. § 2132 ...................................................................................14

19 U.S.C. § 2253 ...................................................................................13

19 U.S.C. § 2411 ............................................................................. 13, 14

19 U.S.C. § 2483 .....................................................................................4

19 U.S.C. § 3501 ...................................................................................14

19 U.S.C. § 3511, *et seq.* ......................................................................14

19 U.S.C. § 3571 ...................................................................................14

19 U.S.C. § 3572 ...................................................................................14

19 U.S.C. § 3581, *et seq.* ......................................................................14

19 U.S.C. § 3601, *et seq.* ......................................................................14

28 U.S.C. § 1331 .....................................................................................2

3 U.S.C. § 301 .........................................................................................4

50 U.S.C. § 1641 .....................................................................................4

Uruguay Round Agreements Act,
Pub. L. 103–465, 108 Stat. 4809 (1994) ............................................15

**Regulations**

Executive Order No. 14257,
*Regulating Imports With a Reciprocal Tariff to Rectify Trade Practices That Contribute to Large and Persistent Annual United States Goods Trade Deficits*,
90 Fed. Reg. 15,041 (Apr. 2, 2025) ......................................................4

Executive Order No. 14266,
*Modifying Reciprocal Tariffs to Reflect Trading Partner Retaliation and Alignment*,
90 Fed. Reg. 15,625 (Apr. 9, 2025) ......................................................5

**Other Authorities**

Eric R. Bolinder,
*Seizing the Duty of Congress: The President's Unilateral Implementation of Tariffs is Unconstitutional* (unpublished manuscript, Liberty Univ. School of Law April 11, 2025)..........................................................................19

H.R. Rep. No. 95-459, 95th Cong., 1st Sess. (June 23, 1977)............................20

*Regulate*, Black's Law Dictionary (4th rev. ed. 1968)...........................................10

Tom Campbell,
*Presidential Authority to Impose Tariffs*, 83 La. L. Rev. 595 (2023).................14

**Rules**

Loc. R. 7.1(L).............................................................................................................29

## INTRODUCTION

Jurisdiction lies in this Court under 28 U.S.C. § 1331 because Plaintiffs' Complaint raises federal statutory and constitutional questions. This Court's jurisdiction can be eliminated only if another statute displaces it as expressly as § 1331 provides for it. Defendants' argument does not begin to meet that exacting standard. Defendants contend that jurisdiction lies in the Court of International Trade ("CIT") based on a provision granting that court exclusive jurisdiction over actions arising out of laws "providing for … tariffs." 28 U.S.C. § 1581(i). But that provision does not eliminate jurisdiction in this Court, because this case does not arise out of a law that expressly—or even implicitly—"provid[es] for tariffs"

This case arises out of the International Emergency Economic Powers Act ("IEEPA"), which never mentions tariffs. IEEPA authorizes the President to counter foreign threats by imposing the economic sanctions it describes. It does not permit him to order Americans to pay tariffs. IEEPA cannot, therefore, provide the express authorization that would be required to eliminate this Court's § 1331 jurisdiction.

Defendants attempt to transform IEEPA's silence on tariffs into affirmative authority to order them. But IEEPA's plain language cannot be stretched to include tariffs. Statutory context confirms that conclusion, as does a comparison of IEEPA with actual tariff statutes, which specifically refer to "tariffs" and "duties." IEEPA

1

also fails the "clear statement" requirement that the major questions doctrine imposes on the vast assertion of presidential power challenged in this case.

Exclusive control over tariffs is one of Congress's core, enumerated constitutional powers. Congress did not surrender that control to the President by using generic language in a statute that addresses emergency sanctions against foreign threats.

That appears to be the view of all seven previous presidents who have held office since IEEPA was enacted. All seven faced drug epidemics from foreign countries, and often larger trade deficits as a percentage of GDP. All cited IEEPA to order sanctions, but none of them ever hinted it gave him the power to order tariffs.

This conclusion also reflects the long history of IEEPA litigation. District courts have exercised jurisdiction over many IEEPA cases in the almost 50 years since IEEPA was enacted, while the CIT never exercised jurisdiction over one (until a month ago when challengers to the Trump Executive Orders filed suit in that court).

This case raises important constitutional and statutory principles that have immediate, life-or-death consequences for the Plaintiff companies. All are small businesses located in Florida. In 28 U.S.C. § 1331, Congress gave them the right to sue in this Court. It would be contrary to law to require them to go to the CIT to challenge the unlawful Executive Orders that are destroying their businesses. This Court should deny Defendants' Motion to Transfer. Because of the ongoing damage

the tariffs are inflicting on Plaintiffs, they respectfully request that the Court does so in an expedited decision.

## ALLEGATIONS OF THE COMPLAINT

The Amended Complaint challenges several Executive Orders that claim authority under IEEPA to impose massive tariffs on imports from every U.S. trading partner. The Amended Complaint's central claim is that IEEPA does not authorize tariffs. Am. Compl ¶ 1.[1]

On February 1, 2025, President Trump issued three Executive Orders imposing tariffs on imports from Canada, Mexico, and China. He declared an emergency relating to China because of the influx of opioids from that country. The Order imposed an incremental across-the-board tariff of 10%. *Id*. ¶ 40. The same day, the President declared or reiterated his earlier declaration of emergencies relating to Canada and Mexico, also primarily because of opioids. He ordered a 25% tariff on all imports from those countries. *Id*. ¶¶ 40-43. A month later, the President issued another Executive Order that doubled the incremental China tariff to 20%. *Id*. ¶ 42. All these Executive Orders claimed authority under IEEPA.[2]

---

[1]  In compliance with the Court's Order of May 5, 2025, Doc. 19, Executive Orders, Presidential Fact Sheets, and Federal Register notices that are at issue in this case are provided in the Appendix, in chronological order. They also are attached to the Amended Complaint filed today.

