UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRIC OF FLORIDA
PENSACOLA DIVISION

EMILY LEY PAPER, INC.,
d/b/a SIMPLIFIED, *et al.*,

    Plaintiffs,

v.

DONALD J. TRUMP, *et al*.,

    Defendants.

No. 3:25-cv-464-TKW-ZCB

Judge T. Kent Wetherell II

**MEMORANDUM OF *AMICUS CURIAE* THE CATO INSTITUTE
IN SUPPORT OF PLAINTIFFS**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................... ii

IDENTITY AND INTEREST OF *AMICUS CURIAE* ..................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ..........................................2

ARGUMENT .............................................................................................................4

    I.    Historical Practice Confirms That Tariff-Setting Is a Nondelegable Legislative Power. ....................................................................................4

    II.   IEEPA Does Not Authorize the President to Modify Tariff Rates. ...............8

        A.  IEEPA Provides No Textual Support for Tariff Authority. .........................8

        B.  IEEPA's Origins Confirm That Tariff Authority Remains with Congress. ...............................................................................................10

CONCLUSION ........................................................................................................14

CERTIFICATE OF SERVICE .................................................................................15

LOCAL RULE 7.1(F) CERTIFICATION ...............................................................15

i

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Alcan Sales v. United States*, 534 F.2d 920 (Cust. and Pat. App. 1976) .................13

*FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000) ........................10

*J.W. Hampton, Jr. & Co. v. United States*, 276 U.S. 394 (1922) ..............................7

*Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024) ................................ 3, 8, 9

*Marsh v. Chambers*, 463 U.S. 783 (1983) ............................................................5, 7

*Stoehr v. Wallace*, 255 U.S. 239 (1921) ..................................................................11

*The Pocket Veto Case*, 279 U.S. 655 (1929) .............................................................7

*United States v. Yoshida Int'l, Inc.*, 526 F.2d 560
  (Ct. Cust. and Pat. App. 1975) .............................................................................13

*Util. Air Regul. Grp. v. EPA*, 573 U.S. 302 (2014) ........................................ 4, 9, 10

*West Virginia v. EPA*, 597 U.S. 697 (2022) ...........................................................4, 9

*Wisconsin v. Pelican Ins. Co.*, 127 U.S. 265 (1888) ..................................................5

**Statutes**

19 U.S.C. § 1821(a) ....................................................................................................9

19 U.S.C. § 2132 ......................................................................................................13

19 U.S.C. § 2411(c)(1)(B) ..........................................................................................9

50 U.S.C. § 1701 ........................................................................................................2

50 U.S.C. § 1702 .....................................................................................................2, 9

Act of Dec. 18, 1941, 55 Stat. 839 ...........................................................................11

Act of July 4, 1789, 1 Stat. 24 ...................................................................................5

Act of March 9, 1933, 48 Stat. 1 ..............................................................................11

Oct. 6, 1917, ch. 106, § 5, 40 Stat. 415 ....................................................................11

Revenue Act of 1913, 30 Stat. 151 .............................................................................5

Tariff Act of 1816, 3 Stat. 310 ...................................................................................5

Tariff Act of 1832, 4 Stat. 583 ...................................................................................5

Tariff Act of 1861, 12 Stat. 178 .................................................................................6

Tariff Act of 1883, 22 Stat. 488 .................................................................................6

Tariff Act of 1890, 26 Stat. 567 .................................................................................6

**Other Authorities**

Exec. Order No. 8843 (1941) ..................................................................................12

Forbidding the Hoarding of Gold Coin, Gold Bullion and Gold Certificates,
  Exec. Order No. 6102 (1933) .............................................................................12

Governing Certain Capital Transfers Abroad, Exec. Order 11387 (1968) ..............12

Imposition of Supplemental Duty for Balance of Payments Purposes,
  Proclamation 4074 (Aug. 15, 1971) ...................................................................13

Mary M.C. Bowman, *Presidential Emergency Powers related to
  International Economic Transactions*, 11 VAND. L. REV. 515 (1978) .................13

