# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
### PENSACOLA DIVISION

EMILY LEY PAPER, INC., d/b/a
SIMPLIFIED, *et al.*,

              Plaintiffs,

v.

DONALD J. TRUMP, *et al.*,

              Defendants.

Case No. 3:25-cv-00464-TKW-ZCB

**BRIEF OF *AMICUS CURIAE* THE BRENNAN CENTER FOR JUSTICE
IN SUPPORT OF PLAINTIFFS**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................... iii

IDENTITY, INTEREST, AND AUTHORITY TO FILE OF AMICUS CURIAE ..1

INTRODUCTION AND SUMMARY OF ARGUMENT ......................................2

ARGUMENT .........................................................................................................4

   I.   The Congressional Intent Behind the NEA and IEEPA Was to Circumscribe
       Presidential Use of Emergency Powers..........................................................4

       A.   The National Emergencies Act ......................................................... 5

       B.   The International Emergency Economic Powers Act ............................... 13

   II.   Construing IEEPA to Authorize Tariffs Would Contravene Congress's
       Intent to Circumscribe Presidential Use of Emergency Powers ...................18


CONCLUSION ......................................................................................................26

# TABLE OF AUTHORITIES

## CASES

*Biden v. Nebraska*, 600 U.S. 477 (2023) ....................................................11

*Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644 (2020)...........................................4

*Eldred v. Ashcroft*, 537 U.S. 186 (2003) ...............................................11

*I.N.S. v. Chadha*, 462 U.S. 919 (1983) ....................................................10

*In re McLean*, 794 F.3d 1313 (11th Cir. 2015) .....................................................2

*Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024) ........................................19

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952)..............................6

## CONSTITUTIONAL PROVISIONS

U.S. Const. art. 1, § 8, cl. 15 ................................................................6

U.S. Const. art. 1, § 9, cl. 2 ................................................................6

U.S. Const. art. I, § 8, cl. 1..............................................................23

U.S. Const. art. II ...........................................................................6

## STATUTES

19 U.S.C. § 1338....................................................................... 22, 23

50 U.S.C. §§ 1701-10................................................................. 15, 16, 17

Act of Dec. 28, 1977, Pub. L. No. 95-223, § 101, 91 Stat. 1625 (1977)
(codified as amended at 50 U.S.C. § 4305(b)(1)) .................................................15

Emergency Banking Relief Act, Pub. L. No. 73-1, 48 Stat. 1 (March 9, 1933)......14

Foreign Relations Authorization Act, Fiscal Years 1986 and 1987, Pub. L. No. 99-93, § 801, 99 Stat. 405 (1985) (codified at 50 U.S.C. § 1622(a)(1)) ...................10

National Emergencies Act, Pub. L. No. 94-412, 90 Stat. 1255 (1976)
(codified as amended at 50 U.S.C. §§ 1601-51) ........................................ 9, 10, 17

Trade Act of 1974, Pub. L. No. 93-618, 88 Stat. 1978
(codified as amended at 19 U.S.C. §§ 2101-2497b) .......................... 19, 21, 22, 23

Trade Expansion Act of 1962, Pub. L. No. 87-794, § 232(b)-(c), 76 Stat. 872, 877
(codified as amended at 19 U.S.C. § 1862(b)-(c)) ................................... 19, 21, 23

Uruguay Round Agreements Act, Pub. L. No. 103-465, 108 Stat. 4809 (1994).....23

## LEGISLATIVE MATERIALS

123 Cong. Rec. 424 (1977)
(statement of Rep. Jonathan B. Bingham, Chairman, Subcomm. on Int'l Econ.
Pol'y and Trade) ................................................................................15

H.R. Rep. No. 94-238 (1976)....................................................................25

H.R. Rep. No. 95-459 (1977).......................................................... *passim*

S. Rep. No. 95-466 (1977) ................................................................ 17, 19

S. Res. 242, 93rd Cong. (1974)....................................................................8

National Emergencies Act, S. 977, 94th Cong. (1975) ...........................................12

## EXECUTIVE ORDERS AND PROCLAMATIONS

Exec. Order No. 14257, 90 Fed. Reg. 15041 (Apr. 2, 2025)...................................20

Exec. Order. No. 14193, 90 Fed. Reg. 9113 (Feb. 1, 2025)...................................20

Exec. Order. No. 14194, 90 Fed. Reg. 9117 (Feb. 1, 2025)...................................20

Exec. Order. No. 14195, 90 Fed. Reg. 9121 (Feb. 1, 2025)...................................20

Proclamation No. 2039, 48 Stat. 1689 (Mar. 6, 1933)...........................................14

## OTHER AUTHORITIES

2A Norman Singer & Shambie Singer, *Sutherland Statutory Construction*
(7th ed. & Nov. 2024 update).................................................................12

Andrew Boyle, Brennan Ctr. for Just., *Checking the President's Sanctions Powers*
(2021), https://perma.cc/V2ZG-573P.......................................................14

Brief of the Brennan Ctr. for Just. & the Cato Inst. as *Amici Curiae*, *Sierra Club v.
Trump*, 977 F.3d 853 (9th Cir. 2020) (Nos. 19-17501, 19-17501, 20-15044) .....24

Christopher A. Casey & Cathleen D. Cimino-Isaacs, Cong. Rsch. Serv., IF10038,
*Trade Promotion Authority (TPA)* (February 20, 2024),
https://www.congress.gov/crs-product/IF10038 ...................................20

