UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISRICT OF FLORIDA
PENSACOLA DIVISION

| | | |
|---|---|---|
| EMILY LEY PAPER, INC., d/b/a SIMPLIFIED, | ) ) ) | |
| *Plaintiff,* | ) ) | |
| v. | ) ) | |
| DONALD J. TRUMP, in his official capacity as President of the United States; EXECUTIVE OFFICE OF THE PRESIDENT; UNITED STATESOF AMERICA; KRISTI NOEM, in her official capacity as Secretary of the U.S. Department of Homeland Security; DEPARTMENT OF HOMELAND SECURITY; PETE R. FLORES, in his official capacity as Acting Commissioner for U.S. Customs and Border Protection; and U.S. CUSTOMS AND BORDER PROTECTION, | ) ) ) ) ) ) ) ) ) ) ) ) ) | No. 3:25-cv-00464 |
| *Defendants.* | ) ) | |

## DEFENDANTS' REPLY TO AMICUS BRIEFS

YAAKOV M. ROTH
Acting Assistant Attorney General

ERIC J. HAMILTON
Deputy Assistant Attorney General

OF COUNSEL:

PATRICIA M. McCARTHY
Director

ALEXANDER K. HAAS
Director

STEPHEN M. ELLIOTT
Assistant Director
U.S. Department of Justice

CLAUDIA BURKE
Deputy Director

Civil Division
Federal Programs Branch


MICHELLE SPAVEN
Acting United States Attorn
JOHN C. SPACCAROTELLA
Assistant United States Attorney
NY Reg No. 4304291
111 N. Adams Street, 4ᵗʰ Fl.
Tallahassee, FL 32301
(850) 216-3862

JUSTIN R. MILLER
Attorney-In-Charge
International Trade Field Office

SOSUN BAE
Senior Trial Counsel
LUKE MATHERS
BLAKE W. COWMAN
CATHERINE M. YANG
Trial Attorneys
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
1100 L St. NW
Washington, D.C. 20005
202-353-9063
Claudia.burke@usdoj.gov

May 19, 2025

*Counsel for Defendants*

## <u>TABLE OF CONTENTS</u>

**PAGE**

I.    IEEPA Does Not Curtail The Tariff Authority Provided In The Trading With the Enemy Act ........................................................... 1

II.   IEEPA Operates Concurrently With Other Tariff Laws ............................................................................................ 6

III.  The Constitutional-Doubt Canon Does Not Apply. ............................ 9

IV.   Amici's Remaining Merits Arguments About The President's Tariffs Are Not Even Arguably Relevant In This Posture ........................................................................................ 12

CONCLUSION ........................................................................................ 14

i

## TABLE OF AUTHORITIES

**CASES**                                                          **PAGES**

*Almendarez-Torres v. United States*,
   523 U.S. 224 (1998) ...................................................................9

*Dames & Moore v. Regan*,
   453 U.S. 654 (1981) ...................................................................3

*Fed. Energy Admin. v. Algonquin SNG, Inc.*,
   426 U.S. 548 (1976) ................................................................7, 9

*Gundy v. United States*,
   588 U.S. 128 (2019) ..............................................................9, 11

*Jennings v. Rodriguez*,
   583 U.S. 281 (2018) .................................................................12

*K Mart Corp. v. Cartier, Inc.*,
   485 U.S. 176 (1988) .................................................................13

*Maine Cmty. Health Options v. United States*,
   590 U.S. 296 (2020) ...................................................................5

*Miller v. French*,
   530 U.S. 327 (2000) .................................................................12

*Regan v. Wald*,
   468 U.S. 222 (1984) ...................................................................3

*Stanley v. Sanford*,
   83 F.4th 1333 (11th Cir. 2023).................................................12

*Touby v. United States*,
   500 U.S. 160 (1991) .................................................................11

*Trump v. Hawaii*,
   585 U.S. 667 (2018) ...................................................................8

*United States v. Amirnazmi*,
   645 F.3d 564 (3d Cir. 2011).....................................................10

*United States v. Arch Trading Co.*,
   987 F.2d 1087 (4th Cir. 1993) ...............................................................11

*United States v. Dhafir*,
   461 F.3d 211 (2d Cir. 2006).........................................................10, 12

*United States v. Mazurie*,
   419 U.S. 544 (1975) ...............................................................................11

*United States v. Shih*,
   73 F.4th 1077 (9th Cir. 2023) ..............................................................11