[2]  The Tariff Executive Orders also cited three other statutes for technical or administrative purposes, but did not purport to rely on them for authority to order tariffs. The Tariff Executive Orders cited the National Emergencies Act, which

A month after that, on April 2, 2025, the President issued Executive Order No. 14257, *Regulating Imports With a Reciprocal Tariff to Rectify Trade Practices That Contribute to Large and Persistent Annual United States Goods Trade Deficits*, 90 Fed. Reg. 15,041 (Apr. 2, 2025). *See* Am. Compl. ¶ 44. The Order declared another national emergency, this one based on "large and persistent annual U.S. goods trade deficits." *Id*. It then expanded the President's tariff campaign, imposing a reciprocal tariff of at least 10% on imports from "all trading partners," except for higher, country-specific reciprocal tariffs on 57 trading partners. 90 Fed. Reg. at 15,047, 15,045, 15,049. As statutory authority, the President again cited IEEPA as authority and no other Act of Congress. *Id*. Am. Compl. ¶¶ 45-46.

The April 2, 2025 Executive Order imposed a country-specific 34% reciprocal tariff on China. *Id*. at 15,049. Am. Compl. ¶ 45. This reciprocal tariff is in addition to the across-the board tariff imposed on all Chinese imports on February 1, 2025 and increased to 20% on March 6, 2025. It also is in addition to the tariffs imposed in February on certain imports from Canada and Mexico.

---

provides the general framework for declarations of national emergencies but explicitly disclaims granting substantive authority, *see* 50 U.S.C. § 1641; section 604 of the Trade Act of 1974, which is a ministerial statute directing the President to update HTSUS to reflect changes in tariff laws, 19 U.S.C. § 2483; and 3 U.S.C. § 301, which authorizes the President to delegate functions to subordinate officials. Defendants' Motion to Transfer bases Defendants' arguments only on IEEPA.

4

The following week, the President issued another Executive Order and repeatedly raised the reciprocal tariff on imports from China until it reached 125%. Executive Order No. 14,266, *Modifying Reciprocal Tariffs to Reflect Trading Partner Retaliation and Alignment*, 90 Fed. Reg. 15,625, 15,626 (Apr. 9, 2025). Am. Compl. ¶ 48. Combining this 125% reciprocal tariff with the 20% tariff ordered March 6, 2025, the total tariff on imports from China is 145%. *Id.* ¶ 49.

Plaintiffs are five small businesses that import products and pay related tariffs. All of them face immense financial harm because of the tariffs at issue in this case. Am. Compl. ¶¶ 13-17.

Emily Ley Inc., d/b/a Simplified, is a Pensacola-based seller of premium planners, organizational tools, and other home management products. *Id.* ¶ 13. It makes and has made significant purchases from sources in China. *Id.* Kilo Brava LLC is a Sarasota-based designer and seller of luxury loungewear, sleepwear, and swimwear. *Id.* ¶ 14. It makes and has made significant purchases from sources in China. *Id.* Bambola LLC is a Sarasota-based seller of luxury loungewear, sleepwear, and swimwear. *Id.* ¶ 15.  It makes and has made significant purchases from sources in China, as well as Bangladesh, Colombia, India, Italy, Morocco, the Philippines, and Turkey. *Id.* Kim's Clothes and Fashion LLC is a Jacksonville-based seller of affordable clothing and accessories for women. *Id.* ¶ 16. It makes and has made significant purchases from sources in China and Australia. *Id.* Rokland LLC is a

Gainesville-based designer and seller of electronic products. *Id.* ¶ 17. It makes and has made significant purchases from sources in China and Taiwan. *Id.*

The Amended Complaint asserts four claims, each raising a federal question. Counts I and II contend that the President acted *ultra vires* by ordering tariffs without statutory authority. Count III asserts a constitutional claim that, if IEEPA were construed to authorize tariffs, it would violate the nondelegation doctrine. Count IV asserts an Administrative Procedure Act claim against the two Defendant agencies and their heads. It asserts that, because the President's Executive Orders were unlawful, the agencies' actions to implement them also were unlawful. (Count IV).

## ARGUMENT

### I.    The CIT's Jurisdiction Is Limited to Actions Arising out of a "Law of the United States Laws Providing for … Tariffs"

Defendants bear the burden to show that exclusive jurisdiction lies in the CIT. *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 377 (1994). This Court must decide whether Defendants have met that burden, since every court must decide its own jurisdiction, *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998), and every court is obligated to hear every case within that jurisdiction, *Sprint Commc'ns v. Jacobs*, 571 U.S. 69, 77 (2013). Defendants are mistaken when they contend that district courts sometimes transfer cases to the CIT to permit it to determine whether it has exclusive jurisdiction. Doc. 5, at 10-11.  In each case Defendants cite, the

original court decided its own jurisdiction, and concluded that jurisdiction lay in the CIT based on a statute expressly addressing tariffs.[3]

This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 ("Federal question"), and that jurisdiction could be eliminated only if a statute expressly eliminated it. "Statutes clearly defining the jurisdiction of the courts … must control … in the absence of subsequent legislation equally express." *Rosencrans v. United States*, 165 U.S. 257, 262 (1897); *see also Axon Enter., Inc. v. Fed. Trade Comm'n*, 598 U.S. 175, 208 (2023) (Gorsuch, J., concurring) (quoting the same). And "'jurisdiction conferred by 28 U.S.C. § 1331,' in particular, 'should hold firm against mere implication[s]' from other laws." *Axon*, 598 U.S. at 208 (Gorsuch, J., concurring) (quoting *Mims v. Arrow Fin. Srvs., LLC*, 565 U.S. 368, 383 (2012)).