Michael H. Salsbury, *Presidential Authority in Foreign Trade: Voluntary
  Steel Import Quotas from a Constitutional Perspective*, 15 VA. J. INT'L L.
  179 (1974) ..........................................................................................................10

Note, *The International Emergency Economic Powers Act: A
  Congressional Attempt to Control Presidential Emergency Power*, 96
  HARV. L. REV. 1102 (1983) ................................................................................11

Reopening Banks, Exec. Order No. 8773 (1933) ...................................................12

Termination of Additional Duty for Balance of Payments Purposes,
  Proclamation 4098 (Dec. 20, 1971) ...................................................................13

THE FEDERALIST NO. 23 (Alexander Hamilton) .......................................................7

**Regulations**

Office of Censorship, U.S. Censorship Regulations, 8 Fed. Reg. 1644 (Feb.
  5, 1943) ..............................................................................................................12

**Constitutional Provisions**

U.S. CONST. art. I, § 1 ...............................................................................................4

U.S. CONST. art. I, § 8 .................................................................................3, 4

U.S. CONST. art. III, § 1 ....................................................................................7

## IDENTITY AND INTEREST OF *AMICUS CURIAE*[1]

The Cato Institute is a nonpartisan public policy research foundation founded in 1977 and dedicated to advancing the principles of individual liberty, free markets, and limited government. Toward that end, Cato's Robert A. Levy Center for Constitutional Studies publishes books and studies about legal issues, conducts conferences, produces the annual Cato Institute *Supreme Court Review*, and files *amicus* briefs.

Cato Institute scholars have published extensive research on regulation and constitutional law. This case interests the Cato Institute because it concerns the legality of a contested exercise of executive power that threatens the separation of powers and economic liberty.

---

[1] No party's counsel authored this brief in whole or part, and no party or party's counsel made a monetary contribution to fund preparation or submission of this brief.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Soon after taking office, President Trump issued a series of executive orders and proclamations imposing tariffs on imports from dozens of countries. These actions, interspersed with negotiations with and responses from some of those countries, resulted in rapid increases and (partial) decreases in tariff rates. *See* Pl. Amend. Compl. 15–22. Presently, the President has imposed a 10% tariff on most trading partners, and imports from China are singled out with a combined tariff rate of 145%. *Id*. at 20–22. Notably, the President's orders cite the International Emergency Economic Powers Act of 1977, 50 U.S.C. § 1701 *et seq*. ("IEEPA"), as a statutory basis for the President's unilateral imposition of additional—and fluctuating—tariffs.

IEEPA grants the President broad authority to block transactions involving Americans and foreign nationals, *see id*. § 1702, and the law is frequently used by Presidents to impose economic sanctions on nations and foreign citizens. But the statute explicitly limits this authority to situations involving "an unusual and extraordinary threat" for which "a national emergency has been declared for purposes of this chapter," and the law provides that these powers "may not be exercised for any other purpose." *Id*. § 1701(b).

The President's novel tariffs, purportedly imposed to combat illegal drug operations, have inflicted significant costs on thousands of American business

owners who rely on imports. Simplified and other plaintiffs have sued to enjoin the imposition of these costly tariffs, alleging violations of IEEPA and of the Constitution. Pl. Amend. Compl. 22–32.

In determining whether IEEPA authorizes the President to impose tariffs, this Court must "determine the best reading" of the statute without deferring to the Executive's interpretation. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400 (2024).

The Constitution vests the power to impose tariffs solely in Congress, U.S. CONST. art. I, § 8, and the Cato Institute writes separately to provide historical context regarding IEEPA's purposes and the original understanding of Congress's constitutional authority to impose tariffs. For over a century, Congress exercised that power directly and in exhaustive detail, even during times of war and economic crisis. When Congress has chosen to delegate limited authority to the Executive to vary tariffs, it has done so explicitly and with clear statutory language.