Christopher A. Casey, Cong. Rsch. Serv., IF11030, *U.S. Tariff Policy: Overview*
(Jan. 31, 2025), https://www.congress.gov/crs-product/IF11030........................20

Christopher T. Zirpoli, Cong. Rsch. Serv., R48435, *Congressional and
Presidential Authority to Impose Import Tariffs* (2025),
https://www.congress.gov/crs-product/R48435 ...................................22

*Constitutions Database*, Constitute, https://perma.cc/GER8-2YPX .........................6

Elaine Halchin, Cong. Rsch. Serv., 98-505, *National Emergency Powers* (2019),
https://perma.cc/NK3V-DLFF ...........................................................7, 8

*Emergency*, Cambridge Dictionary,
   https://dictionary.cambridge.org/us/dictionary/english/emergency .......................5

*Emergency,* Legal Information Institute, https://perma.cc/7EDC-7BTS .................5

*Hearing on Restoring Congressional Oversight over Emergency Powers:*
   *Exploring Options to Reform the National Emergencies Act Before the S. Comm.*
   *on Homeland Sec. and Governmental Affs.*, 118th Cong. (2024)
   (statement of Elizabeth Goitein, Brennan Center for Justice)
   https://perma.cc/4TJL-3QTR ...........................................................................6, 11

John Ferejohn and Pasquale Pasquino, *The Law of the Exception: A Typology of*
   *Emergency Powers*, 2 Int'l J. Const. L. 210 (2004) ................................................6

Saikrishna Prakash, *The Imbecilic Executive*, 99 Va. L. Rev. 1391 (2013)..............7

Scott Lincicome & Inu Manak, *Protectionism or National Security? The Use and*
   *Abuse of Section 232,* CATO Inst. (Mar. 9, 2021),
   https://perma.cc/K8JN-YD8D .................................................................................21

Tara Suter, *Lutnick: 'We do expect a 10 percent baseline tariff to be in place for*
   *the foreseeable future,'* The Hill (May 11, 2025),
   https://thehill.com/business/5294425-lutnick-10-percent-baseline-tariff
   foreseeable-future/...................................................................................................20

*The National Emergencies Act (Public Law 94-412), Source Book: Legislative*
   *History, Text, and Other Documents* (1976) ................................................ *passim*

Thomas E. Cronin, *A Resurgent Congress and the Imperial Presidency*,
   95 Pol. Sci. Q. 209 (1980) .........................................................................................8

## IDENTITY, INTEREST, AND AUTHORITY TO FILE OF AMICUS CURIAE

*Amicus curiae* the Brennan Center for Justice at New York University School of Law ("the Brennan Center") files this brief with the written consent of all parties.[1]

*Amicus curiae* the Brennan Center is a not-for-profit, non-partisan think tank and public interest law institute that seeks to improve systems of democracy and justice. The Brennan Center's interest in this case stems from its extensive research on, analysis of, and public education regarding the National Emergencies Act of 1976 (NEA), the International Emergency Economic Powers Act (IEEPA), and the president's emergency powers more generally. In the motion currently before the Court, Defendants argue that IEEPA should be read to authorize the imposition of tariffs, a novel interpretation that contravenes the law's text and legislative history and would enable the president to circumvent a detailed statutory framework for tariffs.

The Brennan Center submits this brief to show that Defendants' interpretation is contrary to the original purpose of both the NEA and IEEPA, which was to

---

[1] No counsel for a party authored this brief in whole or in part, no party or party's counsel contributed money that was intended to fund preparing or submitting the brief, and no person other than *amicus curiae* and counsel made a monetary contribution to its preparation or submission. This brief does not purport to convey the position, if any, of New York University School of Law.

carefully circumscribe presidential use of emergency powers. Because IEEPA does not authorize the imposition of tariffs, it should not be considered to "provide" for tariffs for purposes of conferring exclusive jurisdiction on the Court of International Trade, and Defendants' motion to transfer the case to that court should be denied.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Emergency powers have a narrow and specific function in our constitutional system. They are meant to provide presidents with a temporary boost in power to deal with sudden, unforeseen crises that require immediate action. They present a significant temptation, however, as they offer a potential means to short-circuit the normal policymaking process in non-emergency circumstances. A pattern of such behavior in the mid-twentieth century led Congress to enact the National Emergencies Act of 1976 (NEA) and the International Emergency Economic Powers Act (IEEPA).

The NEA was intended to rein in presidential use of statutory emergency powers. Although Congress did not define "national emergency," the legislative history of the NEA makes clear that Congress did not intend for the law to provide an affirmative grant of limitless discretion, and that it expected the limits contained within specific emergency powers to be scrupulously observed and enforced. *See In re McLean*, 794 F.3d 1313, 1321 (11th Cir. 2015) ("When ambiguity in a statute

2

renders congressional intent unclear . . . it is appropriate to resort to extrinsic aids such as legislative history." (quoting *Lowery v. Alabama Power Co.*, 483 F.3d 1184, 1205 (11th Cir. 2007))). Moreover, the NEA was carefully designed to ensure that presidential actions in this area would remain subordinate to Congress's authority. Congress similarly enacted IEEPA to rein in the president's authority—in this case, the authority to regulate economic transactions in response to emergencies during peacetime. In addition to predicating the exercise of such powers on a declaration of national emergency, Congress specified that the emergency must constitute an "unusual and extraordinary threat" to the country's national security, foreign policy, or economy, and narrowed the powers available under the law. Congress thus sought to prevent the use of IEEPA to engage in the type of routine policymaking that is and should be governed by non-emergency authorities.