*United States v. Yoshida Int'l, Inc.*,
   526 F.2d 560 (C.C.P.A. 1975) ....................................................... *passim*

*Yellen v. Confederated Tribes of Chehalis Rsrv.*,
   594 U.S. 338 (2021) ................................................................................4

## Statutes

19 U.S.C. §1862(a) ...........................................................................................7

19 U.S.C. §2132 .................................................................................................5

28 U.S.C. §151(i)(1)(D)...................................................................................13

28 U.S.C. §1581(i)(B)......................................................................................13

50 U.S.C. §1702(b) ............................................................................................4

50 U.S.C. §4302 .................................................................................................3

50 U.S.C. § 1621(a) ...........................................................................................2

U.S.C. §1701(a) .................................................................................................4

Pursuant to the Court's April 28 order (ECF 15), defendants respectfully submit this reply to address issues raised in three amicus briefs and not already addressed in the parties' other briefs. ECF 26-1 (Professor-Br.), 27-1 (Cato-Br.), 32-1 (Brennan-Br.). Amici do not clearly address the Court of International Trade's (CIT) exclusive jurisdiction or how its jurisdiction could be meaningfully exclusive if other courts must decide the underlying merits to determine whether to transfer the case. Amici's substantial interest in the (supposedly) *procedural* question of transfer highlights that plaintiffs' approach would effectively destroy the CIT's exclusive jurisdiction by permitting a plaintiff to obtain a merits ruling by filing a challenge in any court it chooses. The Court should transfer to the CIT.

## I.    IEEPA Does Not Curtail The Tariff Authority Provided In The Trading With The Enemy Act

Amici argue that Congress passed the International Emergency Economic Powers Act (IEEPA) to take away power previously asserted by the President in the Trading with the Enemy Act (TWEA). *See* Professor-Br.23-26; Cato-Br.10-14; Brennan-Br.4-17. But they misunderstand the history, and in any event, they ignore the most crucial piece of it: none of the changes between TWEA and IEEPA altered the operative language—"regulate … importation"—that the nationwide appellate court over trade interpreted to include tariff-imposition authority before IEEPA's enactment.

Before IEEPA, TWEA, Pub. L. No. 65-91, 40 Stat. 411 (1917), authorized the President to "regulate … importation" of foreign goods during wartime. Later, Congress expanded the authority to apply during times of peace as well. *See* First War Powers Act, 55 Stat. 838, 839-40 (1941). Because of a balance-of-payments-deficit crisis, President Nixon in 1971 declared a national emergency and imposed a surcharge on imports to address the emergency under TWEA. Proclamation 4074, 36 Fed. Reg. 15,724 (Aug. 17, 1971). The Federal Circuit's predecessor upheld those tariffs as lawful, rejecting an argument that TWEA did not authorize the President to impose tariffs. *United States v. Yoshida Int'l, Inc.*, 526 F.2d 560, 575-76 (C.C.P.A. 1975).

Later, Congress modified the TWEA authority through two new laws: the National Emergencies Act (NEA) and IEEPA. *See* H.R. Rep. No. 95-459, at 6-7. First, the NEA "authorized" "the President" "to declare [a] national emergency" "[w]ith respect to Acts of Congress authorizing the exercise, during the period of a national emergency, of any special or extraordinary power." 50 U.S.C. §1621(a). Congress placed no substantive conditions on the President's ability to declare a national emergency. Instead, it committed this determination to the President, as "it would be wrong to try to circumscribe with words what conditions a President might be confronted."  NEA: Hr'gs Before the Subcomm. on Admin. Law and Gov't Relations, 94th Cong. 27 (Mar. 6, 1975) (statement of Sen. Mathias); *see id.* at 31

("[W]e didn't attempt to define it specifically because we were afraid we would circumscribe the President's constitutional powers.").

Recognizing that emergency declarations would be political questions, Congress gave itself oversight authority over national-emergency declarations. Congress directed the President to "immediately … transmit[]" national-emergency declarations to Congress. 50 U.S.C. §§1621(a), 1641(a)-(c). Congress is authorized to terminate a national emergency by enacting a joint resolution into law and also enacted a special fast-track procedure to accelerate congressional review. §1622(a)(1).