Defendants contend the CIT has jurisdiction under 28 U.S.C. § 1581(i)(1)(B), which provides that court "exclusive jurisdiction of any civil action … that *arises*

---

[3] Doc. 5, at 10–11 (citing *United States v. Universal Fruits & Vegetables Corp.*, 370 F.3d 829 (9th Cir. 2004); *Pentax Corp. v. Myhra*, 72 F.3d 708 (9th Cir. 1995); *Pat Huval's Fisherman Wharf v. Int'l Trade Comm'n*, No. Civ.A. 06-324, 2006 WL 2460846 (W.D. La. 2006). Defendants' quotation of *Pentax* is misleading. The district court there had dismissed the action because Pentax sought "to avoid paying … [a] duty." 72 F.3d at 711. The Ninth Circuit thus agreed that the district court lacked jurisdiction. *Id.* The Ninth Circuit, however, declined to express an opinion on other possible jurisdictional and timeliness bars that would have *precluded the CIT from exercising jurisdiction. Id.* In this context, the Ninth Circuit concluded it was "prudent" for the district court to transfer the case to the CIT—and not dismiss it—so the CIT in the first instance could examine the *other* possible bars.

*out of any law* of the United States *providing for … tariffs*, duties, fees or other taxes on the importation of merchandise." 28 U.S.C. § 1581(i) (1)(B) (emphasis added).[4] "Law of the United States" refers to a statute or regulation. *See, e.g., City of New York v. FCC*, 486 U.S. 57, 63 (1988) (construing the phrase "Laws of the United States" in the Supremacy Clause to "encompass[] both federal statutes themselves and federal regulations that are properly adopted in accordance with statutory authorization."). "Law of the  United States" does not include an executive order. *See Youngstown Sheet & Tube Co v. Sawyer*, 343 U.S. 579, 587 (1952) ("[t]he President's power to see that the laws are faithfully executed refutes the idea that he is … a lawmaker.").

## II.    The CIT Does Not Have Jurisdiction over this Case Because IEEPA Does Not Provide for Tariffs

### A. IEEPA's Text Does Not Refer to Tariffs; Context and Historical Understanding Confirm That IEEPA Does Not Authorize Them

Because this action "arises out of" IEEPA, Defendants must show that statute "provid[es] for … tariffs." 28 U.S.C. § 1581(i)(B). But IEEPA does not refer to tariffs or any synonym for that word. That statutory silence alone should defeat

---

[4] Defendants also contend that the CIT has jurisdiction under § 158l(i)(l)(D), which provides jurisdiction over "any law ... providing for … administration and enforcement with respect to the matters referred to in" any preceding provision of § 158l(i)(l). Thus, jurisdiction under this subparagraph depends on the existence of jurisdiction under another subparagraph. As explained herein, the subparagraph Defendants cite, § 158l(i)(l)(B), does not provide jurisdiction.

Defendants' motion. Statutory silence cannot be construed as a delegation of authority. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400 (2024) .

Defendants contend, however, that IEEPA does authorize the President to order tariffs because it permits the President to "regulate … importation." Doc. 5, at 12-13 (quoting § 1702(a)(1)(B)). "Regulate" is one of nine categories of actions IEEPA's residual provision authorizes the President to take, and IEEPA authorizes those actions against several categories of transactions and property. The relevant subparagraph provides that the President "may" perform the following actions:

> investigate, block during the pendency of an investigation, *regulate*, direct and compel, nullify, void, prevent or prohibit[,]

and may do so with respect to the following transactions or property:

> any acquisition, holding, withholding, use, transfer, withdrawal, transportation, *importation* or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States

§ 1702(a)(1)(B) (emphasis identifying language relied on by Defendants).

Defendants offer no reason to conclude that "regulate" refers to or includes imposing tariffs.  A look at the word's common meaning shows it does not. *Niz-Chavez v. Garland*, 593 U.S. 155, 160 (2021) ("When called on to resolve a dispute over a statute's meaning, this Court normally seeks to afford the law's terms their ordinary meaning at the time Congress adopted them.") The Supreme Court

9

described the power to "regulate" as the power "to prescribe the rule by which [an activity] is to be governed." *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 196 (1824) (describing the power to regulate commerce). This is essentially the same meaning set out in the relevant edition of Black's Law Dictionary: "To fix, establish, or control; to adjust by rule, method, or established mode; to direct by rule or restriction; to subject to governing principles or laws." *Regulate*, Black's Law Dictionary (4th rev. ed. 1968). This common meaning does not encompass imposing a tax or a tariff.

The Constitution indicates the same common meaning, showing that to "regulate" does not include imposing tariffs or other taxes. The Constitution uses two separate clauses to assign the power to tax and the power to regulate. The "Taxing Clause" assigns the "Power To lay and collect Taxes, Duties, Imposts and Excises," U.S. Const. art. I, § 8, cl. 1, while the Commerce Clause separately assigns the "Power … To regulate Commerce with foreign Nations," U.S. Const. art. I, § 8, cl. 3. *See also In re State Tax on Railway Gross Receipts*, 82 U.S. 284, 295-96 (1872) (distinguishing between Congress's regulation of interstate commerce and a state's imposition of a tax); *Consumers' Rsch. v. FCC*, 109 F.4th 743, 756 (5th Cir. 2024) ("the power to tax" "contributions" is "a quintessentially legislative power"). It would also vastly expand agency power if, every time Congress granted an agency

the power to "regulate," the Courts interpreted that grant as including the power to tax.

This conclusion is further confirmed by the statutory context in IEEPA, which restricts the meaning of "regulate … imports" to imposing regulations that advance economic sanctions. Putting "regulate" aside because it is the word at issue, the categories of actions authorized by Section 1702(a)(1)(B) all identify acts that relate to economic sanctions: investigating, blocking, negating, or controlling a problematic activity. "Regulate" fits in this group as long as it takes its common meaning, which is limited to prescribing rules or restrictions, and as long as its meaning is consistent with its use in the Constitution, which distinguishes it from imposing tariffs and other taxes. But "regulate" no longer fits in this group of sanctioning verbs if it is construed to permit imposing tariffs on ordinary American citizens.