The government's reliance on IEEPA as a source of unilateral tariff authority breaks with this tradition and misreads the statute. IEEPA contains no reference to "tariffs" or "duties," and no President had cited it to impose tariffs in the nearly 50 years since its enactment—until now. Congress knows how to grant tariff authority when it chooses to, as it did in the Tariff Act of 1922, the Trade Expansion Act of 1962, and the Trade Act of 1974. IEEPA, by contrast, was enacted to *limit* executive

3

power, not to expand it. Courts should not credit interpretations of vague statutory text that, for the first time in decades, are "discovered" to confer vast economic powers on the President.

The government's reading of IEEPA not only stretches the text beyond recognition, it also undermines the Framers' designs for a separation of powers. Accepting the government's theory would mean that Congress, through ambiguous text and legislative silence, can transfer sweeping legislative power to the President—a result the Supreme Court has warned against. "Courts expect Congress to speak clearly if it wishes to assign to an agency decisions of vast economic and political significance." *West Virginia v. EPA*, 597 U.S. 697, 716 (2022) (cleaned up) (quoting *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014)).

The Constitution, IEEPA's text, and over two centuries of history point in the same direction: the tariff-setting power remains in the hands of Congress. The Court should reject the government's motion for transfer and grant Plaintiffs' request for injunctive and declaratory relief.

## ARGUMENT

**I.     Historical Practice Confirms That Tariff-Setting Is a Nondelegable Legislative Power.**

The Constitution vests "[a]ll legislative powers" in the Congress. U.S. CONST. art. I, § 1. These legislative powers include the exclusive authority to set tariff rates. *Id*. § 8 (granting Congress the power "to lay and collect, taxes, duties, imposts and

4

excises"). While early congressional practice is not dispositive, the practice of the First Congress is probative of the original meaning of a constitutional provision. *See, e.g.*, *Marsh v. Chambers*, 463 U.S. 783, 790 (1983) ("An act 'passed by the first Congress assembled under the Constitution, many of whose members had taken part in framing that instrument, . . . is contemporaneous and weighty evidence of its true meaning.'") (ellipses in original) (quoting *Wisconsin v. Pelican Ins. Co.*, 127 U.S. 265, 297 (1888)).

It is therefore notable that the second law ever enacted by Congress—and signed by President George Washington—was a statute establishing detailed rates of tariffs. Act of July 4, 1789, 1 Stat. 24. That law set detailed and exhaustive duties, such as one cent per pound of brown sugars, fifty cents per pair of boots, and a 12.5% *ad valorem* tax on all goods (except teas) imported from China or India. *Id*.

For more than a century, Congress zealously guarded its power to set tariffs. Tariff legislation followed a familiar pattern: Congress would repeal its previous duties and replace them with new, specific rates and schedules. *See*, *e.g.*, Tariff Act of 1816, 3 Stat. 310; Tariff Act of 1832, 4 Stat. 583; Revenue Act of 1913, 30 Stat. 151. These statutes gave the President no discretion to modify duties. Where Congress authorized the President to administer and enforce customs laws, it carefully withheld any power to revise or adjust Congress's detailed tariff schedules.

5

Even during the crisis of the Civil War, Congress retained exclusive control over tariff rates. *See* Tariff Act of 1861, 12 Stat. 178. While Congress granted the President considerable discretion to exercise his executive powers—like shutting down whole ports held by rebel forces—it did not authorize him to alter tariff rates. *See id*. Even in wartime, when rebel forces controlled American territory, Congress did not concede its legislative tariff powers.

In the late 19th and early 20th centuries, Congress began empowering the Executive to negotiate trade agreements and selectively apply duties based on foreign governments' conduct. But even then, Congress retained the core legislative function: it prescribed detailed duty schedules and permitted the President to activate or suspend them only under certain conditions. For example, the Tariff Act of 1883, 22 Stat. 488, banned cattle imports unless the Secretary of the Treasury found them free from disease. The Tariff Act of 1890, 26 Stat. 567, allowed the President to suspend free trade agreements and impose congressionally-determined tariffs if another nation's duties on American goods were "unequal and unreasonable." In those cases, the President could not set new rates at will; he could only trigger duties Congress had already prescribed. *See id.*

In short, for at least the first century of the Republic, Congress consistently set duty schedules and never relinquished its duty-setting power to the President. Nor, as far as we can tell, did Presidents assert any inherent or emergency power to

6

set tariff rates,[2] even during wars, financial panics, and depressions. This unbroken practice is important in determining the original meaning of a constitutional provision and the best interpretation of IEEPA. *See Marsh*, 463 U.S. at 790; *The Pocket Veto Case*, 279 U.S. 655, 689 (1929) ("Long settled and established practice is a consideration of great weight in a proper interpretation of constitutional" issues of separation of powers.).