This legislative history establishes that IEEPA and other emergency powers available under the NEA, even while they give the president broad powers, must not be interpreted in a way that allows the president to arrogate to himself powers beyond those explicitly conferred. That is particularly true where Congress has explicitly and extensively legislated in the relevant area and where the use of the claimed power would circumvent that legislation. That is the case here, as multiple factors—including the text of IEEPA, its legislative history, the contemporaneous

enactment of specific tariff legislation, and the unsuitability of tariffs as a response to emergency scenarios—indicate that IEEPA does not authorize tariffs, and construing the statute otherwise would enable presidents to bypass the multiple laws Congress has enacted both authorizing and constraining the president's imposition of tariffs.

## ARGUMENT

### I.    The Congressional Intent Behind the NEA and IEEPA Was to Circumscribe Presidential Use of Emergency Powers

Defendants take a wholly novel position: that this case must be transferred to the Court of International Trade because IEEPA, a statute creating a specific set of emergency economic powers, is a statute "providing for . . . tariffs." Defs.' Mot. to Transfer at 11, ECF No. 5 [hereinafter Defs.' Mot.]. Plaintiffs have responded that IEEPA does not authorize the imposition of tariffs. Pls.' Mem. in Opp'n to Defs.' Mot. to Transfer at 1, ECF No. 21 [hereinafter Pls.' Mem.]. Plaintiffs have the better argument, but to the extent there is any ambiguity on this point, the legislative history of the NEA and IEEPA strongly favor the Plaintiffs' reading. *See Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644, 674 (2020) ("[M]embers of this Court have consulted legislative history when interpreting ambiguous statutory language."). That legislative history makes clear that the NEA and IEEPA were enacted to

4

circumscribe the president's use of statutory emergency powers, and it underscores the importance of strictly construing those powers' limits.

### A.    The National Emergencies Act

To understand Congress's intent in passing the NEA, it is necessary to understand more broadly the purpose and history of emergency powers in the United States. Emergency powers play a unique role in our constitutional system. By definition, emergencies are sudden and unexpected, and they require immediate action. *See emergency,* Legal Information Institute, https://perma.cc/7EDC-7BTS (last visited May 8, 2025) (defining "emergency" as "an urgent, sudden, and serious event or an unforeseen change in circumstances that necessitates immediate action to remedy harm or avert imminent danger to life, health, or property"); *emergency*, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/ english/emergency (last visited May 11, 2025) (defining "emergency" as "something dangerous or serious . . . that happens suddenly or unexpectedly and needs fast action in order to avoid harmful results"). Because emergencies are sudden and unexpected, Congress may not be able to enact authorities in advance that are tailored to address them. And as a deliberative bicameral body, Congress is ill-suited to act with the necessary immediacy once the emergency has occurred. Emergency powers thus are designed to grant the president extraordinary legal leeway to respond to crises that

5

Congress could not have foreseen and that are moving too fast or too unpredictably for Congress to address after-the-fact. *See Hearing on Restoring Congressional Oversight over Emergency Powers: Exploring Options to Reform the National Emergencies Act Before the S. Comm. on Homeland Sec. and Governmental Affs.*, 118th Cong. 3-5 (2024) (statement of Elizabeth Goitein, Brennan Center for Justice), https://perma.cc/4TJL-3QTR; *see generally* John Ferejohn and Pasquale Pasquino, *The Law of the Exception: A Typology of Emergency Powers*, 2 Int'l J. Const. L. 210 (2004).

Unlike most other countries' constitutions,[2] the U.S. Constitution does not provide the president with any explicit emergency powers. *See generally* U.S. Const. art. II.[3] Accordingly, from the time of the country's founding, presidents have relied on Congress to provide them with enhanced authorities for emergency situations.[4]

---

[2] A review of current constitutions reveals that at least 165 countries' constitutions have provisions for emergency rule. *See Constitutions Database*, Constitute, https://perma.cc/GER8-2YPX (last visited May 9, 2025) (search database of constitutions for keyword "emergency" and filter for "in force").

[3] Those powers that could be considered "emergency powers" are given to Congress under Article I, such as the power to suspend *habeas corpus* "when in Cases of Rebellion or Invasion the public Safety may require it," U.S. Const. art. 1, § 9, cl. 2, and to provide for "calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions," U.S. Const. art. 1, § 8, cl. 15.

[4] Presidents have, on occasion, claimed that the Constitution gives them broad *inherent* powers to take emergency action without congressional authorization. The Supreme Court has not endorsed such a reading, *see, e.g., Youngstown Sheet & Tube*

6

Throughout the eighteenth and early nineteenth centuries, Congress periodically enacted laws giving presidents standby authorities that they could use in their discretion during military, economic, or labor crises. *See* Elaine Halchin, Cong. Rsch. Serv., 98-505*, National Emergency Powers* 1 (2019), https://perma.cc/NK3V-DLFF.

Beginning in World War I, a new procedure for invoking statutory emergency powers evolved. Presidents would declare a national emergency, and this declaration would give them access to statutory authorities that would otherwise lie dormant. *See id.* at 1. This system continues to this day. Before the enactment of the NEA, however, there was no overarching statute regulating it. *See id.* at 3. There was little transparency or congressional oversight with respect to presidents' use of emergency powers, and nothing to prevent states of emergency from lingering indefinitely.