In enacting IEEPA, Congress also separated the President's authority to act in wartime and peacetime. Congress had limited TWEA to apply only in periods of declared wars. *See* 50 U.S.C. §4302. IEEPA then extended the President's authority to periods of declared national emergencies during peacetime. *See Regan v. Wald*, 468 U.S. 222, 227-28 (1984). The broad powers granted to the President under IEEPA are "essentially the same as" those under TWEA. *Id.* IEEPA's operative language was "directly drawn" from TWEA. *Dames & Moore v. Regan*, 453 U.S. 654, 671-72 (1981). IEEPA authorizes the President to exercise those powers during peacetime, "to deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States." 50 U.S.C. §1701(a). Once the President

declares a national emergency relating to such a threat, IEEPA empowers the President to "regulate … importation … with respect to any property, subject to the jurisdiction of the United States." §1702(a)(1)(B).

This history refutes amici's contention that IEEPA curtailed the President's authority to impose tariffs. *See* Professors-Br.23-26; Cato-Br.10-14; Brennan-Br.4-17. Rather, Congress limited the President's power by including specific procedural directives and delineating specific exceptions to the otherwise broad grant of authority under IEEPA—none of which curtailed the President's authority to impose tariffs to address a declared national emergency. Congress *knew* that TWEA had been used to impose tariffs, *see* H.R. Rep. No. 95-459, at 5, yet it chose to use the same language that had conferred such authority, without modifying or restricting it, *see* 50 U.S.C. §1702(b) (listing "Exceptions to Grant of Authority," none of which involves tariffs).[1] And amici's theory would mean that TWEA itself does not authorize the President *in times of war* to impose tariffs, as TWEA still has the same relevant language plaintiffs and amici claim does not authorize the President to impose tariffs under IEEPA. §4305(b)(1)(B); *see Yellen v. Confederated Tribes of*

---

[1] Indeed, Congress has repeatedly considered and decided *not* to revoke the President's power to impose tariffs under IEEPA. *See, e.g.*, S. 1060, 118th Cong., 1st sess., March 29, 2023; S. 2921, 117th Cong., 1st sess., September 30, 2021; H.R. 2618, 117th Cong., 1st sess., April 16, 2021; S. 691, 117th Cong., 1st sess., March 10, 2021; H.R. 723, 116th Cong., 1st sess., January 23, 2019; S. 899, 116th Cong., 1st sess., March 27, 2019.

*Chehalis Rsrv.*, 594 U.S. 338, 360 (2021) (rejecting interpretation that would have a "highly counterintuitive result").

Amici also seriously misread the effect of the passage of the Trade Act of 1974 on IEEPA. *See* Professors-Br.25-26; Cato-Br.13 (citing 19 U.S.C. §2132). That earlier-enacted statute cannot narrow IEEPA; when statutes irreconcilably conflict, it is the *later* enactment that prevails. *See Maine Cmty. Health Options v. United States*, 590 U.S. 296, 315-16 (2020). In any event, there is no conflict here. Section 2132 authorizes the President to impose tariffs to address balance-of-payment issues before the issues reach the level of an emergency; IEEPA provides broad emergency powers, including tariffs, to address a variety of threats when they reach the level of an emergency. Indeed, *Yoshida* rejected that statutes applicable in non-emergency situations can narrow the powers available in an emergency. *See* 526 F.2d at 578.

The timing of §2132's enactment underscores that it could not limit TWEA or IEEPA. In July 1974, the trial court in *Yoshida* concluded that TWEA did not authorize tariffs. 378 F.Supp.1155 (Cust. Ct. 1974). In response, Congress passed §2132, which authorized the President to impose a limited surcharge to address certain balance-of-payments issues. *See* S. Rep. No. 93-1298, at 88 (1974) (enacting the Trade Act as "necessary … *in the light of the recent decision by the United States Customs Court*," despite Congress's view that the President's "authority" to impose import surcharges was already "manifest" (emphasis added)). But the CCPA's

decision in *Yoshida* reversing the trial court and holding that "regulate …
importation" authorizes tariffs was issued *after* §2132's enactment. Thus, in enacting
§2132, Congress ensured that, if the CCPA had not reversed the trial court, the
President would still have a mechanism to impose tariffs to address a balance-of-
payments deficit, including before that issue reached the level of an emergency.
Thus, the most recent change in the landscape against which Congress legislated was
*Yoshida*—not §2132. Amici point to *no* history supporting the notion that Congress
enacted a non-emergency statute to strip the President's authority to impose tariffs
in an emergency, and they fail to establish that the "legal background" against which
IEEPA was enacted permits departure from *Yoshida*.