The basic interpretive principles of *ejusdem generis* and *noscitur a socii* require the same conclusion These principles prevent Defendants from assigning one member ("regulate") of this nine-word group a meaning that lies outside the meaning of other members of the group. *Fischer v. United States*, 603 U.S. 480, 487 (2024) (describing both doctrines). The Supreme Court illustrated this reasoning in *Yates v. United States*, 574 U.S. 528, 543 (2015), where it emphasized that the "words

immediately surrounding" the statutory term at issue "cabin the contextual meaning of that term." *Id.*

The length of the list of authorized actions (nine verbs), combined with the close relationship of the actions it contains, further shows that Congress did not draft the statute to authorize tariffs. The basic principle of *expressio unius est exclusio alterius* establishes that Congress's decision to list permissible actions excludes the possibility that it meant to permit actions it did not list (imposing tariffs). This principle is especially compelling when applied to § 1702(1)(1)(B), because there Congress took the trouble to include nuanced pairs of synonyms as close in meaning as "nullify" and "void," and "prevent" and "prohibit." This attention to nuance speaks loudly that, if Congress had meant to authorize an activity as different as imposing tariffs, it would have said so.

This statutory silence is powerful for the additional reason that tariffs have the highest constitutional importance. Control over tariffs, taxes, and foreign commerce are core legislative powers specifically enumerated in the Constitution. Defendants' theory is that Congress handed the President broad power over these core functions without ever using any of the critical constitutional words—but instead by tucking the cryptic "regulate" into a list of activities contained in a sanctions statute. *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000) (Congress would not use "cryptic" words to delegate authority of "economic and political

12

significance"). That theory flunks the most basic test for reading a statute, and falls even shorter of the clear-statement standard that governs here.

Presidents other than President Trump appear to have read § 1702(a)(1)(B) the same way Plaintiffs do. Seven other presidents have held office since Congress enacted IEEPA, and none ever suggested it authorized him to impose tariffs.

### B. IEEPA's Silence on Tariffs Contrasts with the Many Specific References to Tariffs in the Trade Laws That Do Authorize Them

#### 1. Tariff laws specifically refer to tariffs, and they impose procedural requirements and scope limitations absent from IEEPA

IEEPA's silence on tariffs is even more glaring when it is contrasted with the specific language Congress has employed in actual tariff statutes. These statutes routinely refer to tariffs or duties. For example, § 201 of the Trade Act of 1974 authorizes the President to "proclaim an increase in, or the imposition of, any *duty* on the imported article" or "proclaim a *tariff*-rate quota on the article." 19 U.S.C. § 2253(a)(3)(A), (B) (emphasis added). Section 301 of the Trade Act of 1974 authorizes the President to "impose *duties* or other import restrictions." 19 U.S.C. § 2411(c)(1)(B) (emphasis added). And Section 232 of the Trade Expansion Act refers to authority to change the level of "*duties*" on imports, 19 U.S.C. § 1862(a) (emphasis added). These tariff statutes show that Congress "speak[s] clearly" when it authorizes tariffs. *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014).

The tariff laws also show that Congress has delegated tariff authority to the President only in discrete pieces, passing tariff statutes for targeted purposes. For example, 19 U.S.C. § 2132 permits certain tariffs to address trade deficits and § 301 of the 1974 Trade Act authorizes certain tariffs to address a country's specific violation of a trade agreement, 19 U.S.C. § 2411. These statutes also generally require fact-finding and other procedures by an agency such as the U.S Trade Representative, the International Trade Commission, or the Department of Commerce.[5]

## 2. When Congress has amended tariff laws to harmonize them with trade agreements, it has not amended IEEPA

Other congressional enactments also prove that Congress did not enact IEEPA to authorize tariffs. Congress periodically has amended tariff laws to harmonize them with new trade agreements. For example, the Uruguay Rounds Agreement Act enacted resulting multilateral trade negotiations. *See* 19 U.S.C. §§ 3501, 3511–3556, 3571–3572, 3581–3592, 3601–3624. In 1994—17 years after IEEPA was enacted—the Uruguay Rounds Agreement Act amended various sections of the Tariff Act of 1930, including Section 303 regarding countervailing subsidies and Title VII regarding enforcement. *See* Uruguay Round Agreements Act, Pub. L. 103–

---

[5] For examples of typical requirements in key tariff statutes, see Tom Campbell, *Presidential Authority to Impose Tariffs*, 83 La. L. Rev. 595, 614-16 (2023) (arguing IEEPA does not authorize tariffs).

465, § 261, 108 Stat. 4809, 4908-18 (1994). It also amended Title III of the Tariff Act of 1974. *See id*., § 314, 108 Stat. at 4939-42.

Congress did not make any related amendments to IEEPA. If IEEPA authorized tariffs, a President could use it to violate the Uruguay Round Agreements by, for example, imposing tariffs for impermissible purposes or exceeding permissible levels. But Congress did not amend IEEPA because Congress has never understood it to be a law that provides for tariffs.

In sum, every relevant tool of statutory construction dictates the conclusion that IEEPA does not "provid[e] for … tariffs." 28 U.S.C. § 1581(i) (requirement for CIT jurisdiction). To rule for Defendants, this Court would have to defy the Supreme Court's requirement to apply textualism and originalism in statutory construction.

## C. Under the "Major Questions" Precedents, IEEPA's Silence Cannot Be Transmuted into Authority to Impose Tariffs

This Court also would have to ignore a series of recent decisions in which the Supreme Court has struck down Executive Branch efforts like the one challenged in this case: attempts to use general statutory language, in a novel way, to justify unprecedented and sweeping executive action. These decisions have applied the major-questions doctrine, which requires Defendants to show that IEEPA provides "clear congressional authorization" for the authority the President claims. *Biden v. Nebraska*, 600 U.S. 477, 506 (2023).

Most recently, the Supreme Court invalidated a Biden Administration plan to forgive approximately $400 billion of student loans. *Biden v. Nebraska*, 600 U.S. 477 (2023). The Court held that the HEROES Act—a national emergency statute passed in the wake of 9/11—did not authorize the Administration's plan. *Id.* at 505. Statutory language authorizing the Secretary to "waive or modify" certain loan provisions was not sufficiently "clear" and "explicit" to support the Administration's massive loan forgiveness program. *Id.* at 492, 500, 504.