The reason for this longstanding practice is clear: Congress cannot vest duty-setting power—a legislative power—with the President, just as Congress cannot vest judicial power with the President or the Speaker of the House. *See* U.S. CONST. art. III, § 1 (vesting the judicial power "in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish"); *J.W. Hampton, Jr. & Co. v. United States*, 276 U.S. 394, 406 (1922) ("[I]t is a breach of the National fundamental law if Congress gives up its legislative power and transfers it to the

---

[2] Strictly speaking, there are no "emergency powers"; there are only those powers enumerated in the Constitution. The United States was founded during several emergencies and the Framers knew this nation would face emergencies of all kinds. *See* THE FEDERALIST NO. 23 (Alexander Hamilton) (noting that "it is impossible to foresee or define the extent and variety of national emergencies . . . ."). The Framers equipped the three branches of the U.S. government with enumerated powers to handle those emergencies.

7

President, or to the Judicial branch, or if by law it attempts to invest itself or its members with either executive power or judicial power.").[3]

## II. IEEPA Does Not Authorize the President to Modify Tariff Rates.

The Supreme Court recently reaffirmed a "judicial practice dating back to *Marbury*: that courts decide legal questions by applying their own judgment." *Loper Bright,* 603 U.S. at 391–91. The President's interpretation of IEEPA is not entitled to deference—rather, it is the duty of the courts to "determine the best reading" of a contested statute. *Id*. at 400. The best reading of IEEPA is that it provides the President no authority to unilaterally modify tariff schedules.

### A. IEEPA Provides No Textual Support for Tariff Authority.

As this brief's historical survey, *supra*, demonstrates, Congress knows how to give the President discretion—with limits—to modify tariff rates. And Congress did so, for instance, in the Tariff Act of 1922, the Trade Act of 1974, and the Trade Expansion Act of 1962, the latter of which President Trump used in his first term when modifying tariffs. *See* Pl. Amend. Compl. 11–12. It's notable that in those

---

[3] While modern practices are less probative in determining the original meaning of Congress's duty-setting power, more recent practices do not aid the President much. Even in the early- and mid-20th century, when Congress authorized the President to function as the principal actor in the formulation of trade policy, Congress constrained his discretion by referencing objective—if sometimes vague or contested—standards. S*ee id.* at 409–11 (affirming the constitutionality of the Tariff Act of 1922, which authorized the Executive to vary tariffs to "equalize the . . . differences in costs of production" between the United States and another nation, but limited rate increases to 50% of existing rates).

8

statutes, Congress expressly identified "duty" or "duties" modification as a permissible policy tool for the President. *See* 19 U.S.C. § 2411(c)(1)(B) (permitting the U.S. Trade Representative to "give preference to the imposition of duties over the imposition of other import restrictions"); 19 U.S.C. § 1821(a) (permitting the President to "enter into trade agreements" and "modif[y] . . . any existing duty"). In contrast, the relevant provisions in IEEPA make no mention of "duty," "duties," or "tariffs." *See* 50 U.S.C. § 1702.

This omission is fatal to the government's strained interpretation. "Courts expect Congress to speak clearly if it wishes to assign to an agency decisions of vast economic and political significance." *West Virginia v. EPA*, 597 U.S. at 716 (cleaned up) (quoting *Util. Air Regul. Grp.*, 573 U. S. at 324).