In the 1970s, several scandals involving executive branch overreach—including Watergate, the bombing of Cambodia, and domestic spying by the CIA—prompted Congress to investigate the exercise of executive power in national security matters, and to enact several laws aimed at reasserting Congress's role as

---

*Co. v. Sawyer*, 343 U.S. 579, 587-89 (1952) (rejecting President Harry S. Truman's claim of inherent constitutional authority to seize control of steel mills during the Korean War), and it finds little support in constitutional history, *see* Saikrishna Prakash, *The Imbecilic Executive*, 99 Va. L. Rev. 1391, 1366-68, 1425 (2013).

an equal branch of government and a check on executive authority. *See generally* Thomas E. Cronin, *A Resurgent Congress and the Imperial Presidency*, 95 Pol. Sci. Q. 209 (1980). It was in this context that a special Senate committee, which eventually came to be named the Special Committee on National Emergencies and Delegated Emergency Powers, was formed to examine presidential use of emergency powers. *See* S. Res. 242, 93rd Cong. (1974); Halchin, *supra*, at 7-8.

The committee was alarmed by what it found. In the course of the committee's investigation, it came to light that several clearly outdated emergency declarations remained on the books, in effect creating "virtually permanent states of emergencies." 120 Cong. Rec. S. 15784-94 (daily ed. Aug. 22, 1974) (statement of Sen. Church), *reprinted in* S. Comm. on Government Operations and the Spec. Comm. on National Emergencies and Delegated Emergency Powers, *The National Emergencies Act (Public Law 94-412), Source Book: Legislative History, Text, and Other Documents* 73 (1976) [hereinafter *Spec. Comm. on National Emergencies Source Book*]. This use of emergency powers outside of acute crises concerned the committee because "[l]egislation intended for use in crisis situations is by its nature not well suited to normal, day-to-day government operations." 121 Cong. Rec. H8325-H8341 (daily ed. Sept. 4, 1972) (statement of Rep. Rodino), *reprinted in Spec. Comm. on National Emergencies Source Book*, *supra*, at 244.

8

In fact, the committee warned that the proliferation of emergency powers with insufficient limits or congressional oversight had created a "dangerous state of affairs." S. Rep. No. 94-922, at 1 (1976), *reprinted in Spec. Comm. on National Emergencies Source Book*, *supra*, at 33. The committee counted more than 470 statutory provisions that delegated extraordinary authority to the executive branch in times of national emergency. These included provisions allowing the president to:

> seize property and commodities, organize and control the means of production, call to active duty 2.5 million reservists, assign military forces abroad, seize and control all means of transportation and communication, restrict travel, and institute martial law, and, in many other ways, manage every aspect of the lives of all American citizens.

S. Rep. No. 93-1170, at 2 (1974), *reprinted in Spec. Comm. on National Emergencies Source Book*, *supra*, at 20.

The committee's work culminated in the introduction and passage of the NEA, which took effect in 1978. *See* National Emergencies Act, Pub. L. No. 94-412, 90 Stat. 1255 (1976) (codified as amended at 50 U.S.C. §§ 1601-51). The purpose of the law, evident in every facet of its legislative history, was to limit presidential use of emergency powers. As summarized by the committee in urging passage of the Act:

> While much work remains, none of it is more important than passage of the National Emergencies Act. Right now, hundreds of emergency statutes confer enough authority on the President to rule the country without reference to normal constitutional process. Revelations of how

9

power has been abused by high government officials must give rise to concern about the potential exercise, unchecked by the Congress or the American people, of this extraordinary power. The National Emergencies Act would end this threat and insure that the powers now in the hands of the Executive will be utilized only in time of genuine emergency and then only under safeguards providing for Congressional review.

S. Rep. No. 94-922, at 18, *reprinted in Spec. Comm. on National Emergencies Source Book*, *supra*, at 50; *see also* S. Rep. No. 94-1168, at 2 (1976), *reprinted in Spec. Comm. on National Emergencies Source Book*, *supra*, at 291 ("At a time when governments throughout the world are turning with increasing desperation to an all-powerful executive, this legislation is designed to ensure that the United States travels a road marked by carefully constructed legal safeguards."). The law included several provisions designed to assert a stronger and more active role for Congress in deciding whether states of emergency should continue. Most notably, it allowed Congress to terminate states of emergency at any time through a concurrent resolution (commonly referred to as a "legislative veto" because it would take effect without the president's signature). *See* National Emergencies Act § 202, 90 Stat. at 1255.[5]

---

[5] The Supreme Court subsequently held that legislative vetoes are unconstitutional. *See I.N.S. v. Chadha*, 462 U.S. 919, 954-55 (1983). Congress thus replaced the concurrent resolution mechanism with one for joint resolutions, which must be signed into law by the president. *See* Foreign Relations Authorization Act, Fiscal Years 1986 and 1987, Pub. L. No. 99-93, § 801, 99 Stat. 405, 448 (1985) (codified

The NEA does not include a definition of "national emergency." Defendants, relying on statements by the special committee's co-chairs in a hearing, claim that this omission was intended to avoid constraining the president's discretion. *See* Defs.' Mot. at 5-6. The relevant committee report, however—a more salient indicator of congressional intent—tells a very different story. *See Eldred v. Ashcroft*, 537 U.S. 186, 209 n.16 (2003) (noting that committee reports on a bill are "the authoritative source for finding the Legislature's intent," because they "'represen[t] the considered and collective understanding of those [Members of Congress] involved in drafting and studying proposed legislation'" (alterations in original)