Finally, the Brennan Center cites the IEEPA House Report's statement, from
the testimony of a witness, that "section 5(b) [of TWEA] is different from other
congressionally authorized controls on U.S. foreign economic policy such as import
and export controls." H.R. Rep. No. 95-459, at 8. True, but irrelevant. The power to
regulate importation in TWEA and IEEPA is an *emergency* power, separate from
permanent trade laws regulating importation under non-emergency circumstances.
Those laws' existence does not undermine the use of IEEPA to impose tariffs. Merits-
Reply 7-8.

## II.    IEEPA Operates Concurrently With Other Tariff Laws

Amici suggest that, if IEEPA authorizes the President to implement tariffs to

address an emergency, it would effectively repeal or replace the many other statutes that relate to tariffs. Professors-Br.20-21; Brennan-Br.23-24. Not so: the President's use of the emergency authorities under IEEPA *coexists* with the enforcement of existing non-emergency trade laws. The Trade Act of 1974, the Trade Expansion Act of 1962,[2] and the antidumping and countervailing duty laws, authorize the Executive to address the specific situations of balance-of-payment problems, injuries to domestic industries, unfair trade practices, and impairment of national security before these issues reach the level of an emergency. All contain complex administrative processes meant to play out in non-emergency situations. And all are currently being used in tandem with the President's emergency measures under IEEPA, showing the President's intention to use IEEPA as Congress intended.

For example, imposing tariffs under IEEPA has not stopped the U.S. Trade Representative from addressing unfair trade practices under Section 301. *E.g.*, 90 Fed. Reg. 10,843 (USTR Feb. 27, 2025). IEEPA has not replaced the use of Section 232 to impose duties to adjust the importation of specific products to protect national

---

[2] Amici appear to suggest that Section 232 of the Trade Expansion Act is an example of "affirmatively granted" tariff powers. Professors-Br.19-20. That misreads the statute. Although they cite 19 U.S.C. §1862(a) as referring to "duties," that subsection merely prohibits the President from reducing duties under other statutes if the President determines "such reduction or elimination would threaten to impair the national security." § 1862(a). Instead, §1862(c) is the applicable provision that authorizes the President to enact duties to "adjust … imports," a power the Supreme Court has determined includes imposing tariffs. *See Fed. Energy Admin. v. Algonquin SNG, Inc.*, 426 U.S. 548, 562 (1976).

security, either. *E.g.*, 90 Fed. Reg. 9,817 (Feb. 18, 2025). Nor has IEEPA slowed the U.S. International Trade Commission or the Department of Commerce under the antidumping and countervailing duty laws in determining whether imports of certain products of particular countries are threatening domestic industries and being sold in the United States at unfair prices. *E.g.*, Inv. No. 701-TA-758 and 731-TA-1739 (Preliminary).

Given the existence of all of these concurrent investigations and actions under other delegated authorities to deal with non-emergency situations, amici are simply wrong that IEEPA supplants other trade statutes. Though IEEPA "overlap[s] with the traditional framework of trade legislation, it is not controlling that some of the same considerations are involved." *Yoshida*, 526 F.2d at 578; *see Trump v. Hawaii*, 585 U.S. 667, 689-90 (2018). This reflects the reality that other trade laws provide tariff authority to address specified non-emergency circumstances, and IEEPA concurrently provides tariff authority to deal with national emergencies. Amici's emphasis that non-emergency statutes involve numerous advance procedural steps (Brennan-Br.21-22) only proves the point: IEEPA is an emergency statute, designed to provide the President "the *flexibility* required to meet problems surrounding a national emergency with the success desired by Congress." *Yoshida*, 526 F.2d at 573.

### III.    The Constitutional-Doubt Canon Does Not Apply

Any constitutional-avoidance argument fails for at least three reasons.

***First***, for purposes of defendants' transfer motion, plaintiffs forfeited any nondelegation or constitutional-avoidance challenge, and amici cannot properly raise the issue at this stage. Merits-Reply 13.

***Second***, there is no constitutional doubt, let alone a grave one. *See Almendarez-Torres v. United States*, 523 U.S. 224, 239 (1998). "The nondelegation doctrine bars Congress from transferring its legislative power to another branch of Government" without supplying "an intelligible principle to guide the delegee's use of discretion." *Gundy v. United States*, 588 U.S. 128, 132, 135 (2019). That standard is "not demanding." *Id.* at 146. "Only twice in this country's history (and that in a single year)" has the Supreme Court "found a delegation excessive." *Id.* Courts, including the Supreme Court, have "over and over upheld even very broad delegations," *id.*, including in the trade realm, *see, e.g.*, *Algonquin*, 426 U.S. at 559-60 (concluding that the President's imposition of a license-fee system under his authority to "adjust imports" in 19 U.S.C. §1862 was not an improper delegation).