The year before that, the Court rejected EPA's effort to reinterpret the 1970 Clean Air Act as authority to force the nation's power plants to transition away from coal. *West Virginia*, 597 U.S. 697 (2022). After stressing that EPA had claimed to discover an unprecedented and transformative power in decades-old general statutory language, *id.* at 721, 724, the Court concluded EPA had failed to "point to 'clear congressional authorization' for the power it claims," *id.* at 723 (quoting *UARG*, 573 U.S. at 324).

Also in 2022, the Court struck down OSHA's attempt to mandate nationwide Covid vaccines or testing by invoking its general authority to set "occupational safety and health standards." *Nat'l Fed'n of Indep. Bus. v. Dep't of Lab.*, 595 U.S. 109, 117 (2022). The Court held that such sweeping measures could not rest on such general statutory terms, but required "clear" congressional authorization. *Id.*

16

In 2021, the Court invalidated the Center for Disease Control's nationwide eviction moratorium. *Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 594 U.S. 758, 764 (2021). The CDC cited its statutory authority "to prevent the introduction, transmission, or spread of communicable diseases," and to require specific measures such as "inspection … disinfection" as well as "other measures as in [its] judgment may be necessary." *Id*. at 761 (citation omitted). Again, this use of the statute was unprecedented. *Id*. at 761. The Court rejected the attempt. It held that the "sheer scope of the CDC's claimed authority" required the agency to show "clear" congressional authorization, which the statute did not provide. *Id*. at 764.

There are too many other examples to list here, but one landmark case where the Supreme Court applied a similarly demanding standard is *Youngstown Sheet & Tube Co*, 343 U.S. 579 (1952). There, the Court invalidated President Truman's executive order seizing control of the nation's steel mills during the Korean War. It held that the President needed specific statutory authorization, which neither the Constitution nor Congress provided. *Id*. at 585-89.

The pattern evident in this series of reversals of executive branch actions is glaring in this case. President Trump has made "vast" assertions of presidential authority, in effect restructuring fundamental trade policy relating to the entire world. These tariffs have "vast economic ... significance." *West Virginia*, 597 U.S. at 716. United States imports totaled at least $3.36 trillion in 2024. Trade Statistics,

17

U.S. Customs and Border Protection.[6] The President himself puts the effect of his tariffs in the trillions, stating that his Executive Orders will raise "trillions and trillions of dollars to reduce our taxes and pay down our national debt."[7]

The President also is asserting a power that was "unheralded" for the first 47 years IEEPA was in effect. *West Virginia*, 597 U.S. at 724 (citation omitted); *UARG*, 573 U.S. at 324 ("When an agency claims to discover in a long-extant statute an unheralded power to regulate a significant portion of the American economy, we typically greet its announcement with a measure of skepticism.") (cleaned up). Since Congress enacted IEEPA in 1977, no other president has attempted to rely on it to impose tariffs.

Also in this case, Defendants attempt to rely on a generic word that does not provide the required "clear" authority. To say the least, the word "regulate" is not a "clear" delegation of Congress's core power over tariffs—especially where, as in IEEPA, Congress grouped it with words describing permitted sanctions.

Finally, the imposition of these massive tariffs—reordering the basic structure of the nation's tariff laws—is a matter of great "political significance." *West Virginia*, 597 U.S. at 716 (citation omitted). As a constitutional matter, tariffs have

---

[6] https://www.cbp.gov/newsroom/stats/trade

[7] Quoted in Jeff Mason and Andrea Shalai, *For Trump, tariff gamble brings political risk*, Reuters, April 3, 2025, https://www.reuters.com/world/us/trump-tariff-gamble-brings-political-risk-2025-04-03/.

the highest level of political significance because determining tariffs and regulating foreign commerce are core Congressional powers, specifically enumerated in the Constitution. *See* U.S. Const. art. I, § 8, cl. 1 (Taxation Clause, assigning Congress the "Power To lay and collect Taxes, Duties, Imposts and Excises"), and U.S. Const. art. I, § 8, cl. 3 (Commerce Clause, assigning Congress the power "to regulate Commerce with foreign Nations, and among the several States.")[8]

Also because the Constitution places tariffs and foreign commerce in the exclusive control of Congress, no basis exists for giving any weight to Defendants' reading of IEEPA. Even Defendants do not suggest the President can impose tariffs without authority from Congress. This Court must "determine the best reading" IEEPA, without deferring to the executive branch's proposed interpretation. *Loper Bright*, 603 U.S. at 400.

The Fifth Circuit recently illustrated this approach in an IEEPA case it decided after the Supreme Court issued *Loper Bright*. In *Van Loon v. Department of the Treasury*, 122 F.4th at 562-63, that Court rejected the Treasury Department's proposed broad reading of "property" in § 1702(a)(1)(B). *Id.* at 565. This is the same

---

[8] For additional explanation of why interpreting IEEPA to permit tariffs would violate the major questions doctrine (and would, in turn, violated the nondelegation doctrine). Eric R. Bolinder, *Seizing the Duty of Congress: The President's Unilateral Implementation of Tariffs is Unconstitutional* (unpublished manuscript, Liberty Univ. School of Law April 11, 2025), at 19-20, available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=5228068.

IEEPA subsection at issue in this case, where the President seeks to stretch "regulate" to authorize tariffs.