The Supreme Court has also emphasized that Executive Branch interpretations "issued contemporaneously with the statute at issue, and which have remained consistent over time, may be especially useful in determining the statute's meaning." *Loper Bright*, 600 U.S. at 394. A telling signal that the government's interpretation is unsound is that, nearly 50 years after IEEPA's enactment, no President invoked it to impose tariffs—until now. It appears the government would have this Court believe that the President and his trade advisers, like Indiana Jones in the *Raiders of the Lost Ark*, found a valuable artifact—an unconditional delegation of legislative power—gathering dust in the depths of the U.S. Code. The Supreme

9

Court has warned courts against rubber-stamping such Executive branch "discoveries" of new authority in decades-old statutes. *See Util. Air Regul. Grp.*, 573 U.S. at 324 ("When an agency claims to discover in a long-extant statute an unheralded power to regulate 'a significant portion of the American economy,' . . . we typically greet its announcement with a measure of skepticism.") (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159 (2000)).

This Court should reject the government's argument that, after 150 years, Congress silently transferred to the President most of its immense duty-making powers through IEEPA's ambiguous language.

### B. IEEPA's Origins Confirm That Tariff Authority Remains with Congress.

Finally, the government's position runs contrary to the purposes of IEEPA. In the 1970s, Congress undertook a long-overdue effort to rein in Presidents' unilateral actions in foreign trade and transactions. *See* Michael H. Salsbury, *Presidential Authority in Foreign Trade: Voluntary Steel Import Quotas from a Constitutional Perspective*, 15 VA. J. INT'L L. 179, 186 (1974) ("Since 1934, the President's authority to impose restrictions on foreign trade has been significantly curtailed by statute."). Congress codified IEEPA in 1977 to clarify and *limit* the executive branch powers that had metastasized under IEEPA's predecessor, the Trading with the Enemy Act of 1917. *See* Gov't Motion to Transfer 15; Note, *The International*

10

*Emergency Economic Powers Act: A Congressional Attempt to Control Presidential Emergency Power*, 96 HARV. L. REV. 1102, 1102 (1983).

Originally, Section 5(b) of the Trading with the Enemy Act of 1917 granted the President authority over Americans' transactions with foreign nationals only during wartime.[4] But within days of taking office, President Franklin Roosevelt unilaterally invoked Section 5(b) in peacetime to respond to bank failures and the Depression.[5] A few days later, Congress ratified those actions and greatly expanded the scope of the President's powers under Section 5(b) to peacetime "emergencies" and transactions with any foreign citizen, ally or enemy. *See* Act of March 9, 1933, 48 Stat. 1, 1–2. Congress amended the Act again in the early days of war in December 1941, going so far as to confer authority to the President to *prescribe the operative definitions* within the Act. Act of Dec. 18, 1941, 55 Stat. 839, 839–40; codified at 50 U.S.C. 4305(b)(3).

The Trading with the Enemy Act became (and, though amended, still is) an immensely powerful law, enabling Presidents to exercise sweeping, and at times

---

[4] *See Stoehr v. Wallace*, 255 U.S. 239, 242 (1921) ("The Trading with the Enemy Act . . . is strictly a war measure, and finds its sanction in the constitutional provision, Art. I, § 8, cl. 11, empowering Congress 'to declare war, grant letters of marque and reprisal, and make rules concerning captures on land and water.'").

[5] Oct. 6, 1917, ch. 106, § 5, 40 Stat. 415, codified, as amended, at 50 U.S.C. § 4305. *See The International Emergency Economic Powers Act*, *supra*, at 1102.

11

authoritarian, powers. In the 1930s, the law was used to place banks under the supervision of the federal government and prohibit them from paying out gold to bank customers (the so-called "bank holiday"),[6] to compel all Americans to surrender all of their gold and gold certificates to their nearest bank,[7] and to impose national regulation of consumer credit in order to curb inflation.[8] The Roosevelt administration even invoked the Trading with the Enemy Act in wartime to censor all news, mail, and communications from abroad—including "[r]umors which might render aid and comfort to the enemy" and "[a]ny other matter whose dissemination might directly or indirectly . . . disparage the foreign relations of the United States or the United Nations." Office of Censorship, U.S. Censorship Regulations, 8 Fed. Reg. 1644–46 (Feb. 5, 1943).