---

at 50 U.S.C. § 1622(a)(1)). This development greatly weakened the effectiveness of the NEA as a check on presidential authority, as Congress in most cases will need a veto-proof supermajority to terminate an emergency declaration. *See Hearing on Restoring Congressional Oversight over Emergency Powers: Exploring Options to Reform the National Emergencies Act Before the S. Comm. on Homeland Sec. and Governmental Affs.*, 118th Cong. 8 (2024) (statement of Elizabeth Goitein, Brennan Center for Justice), https://perma.cc/4TJL-3QTR. The lack of a ready means for Congress to terminate emergency declarations, as originally envisioned in the law, makes it all the more important for the judiciary to fulfill its own role as a check against executive overreach by rejecting overbroad readings of the powers such declarations unlock. Notwithstanding Defendants' claim that "Congress gave itself the exclusive oversight authority over a President's national emergency declaration," Defs.' Mot. at 6, courts can and do review whether a president's exercise of power pursuant to a national emergency declaration is authorized by the power invoked. *See, e.g.*, *Biden v. Nebraska*, 600 U.S. 477 (2023) (holding that the HEROES Act, an emergency power invoked by President Joe Biden pursuant to the COVID-19 national emergency declaration, does not authorize the forgiveness of student loan debt).

(quoting *Garcia v. United States*, 469 U.S. 70, 76 (1984))); 2A Norman Singer & Shambie Singer, *Sutherland Statutory Construction* § 48:6 (7th ed. & Nov. 2024 update) ("[C]ourts generally view committee reports as the most persuasive indicia of legislative intent." (internal quotation marks omitted)) (collecting cases). Under an earlier draft of the legislation, the president was authorized to declare a national emergency "[i]n the event the President finds that a proclamation of a national emergency is essential to the preservation, protection and defense of the Constitution or to the common defense, safety, or well-being of the territory or people of the United States." National Emergencies Act, S. 977, 94th Cong. § 201(a) (1975). One committee report noted that this definition was "deliberately cast in broad terms that makes it clear that a proclamation of a state of national emergency requires a grave national crisis." S. Rep. No. 93-1193, at 2 (1974), *reprinted in Spec. Comm. on National Emergencies Source Book*, *supra*, at 96. The Senate Committee on Government Operations removed this language, not because it was too limiting, but because the committee believed it to be too broad. As stated in the committee's report:

> [F]ollowing consultations with several constitutional law experts, the committee concluded that section 201(a) is overly broad, and might be construed to delegate additional authority to the President with respect to declarations of national emergency. In the judgment of the committee, the language of this provision was unclear and ambiguous and might have been construed to confer upon the President statutory

12

authority to declare national emergencies, other than that which he now
has through various statutory delegations.

The Committee amendment clarifies and narrows this language. The
Committee decided that *the definition of when a President is authorized
to declare a national emergency should be left to the various statutes
which give him extraordinary powers*. The National Emergencies Act
is not intended to enlarge or add to Executive power. Rather the statute
is an effort by the Congress to establish clear procedures and safeguards
for the exercise by the President of emergency powers conferred upon
him by other statutes.

S. Rep. No. 94-1168, at 3, *reprinted in Spec. Comm. on National Emergencies
Source Book*, *supra*, at 292 (emphasis added). In other words, Congress viewed the
specific criteria and limitations within the various emergency authorities that the
president may invoke in a national emergency as key constraints on the executive
power presidents retained under the NEA. The legislative history of the NEA thus
underscores the importance of strictly interpreting and enforcing those criteria and
limitations.

## B.    The International Emergency Economic Powers Act

Enacted one year after the NEA and in response to the same concerns over
executive branch overreach, IEEPA was Congress's attempt to rein in presidential
power to take economic action in emergencies. In particular, Congress was
responding to abuses of the Trading With the Enemy Act of 1917 (TWEA). That
statute was originally enacted in World War I to give the president powers to take

13

economic measures against enemy nations, such as blocking enemy property, during wartime. *See* Andrew Boyle, Brennan Ctr. for Just., *Checking the President's Sanctions Powers* 5 (2021), https://perma.cc/V2ZG-573P. In 1933, however, after President Franklin Delano Roosevelt deployed the law to declare a bank holiday in the United States, *see* Proclamation No. 2039, 48 Stat. 1689 (Mar. 6, 1933), Congress hastily amended it to apply during national emergencies as well as wartime, *see* Emergency Banking Relief Act, Pub. L. No. 73-1, 48 Stat. 1 (Mar. 9, 1933). In doing so, "Congress recognized that it was conferring unusual powers on the President which were justified by the gravity of the situation which the country faced, but which should not normally be available to Presidents in peacetime." H.R. Rep. No. 95-459, at 4 (1977).

The NEA originally exempted the TWEA from its ambit. Because a small number of emergency powers, including the TWEA, were in regular use, Congress decided to temporarily exclude them "to allow for a careful study of how to revise them in accordance with the intent of the National Emergencies Act without disrupting policies currently in effect under their authority." H.R. Rep. No. 95-459, at 6. The resulting inquiry into the TWEA, conducted by the committees of jurisdiction in both chambers, confirmed that "[s]uccessive Presidents [had] . . . seized upon" the TWEA's open-ended language to turn it "through usage, into

something quite different from what was envisioned in 1917." H.R. Rep. No. 95-459, at 8-9. Indeed, the TWEA had "become essentially an unlimited grant of authority for the President to exercise, at his discretion, broad powers in both the domestic and international economic arena, without congressional review." H.R. Rep. No. 95-459, at 7. Its emergency authorities had "in effect become routine authorities used to conduct the day-to-day business of the Government." 123 Cong. Rec. 424 (1977) (statement of Rep. Jonathan B. Bingham, Chairman, Subcomm. on Int'l Econ. Pol'y and Trade).