Most on point, in *Yoshida*, the Federal Circuit's predecessor rejected a similar nondelegation challenge to TWEA. 526 F.2d at 582. There, the Court identified the intelligible principles: (1) "Presidential exercise is limited to actions consistent with the national emergency purpose"; and (2) "that the power delegated therein shall be

applied only to 'property in which any foreign country or a national thereof has any interest.'" *Id.* at 581-83. IEEPA provides at least the same intelligible principles *Yoshida* identified as lawful—a limitation to actions consistent with the national-emergency purpose applying only to property in which there is a foreign interest. *See id.*

If anything, this case is easier than *Yoshida* because IEEPA has even more limitations than TWEA, meaning that Congress provided intelligible principles that "meaningfully constrain the President's discretion." *United States v. Dhafir*, 461 F.3d 211, 216 (2d Cir. 2006) (cleaned up). In IEEPA, Congress added "several procedural restrictions" not in TWEA, "including congressional consultation, review, and termination" of declared emergencies. *United States v. Amirnazmi*, 645 F.3d 564, 577 (3d Cir. 2011). Those restrictions "struck a careful balance between affording the President a degree of authority to address the exigencies of national emergencies and restraining his ability to perpetuate emergency situations indefinitely by creating more opportunities for congressional input." *Id.* Congress thus guarded against any nondelegation concerns by positioning itself as the body to determine whether the President's use of IEEPA authority is permissible.

Contrary to amici's contention, IEEPA does not "obviat[e] Congress's role as ultimate arbiter of emergency trade policy." *Amirnazmi*, 645 F.3d at 576; *accord Yoshida*, 526 F.2d at 582. The "powers" IEEPA grants "to the President are

explicitly defined and circumscribed." *United States v. Arch Trading Co.*, 987 F.2d 1087, 1093 (4th Cir. 1993) (citing 50 U.S.C. §1702). And they "may only be exercised to deal with an unusual and extraordinary threat with respect to which a national emergency has been declared." *Dhafir*, 461 F.3d at 216-17. Those are meaningful restrictions that have been upheld as sufficient by every circuit to consider the question. *See United States v. Shih*, 73 F.4th 1077, 1092 (9th Cir. 2023) (collecting cases).

In addition, IEEPA involves an area where the President has independent authority—national security and foreign affairs—making the intelligible-principle standard even easier to meet. *See, e.g.*, *United States v. Mazurie*, 419 U.S. 544, 556-57 (1975) ("This Court has recognized limits on the authority of Congress to delegate its legislative power. Those limitations are, however, less stringent in cases where the entity exercising the delegated authority itself possesses independent authority over the subject matter." (citation omitted)); *Gundy*, 588 U.S. at 159 (Gorsuch, J., dissenting) (similar); *Dhafir*, 461 F.3d at 215.[3]

Given that every circuit to address a nondelegation challenge to IEEPA or TWEA has upheld the statutes, and given the intelligible principles guiding the

---

[3] Moreover, other circuits have rejected nondelegation challenges to the use of IEEPA to "define criminal conduct," an area where courts assume a higher nondelegation standard applies. *See, e.g.*, *Shih*, 73 F.4th at 1092 (relying on *Touby v. United States*, 500 U.S. 160, 166 (1991), which assumed, without deciding, that "greater congressional specificity is required in the criminal context" for nondelegation purposes). The delegation of authority here easily passes the even less demanding standard that applies here.

President's exercise of his delegated authority and the President's independent authority in the realm of foreign affairs and national security, any nondelegation argument fails.

*Finally*, constitutional avoidance applies "only when, after the application of ordinary textual analysis, the statute is found to be susceptible of more than one construction." *Jennings v. Rodriguez*, 583 U.S. 281, 296 (2018). But text, context, history, and purpose show that IEEPA clearly authorizes the President to impose tariffs on imports; plaintiffs' and amici's reading is thus "plainly contrary to the intent of Congress" and should not be adopted. *Miller v. French*, 530 U.S. 327, 341 (2000).