### D. Defendants Offer No Basis for the Court to Construe IEEPA's Silence as Authority to Order Tariffs

#### 1. Legislative history shows IEEPA's drafters understood it would not authorize tariffs

Defendants suggest the legislative history supports the view that IEEPA authorizes tariffs. See Doc. 5, at 12. To the contrary, however, that history documents the understanding that the TWEA language later included in IEEPA did not authorize tariffs. First, the House Report set out an exhaustive description of the powers IEEPA would grant the President, but did not refer to tariffs or anything like them. H.R. Rep. No. 95-459, 95th Cong., 1st Sess., at 2 (June 23, 1977). Second, that Report criticized the Nixon surcharges as unauthorized by TWEA. *Id.* at 5 (describing surcharge), 7 (referring to surcharge and other presidential acts, complaining that TWEA had "become essentially an unlimited grant of authority for the President to exercise, at his discretion).

#### 2. *United States v. Yoshida* is not controlling, and it erroneously construed statutory silence as a grant of authority

Defendants cite *United States v. Yoshida Int'l, Inc.*, 526 F.2d 560 (C.C.P.A. 1975), as a case where the Court of Customs and Patent Appeals adjudicated a matter involving the Trading with the Enemy Act. The court addressed language in TWEA

20

identical to the current IEEPA § 1702(a). *Id.* at 569-70. The court concluded TWEA permitted a surcharge on imports that President Nixon ordered in based in part on that statute along with Tariff Act of 1930 and the Trade Expansion Act of 1962. But TWEA was not the basis of Customs Court jurisdiction, the two tariff statutes were. *See Yoshida Int'l, Inc. v. United States*, 378 F. Supp. 1155, 1157-58 (Cust. Ct. 1974), *rev'd*, 526 F.2d 560 (C.C.P.A. 1975). No such tariff statute underpins President Trump's Executive Orders.

Nor is *Yoshida* even persuasive authority on the question of whether IEEPA authorizes tariffs. To reach its conclusion that court TWEA permitted President Nixon's surcharge, the court construed statutory silence as a grant of executive power.

The court first stated that "*nothing* in the TWEA or in its history … specifically *either authorizes or prohibits* the imposition of a surcharge." 526 F.2d at 572-73 (emphasis added). It then construed this indeterminate language in the President's favor because the language *could be* read to authorize tariffs. It stated (contrary to the above evidence of the word's common meaning) that "regulate … *can*" include imposing duties. *Id.* at 575 ("to impose duties can be to 'regulate'"). The court capped off this charitable treatment of statutory silence by assuming that the statute authorized what it did not expressly prohibit. The court

21

explained that the TWEA legislative history did not "indicate[] an intent to *prohibit*" the President from imposing tariffs. *Id.* at 576 (emphasis added).

This approach to reading statutes is obsolete and discredited. Today, another court could not reach the same outcome without violating governing interpretive principles and clear Supreme Court precedent. The most obvious are the holding in *Loper Bright* that silence, gap, or ambiguity in a statute can no longer be construed to grant affirmative authority from Congress. 603 U.S. at 400. Another is the major-questions doctrine's requirement that the executive branch must identify a clear statutory statement to justify an assertion of power.

*Yoshida* collides head-on with these recent Supreme Court precedents. As they establish, the question in deciding whether IEEPA authorizes tariffs is not whether the statute is silent on the issue, as the *Yoshida* court indicated, nor whether the legislative history *prohibits* tariffs. The question is whether Congress affirmatively and "clearly" authorized these indisputably significant tariffs. *Biden v. Nebraska*, 600 U.S. at 507. It did not.

*Yoshida* also ignored the common meaning of "regulate" as reflected in Black's Law Dictionary, Supreme Court precedent, and the Constitution itself. Even at the time it was decided, *Yoshida* conflicted with Congress's view that TWEA did not authorize the Nixon surcharge, as demonstrated by Congress's 1974 tariff legislation and the 1977 House Report. *Yoshida* is outright damaging to Defendants'

22

reading of IEEPA, because it establishes that a court could rule for Defendants in this case only by violating the Supreme Court precedents recounted here.

### 3. Defendants cases—where the CIT had jurisdiction arising from *tariff* statutes—are irrelevant

Defendants do not attempt to argue that IEEPA "clearly" authorizes tariffs, but primarily focus on three topics that do not address the question of what IEEPA authorizes. The first is that the CIT can hear constitutional challenges to tariffs, duties, exactions, and embargoes. Doc. 5, 13-14. This point is undisputed, but irrelevant. Notably, every case Defendants cite involves tariff laws located in Title 19, not IEEPA or TWEA.[9]

Second, Defendants cite various cases where CIT had jurisdiction over challenges to presidential proclamations. Doc. 5, at 22, 24. These cases also are irrelevant because every proclamation relied on one or more statutes from Title 19 that—unlike on IEEPA or TWEA—expressly provided for tariffs. *See id*. In each case, CIT's jurisdiction was based on the *statute* at issue, not the presidential

---

[9] *U.S. Shoe Corp. v. United States*, 523 U.S. 360 (1998) (constitutional challenge to Harbor Maintenance Fee); *Totes-Isotoner Corp. v. United States*, 594 F.3d 1346, 1350-51 (Fed. Cir. 2010) (constitutional challenge to Tariff Schedules of the United States); *Arjay Assocs., Inc. v. Bush*, 891 F.2d 894 (Fed. Cir. 1989) (constitutional challenge to embargo on imports from certain Japanese companies); *see also Commodities Export Co. v. U.S. Customs Serv.*, 957 F.2d 223, 229-30 (6th Cir. 1992) (action to recover upon a bond relating to the importation of merchandise).

proclamation. After all, CIT's exclusive jurisdiction is of "any civil action … that "arises out of *any law of the United States* providing for … tariff." 28 U.S.C. § 1581(i)(1)(B) (emphasis added). Presidents do not proclaim "the law of the United States;" instead, they enforce and execute the law. *See* U.S. Const. art. II, § 1 ("The executive power shall be vested in a President of the United States …").

Defendants note that the CIT has "entertained thousands of challenges" to Presidential orders, but the cited actions all arose under the Trade Act of 1974. Doc. 5 at 24, *HMTX Indus. v. United States,* No. 20-00177 (Ct. Int'l Trade), appeal filed, No. 23-1891, ECF No. 5 ("Notice of Related Case Information"), at 1 (Fed. Cir. May 25, 2023) (challenges to "tariffs imposed on imports from China by the United States Trade Representative ("USTR") pursuant to section 301 et seq. of the Trade Act of 1974").