Later Presidents used the Trading with the Enemy Act in trade policy. In his final days in office in 1968, President Lyndon Johnson issued an executive order to halt and supervise capital transfers abroad in order to improve the nation's "balance of payments position." Governing Certain Capital Transfers Abroad, Exec. Order 11387 (1968). His successor, President Nixon, relied on the Act in August 1971 to

---

[6] Reopening Banks, Exec. Order No. 8773 (1933).

[7] Forbidding the Hoarding of Gold Coin, Gold Bullion and Gold Certificates, Exec. Order No. 6102 (1933).

[8] Exec. Order No. 8843 (1941).

12

impose a 10% tariff on imports to improve America's balance of payments as the U.S. withdrew from the gold standard. Imposition of Supplemental Duty for Balance of Payments Purposes, Proclamation 4074 (Aug. 15, 1971).[9]

In response to these unilateral actions in trade policy, Congress moved to clarify and restrict presidential authority. In the Trade Act of 1974, Congress provided express and narrow authority to address balance-of-payments issues in trade. *See* 19 U.S.C. § 2132. Three years later, Congress passed IEEPA to constrain the President further. As one contemporaneous account explained, IEEPA's "primary purpose . . . [was] to revise the Trading With the Enemy Act of 1917 (TWEA), and thus to restrict presidential authority to respond to emergencies related to international economic transactions." Mary M.C. Bowman, *Presidential Emergency Powers related to International Economic Transactions*, 11 VAND. L. REV. 515, 515 (1978).

It is thus ironic—and legally untenable—for a President to invoke IEEPA for tariff-setting authority that no President has ever exercised. Even President Franklin

---

[9] Those tariffs were terminated by proclamation three months later. Termination of Additional Duty for Balance of Payments Purposes, Proclamation 4098 (Dec. 20, 1971). The United States Court of Customs and Patent Appeals held that the imposition of duties was a valid exercise of the authority delegated to the President by section 5(b) of the Trading with the Enemy Act (TWEA). *See United States v. Yoshida Int'l, Inc.*, 526 F.2d 560 (Ct. Cust. and Pat. App. 1975); *Alcan Sales v. United States*, 534 F.2d 920 (Cust. and Pat. App. 1976), *cert. denied*, 429 U.S. 986 (1976).

13

Roosevelt—who had an expansive theory of presidential power and was President during economic depression and a global war—never used IEEPA's more powerful predecessor, the Trading with the Enemy Act, to modify tariffs. Courts should not require Congress to play legislative whack-a-mole and respond specifically to every claimed emergency a President might cite to usurp Congress's powers. The text of the Constitution is clear that duty-setting is a legislative power, and the history of tariffs and "emergency power" legislation like IEEPA shows that Congress provided no authority to the President to unilaterally impose tariffs.

## CONCLUSION

For the foregoing reasons, *amicus* requests the Court deny the government's motion to transfer and grant Plaintiffs' request for injunctive and declaratory relief.

Respectfully submitted,

/s/ Thomas A. Berry
Thomas A. Berry
    *Admitted pro hac vice*
Brent Skorup
Cato Institute
1000 Mass. Ave., N.W.
Washington, DC 20001
(443) 254-6330
tberry@cato.org

*Counsel for Amici Curiae the Cato Institute*

May 12, 2025

## CERTIFICATE OF SERVICE

I hereby certify that on May 12, 2025, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will cause it to be served on all parties and counsel of record.

/s/ Thomas A. Berry
Thomas A. Berry

*Counsel for Amicus Curiae the Cato Institute*

## LOCAL RULE 7.1(F) CERTIFICATION

I certify that this memorandum contains 3,191 words, per Microsoft Word's word count, which complies with the word limit requirements set forth in Local Rule 7.1(F).

/s/ Thomas A. Berry
Thomas A. Berry

*Counsel for Amicus Curiae the Cato Institute*