In response to these findings and concerns, Congress amended the TWEA in 1977 to limit it to instances where Congress had declared war, as had originally been intended. H.R. Rep. No. 95-459, at 10; Act of Dec. 28, 1977, Pub. L. No. 95-223, § 101, 91 Stat. 1625 (1977) (codified as amended at 50 U.S.C. § 4305(b)(1)). At the same time, Congress promulgated a new statute—IEEPA—to provide for a more constrained set of economic powers that would be available during national emergencies in peacetime. International Emergency Economic Powers Act, Pub. L. No. 95-223, §§ 201-08, 91 Stat. 1625, 1626-29 (1977) (codified as amended at 50 U.S.C. §§ 1701-10).

Congress intended the powers it was conferring under IEEPA to be subject to significant "substantive restrictions." H.R. Rep. No. 95-459, at 10. The first such

restriction was the high bar to invoking the statute. Congress perceived the requirement of declaring a national emergency to be a significant limitation, given that "emergencies are by their nature rare and brief, and are not to be equated with normal, ongoing problems." *Id.* Even so, Congress added a further constraint, providing that IEEPA's authorities may be used only to deal with an "unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States." 50 U.S.C. § 1701(a).

In addition, the authorities provided under IEEPA were "limited to the regulation of international economic transactions" and were "more restricted than those available during time of war." H.R. Rep. No. 95-459, at 10-11. IEEPA sets forth a detailed list of powers that the president may exercise over property or transactions under U.S. jurisdiction in which a foreign nation or person has any interest. Specifically, the president may:

> investigate, block during the pendency of an investigation, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States[.]

50 U.S.C. § 1702(a)(1)(B). Neither this list nor the legislative history includes any mention of the imposition of tariffs or duties. To the contrary, Congress described the powers it was transferring in IEEPA as involving regulation of financial transactions (foreign exchange and banking, currency, and securities transactions) and controlling or freezing foreign property, H.R. Rep. No. 95-459, at 14-15; S. Rep. No. 95-466, at 5 (1977), and actually cited expert testimony *contrasting* these powers with "other congressionally authorized controls on U.S. foreign economic policy such as import and export controls," H.R. Rep. No. 95-459, at 8.

Finally, IEEPA includes procedural requirements to facilitate a strong congressional oversight role. The president must consult with Congress "in every possible instance" before invoking IEEPA and must submit reports to Congress on a regular basis. 50 U.S.C. § 1703(a)-(c). Moreover, because the powers granted by IEEPA are exercised pursuant to a national emergency declaration, Congress may block the use of IEEPA powers by terminating the national emergency declaration on which the IEEPA invocation relies. 50 U.S.C. § 1622(a)(1).

In short, the legislative history of IEEPA—like that of the NEA—reflects a resolute focus on restricting presidential use of emergency powers and ensuring that such use would not exceed the authority provided by Congress.

17

## II.    Construing IEEPA to Authorize Tariffs Would Contravene Congress's Intent to Circumscribe Presidential Use of Emergency Powers

The legislative histories of the NEA and IEEPA bear directly on the proper interpretation of IEEPA's scope. Plaintiffs cite the Supreme Court's admonition that executive actions with major political or economic significance must be clearly authorized by Congress. *See* Pls.' Mem. at 15-17. There is an independent reason, however, to require clear authorization by Congress when the president takes action under the NEA and/or IEEPA—laws designed to ensure that emergency powers would be used sparingly and only within the bounds Congress has established. As Congress recognized in passing the NEA and IEEPA, the powers expressly granted to the president during a national emergency are extremely potent and vulnerable to exploitation or abuse. Allowing a president to expand these powers beyond their already sweeping scope by inferring powers not explicitly conferred would create exactly the kind of danger that Congress sought to mitigate. The fact that the powers expressly granted by IEEPA are "broad," as Defendants correctly observe, Defs.' Mot. at 2, merely underscores the importance of resisting efforts to broaden them even further beyond their textual limits.

As set forth extensively in Plaintiffs' opposition and briefly summarized here, IEEPA does not clearly authorize the imposition of tariffs. The long list of presidential actions that it authorizes does not include imposing tariffs or leveling

taxes or duties. Construing the word "regulate" to encompass the imposition of tariffs is a strained reading of the term that would render it an outlier from the other actions on the list, all of which relate to requiring or prohibiting transactions rather than taxing them. *See* Pls.' Mem. at 8-13. The legislative history of IEEPA, which describes intended uses for the law, is similarly devoid of any mention of tariffs. *See* H.R. Rep. No. 95-459, at 14-15; S. Rep. No. 95-466, at 5. The notion that Congress intended to create a sweeping new emergency tariff power *sub silentio* is all the more unlikely given that Congress had recently enacted broad tariff legislation, *see* Trade Act of 1974, Pub. L. No. 93-618, 88 Stat. 1978 (codified as amended at 19 U.S.C. §§ 2101-2497b), and there was already a statute in place specifically authorizing the adjustment of imports to protect national security, *see* Trade Expansion Act of 1962, Pub. L. No. 87-794, § 232(b)-(c), 76 Stat. 872, 877 (codified as amended at 19 U.S.C. § 1862(b)-(c)). Until now, no president had ever used IEEPA for tariffs in its nearly 50-year history, itself a powerful sign that the law does not authorize such a measure. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 386 (2024) ("'[T]he longstanding practice of the government'—like any other interpretive aid— 'can inform [a court's] determination of what the law is.'" (second alteration in original) (quoting *NLRB v. Noel Canning*, 573 U.S. 513, 525 (2014))).