## IV.    Amici's Remaining Merits Arguments About The President's Tariffs Are Not Even Arguably Relevant In This Posture

Plaintiffs' and amici's insistence on briefing the merits—pressing the Court to paradoxically decide the merits to determine whether to transfer the case to the Court of International Trade—does not stop with the text or nondelegation arguments. Amici even contest the President's emergency declaration and whether the challenged actions satisfy IEEPA. Those arguments are not even arguably relevant to whether the CIT has jurisdiction, and the Court should not consider them.

To start, plaintiffs do not challenge the President's emergency or threat determination. So amici cannot raise the issue. *See Stanley v. Sanford*, 83 F.4th 1333, 1344 (11th Cir. 2023).

Regardless, amici's emergency and threat arguments are irrelevant to jurisdiction. The CIT has exclusive jurisdiction because this is a "civil action" that "arises out of any law of the United States providing for … tariffs" or "administration and enforcement with respect to" tariffs. 28 U.S.C. §1581(i)(B), (D). Section 1581 covers this case because plaintiffs challenge tariffs imposed under IEEPA, as well as administration and enforcement with respect to tariffs, by asking for changes to the Harmonized Tariff Schedule. As defendants have argued here and in other cases, IEEPA "provid[es] for" tariffs because, in context, "providing for" means "relating to." *K Mart Corp. v. Cartier, Inc.*, 485 U.S. 176, 189 (1988); *see* ECF 5 at 12; *see also Learning Resources, Inc. v. Trump*, D. D.C. 25-1248, ECF 8 at 9. Even if "providing for" is narrower, plaintiffs' challenge—by contesting the Harmonized Tariff Schedule and asking the Court to order the government to modify that schedule—meets a broader provision of the CIT's exclusive-jurisdiction statute because plaintiffs' challenge is to the "administration and enforcement *with respect to* the matters *referred to* in subparagraph[]" (B). 28 U.S.C. §1581(i)(1)(D) (emphases added). Thus, amici's arguments—both that IEEPA does not actually authorize tariffs and that the declared emergency and identified threat are insufficient here—are irrelevant.

Even under plaintiffs' (and, apparently, amici's) theory, jurisdiction hinges on whether IEEPA "provid[es] for" tariffs, *i.e.*, whether IEEPA authorizes the President

to impose any tariffs on importation. Plaintiffs' jurisdictional theory thus turns only on whether "regulate … importation" provides the President *any* authority to impose tariffs on imports, not on whether the President's emergency or threat determinations are adequate in a particular case. Accordingly, even under that theory, amici's emergency and threat arguments are irrelevant.

## CONCLUSION

This Court should transfer this case to the CIT.

Respectfully submitted,

YAAKOV M. ROTH
Acting Assistant Attorney General

ERIC J. HAMILTON
Deputy Assistant Attorney General

OF COUNSEL:

ALEXANDER K. HAAS
Director
STEPHEN M. ELLIOTT
Assistant Director
U.S. Department of Justice
Civil Division
Federal Programs Branch

/s/ Patricia M. McCarthy
PATRICIA M. McCARTHY
Director

/s/ Claudia Burke
CLAUDIA BURKE
Deputy Director

JUSTIN R. MILLER
Attorney-In-Charge
International Trade Field Office

14

SOSUN BAE
Senior Trial Counsel
LUKE MATHERS
BLAKE W. COWMAN
COLLIN MATHIAS
CATHERINE M. YANG
Trial Attorneys
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
1100 L St. NW
Washington, D.C. 20005
202-353-9063
Claudia.burke@usdoj.gov
*Counsel for Defendants*

MICHELLE SPAVEN
Acting United States Attorney
JOHN C. SPACCAROTELLA
Assistant United States Attorney
NY Reg No. 4304291
111 N. Adams Street, 4th Fl.
Tallahassee, FL 32301
(850) 216-3862

May 19, 2025

**LOCAL RULE 7.1(F) CERTIFICATION**

I HEREBY CERTIFY that this memorandum contains 3170 words, per Microsoft Word's word count, which complies with the word limit requirements set forth in Local Rule 7.1(F).

*/s/ Claudia Burke*
CLAUDIA BURKE

**LOCAL RULE 5.1(F) CERTIFICATION**

I HEREBY CERTIFY that a copy of the foregoing has been furnished via CM/ECF to all interested parties, this 19th day of May, 2025.

*/s/ Claudia Burke*
CLAUDIA BURKE