Third and finally, Defendants erroneously assert that this case is "similar" to other cases over which the CIT has had jurisdiction. But those cases are not at all like this one: None of them based jurisdiction on IEEPA. In every case Defendants cite, jurisdiction rested on a statute that expressly authorizes tariffs and is located in Title 19, "Customs Duties."

*Cornet Stores,* a generic tariff-recovery case, was transferred under 28 U.S.C. § 1582, which granted the Customs Court exclusive jurisdiction over "any civil actions" who asserts a claim pursuant to the Tariff Act of 1930. *Alcan Sales,*

*Division of Alcan Aluminum Corp. v. United States*, 693 F.2d 1089, 1091 (Fed. Cir. 1982), addressed events related to those addressed in *Yoshida*. *Earth Island Institute v. Christopher*, 6 F.3d 648, 650-51 (9th Cir. 1993), is irrelevant. Jurisdiction in that case involved provisions in the Endangered Species Act protecting sea turtles and provisions for a related embargo. Exclusive jurisdiction in the CIT lay under § 1581(i)(3) and (4) (now § 1581(i)(1)(C) and (D)), which expressly refer to "embargoes." Moreover, as explained below in section II.D.4, also illustrates that the reference to "embargoes" in the CIT jurisdictional statute  does not sweep all IEEPA litigation into the CIT.

While the CIT cases Defendants cite all involved tariff statutes, the history of CIT cases involving IEEPA is almost non-existent. CIT has never heard a single IEEPA case in the 47 years that the statute has been in effect—that is, until just  a month ago. For example, an early case that reached the Supreme Court involved challenges to the President's exercise of IEEPA authority after the Iranian revolution and hostage crisis. *See*, *e.g.*, *Dames & Moore v. Regan*, 453 U.S. 654 (1981). This Court recently exercised jurisdiction in *Coin Center v. Yellen*, No. 3:22-cv-20375-TKW, 2023 WL 7121095, at *5 (N.D. Fla. Oct. 30, 2023) (addressing claims arising under IEEPA, granting summary judgment for defendants). IEEPA cases in this last year include *Van Loon v. Dep't of the Treasury*, 122 F.4th 549, 560 (5th Cir. 2024) and *Diegelmann v. Yellen*, No. CV 24-1090, 2024 WL 4880468,

at *1 (D.D.C. Nov. 25, 2024). This history is persuasive because it indicates that, since IEEPA was enacted, the United States has understood that jurisdiction over IEEPA cases lay in district court. *See Loper Bright*, 603 U.S. at 386 (stating "Executive Branch interpretation [that] was issued roughly contemporaneously with enactment of the statute and remained consistent over time" is entitled to great respect). That history contradicts Defendants' argument that IEEPA is a tariff statute and that, consequently, exclusive jurisdiction over IEEPA claims lied in the CIT.

### 4. Amicus curiae's categorical "embargo" argument is erroneous

Finally, *amicus curiae* America First Legal Foundation advances a jurisdictional theory that is demonstrably wrong. Amicus contends that, because a section of IEEPA (not relied on by President Trump) authorizes embargoes, and 28 U.S.C. § 1581(i)(1), (C), provides CIT jurisdiction over actions "that arise[] out of any law … providing for … embargoes," that CIT has exclusive jurisdiction over every case arising under any section of IEEPA. Doc. 7.1, at 11-12.

Amicus's jurisdiction argument sweeps far too broadly because it misunderstands the narrow meaning of "law" as used in § 1581(i)(1). Courts have not interpreted "law" to refer to an entire statute, as amicus contends, but rather to refer to the specific statutory provision underlying the claim at issue. That is why

§ 1581(i) has not swept entire substantive statutes—and the accompanying vast tracks of litigation arising under those statutes—into the CIT.

The Federal Circuit explained this distinction in *Orleans Int'l Inc. v. United States*, 334 F.3d 1375 (Fed. Cir. 2003). Plaintiffs' claims arose under the Beef Promotion and Research Act of 1985 (the "Beef Act"), which contains separate sections addressing domestic beef purchasers and beef importers. *Id*. at 1377. Plaintiff challenged a provision in the section addressing importation. *Id*. The court explained that jurisdiction depended on the nature of the specific "claim," *id*. at 1378, or "action," *id*. at 1379. Accordingly, the court continued, jurisdiction over matters involving imports lay in the CIT, but jurisdiction over matters involving the domestic portion of the Beef At lay in district court. *Id*. at 1379.

The court drew the same distinction in a case Defendants cite, *Earth Island Institute v. Christopher*, 6 F.3d 648, 650-51 (9th Cir. 1993). There, plaintiff sought to enforce a provision of the Endangered Species Act involving embargoes to protect sea turtles. *Id*. at 649-50 (citing § 609 of the Endangered Species Act, 16 U.S.C. § 1537). The court focused on the nature of the specific claim, which involved "embargoes" or "quantitative restrictions," *id*. at 650, and held that exclusive jurisdiction lay in the CIT under the "embargoes" provision (currently at § 1581(i)(1)(C)). *Id*. at 651. Neither the court nor any subsequent

27

citation has suggested that this conclusion swept all litigation arising under any section of the Endangered Species Act into the CIT.