Additionally, tariffs are an unlikely subject for emergency powers. Emergencies are, by the very term, "rare and brief, and are not to be equated with normal, ongoing problems." H.R. Rep. No. 95-459, at 10. Emergency powers are intended to authorize short-term actions to address these rare and brief occurrences. Tariffs, by contrast, are a type of tax generally used to effectuate longer term policies like protecting domestic industries, advancing foreign policy goals, or providing leverage in trade negotiations. Christopher A. Casey, Cong. Rsch. Serv., IF11030, *U.S. Tariff Policy: Overview* 1 (Jan. 31, 2025), https://www.congress.gov/crs-product/IF11030. Indeed, in this case, the majority of the tariffs at issue are intended to address "structural imbalances in the global trading system"—by President Trump's own admission, a longstanding and widespread state of affairs, Exec. Order No. 14257, 90 Fed. Reg. 15041 (Apr. 2, 2025),[6] and one that will ostensibly require baseline tariffs to remain in place "for the foreseeable future," *see* Tara Suter, *Lutnick: 'We do expect a 10 percent baseline tariff to be in place for the foreseeable future,'* The Hill (May 11, 2025), https://thehill.com/business/5294425-lutnick-10-

---

[6] Three of President Trump's executive orders cite unlawful immigration and fentanyl trafficking as the impetus for tariffs. Exec. Order. No. 14194, 90 Fed. Reg. 9117 (Feb. 1, 2025); Exec. Order. No. 14195, 90 Fed. Reg. 9121 (Feb. 1, 2025); Exec. Order. No. 14193, 90 Fed. Reg. 9113 (Feb. 1, 2025). As set forth in Plaintiffs' Complaint, however, tariffs are a poor fit for addressing these problems. *See* Pls.' Am. Compl. ¶¶ 63-72, ECF No. 20.

percent-baseline-tariff-foreseeable-future/ (quoting Secretary of Commerce Howard Lutnick).

It is thus unsurprising that, when Congress has authorized the president to impose tariffs, it has generally done so under conditions that facilitate some degree of deliberation and advance notice, enabling domestic manufacturers and distributers to plan ahead and adjust their practices. *See, e.g.*, Trade Expansion Act of 1962 § 232(b)-(c), 76 Stat. at 877 (codified as amended at 19 U.S.C. § 1862(b)-(c)) (authorizing presidential action only after Secretary of Commerce conducts an investigation, notifies and consults with the Secretary of Defense and other appropriate officers of the United States, provides, as appropriate, for public hearings, and issues a report concluding that a good is imported in quantities or under circumstances that threaten national security);[7] Trade Act of 1974 §§ 201-03, 88 Stat. at 2011-18 (codified as amended at 19 U.S.C. §§ 2251-55) (authorizing tariffs

---

[7] Section 232 of the Trade Expansion Act, which authorizes the president to "adjust the imports of an article and its derivatives," does not use the term "tariffs" or "duties," raising the question of whether this provision may be construed as a tariff authority. There are notable differences between this provision and IEEPA, however, including the fact that Section 232 was enacted as part of the "Trade Expansion Act," is codified in Title 19 ("Customs Duties"), was not part of legislation designed to rein in presidential power, and has previously been interpreted and applied as a tariff authority. *See* Scott Lincicome & Inu Manak, *Protectionism or National Security? The Use and Abuse of Section 232*, CATO Inst. (Mar. 9, 2021), https://perma.cc/K8JN-YD8D.

only after the U.S. International Trade Commission conducts an investigation, holds public hearings, affords interested parties an opportunity to present evidence and submit comments, and concludes that importation is "a substantial cause of serious injury, or the threat thereof, to the domestic industry producing" the good); Trade Act of 1974 §§ 301-02, 88 Stat. at 2041-43 (codified as amended at 19 U.S.C. §§ 2411-20) (authorizing tariffs only after the U.S. Trade Representative conducts an investigation, provides opportunity for public input, and determines that a foreign country is violating a trade agreement). While Congress has provided for some limited circumstances where a president may impose tariffs without any such procedural barriers (although with restrictions on the amount and, in one case, duration of the tariffs), these authorities have tellingly never been used. *See* 19 U.S.C. § 1338 (authorizing tariffs in response to discrimination by other countries against U.S. commerce); 19 U.S.C. § 2132 (authorizing tariffs in response to international payments problems); *see also* Christopher T. Zirpoli, Cong. Rsch. Serv., R48435, *Congressional and Presidential Authority to Impose Import Tariffs* 23 (2025), https://www.congress.gov/crs-product/R48435 (summarizing requirements under various authorities and noting that 19 U.S.C. § 1338 and 19 U.S.C. § 2132 have "[n]ever [been] used to impose tariffs").