This narrow understanding of "law" is also apparent in another case amicus cites, *Int'l Lab. Rts. Fund v. Bush*, 357 F. Supp. 2d 204, 209 n.3 (D.D.C. 2004). There, plaintiffs contended that Customs and Border Protection was required to take enforcement action relating to certain conditions in Cote d'Ivoire. *Id.* at 206. This demand rested on regulations issued under § 307 of the Tariff Act of 1930, 19 U.S.C. § 1307, which provides for an embargo against importation of certain goods, 357 F. Supp. 2d at 208. The court found exclusive jurisdiction in the CIT because plaintiffs' claims "ar[o]se out of" § 307. *Id.* at 208 (quoting the current 28 U.S.C. § 1581(i)(1)(C)). It identified the "law" under which plaintiffs' claims arose by focusing solely on the statutory section underlying their claim. 357 F. Supp. 2d at 208, even while referring to the entire statute, which is codified across many sections in 19 U.S. Code Ch. 4 as the "Tariff Act of 1930.

Amicus's misunderstanding of the word "law" explains why, as even *amicus* acknowledges (Doc. 7-1, at 8-9), this theory is contrary to the long, unbroken history of jurisdiction over IEEPA cases in district courts. *See, e.g., Coin Center v. Yellen*, 2023 WL 7121095, *supra*, section II.D.2. This background also explains why Defendants did not advance this argument. They distanced themselves from it in the Montana litigation, disavowing any reliance on the "embargoes" provision amicus

relies on. Def. Reply Brief in Support of Motion to Transfer, *Webber v. U.S. Dep't of Homeland Sec.*, No. 4:25-cv-00026 (D. Mont. April 26, 2025) at 9 (stating that "Section 1581(i)(1)(C) is simply not relevant to this case").

Finally, this proper understanding of the word "law" ensures that the President cannot force jurisdiction over his unlawful actions into the CIT, as amicus contends, by invoking an inapplicable statute (IEEPA) purportedly to order tariffs. If the President cannot show that IEEPA is a tariff statute, then he lacked authority to issue the Executive Orders in the first place—and he cannot then limit jurisdiction to the CIT. In other words, if the Court concludes IEEPA does not permit tariffs, it would be illogical to afford the President his procedural preference of jurisdiction in the CIT based on a statute that does not apply. So, as established by *Orleans Int'l Inc.*, *Earth Island Institute*, and *Int'l Lab. Rts. Fund*, the decision on whether IEEPA is a tariff statute and whether this court has jurisdiction to hear the case must rise and fall together.

### III.    Plaintiffs Motion to Expedite Resolution of Defendant's Motion

Plaintiffs respectfully request expedited consideration of Defendants' Motion to Transfer (Doc. 5). In short, Plaintiffs seek this expedited consideration because a delayed ruling would permit damage to Plaintiffs that would be impossible to remedy. *See* Loc. R. 7.1(L) (addressing Emergencies and providing for "a ruling more promptly than would occur in the ordinary course of business"). Defendants

have stated that they take no position on this motion for an expedited decision, with the understanding that Plaintiffs are not requesting that the briefing schedule be expedited.

The tariffs that Plaintiffs challenge already are in effect. Because these tariffs are unlawful, Plaintiffs suffer additional harm each day they remain in effect. Because Plaintiffs are small businesses that cannot pass the cost of tariffs to their customers or absorb that cost themselves, the tariffs threaten the very existence of Plaintiffs' businesses.  If Plaintiffs are forced to shutter their businesses or if they lose customers because their businesses are not able to absorb the cost of the tariffs, such losses would be difficult. at best, to remedy by a subsequent favorable judgment.

Moreover, an expedited decision on Defendants' Motion to Transfer will help advance the matter towards ultimate resolution. As explained in this Opposition, the resolution of Defendants' jurisdiction motion overlaps substantially with the merits determination of whether the President possessed authority under IEEPA to order tariffs.

## CONCLUSION

As the Supreme Court has done in so many recent decisions, this Court should reject the Executive's effort to construe one vague word, taken out of context, as a

delegation of vast power to impose new obligations on the American people.[10] It follows that Defendants fail to identify, as they must to strip this Court of jurisdiction, statutory authority "equally express" to this Court's federal-question jurisdiction under § 1331. Plaintiffs respectfully request that the Court deny Defendants' Motion to Transfer.[11]

---

[10] If IEEPA were construed to permit the tariff Executive Orders, the statute would violate the nondelegation doctrine because it lacks an intelligible principle that constrains the President's authority. The Court should not reach this issue on the clear language of IEEPA. But if it were to do so the IEEPA is unconstitutional because it permits presidents to usurp Congress's prerogative to tax and to regulate commerce with foreign nations. *See A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 539 (1935).

[11] If the Court decides to grant Defendants' motion, Plaintiffs will immediately move for a 10-day stay to seek Court of Appeals review of any transfer order.

May 05, 2025

Respectfully submitted,

*/s/ Andrew J. Morris*
Andrew J. Morris
*pro hac vice*
John J. Vecchione
*pro hac vice*
NEW CIVIL LIBERTIES ALLIANCE
4250 N. Fairfax Drive, Suite 300
Arlington, VA 22203
Tel.: (202) 869-5210
Fax: (202) 869-5238
andrew.morris@ncla.legal
john.vecchione@ncla.legal


Bryan S. Gowdy
Florida Bar No. 176631
Creed & Gowdy, P.A.
865 May Street
Jacksonville, FL 32204
bgowdy@appellate-firm.com

*Counsel for Plaintiffs*

32

## REQUEST FOR ORAL ARGUMENT

Pursuant to Local Rule 7.1(K), Plaintiffs hereby request oral argument of 30 minutes for each side.

*/s/ Andrew J. Morris*
Andrew J. Morris

## CERTIFICATE OF COMPLIANCE WITH RULE 7.1

Pursuant to Local Rule 7.1, counsel for Plaintiff conferred with counsel for Defendants, and is authorized to represent that Defendants take no position on this motion for an expedited decision, with the understanding that Plaintiffs are not requesting that the briefing schedule be expedited.

*/s/ Andrew J. Morris*
Andrew J. Morris

## LOCAL RULE 7.1(F) CERTIFICATION

I hereby certify that this Memorandum contains 7,404 words, per Microsoft Word's word count and counted as required by Local Rule 7.1(F).

*/s/ Andrew J. Morris*
Andrew J. Morris