Moreover, as this comparison reflects, Congress has established a detailed statutory scheme for tariffs. The authority to impose tariffs is expressly committed to Congress under the Constitution, as the first of its powers. *See* U.S. Const. art. I, § 8, cl. 1 (conferring on Congress the power to "lay and collect Taxes, Duties, Imposts and Excises"). Pursuant to that authority, Congress has passed multiple statutes explicitly authorizing tariffs in a range of circumstances. The General Agreement on Tariffs and Trade—an international agreement first signed in 1947, modified through subsequent rounds of negotiation, and most recently incorporated into domestic law through the Uruguay Round Agreements Act of 1994—establishes tariff commitments for signatories and (today) members of the World Trade Organization, including the United States. *See generally* Uruguay Round Agreements Act, Pub. L. No. 103-465, 108 Stat. 4809 (1994). In addition, as noted above, Congress has enacted several laws giving the president significant discretion to impose or adjust tariffs in response to specified circumstances, including national security threats (19 U.S.C. § 1862(b)-(c)); injury to domestic industry (19 U.S.C. §§ 2251-55); trade agreement violations by other nations (19 U.S.C. §§ 2411-20); discrimination against U.S. commerce (19 U.S.C. § 1338); and international payments problems (19 U.S.C. § 2132). Where presidents have sought to raise or lower tariffs under other circumstances, they have availed themselves of Trade

23

Promotion Authority laws, which provide for expedited approval of trade agreements that meet specified negotiating objectives and consultation/notification requirements. *See* Christopher A. Casey & Cathleen D. Cimino-Isaacs, Cong. Rsch. Serv., IF10038, *Trade Promotion Authority (TPA)* 1 (February 20, 2024), https://www.congress.gov/crs-product/IF10038. Construing IEEPA to implicitly authorize the imposition of tariffs without any of the procedural and substantive restrictions of these laws would allow the president to bypass an elaborate legislative scheme in an area of plenary congressional authority.

Such a result would be inconsistent with both the purpose of emergency powers and Congress's intent in passing the NEA and IEEPA. As discussed in Part I.A., the purpose of emergency powers is to permit swift and temporary action by the president in sudden, fast-moving crises where Congress is institutionally ill-suited to act. In passing the NEA and IEEPA, Congress emphasized that emergency powers should not be used as a stand-in for regular, non-emergency legislation.[8] *See*

---

[8] In passing IEEPA, Congress did contemplate that the law might be used, as a last resort, to control exports in the event of a lapse in non-emergency export control legislation. *See* H.R. Rep. No. 95-459, at 13. There are no such gaps to fill when it comes to non-emergency tariff legislation, as discussed herein. Similarly, while "Congress has for decades acquiesced in the use of IEEPA as a substitute for ordinary *sanctions* legislation," *see* Brief of the Brennan Ctr. for Just. & the Cato Inst. as *Amici Curiae* at 17, *Sierra Club v. Trump*, 977 F.3d 853 (9th Cir. 2020) (Nos. 19-17501, 19-17501, 20-15044) (emphasis added), there is no such history of

24

H.R. Rep. No. 94-238, at 2 (1976) (noting that the NEA "will make it possible for our Government to function in accordance with regular and normal provisions of law rather than through special exceptions and procedures which were intended to be in effect for limited periods during specific emergency conditions"); H.R. Rep. No. 95-459, at 11 (directing that "authority for routine, nonemergency regulation of international economic transactions which has heretofore been conducted under [the TWEA] should be transferred to other legislation"). By the same token—and even more importantly—emergency powers should never be used to circumvent restrictions or prohibitions included in non-emergency legislation absent clear authorization to do so. That clear authorization does not exist in IEEPA.

---

acquiescence with respect to tariffs because no previous president has used IEEPA for that purpose.

25

## CONCLUSION

For the reasons stated above, interpreting IEEPA to authorize tariffs would contravene Congress's intent in enacting both the NEA and IEEPA. Because IEEPA is not a statute that provides for tariffs, this Court has jurisdiction over this case and need not transfer it to the Court of International Trade.

Dated:  May 12, 2025                    Respectfully submitted,

                                        /s/ *Leah J. Tulin*
                                        Leah J. Tulin*
                                        Elizabeth Goitein*
                                        Hannah James*
                                        BRENNAN CENTER FOR JUSTICE AT
                                        NYU SCHOOL OF LAW
                                        1140 Connecticut Ave. NW, Ste.
                                        1150
                                        Washington, D.C. 20036
                                        (202) 650-6397 (telephone)
                                        (202) 223-2683 (fax)
                                        tulinl@brennan.law.nyu.edu
                                        goiteine@brennan.law.nyu.edu
                                        jamesh@brennan.law.nyu.edu

                                        *Admission pro hac vice pending*

                                        *Counsel for* Amicus Curiae *the*
                                        *Brennan Center for Justice*

**CERTIFICATE OF SERVICE**

I hereby certify that on May 12, 2025, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will cause it to be served on all parties and counsel of record.

_/s/ Leah J. Tulin_
Leah J. Tulin

*Counsel for* Amicus Curiae *the Brennan Center for Justice*

**LOCAL RULE 7.1(F) CERTIFICATION**

I certify that this memorandum contains 5,941 words, per Microsoft Word's word count, which complies with the word limit requirements set forth in Local Rule 7.1(F).

_/s/ Leah J. Tulin_
Leah J. Tulin

*Counsel for* Amicus Curiae *the Brennan Center for Justice*